**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

United States District Court
Southern District of Texas
FILED

MAR 1 0 2000

Michael N. Milby, Clerk

| | |
|---|---|
| **GAMFW, INC., d/b/a FISHERMAN'S WHARF and BOBBY GRUMBLES** | §<br>§<br>§ |
| **v.** | §<br>§ |
| **THE UNITED STATES OF AMERICA AND THE DEPARTMENT OF COMMERCE, WILLIAM DALEY, Secretary, and NATIONAL MARINE FISHERIES SERVICE** | §<br>§<br>§<br>§<br>§<br>§    **C. A. NO. C-00-028** |

## MEMORANDUM IN SUPPORT OF MOTION TO INTERVENE

### Background

In this lawsuit, Plaintiffs GAMFW, Inc., d/b/a Fisherman's Wharf and Bobby Grumbles, seek to set aside regulations issued by the United States Department of Commerce on December 20, 1999. Such regulations impose additional restrictions on the commercial and recreational harvest of red snapper in the exclusive economic zone of the Gulf of Mexico.

The Coastal Conservation Association ["CCA"] is a non-profit national association headquartered in Houston, Texas. CCA has over 72,000 members who engage in recreational fishing and marine fishery conservation efforts. CCA members fish within the exclusive economic zone of the Gulf of Mexico and are active in the formulation of both State and federal fishery conservation laws and regulations. CCA members are active participants in the administrative process by which the Gulf of Mexico Fishery Management Council, the National Marine Fisheries Service and the Secretary of Commerce promulgated the regulations at issue in this litigation.

CCA was an Intervenor-Defendant in the case that the Texas Shrimp Association ["TSA"] brought against the Secretary of Commerce in this Court in 1988 and which was subsequently transferred to United States District Court for the Northern District of Florida,

1

Tallahassee Division, and consolidated with the case *Florida Wildlife Federation v. Daley*. The TSA case challenged regulations pertaining to fishing for both shrimp and red snapper in the Gulf of Mexico. In a decision issued on November 3, 1999, the Honorable Robert H. Hinkle upheld all of the regulations against claims that they violated both the Magnuson-Stevens Fishery Conservation and Management Act and the Administrative Procedure Act. A copy of Judge Hinkle's decision is appended hereto. With respect to the shrimp fishing regulations, TSA has appealed to the United States Court of Appeals for the Eleventh Circuit, and TSA has filed another challenge to the red snapper regulations in the Northern District of Florida. CCA is participating in the appeal and has moved to intervene in the action recently filed in Florida, *Texas Shrimp Association v. Daley*, a copy of which is also appended hereto.

In the instant case, CCA seeks now to intervene in order to protect the interests of its members by supporting the regulations issued on December 20, 1999, as reasonable and necessary restrictions on fishing for red snapper that will help rebuild the red snapper resource for the enjoyment of all recreational fishermen in the Gulf of Mexico.

I. Standards for Intervention

Under Rule 24[a] of the Federal Rules of Civil Procedure, intervention is proper if: [1] the application is timely, [2] the applicant has an interest related to the property or the transaction which is the subject of the action, [3] disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest, and 4) the applicant's interest is not adequately represented by others.

A.    CCA's Application for Intervention is Timely. Plaintiffs' Complaint was filed on or about January 19, 2000. Lead counsel for CCA is intimately familiar with the administrative

2

record heretofore filed in this case.  Intervention at this time will not result in any delay of the resolution of the controversy or prejudice those already parties in the case.

B.      Defendant-Intervenor has an Interest in the Transaction.  As stated above, CCA has been a full participant in the regulatory process that developed the regulations at issue in the current action and intervened in the 1998 litigation as well.  CCA has incurred significant legal costs in protecting its members' interest in maintaining the red snapper population throughout the Gulf of Mexico.  Should the plaintiffs be successful in setting aside the regulations issued on December 20, 1999, the recreational portion of the total allowable catch of red snapper would be harvested before many of CCA's members would have an opportunity to fish.

C.      Defendant-Intervenor's Ability to Protect its Interests Will be Impaired and Impeded.  CCA has worked hard to develop and implement a balanced, interrelated, stable, and effective package of red snapper conservation measures.  If plaintiffs are successful in challenging the regulation which delays the opening of the red snapper season until April 21, 2000, the Secretary of Commerce might be forced to adopt even more stringent measures to protect these fish, including lowering the bag limits or increasing the allowable minimum size.

D.      Defendant-Intervenor's Interests Are Not Adequately Protected by Others.  The interests of the Defendant United States and the interests of CCA's membership, while similar, are not identical.  The Secretary of Commerce is charged primarily with protecting the fish and only secondarily with balancing the conservation burdens among recreational fishermen, commercial red snapper fishermen, and commercial shrimp fishermen.  CCA, however, must protect both the interests of its members in having access to recreational fishing opportunities on an annual basis and their interest in protecting the fish so that their opportunities to fish will continue.

3

CitiPDF - www.fastio.com

For the foregoing reasons, Defendant-Intervenor is entitled to intervene as a matter of right in this action.

II   Permissive Intervention

Alternatively, Defendant-Intervenor seeks the permission of the Court to intervene pursuant to Rule 24[b] of the Federal Rules of Civil Procedure, which provides in pertinent part:

> Upon timely application anyone may be permitted to intervene in an action: . . . (2) when an applicant's claim or defense and the main action have a question of fact in common . . .   In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

For the reasons already set forth, permitting CCA to intervene as a Defendant would not unduly delay or prejudice the adjudication of the rights of the existing parties.   Due to the existence of common questions of fact and law, the absence of any potential for undue prejudice or delay, and Defendant-Intervenor's direct interest in protecting the interests of its members, the Court should grant CCA's Motion to Intervene in this case.

Respectfully submitted,

By _Bruce S. Hawn_____

Robert G. Hayes
D. C. Bar Number:  393215
BALL JANIK, LLP
1455 F. Street NW, Suite 225
Washington, D. C.  20005
[202] 638-3307; fax [202] 783-6947

Bruce S. Hawn
Fed / State Bar No. 17584 / 00784228
THE KLEBERG LAW FIRM
800 N. Shoreline Blvd., Suite 900N
Corpus Christi, Texas   78401
[361] 693-8500; fax [361] 693-8600

ATTORNEYS FOR COASTAL
CONSERVATION ASSOCIATION

CMxPDF - www.fesnix.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been sent by United States certified mail, return receipt requested, this ___10___ day of March, 2000, to the following attorneys of record:

**ATTORNEY FOR PLAINTIFFS:**

Les Cassidy
Woolsey & Cassidy
1020 Bank of America Center North
500 North Water Street
Corpus Christi, Texas  78471

**ATTORNEYS FOR DEFENDANTS,**
**THE UNITED STATES OF AMERICA,**
**THE DEPARTMENT OF COMMERCE,**
**WILLIAM DALEY and NATIONAL**
**MARINE FISHERIES SERVICE:**

Heidi Kukis
United States Department of Justice
Environment & Natural Resources Division
950 Pennsylvania Avenue, NW, Room 2736
Washington, D. C.  20530

Eve Joy
United States Department of Commerce
National Oceanic and Atmospheric Administration
Office of General Counsel – Southeast Region
9721 Executive Center Drive N, Suite 137
St. Petersburg, Florida  33702

Constance Sathre
United States Department of Commerce
National Oceanic and Atmospheric Administration
Office of General Counsel for Fisheries
1315 East-West Highway, Room 15602
Silver Spring, Maryland  20910

Bruce S. Hawn
_____
Bruce S. Hawn

1

CutePDF – www.fwiso.com

Case 2:00-cv-00028  Document 18  Filed in TXSD on 03/10/2000  Page 7 of 81

DOCKETED

NOV 0 4 1999

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


THE FLORIDA WILDLIFE
FEDERATION, et al.,

      Plaintiffs,

v.                                        CONSOLIDATED
                                          CASE NO. 4:98cv101-RH

WILLIAM M. DALEY, et al.,

      Defendants.
_____/


ORDER DENYING PETITIONS CHALLENGING REGULATIONS


I.  INTRODUCTION


    This case concerns challenges by two sets of plaintiffs

to regulations promulgated by the National Marine Fisheries

Service, acting through the delegation of authority by the

Secretary of Commerce.  Specifically, the Texas Shrimp

Association and industry representative Wilma Anderson

ENTERED ON DOCKET 11/3 BY _____
(Rules 58 & 79(a) FRCP or 32(d)(1) & 55 FRCRP)

Copies mailed to: _____
_____
_____
_____
_____

FILED

Case 2:00-cv-00028   Document 18   Filed in TXSD on 03/10/2000   Page 8 of 81

challenge an amendment to a fishery management plan that
requires the use of bycatch reduction devices on shrimp
trawlers west of Cape San Blas, in the Gulf of Mexico.   In
addition, the Texas Shrimp Association challenges the
National Marine Fisheries Service's related decision to
release 9.12 million pounds of total allowable catch of red
snapper.   The Florida Wildlife Federation, along with the
Coastal Conservation Association and the Center for Marine
Conservation, also challenges the amendment requiring the
use of bycatch reduction devices.   They, however, base their
challenge on the failure to apply the regulation to the
portion of the Gulf of Mexico east of Cape San Blas.

I conclude that the Secretary of Commerce acted within
his discretion in the approval and implementation of the
regulations at issue, in compliance with the Magnuson-
Stevens Fishery Conservation and Management Act, the
Administrative Procedure Act, and the Regulatory Flexibility
Act.   Accordingly, I deny all petitions.

## II.  FACTUAL BACKGROUND

A Fishery Management Plan ("FMP") is promulgated by one

of eight Regional Fishery Management Councils established by

Congress through the Magnuson-Stevens Fishery Conservation

and Management Act (the "Magnuson-Stevens Act").  See 16

U.S.C. § 1801 et seq.  Congress instructed in the Magnuson-

Stevens Act that any FMP must be consistent with various

"national standards," which include requirements such as the

prevention of overfishing, the use of the best scientific

evidence in decision-making, and the promotion of efficient

utilization of resources.  See 16 U.S.C. § 1851 (a).[1]  Once

_____

[1] 16 U.S.C. § 1851(a), pertaining to National
Standards, states:

(a) In general
     Any fishery management plan prepared, and any
regulation promulgated to implement any such plan,
pursuant to this subchapter shall be consistent
with the following national standards for fishery
conservation and management:
     (1) Conservation and management measures shall
prevent overfishing while achieving, on a
continuing basis, the optimum yield from each
fishery for the United States fishing industry.
     (2) Conservation and management measures shall
be based upon the best scientific information
available.
     (3) To the extent practicable, an individual
stock of fish shall be managed as a unit
throughout its range, and interrelated stocks of

3

Case 2:00-cv-00028   Document 18   Filed in TXSD on 03/10/2000   Page 10 of 81

proposed by a Council, an FMP is submitted to the National

fish shall be managed as a unit or in close coordination.

(4) Conservation and management measures shall not discriminate between residents of different States.  If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen;(B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.

(5) Conservation and management measures shall, where practicable, consider efficiency in the utilization of fishery resources; except that no such measure shall have economic allocation as its sole purpose.

(6) Conservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches.

(7) Conservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication.

(8) Conservation and management measures shall, consistent with the conservation requirements of this chapter (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

(9) Conservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch.

(10) Conservation and management measures shall, to the extent practicable, promote the safety of human life at sea.

4

Case 2:00-cv-00028  Document 18   Filed in TXSD on 03/10/2000   Page 11 of 81

Marine Fisheries Service (NMFS) (to whom the Secretary of Commerce has delegated his authority under the Act) for review, approval, public comment, and implementation. See 16 U.S.C. § 1854.

The specific regulation at issue in the instant case is Amendment 9 to the FMP for the Shrimp Fishery of the Gulf of Mexico, implemented by final rule published April 14, 1998, in the Federal Register, with an effective date of May 14, 1998. See 63 Fed. Reg. 18,139 (1998) (to be codified at 50 C.F.R. pt. 622).[2] Amendment 9 requires the use of certified

---

[2]  Amendment 9 requires:

[T]he use of certified bycatch reduction devices (BRDs) in shrimp trawls in the exclusive economic zone (EEZ) in the Gulf of Mexico shoreward of the 100-fathom (fm) (183-m) depth contour west of 85 degrees 30' W. long.; sets the bycatch reduction criterion for the certification of BRDs; and establishes an FMP framework procedure for modifying the bycatch reduction criterion, for establishing and modifying the BRD testing protocol and its specifications, and for certifying and decertifying BRDs. The intended effect is to reduce the bycatch mortality of juvenile red snapper, while, to the extent practicable, not adversely affecting the shrimp fisheries in the Gulf of Mexico.

63 Fed. Reg. at 18,139.

CShPDF - www.fazio.com

Case 2:00-cv-00028  Document 18  Filed in TXSD on 03/10/2000  Page 12 of 81

bycatch reduction devices[3] in a portion of the Exclusive
Economic Zone ("EEZ") west of Cape San Blas in the Gulf of
Mexico.  The goal of the regulation is to reduce the bycatch
of juvenile red snapper through the use of BRDs, that is, to
reduce the amount of red snapper inadvertently caught by
shrimp trawlers by requiring the use of a device that allows
marine life below a certain size to escape from shrimp nets.
Specifically, the regulation requires that shrimpers
trawling at a certain distance from shore and at a certain
depth attach certified BRDs to their gear.  See 63 Fed. Reg.
18,139.

As it imposed significant costs on the shrimp
industry, the passage of Amendment 9 was controversial.  In
1991, Congress began a $15,000,000 study of the problem of

---

[3] "Bycatch" is defined as fish that are harvested in a
particular fishery but are not sold or kept for personal use
and fish that are released dead in the recreational fishing
activity.  See 16 U.S.C. § 1802(2).  Bycatch reduction
devices (BRDs) are devices attached to fishing gear that
reduce the amount of bycatch by releasing marine life of a
certain size.  "Certified," in this context, means approved
by the NMFS.  A BRD must reduce bycatch mortality by 44
percent to be certified.  See 62 Fed. Reg. 35,774.

6

CutePDF - www.fastio.com

bycatch.[4]  The study, concluded in 1995, included input from

the NMFS and the shrimp industry as well as various experts.

See A.R. Vol. 2, 1.A.19 (1995 report to Congress).  The most

significant result of the study was a finding that

effectively restoring the red snapper population to an

acceptable level by the year 2019 would require a 50%

reduction in the bycatch mortality of juvenile red snapper.

See A.R. Vol. 3, I.A.35, at 2 (1997 briefing paper).  As a

result, the Gulf of Mexico Fishery Management Council

developed the BRD regulation at issue, Amendment 9.  After

public review and comment, as well as a statutorily mandated

peer review, the NMFS promulgated Amendment 9.  See 16

U.S.C. § 1883(a) (peer review requirement); 63 Fed. Reg.

---

[4]  The record makes clear that bycatch is a significant
problem for the nation's fisheries.  See, e.g.,
Administrative Record ("A.R.") Vol. 32, III.B.372, at 5;
A.R. Vol. 34, IV.A.456, at 35,774; A.R. Vol. 9, I.B.49k, at
24-25.  That the red snapper population, specifically, is
severely affected by bycatch resulting from shrimp trawlers
is also beyond dispute.  See A.R. Vol. 9, I.B.49k, at 24-25;
A.R. Vol. 3, I.A.35, at 1; A.R. Vol. 9, I.B.491, at 24.
Further, because the mud bottom favored by shrimp is also
the habitat of young red snapper, the bycatch mortality
particularly affects juvenile population of red snapper.
See A.R. Vol. 3, I.A.35, at 1.

7

Case 2:00-cv-00028 Document 18 Filed in TXSD on 03/10/2000 Page 14 of 81

18,139 (final regulation procedural summary).

Also at issue is the related decision of the NMFS to release a total allowable catch ("TAC") of 9.12 million pounds of red snapper.[5] The NMFS issued a regulation in April 1998, maintaining the TAC of red snapper at that level, consistent with previous years. 63 Fed. Reg. 18,144, 18,145 (1998)(to be codified at 50 C.F.R. pt. 622). The NMFS, however, conditioned the release of a portion of that amount -- 3.12 million pounds -- on the findings of a study investigating the efficacy of BRDs. 63 Fed. Reg. at 18,145. The NMFS then, in a separate decision, released the 3.12 million pounds. 63 Fed. Reg. 45,760 (1998)(to be codified at 50 C.F.R. pt. 622). Further limiting the amount of red snapper allowed to be caught, argues the Texas Shrimp Association ("TSA"), would eliminate the need for the use of BRDs. They therefore also challenge both of the TAC decisions.

---

[5] TAC, or Total Allowable Catch, is a harvest quota system that limits the total amount of a fish that may be harvested.

8

### III. STANDARD OF REVIEW

This court may set aside a regulation promulgated under
the Magnuson-Stevens Act only on a ground specified in 5
U.S.C. § 706(2)(A),(B),(C), or (D); i.e., pursuant to the
traditional arbitrary and capricious standard set forth in
the Administrative Procedure Act. See 16 U.S.C. §
1855(f)(1)(B). Under this standard, the court may set aside
an agency decision only if it is "arbitrary, capricious, an
abuse of discretion, or otherwise not in accordance with
law." 5 U.S.C. § 706(2)(A). This standard is deferential.
See Fund for Animals, Inc. v. Rice, 85 F.3d 535, 541 (11th
Cir. 1996). To determine whether the agency's decision is
entitled to deference under this standard, the court "must
consider whether the decision was based on a consideration
of the relevant factors and whether there has been a clear
error of judgment." North Buckhead Civic Ass'n v. Skinner,
903 F.2d 1533, 1538-40 (11th Cir. 1990). While the inquiry
should be searching and careful, the ultimate standard of
review is narrow. Id. The court's application of this

9

CUTEPDF - www.texive.com

Case 2:00-cv-00028   Document 18   Filed in TXSD on 03/10/2000   Page 16 of 81

deferential standard of review should be limited to the
administrative record the agency presents. See Florida
Power & Light Co. v. Lorion, 470 U.S. 729, 742-44, 105 S.
Ct. 1598, 84 L. Ed. 2d 643 (1985); Preserve Endangered Areas
of Cobb's History, Inc. v. United States Army Corps of
Engineers, 87 F.3d 1242, 1246 (11th Cir. 1996). As to the
specific claims under the Regulatory Flexibility Act, the
Small Business Regulatory Enforcement and Fairness Act of
1996 authorizes judicial review of an agency's compliance
with the specific provisions of the Regulatory Flexibility
Act. See 5 U.S.C. § 611(a)(1). That standard of review is
in accordance with the arbitrary and capricious standard of
the Administrative Procedure Act, as described above.

## IV.  DISCUSSION

The parties present numerous arguments. I will first
address TSA's challenge to Amendment 9, then TSA's challenge
to the TAC decision, and finally Florida Wildlife
Federation's challenge to the geographic scope of the
Amendment.

10

CUtePDF - www.tanto.com

Case 2:00-cv-00028  Document 18  Filed in TXSD on 03/10/2000  Page 17 of 81

A.   **TSA's Challenge to the Issuance of Amendment 9**

TSA contends that the NMFS's decision to implement the
BRD regulation was arbitrary and capricious, that it
violated requirements of the Magnuson-Stevens Act, and that
it was not in accordance with the Regulatory Flexibility
Act.  Several specific arguments require analysis.

1.   **Challenges to Scientific Information**

a. Use of GLM Model

NMFS relied on a specific technical model in its
determination of the impact of shrimp bycatch on red snapper
population.  TSA claims that reliance on this model, the
General Linear Model ("GLM"), was arbitrary and capricious.
TSA contends that the model does not hold up to "close
scrutiny" and points to the now-stricken declaration
testimony of a Dr. Benny Gallaway, who attests to that
scientific conclusion.

A court should defer to the use of a technical model
unless there is no rational relationship between the model

11

Case 2:00-cv-00028   Document 18   Filed in TXSD on 03/10/2000   Page 18 of 81

and the focus of its use. See Chemical Mfrs. Ass'n v. EPA,
28 F.3d 1259, 1265 (D.C. Cir. 1994). In this case, the NMFS
must be able to demonstrate, in the record, evidence
illustrating a rational relationship between the GLM and the
effect of shrimp bycatch on the red snapper population.

Evidence in the record indicates that there is a
rational relationship between the GLM and the measure of
effect of bycatch. See A.R. Vol. 10, I.B.49n, at 5; A.R.
Vol. 10, I.B.49r; A.R. Vol. 12, I.B.52.a-c (peer review
reports). Furthermore, some scientists specifically
endorsed the use of the model as the most appropriate method
of measuring such effects.

This case is notably different from the situation in
Chemical Mfrs. Ass'n v. EPA, 28 F.3d 1259 (D.C. Cir. 1994),
the case TSA presents as controlling. In that case,
concerning a challenge to an EPA model, the court observed
that the EPA could not point to "any record evidence that
shows a rational relationship . . . even in the face of
specific scientific evidence to the contrary . . . ." Id,
at 1265. In the present case, the opposite is true: aside

12

Case 2:00-cv-00028  Document 18  Filed in TXSD on 03/10/2000  Page 19 of 81

from evidence from Dr. Gallaway that is not part of the

record, TSA can point to no evidence demonstrating that the

Secretary's reliance on the majority of scientists is

anything but rational.  I find, therefore, that the agency

has met its burden of demonstrating the existence of a

rational relationship on the record of the model and the

effect of bycatch on the red snapper population.

### b.  The 20% SPR Target

As another challenge to the Council's use of scientific

evidence, TSA attacks the scientific soundness of the

underlying aim of the regulation.  The NMFS found that a 20%

spawning potential ratio ("SPR") for red snapper would be

required to prevent overfishing.  The prevention of

overfishing is set forth in the Magnuson-Stevens Act as

National Standard 1.[6]  TSA claims that the decision to

---

[6]  National Standard 1 requires that any FMP or
implementing regulation be consistent with the following:
"Conservation and management measures shall prevent
overfishing while achieving, on a continuing basis, the
optimum yield from each fishery for the United States
fishing industry."  16 U.S.C. § 1851(a)(1).

CVAPDF - www.tecna.com

Case 2:00-cv-00028   Document 18   Filed in TXSD on 03/10/2000   Page 20 of 81

accept the 20% figure as an underlying goal in measuring
compliance with National Standard 1 constitutes an abuse of
discretion.

SPR is a technical measure of the health of a fish
stock; it measures the spawning percentage of a particular
stock relative to a healthy unfished stock.  TSA contends
that the 20% goal violates National Standard 2, which
requires the use of the best scientific information
available,[7] as well as the requirement that FMPs specify
objective and measurable criteria for identifying when a
fishery is overfished.[8]  TSA contends that this figure is so
conservative, in terms of protection of the stock, as to be
irrational.

The administrative record reflects that the 20%
threshold was endorsed by numerous biologists with expertise
in the relevant area.  <u>See</u> Supplemental Administrative

---

[7]  "Conservation and management measures shall be based
upon the best scientific evidence available."  16 U.S.C. §
1851(a)(2).

[8]  <u>See</u> 16 U.S.C. § 1853(a)(10), regarding the specific
contents required in an FMP.

14

CVAPDF - www.fasta.com

Record I.1. (*An Evaluation of the Use of Spr Levels as the
Basis for Overfishing Definitions in Gulf of Mexico Finfish
Fishery Management Plans*). See also 55 Fed. Reg. 2078,
2078-79 (1990)(to be codified at 50 C.F.R. pt. 641).  A 1996
report by the Gulf of Mexico SPR Management Strategy
Committee specifically concluded that the 20% threshold was
reasonable.  That committee was made up of experts in the
field.  TSA presents, essentially, an argument that the
scientific opinion of experts in the field is incorrect.
But where an agency makes a technical finding regarding a
specific question, the job of the court is to make sure that
decision is not unreasonable.  See, e.g., Motor Vehicles
Mfrs. Ass'n of the United States, Inc. v. State Farm Mut.
Auto. Ins. Co., 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed.
2d 443 (1983).  In this case, a group of experts determined
that a 20% SPR was necessary.  The issue was extensively
debated.  See, e.g., A.R. Vol. 11, I.B.50d; A.R. Vol. 35,
IV.A.472, at 18,140.  The Secretary did not abuse his
discretion when he, acting through the NMFS, accepted the
recommendation of a committee of experts and set the 20% SPR

15

Case 2:00-cv-00028    Document 18    Filed in TXSD on 03/10/2000    Page 22 of 81

as a target for the prevention of overfishing.[9]  The

Secretary's decision was not arbitrary and capricious.

## 2.  The Practicality of BRDs

National Standard 9 of the Magnuson-Stevens Act

requires that "[c]onservation and management measures shall,

---

[9]  NMFS addressed in the Federal Register the claim
that Amendment 9 did not comport with the best scientific
evidence:

> NMFS disagrees that Amendment 9 is not based
> on the best available scientific information.  The
> Director, Southeast Fisheries Science Center,
> determined that Amendment 9 was based on the best
> available scientific information . . . . In
> addition to the 1997 peer review of the bycatch
> estimates [using the GLM Model], the Council
> contracted with Dr. Phil Goodyear, a prominent
> stock assessment biologist, to review the 1995
> stock assessment and to determine the effects of
> over-estimates of red snapper bycatch on the
> scientific advice that bycatch had to be reduced
> to recover this species.  Dr. Goodyear's
> sensitivity analysis showed that even with
> overestimates of bycatch up to 33 percent, red
> snapper bycatch in the shrimp fisheries still had
> to be reduced significantly for red snapper stock
> recovery.  Based on these peer review results and
> on all other available information, the Council
> concluded that Amendment 9 is based on the best
> available scientific information.

63 Fed. Reg. 18,139, 18,140.

16

Case 2:00-cv-00028  Document 18  Filed in TXSD on 03/10/2000  Page 23 of 81

to the extent practicable, (A) minimize bycatch and (B) to

the extent bycatch cannot be avoided, minimize the mortality

of such bycatch." 16 U.S.C. § 1851(a)(9). TSA contends

that Amendment 9 violates this requirement because it is not

practicable. Specifically, TSA argues that the BRD

requirement is inconsistent with the advisory regulations to

National Standard 9, as set forth in 50 C.F.R. § 600.350(d),

in that the amendment does not result in "net benefits to

the Nation." Further, TSA contends that the BRD regulations

are impractical because they do meet the mortality reduction

criterion established by the NMFS.

### a. Net Benefits to the Nation

Under the practicability requirement mandated by

National Standard 9, the Council must consider the "net

benefits to the Nation." 50 C.F.R. § 600.350(d). Ten

factors are provided in the advisory guidelines as relevant

in the determination of whether a particular regulation

minimizes bycatch to an extent practicable, consistent with

maximization of "net benefits to the Nation" and the other

17

Case 2:00-cv-00028   Document 18   Filed in TXSD on 03/10/2000   Page 24 of 81

national standards.  500 C.F.R. § 600.350(d)(3)(i).  They
are population effects for the bycatch species; ecological
effects due to changes in the bycatch of that species, i.e.,
effects on other species; changes in the bycatch of other
species of fish and the resulting population and ecosystem
effects; effects on marine mammals and birds; changes in
fishing, processing, disposal, and marketing costs; changes
in fishing practices and behavior of fishermen; changes in
research, administration and enforcement costs and
management effectiveness; changes in the economic, social or
cultural value of fishing activities and nonconsumptive uses
of fishery resources; changes in the distribution of
benefits and costs; and social effects.  Id.

TSA contends the administrative record reflects that
Amendment 9 does not provide net benefits to the nation.
TSA points out various statements implying that the net
economic effect of the Amendment may not be positive.  See
TSA's and Wilma Anderson's Memorandum of Points and
Authorities in Support of their Motion for Summary Judgment,
at 26-27.  Even if I were to find that the net economic

18

Case 2:00-cv-00028 Document 18 Filed in TXSD on 03/10/2000 Page 25 of 81

benefit to the nation was in fact negative, this would not

necessarily mean the Amendment failed to comply with

National Standard 9, "to the extent practicable" clearly

encompasses a balancing of factors, as described by the

relevant C.F.R. guidelines.[10] TSA could prevail on this

---

[10] The Florida Wildlife Federation asserts that "to the extent practicable" means "unless costs are wholly disproportionate." See Florida Wildlife Federation's Response to TSA's Memorandum of Law in Support of its Motion for Summary Judgment, at 10. I reject this categorization. 50 C.F.R. § 600.350(d)(3) explicitly sets forth factors relevant in determining whether a regulation reduces bycatch to the extent practicable. Consideration of these factors is plainly inconsistent with Florida Wildlife Federation's contention that a regulation must be adopted unless costs are wholly disproportionate to the potential benefits. This is further illustrated by the legislative history of the Magnuson-Stevens Act. See, e.g. 142 Cong. Rec. H11,418, H11,437 (1996) (Chairman of the House Resources Committee stating: "The use of the term 'to the extent practicable' was chosen deliberately by both the Senate and the House. Both bodies recognize that bycatch can occur in any fishery, and that complete avoidance of mortality is impossible. Councils should make reasonable efforts in their management plans to prevent bycatch and minimize mortality. However, it is not the intent of Congress that the councils ban a type of fishing gear or type of fishing in order to comply with this standard. 'Practicable' requires an analysis of the cost of imposing a management action; the Congress does not intent that this provision will be used to allocate among fishing gear groups, nor to impose costs on fishermen and processors that cannot be reasonably met."). Finally, as the agency in charge of fishery management, the NMFS's interpretation of the term practicability should be given

19

point only if the Council (and through adoption the NMFS and

the Secretary of Commerce) abused their discretion in

balancing the above factors.  See Southern Offshore Fishing

Ass'n v. Daley, 995 F. Supp. 1411, 1425 (M.D. Fla. 1998)

(holding that agencies must only exercise reasonable

discretion after having considered the relevant factors).

I find that the NMFS acted within its discretion

after considering the relevant factors.  The record is

replete with opinions of the costs and benefits (economic

and otherwise) of different alternatives.  See, e.g., A.R.

Vol. 34, IV.A.445, at 12-35 (a summary of the biological,

economic, and social impacts of each alternative); A.R. Vol.

34, IV.A.445 (Initial Regulatory Flexibility Analysis); A.R.

Vol. 35, IV.A.461 (Final Regulatory Flexibility Analysis).

TSA may be correct in its opinion that the net economic

effect of the regulation is negative.  Nonetheless, the NMFS

---

effect unless it is clearly contrary to Congressional
intent.  See Chevron, U.S.A., Inc. v. Natural Resources
Defense Council, Inc., 467 U.S. 837, 842-43, 104 S. Ct.
2778, 81 L. Ed. 2d 694 (1984).  The balanced interpretation
made by the NMFS is not inconsistent with Congressional
intent and therefore applies.

20

Case 2:00-cv-00028   Document 18   Filed in TXSD on 03/10/2000   Page 27 of 81

and the Council weighed this particular factor with all the other standards, compared options, and came to a conclusion. TSA points to no evidence that this balance represents an abuse of the agency's decision-making discretion.

                    b.    BRDs' Ability to Meet the Mortality
                          Reduction Criterion of 44%

TSA asserts the administrative record lacks evidence supporting NMFS's finding that certified bycatch reduction devices are able to meet the 44% mortality reduction rate set earlier by the agency, and as a result, Amendment 9 is impracticable.

Ample evidence in the record supports the agency's decision that certified BRDs can meet (and exceed) the required 44% reduced mortality rate. See, e.g., A.R. Vol. 25, III.A.E-Mail (report attached to email dated October 23, 1997); A.R. Vol. 2, I.A.19, at 33 (1995 report to Congress); A.R. Vol. 4, I.A.41, at 5 (1997 study); A.R. Vol. 34, IV.A.445, App. A, at 4 (1996 study). Further, the contrary evidence relied on by TSA was specifically discounted. See

                              21

Case 2:00-cv-00028  Document 18  Filed in TXSD on 03/10/2000  Page 28 of 81

A.R. Vol. 32, III.B.370.  The remaining data cited by TSA
was gathered after Amendment 9 was promulgated; it is thus
not pertinent to this review.  Even if it were to be
considered, however, I would conclude that the agency
exercised rational discretion in determining that certified
BRDs could achieve a bycatch mortality rate of 44%.  Nothing
in the record indicates an irrational choice; at the very
most, the record indicates a minority view that certified
BRDs cannot reach the 44% goal.  Rejecting that viewpoint in
favor of another, especially considering the evidence
supporting what seems to be the majority position, is simply
not an abuse of discretion.  See Southern Offshore Fishing
Ass'n v. Daley, 1433 F. Supp. 1411, 1433 (M.D. Fla.
1998)(noting that it is the prerogative of the Secretary to
weigh competing scientific opinions and make a policy
determination).

### 3.   Inequity of Burden

Where a regulation reduces an overall harvest, any
harvest restrictions or recovery benefits must be

CMPDF - www.fesisi.com

Case 2:00-cv-00028 Document 18 Filed in TXSD on 03/10/2000 Page 29 of 81

distributed "fairly and equitably among the commercial,
recreational, and charter fishing sectors in the fishery."
16 U.S.C. § 1853(a)(14). TSA claims Amendment 9 unfairly
burdens the shrimp industry, while inequitably benefitting
recreational fishers. This claim is based on the fact that
the BRD regulations impose an economic burden on the shrimp
trawlers, even though the same result (prevention of
overfishing of red snapper) allegedly could be reached by
further limitations on recreational fishing.

Though Amendment 9 undeniably places serious costs on
the shrimp industry, the burden is not distributed
inequitably. First, the administrative record indicates
that the directed red snapper fishery (i.e., those whose
primary goal is to catch red snapper, such as recreational
and commercial fishers of red snapper) has, for several
years, been subject to numerous restrictions. These include
(a) increased minimum size limits; (b) a total allowable
catch, or harvest quota, system; (c) reduced bag limits; and
(d) trip limits. See A.R. Vol. 10, I.B.49n.

Case 2:00-cv-00028  Document 18  Filed in TXSD on 03/10/2000  Page 30 of 81

Second, the shrimp industry has been, until recently,
required to do very little in terms of bycatch reduction of
red snapper.  See A.R. Vol 21, III.A.E-Mail (Attachment 1 to
email dated 3/28/97); A.R. Vol. 34, IV.A.445 (history of
management section of proposed Amendment 9).  In fact, the
NMFS was expressly prohibited by Congress from promulgating
any regulations restricting red snapper bycatch by shrimp
trawlers until April 1994.  See Coast Guard Authorization
Act of 1993, Pub. L. No. 103-206, § 702, 107 Stat. 2419,
2446 (1993).

Amendment 9 requires, in effect, that the shrimp
industry pay part of the cost of restoring the red snapper
fishery.  Nothing in the record indicates an abuse of
discretion in making this decision.  Voluminous evidence
indicates that bycatch reduction is necessary to the
restoration of, or prevention of overfishing of, the red
snapper fishery.  See A.R. Vol. 3, I.A.35 (June 1997
Briefing Paper).  The prevention of overfishing is required
by statute.  See 16 U.S.C. § 1851(a)(1).  Imposing Amendment
9, or some type of bycatch reduction plan, on the shrimp

24

Case 2:00-cv-00028  Document 18  Filed in TXSD on 03/10/2000  Page 31 of 81

industry is therefore not only within the discretion of the
agency, but perhaps required.  As such, the NMFS did not act
inequitably, or abuse its discretion, in establishing
Amendment 9.

### 4.  Compliance with the Regulatory Flexibility Act

The NMFS's authority to promulgate regulations is
limited by the Regulatory Flexibility Act, as amended by the
Small Business Regulatory Enforcement Fairness Act of 1996,
5 U.S.C. § 601 et seq., which requires administrative
agencies to consider the effects of their regulatory actions
on small business entities.  Under the Regulatory
Flexibility Act, an agency must prepare an initial and final
regulatory flexibility analysis describing the effects of
the proposed rule on small businesses and discussing
alternatives that might minimize adverse economic
consequences.

The parties agree that an Initial Regulatory
Flexibility Analysis ("IRFA"), as well as a Final Regulatory
Flexibility Analysis ("FRFA"), was performed.  TSA contends,

25

CutePDF - www.tecno.com

Case 2:00-cv-00028   Document 18   Filed in TXSD on 03/10/2000   Page 32 of 81

however, that the analyses were so flawed as to require a
striking down of the rule, or at minimum, the re-submission
to the NMFS for review.  Specifically, TSA challenges the
agency's analysis as "inaccurate and misleading," as well
lacking proper public review procedure.  <u>See</u> TSA's and Wilma
Anderson's Memorandum of Points and Authorities in Support
of their Motion for Summary Judgment, at 32.

A court may require an agency to reconsider a rule, or
even strike down that rule, where the terms of the
Regulatory Flexibility Act are not met.  <u>See, e.g., Southern
Offshore Fishing Ass'n v. Daley</u>, 995 F. Supp. 1411, 1437
(M.D. Fla. 1998).  This, however, is only appropriate where
the agency exceeds the bounds of reasonableness; the court
should not require NMFS to re-analyze the issue, or impose a
more drastic remedy, where a good faith effort at compliance
with the Regulatory Flexibility Act is made.  <u>See Associated
Fisheries of Maine, Inc. v. Daley</u>, 127 F.3d 104, 114 (1st
Cir. 1997); <u>Southern Offshore Fishing Ass'n v. Daley</u>, 995 F.

26

Case 2:00-cv-00028   Document 18   Filed in TXSD on 03/10/2000   Page 33 of 81

Supp. at 1435 (citing <u>Associated Fisheries of Maine</u>).[11]

The Regulatory Flexibility Act sets forth specific
requirements for both the initial and final economic
analyses.  Specifically, the Act requires an IRFA to contain
the following:

> (1) a description of the reasons why action by the
> agency is being considered;
>
> (2) a succinct statement of the objectives of, and
> legal basis for, the proposed rule;
>
> (3) a description of and, where feasible, an
> estimate of the number of small entities to which
> the proposed rule will apply;
>
> (4) a description of the projected reporting,
> recordkeeping and other compliance requirements of
> the proposed rule, including an estimate of the
> classes of small entities which will be subject to
> the requirement and the type of professional
> skills necessary for preparation of the report or
> record;
>
> (5) an identification, to the extent practicable,
> of all relevant Federal rules which may duplicate,
> overlap or conflict with the proposed rule.

---

[11]  Again, agency actions under the Regulatory
Flexibility Act are to be reviewed for compliance in
accordance with the "arbitrary and capricious" standard
under the Administrative Procedure Act.  <u>See</u> § 5 U.S.C. 611
et seq.; <u>North Carolina Fisheries Ass'n, Inc. v. Daley</u>, 27
F. Supp. 2d 650 (E.D. Va. 1998).

Case 2:00-cv-00028  Document 18  Filed in TXSD on 03/10/2000  Page 34 of 81

5 U.S.C. § 603(b).  Section 603(c) prescribes the following:

> Each initial regulatory flexibility analysis shall
> also contain a description of any significant
> alternatives to the proposed rule which accomplish
> the stated objectives of applicable statutes and
> which minimize any significant economic impact of
> the proposed rule on small entities.  Consistent
> with the stated objectives of applicable statutes,
> the analysis shall discuss significant
> alternatives such as -
>
> (1) the establishment of differing compliance or
> reporting requirements or timetables that take
> into account the resources available to small
> entities;
>
> (2) the clarification, consolidation, or
> simplification of compliance and reporting
> requirements under the rule for such small
> entities;
>
> (3) the use of performance rather than design
> standards; and
>
> (4) an exemption from coverage of the rule, or any
> part thereof, for such small entities.

5 U.S.C. § 603(c).

> A FRFA must contain:
>
> (1) a succinct statement of the need for, and
> objectives of, the rule;
>
> (2) a summary of the significant issues raised by
> the public comments in response to the initial
> regulatory flexibility analysis, a summary of the
> assessment of the agency of such issues, and a

28

Case 2:00-cv-00028 Document 18 Filed in TXSD on 03/10/2000 Page 35 of 81

statement of any changes made in the proposed rule
as a result of such comments;

(3) a description of and an estimate of the number
of small entities to which the rule will apply or
an explanation of why no such estimate is
available;

(4) a description of the projected reporting,
recordkeeping and other compliance requirements of
the rule, including an estimate of the classes of
small entities which will be subject to the
requirement and the type of professional skills
necessary for preparation of the report or record;
and

(5) a description of the steps the agency has
taken to minimize the significant economic impact ·
on small entities consistent with the stated
objectives of applicable statutes, including a
statement of the factual, policy, and legal
reasons for selecting the alternative adopted in
the final rule and why each one of the other
significant alternatives to the rule considered by
the agency which affect the impact on small
entities was rejected.

5 U.S.C. § 604(a).

The IRFA at issue in this matter contained all the

necessary elements. See A.R. Vol. 34, IV.A.445 (IRFA). The

FRFA, as well, contained all five of the necessary elements.

See A.R. Vol. 35, IV.A.461 (FRFA). TSA does not

specifically challenge any of the statutorily mandated

29

Case 2:00-cv-00028  Document 18  Filed in TXSD on 03/10/2000  Page 36 of 81

requirements, but rather three more technical aspects of the analysis. None of TSA's complaints is well founded or demonstrates any abuse of discretion.

First, TSA contends the NMFS misunderstood the estimated profit margin of shrimpers to be 51%. The record indicates, however, that this issue was addressed in the FRFA. See A.R. Vol. 35, IV.A.461 (FRFA, at 9). The FRFA explicitly states that "the pretax margin was 19%, not 51 percent of the revenue." Id. Second, TSA argues that certain figures in a table taken from a 1995 NMFS study were incorrectly "added up." The figures TSA notes are related to the overall economic analysis of Amendment 9. See A.R. Vol. 34, IV.A.445 (Table R-5, at 47). TSA's argument fails for two reasons. First, it appears that these figures are not intended to "add up." Second, even if these figures were incorrectly added, it appears from the record that the totaled figures were not the basis for any decision; rather, the underlying data was used for further decisions.

TSA's final argument is that NMFS refused to consider additional information provided by TSA, even though NMFS did

30

CVAPDF - www.fasdoc.com

in fact consider additional information in preparing a supplemental economic analysis. It is difficult to determine from the record if this is an accurate allegation, though it does not appear that any such "new" information made a substantive difference in the analysis. A review of the record indicates that an in-depth analysis was performed, and that TSA was afforded the opportunity to participate. The Regulatory Flexibility Act requires that an agency make a good-faith attempt to examine various economic aspects of a regulation. This was done in the instant case, with sufficient thoroughness to ensure compliance with the statute.

### 5. Minimization of Adverse Impact to Fishing Communities (National Standard 8)

National Standard 8 requires that conservation measures, to the extent practicable, minimize adverse economic impact on fishing communities.[12] 16 U.S.C. §

---

[12] A "fishing community" is "a community which is substantially dependent on or substantially engaged in the harvest or processing of fishery resources to meet social and economic needs, and includes fish vessel owners, operators, and crew . . . ." 16 U.S.C. § 1802(16).

31

Case 2:00-cv-00028  Document 18  Filed in TXSD on 03/10/2000  Page 38 of 81

1851(a)(8).  TSA alleges that the NMFS failed to meet this requirement in that it failed to consider the impact on shrimping communities.  TSA specifically contends that the NMFS "failed to include even the most rudimentary information" about the relevant shrimp fishing communities.  See TSA's motion for summary judgment (document 58).

I initially note that National Standard 8's goal regarding minimization of adverse economic consequences is not absolute.  It is limited by the explicit language of the statute, which states that the minimization of adverse economic impacts is to be achieved "consistent with the conservation requirements of this chapter (including the prevention of overfishing and rebuilding of overfished stocks)."  16 U.S.C. § 1851(a)(8).  Further, the section includes the language "to the extent practicable," which, as previously noted, implies a balancing of various factors.  Id.

An examination of the record reveals that the NMFS did in fact consider the adverse consequences to the shrimping communities in promulgating Amendment 9.  First, IRFA at

32

Case 2:00-cv-00028   Document 18   Filed in TXSD on 03/10/2000   Page 39 of 81

issue explicitly assessed the effects of a BRD requirement on the shrimp industry. Second, the Regulatory Impact Review also examined the issue, similarly finding that there would indeed be significant costs. Further, the FRFA specifically conceded the significant impact on shrimping communities. See A.R. Vol. 35, IV.A.461 (FRFA, at 4-6)("The Council was aware of the potential adverse economic impact of BRDs on the shrimp industry . . . ."; "Regarding severe economic impacts on the shrimp industry and the United States, NMFS and the Council agree that requiring the use of BRDs will result in negative economic impact on the shrimp industry."). Moreover, the record makes clear that the shrimp industry (including TSA specifically) had numerous opportunities, which it in fact utilized, to present evidence on this issue.

Lastly, the NMFS examined a variety of alternative proposals designed to meet the bycatch reduction goal while at the same time minimizing adverse economic impacts to shrimpers, as required by National Standard 8. See A.R. Vol. 35, IV.A.461 (FRFA, at 10). These included maintaining

CMsPDF - www.fasina.com

Case 2:00-cv-00028   Document 18   Filed in TXSD on 03/10/2000   Page 40 of 81

the status quo and the closing of the shrimp fishery for a
portion of the season.  _Id._ (FRFA, at 11).  Additionally,
the regulation excluded certain depth and geographical areas
(depths more than 100 fathoms and the geographic area east
of Cape San Blas), as well as gear types.  _Id._  The purpose
of these decisions was to minimize adverse economic impact
on the shrimping community.

   This case is significantly different from the only
other case to extensively examine this issue, _North Carolina_
_Fishing Ass'n, Inc. v. Daley_, 16 F. Supp. 2d 647 (E.D. Va.
1997).  In that case, the agency initially failed to prepare
any economic analysis pursuant to the Regulatory Flexibility
Act or National Standard 8, instead certifying that there
were no negative economic effects on the fishing
communities.  16 F. Supp. 2d at 651-54.  The NMFS argued in
that case that the agency was not required to consider a
range of alternatives to the proposed rule.  _Id._ at 654.
The court correctly ordered the NMFS to conduct an analysis,
in accordance with the Regulatory Flexibility Act and
National Standard 8.  _Id._  The court later rejected the

Case 2:00-cv-00028  Document 18  Filed in TXSD on 03/10/2000  Page 41 of 81

analysis presented after remand because it "failed to give any meaningful consideration to the economic impact" and presented a "so-called economic report . . . designed to justify a prior determination." North Carolina Fishing Ass'n, Inc. v. Daley, 27 F. Supp. 2d 650, 652 (E.D. Va. 1998). The court held that the Secretary "completely abdicated his responsibilities" in terms of a determination of economic impact. Id. at 662. Further, the court observed that the analysis was "clearly skewed" and totally ignored the findings of the Secretary's own scientists. Id. at 667-68. In short, the court found a good-faith effort was not made.

Such an extreme situation is not present in the instant case. First, as discussed above, several analyses of the impact on the shrimp community were performed. Second, the reports frankly acknowledged a significant impact on the shrimping community. This is not an unlawful case of ignoring data or refusing to examine issues; rather, this is a case where the agency candidly described potential adverse effects of its action, considered alternatives, and made a

35

Case 2:00-cv-00028  Document 18  Filed in TXSD on 03/10/2000  Page 42 of 81

reasoned decision.  To the extent TSA contends an analysis was not made, it is factually incorrect.[13]

### 6.  Avoidance of Serious Adverse Impact to the Environment

Measures aimed at the reduction of bycatch must "be consistent with . . . the need to avoid any serious adverse environmental impact on such bycatch species or the ecology of the affected area."  16 U.S.C. § 1881d(f)(2).  TSA states that the NMFS "[made] no determination about this mandate."  See TSA's and Wilma Anderson's Memorandum of Points and Authorities in Support of their Motion for Summary Judgment, at 29.

This contention is without merit.  First, the record is replete with research concerning the environmental impact of the BRD requirement, including the effect on red snapper and

---

[13]  The bulk of TSA's critique with regard to National Standard 8 is not that the figures are so inaccurate as to be contrary to statute, but that the NMFS failed to make the analysis.  See TSA's and Wilma Anderson's Memorandum of Points and Authorities in Support of their Motion for Summary Judgment, at 31.  As discussed above, this is simply not accurate.

36

Case 2:00-cv-00028 Document 18 Filed in TXSD on 03/10/2000 Page 43 of 81

the impact on the environment of the affected area. See
A.R. Vol. 34, IV.A.445; A.R. Vol. 34, IV.A.457 (Attachment
B, at 1). It is clear that the environmental impact on red
snapper was the preeminent justification for the measure.
Additionally, TSA points to no evidence in the record that
Amendment 9 is inconsistent with the need to avoid serious
adverse environmental impacts on bycatch or the ecology of
the affected areas. Accordingly, I find that the Secretary
did not abuse his discretion relative to this provision.

### 7.   National Standard 5

Under National Standard 5, conservation measures must
not be based solely on economic allocation. 16 U.S.C. §
1851(a)(5). TSA contends Amendment 9 is based solely on
economic allocation. The record proves this not to be
accurate. The obvious purpose of the BRD regulation is to
reduce bycatch. While TSA may argue that the burden
distribution is unfair (as they do and as discussed above),
TSA points to no evidence in the record to support the
allegation that Amendment 9 was promulgated solely in an

37

Case 2:00-cv-00028 Document 18 Filed in TXSD on 03/10/2000 Page 44 of 81

attempt to allocate economic benefits. Accordingly, this claim is unpersuasive. See Alaska Factory Trawler Ass'n v. Baldridge, 831 F.2d 1456, 1465 (9th Cir. 1987) (holding that where the Secretary considered non-economic factors, National Standard 5 is not violated).

In sum, in light of the well-founded beliefs that the red snapper population is severely overfished and that bycatch reduction is required to restore the fishery, and in view of the statutorily mandated requirement of the prevention of overfishing, the NMFS made a reasonable decision in balancing the various objectives of the Magnuson-Stevens Act in the promulgation of Amendment 9.

## B. Challenge to 1998 TAC Regulations

TSA also challenges the decision of the NMFS to set the 1998 total allowable catch of red snapper at 9.12 million pounds. Specifically, TSA challenges the original interim rule releasing 6 million pounds, as well as an emergency second regulation releasing the remaining 3.12 pounds. See 63 Fed. Reg. 18,144 (1998)(to be codified at 50 C.F.R. pt.

CiliPDF - www.fastio.com

Case 2:00-cv-00028  Document 18   Filed in TXSD on 03/10/2000  Page 45 of 81

622)(initial interim rule); 63 Fed. Reg. 45,760 (1998) (to
be codified at 50 C.F.R. pt. 622)(emergency interim rule).

The federal defendants assert that TSA lacks standing
to challenge this regulation because there is no casual
connection between the TAC regulations and TSA's alleged
injury, and because TSA's alleged injury would not be
addressed even if its challenge to the TAC regulations was
successful.  I conclude that TSA does in fact have standing
to challenge the TAC regulations.

Three requirements must be met to establish standing.
First, TSA must have suffered an injury in fact; i.e., a
"concrete and particularized" injury that is "actual or
imminent," and not conjectural or hypothetical.  See Lujan
v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct.
2130, 119 L. Ed. 2d 351 (1992).  Next, standing requires a
causal connection between the injury and the conduct at
issue.  The injury has to be "fairly trace[able]" to the
defendant's conduct.  Id.  Finally, it must be likely that
the injury would be redressed by a decision in a plaintiff's
favor, that is, that a favorable decision would make an

39

Case 2:00-cv-00028   Document 18   Filed in TXSD on 03/10/2000   Page 46 of 81

"appreciable difference" in the plaintiff's own situation. Id.; Allen v. Wright, 468 U.S. 737, 758, 104 S. Ct 3315, 82 L. Ed. 2d 556 (1984).

In the case at bar it is Amendment 9, and not the TAC release, that directly injures TSA. In the context of Amendment 9, however, TSA certainly has standing. TSA has alleged a concrete and particularized injury: the regulations at issue require the shrimp industry to incur significant costs in that BRDs lower productivity of shrimp trawlers and raise the costs of shrimping. Amendment 9 directly caused these costs, and the elimination of Amendment 9 would address the injury.

The issue, then, is whether the increase in costs to shrimpers is "fairly traceable" to the TAC regulations in addition to Amendment 9, and whether a reduced TAC would "likely" ameliorate this injury. As the party invoking federal jurisdiction, the burden is on TSA to establish these elements.

Although the federal defendants assert that BRDs would still be required, even were no TAC released, I conclude

40

Case 2:00-cv-00028 Document 18 Filed in TXSD on 03/10/2000 Page 47 of 81

that the relationship between the TAC and Amendment 9 is
sufficiently strong to provide TSA standing. The lower the
NMFS sets the yearly TAC, the more the red snapper fishery
grows. The more the red snapper fishery grows, the less the
need for the shrimp industry to incur the costs of BRDs. In
short, a lower TAC will help restore the red snapper fishery
more rapidly, thus alleviating the need for BRDs. Thus, the
costs incurred by the shrimp industry are "fairly traceable"
to the TAC regulations, and it is "likely" that a reduced
TAC would help alleviate the burden on shrimpers. Cf.
Bennett v. Spear, 520 U.S. 154, 117 S. Ct. 1154, 137 L. Ed.
2d 281 (1997)(holding that ranchers and irrigation district
alleged sufficient injury and connection as a result of
Secretary of Interior's decision to protect endangered
sucker fish through minimization of water project, which in
turn was likely to result in a decision to reduce water
available for irrigation).[14]

---

[14]  Coastal Conservation Association claims that the TAC
issue is moot and therefore non-justiciable, because it has
already been decided. See Coastal Conservation
Association's Memorandum of Points and Authorities in
Opposition to TSA's Motion for Summary Judgment, at 34-35.

41

CUTEPDF - www.testra.com

Case 2:00-cv-00028  Document 18  Filed in TXSD on 03/10/2000  Page 48 of 81

1.   <u>The Interim Rule Releasing 6 Million Pounds</u>
     <u>TAC</u>

TSA's sole argument with respect to the NMFS decision

to keep the TAC at 9.12 million pounds (immediately

releasing 6 million pounds and reserving the remaining 3.12

million pounds pending a later finding of the efficiency of

the BRDs) is that "[n]ot a single scientific document in the

record supports" the decision.  <u>See</u> TSA's and Wilma

Anderson's Memorandum of Points and Authorities in Support

of their Motion for Summary Judgment, at 35.  The record

shows this is inaccurate.

NMFS scientists concluded that a 20% SPR could be

achieved if the BRDs reached a 60% efficiency rate and the

TAC was maintained at 9.12 million pounds.  <u>See</u> A.R. Vol.

42, VIII.D.584, at 18,145; A.R. Vol. 42, VIII.D.573.  The

---

The TAC decision, however, is capable of repetition yet
evading review; the TAC is annually set with the prior
year's TAC a factor in the analysis.  <u>See Gannett Co., Inc.</u>
<u>v. DePasquale</u>, 443 U.S. 368, 377, 99 S. Ct. 2898, 61 L. Ed.
2d 608 (1979).  As such, it is excepted from the mootness
doctrine.  Thus, I disagree with the contention that TSA's
"discovery skirmishes" warrant an equitable determination of
non-justiciability.

Case 2:00-cv-00028  Document 18   Filed in TXSD on 03/10/2000   Page 49 of 81

20% SPR goal, as discussed earlier, is supported by the
record.  The 60% efficiency rate also is supported by the
record, although perhaps not as clearly, and is within the
reasonable range of decision-making.  Though the BRD studies
at the time of the decision were less than definitive, the
Council noted that "efficiencies of 60% or greater had been
achieved under experimental conditions."  See 63 Fed. Reg.
18,144.  See also A.R. Vol. 40, VII.518 (minutes, at 24).
That the precise efficiency of the BRDs was not known does
not prohibit the NMFS from making a decision based on
reasonable expectations.  See Southern Offshore Fishing
Ass'n v. Daley, 995 F. Supp. 1411, 1429 (M.D. Fla.
1998)(noting that, in the face of uncertain scientific
evidence, the Secretary's decision-making "will necessarily
entail some measure of intuitive management that the
proponents will applaud as wisdom and the detractors will
condemn as mere caprice.  This regulatory framework [the
Magnuson-Stevens Act] permits this managerial result and
implies the predictable commentary."); Associated Fisheries
of Maine, Inc. v. Daley, 127 F.3d 104, 111 (1st Cir. 1997)

43

CIXPDF - www.fesho.com

Case 2:00-cv-00028   Document 18   Filed in TXSD on 03/10/2000   Page 50 of 81

("Administrative decisionmaking is not an exact science, and
judicial review must recognize that some arbitrariness is
inherent in the exercise of discretion amid uncertainty.");
Fisherman's Dock Coop., Inc. v. Brown, 75 F.3d 164, 172 (4th
Cir. 1996).

The NMFS planned to start with a TAC of 6 million
pounds and to release the rest depending on whether the BRDs
worked as efficiently as hoped.  The 20% SPR figure is in
accordance with the best scientific information, and the 60%
goal was supported by a reasonable amount of evidence.  TSA
apparently does not dispute that if the 60% level was
reached, a TAC of 9.12 million pounds would be reasonable.
In view of these facts, the initial interim rule does not
constitute an abuse of discretion.

   2.   Release of Remaining 3.12 Million Pounds TAC

The second regulation is more troublesome, because it
is inconsistent with the express provisions of the interim
rule; the remaining 3.12 million pounds of TAC was not to be
released unless the BRDs reached a mortality reduction rate

44

Case 2:00-cv-00028  Document 18   Filed in TXSD on 03/10/2000   Page 51 of 81

of 60%.  See 63 Fed. Reg. 45,760.  Preliminary results of a

study examining BRD efficiency indicated that BRDs did not,

on average, reach that result.  Accordingly, TSA (as well as

the Center for Marine Conservation) contend the regulation

is arbitrary and capricious.

Two groups of evidence, however, support the agency's

decision and demonstrate that the emergency regulation was

not an abuse of discretion.  First, scientific evidence

revealed that although the BRDs did not, on average, reach

the desired 60% reduction goal, that target was imminently

reachable.  There exists evidence in the record that some

BRDs exceeded 60%, and that there was a reasonable prognosis

the other less effective BRDs could achieve 50% or higher in

the near future.  See 63 Fed. Reg. at 45,762; A.R. Vol. 4,

I.A.41, at 4-5.  Further, the NMFS determined that where

BRDs were installed properly and vessel captains taught how

to optimize BRD performance, efficiency levels were raised

to between 59 and 70%.  See 63 Fed. Reg. at 45,761.  Also,

NMFS has observed increased efficiency over time with

similar devices, and concluded through an apparently

45

Case 2:00-cv-00028 Document 18 Filed in TXSD on 03/10/2000 Page 52 of 81

reasonable analogy that BRDs would see the same result. <u>See</u> A.R. Vol. 40, VII.518 (minutes, at 23-24 (discussing turtle excluder devices).

Second, the NMFS also based the emergency regulation on more than just the study of BRD efficiency; it considered the effect of the lower TAC on the red snapper industry. The NMFS concluded that without the release of the remaining TAC, "severe economic and social hardships" were likely to impact the red snapper commercial and recreational fisheries. <u>See</u> 63 Fed. Reg at 45,761. The scientific evidence revealed that the BRDs were close to achieving the desired rate (in terms of actual numbers and time until those numbers were reached), and the NMFS determined that the economic hardship on the red snapper industry would be particularly severe. It was within the discretion of the agency to balance the potential success of the BRDs and the cost to the red snapper industry and adjust the agency's regulation accordingly.

46

Case 2:00-cv-00028   Document 18   Filed in TXSD on 03/10/2000   Page 53 of 81

## C.  EEZ East of Cape San Blas

Florida Wildlife Federation ("FWF") alleges that
Amendment 9 is not in compliance with the Magnuson-Stevens
Act in that it fails to include the EEZ east of Cape San
Blas, Florida.  It bases this contention on three grounds:
that Amendment 9 violates National Standard 9's
practicability requirement, that Amendment 9 does not
minimize adverse impact on essential fish habitat, and that
Amendment 9 fails to comply with various national standards
in place during the implementation of the amendment.  These
contentions are incorrect.  The NMFS not did act in an
arbitrary manner when it exempted trawlers in the EEZ east
of Cape San Blas from the regulation.

### 1.  Minimizing Bycatch to the Extent Practicable

The NMFS determined that application of Amendment 9 to
the eastern area of the Gulf of Mexico was not practicable.
The predominant basis for this finding was that the
potential increase in the minimal red snapper population

47

Case 2:00-cv-00028  Document 18  Filed in TXSD on 03/10/2000  Page 54 of 81

would not outweigh the significant costs associated with the
BRD requirement.  See 63 Fed. Reg. 48,139, 18,140 ("The
Council limited the geographical scope of the BRD
requirement . . . to the area west of cape San Blas, FL,
because most red snapper bycatch occurs in this area.";
"[T]he Council . . . minimized the adverse economic and
social impacts on the shrimp fisheries . . . by limiting the
BRD requirement to the geographical area west of Cape San
Blas."); A.R. Vol. 35, IV.A.472, at 18,140.

FWF argues, essentially, that the NMFS failed to
minimize bycatch to the extent practicable because of an
incorrect understanding of the definition of the term
"practicability." FWF contends that "practicable" means
that a conservation action must be taken unless the costs
are wholly disproportionate to the potential benefits. As
discussed earlier, I reject this definition.

As with TSA's challenges, my duty is to ensure that
NMFS's decision was within the realm of reasonableness; if
evidence in the record supports the agency's determination
that the application of Amendment 9 to the eastern portion

48

Case 2:00-cv-00028   Document 18   Filed in TXSD on 03/10/2000   Page 55 of 81

of the EEZ is not practicable, then that decision will not
be disturbed.

The record contains ample evidence that red snapper do
not exist in mass in the eastern EEZ.  See A.R. Vol. 14,
II.A.69c, at 6.  The record also contains ample evidence of
the social and economic costs to the shrimp industry
required to install and utilize BRDs.  Practicability, as
discussed earlier, entails balancing various factors, such
as the impact on fishing communities, the costs involved,
and the ecological benefit.  FWF has not demonstrated that
the balancing of factors by the NMFS was in any way
arbitrary or capricious.

### 2.  16 U.S.C. § 1853(a)(7)

All FMPs must minimize, to the extent practicable,
adverse impacts on essential fish habitat.  16 U.S.C. §
1853(a)(7).  This section was part of the Sustainable
Fisheries Act of 1996, which added several amendments to the
Magnuson-Stevens Act.  See Sustainable Fisheries Act of
1996, Pub. L. No. 104-297, §108(b), 110 Stat. 3559, 3575

49

CVAPDF - www.fastio.com

Case 2:00-cv-00028  Document 18  Filed in TXSD on 03/10/2000  Page 56 of 81

(1996).  Section 108(b) of the Sustainable Fisheries Act,
which includes 16 U.S.C. § 1853(a)(7), allowed each regional
Council two years to implement the amendments.  Id.  The
date of the Act was October 11, 1996.  Therefore, FMPs were
not required to comply with the amendment until October 11,
1998, well past the date of Amendment 9.  Accordingly, 16
U.S.C. § 1853(a)(7) is inapplicable, and the minimization of
essential fish habitat is not a standard properly considered
here.[15]

---

[15]  As an additional attack on NMFS's practicability
analysis, FWF contends that the NMFS was required to
consider the effect of bycatch of all finfish, not just red
snapper.  Amendment 9 clearly does not address the bycatch
of finfish other than red snapper.  As such, FWF argues,
Amendment 9 is impracticable and the implementation of the
regulation was arbitrary and capricious.

The consideration of bycatch on all finfish is required
in the preparation of a FMP.  16 U.S.C. § 1853(a)(11).  This
section, however, was enacted in the same manner as 16
U.S.C. § 1853(a)(7); i.e., pursuant to the Sustainable
Fisheries Act.  Section 1853(a)(11), like § (a)(7), falls
under the two year grace period.  As such, NMFS's decisions
were not subject to § 1853(a)(11) at the time Amendment 9
was enacted.  Because the Magnuson-Stevens Act did not
require every FMP to consider all finfish, this argument is
unsuccessful.

CUtPDF - www.fastio.com

3.    National Standards 1 and 3

Finally, FWF briefly challenges Amendment 9 on the
grounds that it does not manage the red snapper fishery
throughout its range, as required by National Standard 3,
and that it does not prevent overfishing while maintaining
the optimal yield from each fishery, as required by National
Standard 1.  FWF notes that the failure of Amendment 9 to
apply to the entire EEZ has slowed the recovery of the
fishery and left part of the red snapper fishery
unprotected, thereby implicating the above two requirements.

Both National Standard 3 and National Standard 1
incorporate a practicability requirement.  See 16 U.S.C. §
1851(a)(1) and (3).  That requirement, as discussed above,
allows the NMFS to reasonably balance a variety of factors
in addition to National Standards 1 and 3.  The NMFS
determined through the reasonable use of available science
that the red snapper fishery will be effectively restored
under Amendment 9.  FWF has not demonstrated an abuse of
discretion in that determination.

51

CISPDF - www.fxxta.com

Case 2:00-cv-00028   Document 18   Filed in TXSD on 03/10/2000   Page 58 of 81

Accordingly,

IT IS ORDERED:

Texas Shrimp Association's motion for summary judgment (document 57) and Florida Wildlife Federation's motion for summary judgment (document 60) are DENIED. The federal defendants' cross-motion for summary judgment on both petitions (document 87) is GRANTED. The clerk shall enter judgment stating, "Judgment is entered in favor of defendants dismissing each petition." The clerk shall close the file.


SO ORDERED this 3d day of November, 1999.

Robert L. Hinkle
United States District Judge


52

2

CutePDF - www.fwrio.com

cc: mr Lamore, d
Weaver

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### Tallahassee Division

TEXAS SHRIMP ASSOCIATION )
126 West Cleveland )
Aransas Pass, Texas 78336 )
)
    and )
)
WILMA ANDERSON )
160 Port St. Claire )
City by the Sea, Texas 78336 )
)
    Plaintiffs, )
)
    v. )    Civil Action No. 4:00cv20-RH
)
WILLIAM M. DALEY )
Secretary of Commerce )
Room 558 )
14ᵗʰ and Constitution Ave., N.W. )
Washington, D.C. 20230 )
)
PENELOPE D. DALTON )
Director )    **FIRST AMENDED**
National Marine Fisheries Service )    **COMPLAINT**
Room 14555 )
Silver Spring Metro Ctr. 3 )
Silver Spring, MD 20910 )
)
WILLIAM T. HOGARTH )
Regional Director )
National Marine Fisheries Service )
9721 Executive Center Drive )
St. Petersburg, FL 33702 )
)
    Defendants. )
)

FEB 1 5 2000

FIRST AMENDED COMPLAINT - 1
ERVIN, VARN, JACOBS & ERVIN TALLAHASSEE, FLORIDA

Case 2:00-cv-00028 Document 18 Filed in TXSD on 03/10/2000 Page 61 of 81

Plaintiffs, Texas Shrimp Association and Wilma Anderson, for their First Amended Complaint against Defendants, William M. Daley, Secretary of Commerce; Penelope D. Dalton, Director, National Marine Fisheries Service ("NMFS"); and William T. Hogarth, Regional Director, NMFS (collectively "Defendants" or "Federal Defendants"), allege as follows.

### Introduction

1. This action seeks declaratory and injunctive relief against officers of the United States, acting in their official capacities, who have violated the Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson-Stevens Act"), 16 U.S.C. § 1801 et seq., the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq., and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321-4370e. In particular, this action petitions this Court, pursuant to 16 U.S.C. § 1855(f), for review of regulations promulgated on Dec. 20, 1999 to implement the Fishery Management Plan ("FMP") for the Gulf of Mexico Reef Fish Plan. 63 Fed. Reg. 18139-44. The purpose of the regulations is to establish certain management measures for the red snapper commercial and recreational fishery for the year 2000, including establishing a recreational season of Apr. 21 to Oct. 31, 2000; increasing the minimum size limit to 16 inches; creating a 4-fish bag limit for captain and crew of for-hire vessels; changing the openings of the commercial season to the first 10 days of each month, beginning Feb 1, 2000; and maintaining the total allowable catch ("TAC") for 2000 at 9.12 million pounds. Federal Defendants did not prepare an environmental impact statement or an environmental assessment with respect to the determination of the TAC for 2000.

2. Pursuant to 16 U.S.C. § 1855(f)(4), Plaintiffs have filed a Motion for Expedited Treatment of this case because the challenged regulations will be effective on Jan. 18, 2000 and commercial fishing will begin on Feb. 1, 2000 and recreational fishing will begin on Apr. 21,

FIRST AMENDED COMPLAINT - 2

Case 2:00-cv-00028   Document 18   Filed in TXSD on 03/10/2000   Page 62 of 81

2000. Federal Defendants' failure to reduce the TAC of red snapper from 9.12 million to 6 million pounds or less will allow overfishing of sub-adult and adult red snapper to continue in face of a scientific consensus that such catch levels are biologically untenable. Under the Magnuson-Stevens Act, challenged regulations cannot be set aside unless and until this Court finds them to be unlawful. Thus, time is of the essence in the judicial review of these arbitrary, environmentally harmful, and ill-conceived regulations.

3.      The Secretary of Commerce and the Administrator, National Oceanic and Atmospheric Administration, have delegated to NMFS the responsibility and authority under the Magnuson-Stevens Act to manage the nation's marine fisheries. Under the Magnuson-Stevens Act, NMFS is required to implement certain aspects of FMPs developed by regional Fishery Management Councils by regulation. 16 U.S.C. §§ 1854(b), 1855(c) and (d). This case involves regulatory amendments to carry out the FMP for the Reef Fish Resources for the Gulf of Mexico (50 C.F.R. Part 622) (the "Reef Fish FMP"). The action by NMFS in maintaining the TAC for red snapper in 2000 is an action subject to judicial review under the Magnuson-Stevens Act. 16 U.S.C. §§ 1855(f)

Jurisdiction and Venue

4.      This action presents a federal question under the laws of the United States, including the Magnuson-Stevens Act, 16 U.S.C. § 1855, and NEPA. It also arises under the judicial review provisions of the APA, 5 U.S.C. §§ 702-706.

5.      Jurisdiction over this case is vested in this Court pursuant to 28 U.S.C. § 1331 (federal question) and § 1361 (mandamus against federal agency). Declaratory relief is authorized by 28 U.S.C. §§ 2201, 2202. A present and actual controversy exists between the parties.

FIRST AMENDED COMPLAINT - 3

Case 2:00-cv-00028  Document 18  Filed in TXSD on 03/10/2000  Page 63 of 81

6.      Venue is proper in this judicial district under 28 U.S.C. § 1391(e)

### Parties

7.      Plaintiff Texas Shrimp Association ("TSA") is a trade association organized as a non-profit corporation under the laws of the State of Texas. TSA's offices are located at 126 West Cleveland, Aransas Pass, Texas 78336. TSA membership is made up of owners of 763 shrimp trawl vessels who operate their vessels in coastal waters in Texas and the Gulf of Mexico TSA is a "small organization" and its membership includes "small businesses" within the meaning of the Regulatory Flexibility Act, 5 U S.C.§ 601  Federal Defendants' actions, or failure to act, directly affects the interests of TSA and its membership.  Members of TSA are required to use bycatch reduction devices ("BRDs") in order to assist in increasing the size of the red snapper population in the Gulf of Mexico.  Use of BRDs results in considerable loss of shrimp and income to shrimp trawl vessels.  Moreover, the best scientific information available indicates that BRDs do not result in a 60 percent reduction of juvenile red snapper mortality, the rate of reduction Federal Defendants said was necessary in 1998 to support a TAC of 9.12 million pounds.  Federal Defendants' failure to reduce the TAC of red snapper below this amount, along with the burgeoning growth in the number of private and for-hire recreational fishing vessels, will offset by a large degree the modest improvement in the red snapper population that might be brought about by BRDs.  As a consequence, the red snapper population is not expected to recover such that BRDs, or other more stringent regulatory measures on the shrimp fishery, are no longer necessary.

8      Plaintiff Wilma Anderson is a resident of the State of Texas who serves as the Executive Director and a member of TSA.  In addition, Ms. Anderson owns and operates three

FIRST AMENDED COMPLAINT - 4

Case 2:00-cv-00028   Document 18   Filed in TXSD on 03/10/2000   Page 64 of 81

shrimp vessels in Texas and elsewhere in the Gulf of Mexico. Defendants' actions, or failure to act, directly affect the operation of Ms. Anderson's vessels.

9.    Defendant William M. Daley is Secretary of the United States Department of Commerce, which department includes NOAA and NMFS  Mr. Daley is sued in his official capacity.

10.    Defendant Penelope D. Dalton is the Director of NMFS. Ms. Dalton is sued in her official capacity.

11.    Defendant William T. Hogarth is the Regional Director of NMFS for the Southeast Region. Dr. Hogarth is sued in his official capacity.

### Regulation and Management of the Gulf of Mexico Red Snapper Fishery

12.    The red snapper fishery in the Gulf of Mexico was first placed under federal management on Nov. 8, 1984, when regulations implementing the Reef Fish FMP first went into effect. 49 Fed. Reg. 39548 (Oct. 9, 1984). The original FMP and the implementing regulations, among other requirements, established limits on the use of certain gear, regulated fish traps, set minimum size limits for red snapper, and outlawed the use of explosives or poison to take reef fish. Noting that the number of recreational fishermen in the Gulf of Mexico had increased 286 percent between 1970 and 1979, the Gulf Council concluded in 1983 that red snapper were overfished throughout the management area due to directed fishing by recreational fishermen, who were the primary users, commercial fishermen, and incidental catches in other fisheries  48 Fed. Reg. 38511, 38512 (Aug. 24, 1983). A minimum size limit of 12 inches in fork length was proposed for red snapper; but no specific annual quotas were instituted.

13.    On Jan. 22, 1990, NMFS promulgated regulations implementing Amendment 1 to the Reef Fish FMP. 55 Fed. Reg. 2078 (Jan. 22, 1990). Despite previous measures, the agency

FIRST AMENDED COMPLAINT - 5

CSIPDF - www.twisv.com

03/09/2000  11:56    202-783-6947                    BALL JANIK LLP                          PAGE  09
                                                                                                      @ 009

had concluded that "data indicate red snapper is severely overfished." 54 Fed. Reg. 41297 (Oct.

6, 1989). Among other measures, these regulations created a procedure for setting annual levels

of TAC based on stock assessments:

> The stock assessment for red snapper concluded that the fishery was being
> subjected to recruitment overfishing and that the spawning stock biomass per
> recruit ratio (SSBR) was likely no greater than 4.8 percent of the unfished level.
> This analysis . . . indicated that to restore the spawning stocks to a 20 percent
> SSBR level, reductions in fishing mortality on the order of 60 to 70 percent would
> be necessary by the year 2000 for red snapper . . ." Id.

The draft regulations published in late 1989 noted that the adult red snapper population had

declined since 1979. 54 Fed. Reg. 41297(Oct. 6, 1990). It was also noted that directed fishing

pressure by commercial and recreational vessels had increased dramatically in the past decade

due to more vessels, greater use of sophisticated electronic equipment for fishing fish, and more

efficient harvesting equipment. A long term optimum yield ("OY") was established, defined as

(a) an increased spawning stock objective of 20 percent SSBR by the year 2000 and (b) annual

quotas, or TAC, for the directed fishery. The annual quotas were to be set each year by NMFS to

achieve the 20 percent SSBR goal. The Gulf Council would recommend an annual TAC and

NMFS would determine the appropriate levels, consistent with the requirements of the

Magnuson-Stevens Act.

14.    The regulations implementing Amendment 1 to the Reef Fish FMP established an

annual quota for the commercial fishery  Upon reaching this quota, the commercial fishery

would be closed for the remainder of the year  However, the recreational fishery would remain

open, subject to a seven fish per day bag limit. The TAC is allocated between recreational and

commercial sectors, based on historical harvest percentages between 1979 and 1987. The

regulations stated that any harvest in excess of a sector quota would result in an adjustment in the

next year to ensure that the 20 percent SSBR goal was reached. 54 Fed. Reg. 41297, 41307

FIRST AMENDED COMPLAINT - 6

Case 2:00-cv-00028  Document 18   Filed in TXSD on 03/10/2000   Page 66 of 81

15.    In mid-1991, NMFS issued a regulation extending the target date for rebuilding the red snapper resource from Jan 1, 2000 to Jan. 1, 2007   56 Fed. Reg. 30513 (Jul. 3, 1991) This regulation noted that SSBR would no longer be the management standard (or OY) for the fishery and instead the new objective would be the spawning potential ratio, or SPR, of the fishery.  Moreover, all calculations of TAC began to be formulated on the assumption that future shrimp bycatch measures would be imposed and that these would actually reduce the mortality of juvenile red snapper by at least 50 percent.  Id.

16.    In April, 1995, a report was issued entitled "Cooperative Research Program Addressing Finfish Bycatch in the Gulf of Mexico and South Atlantic Shrimp Fisheries."  The report did not identify any particular technological device that would actually achieve a 50 percent reduction in juvenile red snapper mortality.  In fact, the report indicated that the "fish eye" excluder device, one of the few approved devices that can be used to met the requirements of Amendment 9, was effective in excluding juvenile red snapper by only 27 percent.  In a logical non-sequitur, the report then said that NMFS biologists concluded that this design is "capable of reducing overall bycatch-induced mortality by 40-60 percent" without giving any scientific explanation for this conclusion

17.    After extending the target date for achieving the 20 percent SPR goal, the Gulf Council and NMFS established a 1992 quota for the commercial red snapper fishery of 2.04 million pounds.  By interim emergency rule issued on Dec. 30, 1992, the commercial fishery was closed upon reaching this limit, from that date until Feb 15. 1993.  57 Fed. Reg. 62236. 62238 (Dec. 30, 1992).  However, no action was taken to close the recreational fishery.  NMFS also proposed that the 1993 commercial quota for red snapper be increased to 3.06 million pounds.

FIRST AMENDED COMPLAINT - 7

CIbPDF - www.fasiio.com

Case 2:00-cv-00028  Document 18  Filed in TXSD on 03/10/2000  Page 67 of 81

On that same date, NMFS issued an emergency rule to set trip limits for commercial vessels, noting that the red snapper resource is "severely overfished." 57 Fed. Reg. 57129 (Dec. 3, 1992); 57 Fed. Reg. 62237 (Dec. 30, 1992). Ironically, the agency also noted that red snapper were more available to a growing fleet because of a 1991 four-month closure of the fishery and "recruitment of a good 1989 year class to the fishery."

18.     The Gulf Council and NMFS said that the 1993 TAC for the directed fisheries (commercial and recreational) could be increased to 6 million pounds to alleviate economic impact on directed fishery participants and would still be consistent with the stock rebuilding program. It was again stated that this conclusion assumed a 50 percent reduction of red snapper bycatch in the shrimp fishery. 57 Fed. Reg. 57129. Yet Pub.L. 101-627 had prohibited the use of bycatch reduction devices in the shrimp fishery through Jan. 1, 1994, so any such reduction was not then possible.

19.     On Mar. 26, 1993, NMFS promulgated a final rule raising the 1993 TAC for red snapper from 4 million pounds to 6 million pounds and setting the commercial quota at 3.06 million pounds. 58 Fed. Reg. 16371 (Mar. 26, 1993). This increase was accompanied by the decision to extend again the rebuilding target date, this time from Jan. 1, 2007 to Jan. 1, 2009. Again, NMFS noted that a 50 percent reduction in bycatch of juvenile red snapper in the shrimp fishery was presumed, even though no evidence had been provided to establish that such a reduction was, at that time, either technically or practically feasible.

20.     In 1993, scientific information continued to show that the red snapper population, particularly sub-adults, were still in an overfished condition, according to the OY standard adopted by the Gulf Council and NMFS. Therefore, as part of Amendment 5 to the Reef Fish FMP, it was proposed that the minimum size limit for red snapper be increased every other year,

Case 2:00-cv-00028  Document 18  Filed in TXSD on 03/10/2000  Page 68 of 81

beginning Jan. 1, 1994, in one-inch increments, from 13 inches to 16 inches effective Jan. 1,
1998. But it was also stated that there were relatively strong red snapper year classes in 1989
and 1990. 58 Fed. Reg. 52063, 52064 (Oct. 6, 1993). The final rule imposing these new
changes was issued Jan. 7, 1994. 59 Fed. Reg. 966 (Jan 7, 1994). Again, it was noted that a 50
percent shrimp bycatch reduction was presumed and that " a very active research program is
underway that potentially will provide bycatch and mortality information leading to the desired
bycatch reduction goal without adversely impacting the fisheries for either shrimp or red
snapper." 59 Fed. Reg. 966, 969.

    21.    At the end of 1994, NMFS took action to (a) reduce the recreational daily bag
limit from seven to five fish, (b) increase the minimum size limit from 14 to 15 inches, and (c)
delay the opening of the 1995 commercial red snapper fishery to Feb. 24, 1995. 59 Fed. Reg.
67646 (Dec. 30, 1994). The goal of these changes was to maintain the TAC for red snapper at 6
million pounds. 59 Fed. Reg. 60124 (Nov. 22, 1994). In the discussion of these regulations,
NMFS addressed the question of whether a technological solution to shrimp bycatch was then
available:

> The red snapper stock assessment indicates that recovery of the overfished
> resource is dependent on reducing shrimp trawl bycatch of juvenile red snapper
> by 50 percent. A prior amendment to the Magnuson Act prohibited mandatory
> reductions of shrimp trawl bycatch before the year 1994. NMFS and the Council
> are working cooperatively with universities, states, and the fishing industry to
> develop satisfactory methods of reducing the red snapper bycatch to this level,
> which has not yet been achieved.

59 Fed. Reg. 67646, 67649-50.

    22.    Notwithstanding this public statement, in 1996 NMFS continued the TAC for the
red snapper fishery at 6 million pounds. In that year, the commercial sector reached its quota in

early April and the directed commercial fishery for red snapper was closed on Apr. 4, 1996 through the end of the year   61 Fed. Reg. 14683 (Apr. 3, 1996).

23.    On Sept. 15, 1996, NMFS reopened the commercial fishery for red snapper after dramatically increasing the annual TAC again.  In addition, the rebuilding target date was extended, again, from Jan. 1, 2009 to Jan. 1, 2019.  NMFS stated that this was consistent with the finding, in the 1995 stock assessment, that red snapper had a longer life span and lower natural mortality rate than previously estimated.  61 Fed. Reg. 48641, 48642 (Sept. 15, 1996).  The new TAC for 1996 and 1997 was set at 9 12 million pounds, split between the recreational (49 percent) and commercial (51 percent) sectors.

24.    As noted, the commercial sector of the red snapper fishery is subject to a fixed annual quota and is closed once the quota is reached   No equivalent closure applied to the recreational sector, only a daily bag limit of five fish.  Thus, the Reef Fish FMP did not actually impose a limit on the recreational fishery, at least not prior to Oct. 11, 1996.  However, in theory, the Reef Fish FMP allocated the overall annual catch 51 percent to the commercial sector and 49 percent to the recreational sector.  In 1994, 1995, and 1996, NMFS data indicates that the recreational sector, based on estimates of fishing effort as it applied to the daily bag limit, well exceeded its quota of red snapper, by as much as twice this quota.

25.    On Oct. 11, 1996, an amendment to the Magnuson-Stevens Act mandated that any quota system for the red snapper fishery include the requirement that the recreational sector of the fishery be closed when it reaches its quota, just as for the commercial sector.  Pub.L. 104-297;  § 207; 16 U.S.C. § 1883(d).

26.    The directed fisheries for red snapper also generate considerable amounts of incidental bycatch of under-sized red snapper (e.g. fish below the minimum size limit)

CIVPDF - www.fxvisi.com

Case 2:00-cv-00028  Document 18   Filed in TXSD on 03/10/2000  Page 70 of 81

Although these fish are caught, they are not counted against the quota and must be returned to the water and not kept. In stock assessments, NMFS assumes a release mortality of 20 percent for recreational fisheries and 33 percent for commercial fisheries. However, recent evidence provided to the Gulf Council indicates that the mortality rate of recreational discards may be as high as 50 percent.

### Adoption of Bycatch Reduction Devices for Shrimp Vessels

27.     In 1996, the Gulf Council and NMFS pushed for the adoption of a regulation to mandate the use of fish excluder devices in the Gulf of Mexico shrimp fishery. The stated goal of this regulation, to be included as Amendment 9 to the Shrimp FMP, was to achieve a 50 percent reduction in juvenile red snapper bycatch mortality (age 0 and age 1 fish) in shrimp trawls from the average level of mortality during years 1984-1989, a period prior to the use of turtle excluder devices. Juvenile red snapper are estimated to account for approximately one-half of one percent of the total bycatch (by weight) in shrimp trawls. At the time, NMFS claimed that two fish excluder device designs met the 50 percent mortality reduction standard—the fisheye and the extended funnel—under laboratory conditions. Despite strong doubts about these conclusions, the Gulf Council and NMFS proceeded with consideration of Amendment 9 in 1996.

28      The Gulf Council formally approved Amendment 9 to the Shrimp FMP on Nov. 14, 1996. Amendment 9 would require the use of approved fish excluder devices on all shrimp vessels operating shoreward of the 100-fathom depth contour west of Cape San Blas, Florida, in the Gulf of Mexico.

29.     NMFS published proposed regulations to implement Amendment 9 in the Federal Register on Jul. 2, 1997. 62 Fed. Reg. 35774 (Jul. 2, 1997). Final regulations implementing

FIRST AMENDED COMPLAINT - 11

Case 2:00-cv-00028   Document 18   Filed in TXSD on 03/10/2000   Page 71 of 81

Amendment were published on Apr. 14, 1998. 63 Fed. Reg. 18139 (Apr. 14, 1998). The
regulations were effective May 14, 1998 and have been in effect ever since.

### Approval of the Annual 9.12 Million Pound TAC

30.     Each year, as part of the Reef Fish FMP, NMFS consults with the Gulf Council as
to the appropriate level of the next years' TAC for the directed fishery. Following consultations,
NMFS issues what is called a "regulatory amendment" to the FMP, which does not require the
same formal procedures for approval under the Magnuson-Stevens Act as a "plan amendment."
The FMP gives NMFS the authority to change the annual quotas, or TAC, by issuing regulations
on an annual basis. 50 C.F.R. § 622.42(a)(1)(i) (the commercial quota) and 622(A)(2)(the
recreational quota).

31.     In the Sustainable Fisheries Act, Congress mandated an independent scientific
review of the scientific information underpinning the management of red snapper under the Reef
Fish FMP. Pub.L. 104-297; § 207; 16 U.S.C § 1883(a). The Peer Review Report was finished
in December, 1997, and presented to the Gulf Council and NMFS

32.     The scientific consensus of the Peer Review Group was that the red snapper
fishery was overfished, as viewed against the selected OY standard, and that measures governing
the directed fisheries implemented to date were not adequate to achieve the target rebuilding goal
of 20 percent SPR by Jan. 1, 2019. In particular, several scientists stated that the TAC of 9.12
million pounds was too large and that the TAC should be reduced, at a minimum, to 6 million
pounds. Most reviewers were also skeptical that the technology existed to reduce the shrimp
bycatch by the percentages claimed (between 44 and 60 percent).

33.     Notwithstanding the Peer Review Report, which constitutes the best scientific
information available on the question of an appropriate TAC, the Gulf Council voted to maintain

FIRST AMENDED COMPLAINT · 12

Case 2:00-cv-00028   Document 18   Filed in TXSD on 03/10/2000   Page 72 of 81

the TAC at 9.12 million pounds for 1998. On Apr. 14, 1998, in its determination on the TAC for 1998, NMFS took the Gulf Council's recommendation and did not change the TAC but instead concocted a new quota reserve system, whereby a portion of the overall 9.12 million pound TAC would be immediately available and a portion kept in reserve, pending the outcome of a four-month study of the "observed efficiency" of the newly mandated fish excluder devices. 63 Fed. Reg. 18144, 18145. If these devices reduce shrimp trawl-induced juvenile red snapper mortality by 60 percent, the reserve will be released. If the reduction is less than 50 percent, no reserve will be released. If the reduction is between 50 and 60 percent, a portion will be released. NMFS also reduced the size of the daily bag limit for the recreational fishery from five to four fish. These interim regulation were to be effective for not more than 180 days.

34.     NMFS prepared an Environmental Assessment ("EA") in April, 1998 that addressed the TAC determination for 1998. The EA noted that a Congressionally mandated peer review and NMFS' 1997 stock assessment for red snapper determined that the current rebuilding target for red snapper, 20 percent spawning potential ratio ("SPR") by 2019, could only be reached with a 9.12 million pound TAC if BRDs achieved a bycatch reduction efficiency of 60 percent or greater. The EA stated that this is the best available scientific information. NMFS stated that leaving the TAC at 9.12 million "would not address overfishing of red snapper or provide the flexibility needed to reduce commercial and recreational harvests if the efficiency of BRDs is less than expected." The proposed decrease in TAC to 6 million pounds, it was stated, "will address the current overfishing status by reducing fishing mortality and increasing the species' SPR and yield per recruit." The agency also stated: "The no-action alternative rejected by NMFS (status quo TAC [e.g. 9.12 million pounds] and bag limits) would allow a rapid rate of harvest and not prevent overfishing."

Case 2:00-cv-00028   Document 18   Filed in TXSD on 03/10/2000   Page 73 of 81

35.    On Aug. 27, 1998, NMFS issued an emergency interim rule releasing the remaining portion of the 1998 TAC (3.12 million pounds), without regard to the efficacy of BRDs. 63 Fed. Reg. 45760-63. The agency stated that "[p]reliminary results from the 1998 summer study indicated that juvenile red snapper bycatch in shrimp trawls has been reduced. However, the analyses of these data conducted to date do not warrant release of any of the reserve red snapper TAC in accordance with the [Apr. 14, 1998] interim rule." The study results confirmed that BRDs would not achieve a 60 percent reduction in juvenile red snapper mortality at any time in the near future, a result consistent with the opinion of NMFS' Regional Director who stated that such a reduction would take at least 2 years to achieve. In December, 1999, the director of NMFS told a Senate Committee that the agency "hopes" to achieve this level of mortality reduction from BRDs in "two to three years." No rational basis exists to conclude that BRDs will achieve this level of mortality reduction in 2000.

Continuation of the 9.12 Million Pound TAC in 2000

36.    NMFS continued to review the results from the 1998 study of the efficacy of BRDs into 1999. However, the agency reported to the Reef Fish Stock Assessment Panel, a panel of outside scientists that advise the Gulf Council on scientific matters, that "a 40% reduction in bycatch fishing mortality is achievable, and a 50% reduction may be possible with training of fishermen and the continued refinement of BRDs." Based on this report, the Panel concluded that it "did not consider reductions of bycatch mortality of over 50%" as possible in recommending a TAC for 2000. Consultants for TSA believe that the actual rate of reduction is more on the order of perhaps 25-28 percent. Any resulting increase in juvenile red snapper (ages 0 and 1) from BRD exclusion will not result in sub-adult population increases for two to three years.

FIRST AMENDED COMPLAINT - 14

37.   On Aug. 18, 1999, NMFS announced the availability of a generic plan amendment to various FMPs for the Gulf of Mexico to bring these plans into compliance with the 1996 Amendments to the Magnuson-Stevens Act with respect to criteria for determining when a stock is overfished. 64 Fed. Reg. 44884-85  The Reef Fish FMP does not currently contain a definition that is consistent with those requirements  In that generic plan amendment, the definition of OY that forms the basis for managing the red snapper stock would be changed from 20 percent spawning potential ratio (SPR) to 36 percent SPR.  As a consequence of this change, if approved, management restrictions on the harvest of red snapper will have to be strengthened so that the mandated reduction of overfishing is realized.  The new regional director of NMFS has publicly stated that this new OY level would require tighter restrictions on red snapper harvests.

38.   In reviewing the TAC recommendation for 2000, the Reef Fish Stock Assessment Panel confirmed that the recreational sector overfished its quota in 1997 by at least 17 percent and by an unspecified amount in 1998. Moreover, data was presented showing that recreational harvests were increasing significantly, especially in Florida.

39.   Following its deliberations, the Reef Fish Stock Assessment Panel recommended that the 2000 TAC be no larger than 5.8 million pounds in order to achieve the existing goal of 20 percent SPR.  The Panel stated that it "does not think that a 50 percent level of bycatch reduction is achievable in 2000, and therefore does not recommend a management strategy based on this level of bycatch reduction."  If the new OY objective, required by the 1996 Amendments to the Magnuson-Stevens Act is adopted, the harvest level was recommended to be set at zero.

40.   Notwithstanding the independent scientific recommendations of the Reef Fish Stock Assessment Panel, the continuing overharvest of quota by the recreational sector, the

Case 2:00-cv-00028   Document 18   Filed in TXSD on 03/10/2000   Page 75 of 81

growing fleet of recreational vessels, and the clear evidence that BRDs are not working as previously claimed, the Gulf Council recommended and NMFS agreed to keep the TAC in 2000 for red snapper at 9.12 million pounds.

41.    On Dec. 20, 1999, NMFS issued an Interim rule containing regulatory amendments for management of the red snapper fishery in the Gulf of Mexico for the year 2000. 64 Fed. Reg. 71056-60. The TAC for red snapper was maintained at 9.12 million pounds. NMFS continues to ignore not only the best scientific information available but its own previous determinations that the TAC should be set at 9.12 million only if BRDs are reducing juvenile red snapper mortality by 60 percent. This rule (and the decision not to change the TAC) constitutes an action subject to judicial review pursuant to 16 U.S.C. § 1855(f). Consequently, NMFS has taken an action, e.g. kept the TAC at 9.12 million pounds, that is inconsistent with the requirements of the Magnuson-Stevens Act, as amended. Moreover, in reviewing the interim rule, NMFS admitted that the recreational sector of the red snapper directed fishery has exceeded its quota every year in the last three years (1997-1999).

42.    NMFS did not prepare an EA that addressed the failure to reduce the TAC in 2000 given that the agency concluded that BRDs will not, in the immediate future, achieve a bycatch mortality reduction of 50 to 60 percent and that the recreational sector exceeded its quota in the last three years. Thus, contrary to past practice, the agency did not prepare an EA that determined that the 9.12 million pound TAC for 2000 will, or will not, result in "no significant environmental impact," which triggers the need for a supplemental environmental impact statement under NEPA

*FIRST AMENDED COMPLAINT - 16*

Case 2:00-cv-00028  Document 18  Filed in TXSD on 03/10/2000  Page 76 of 81

## Violations of Law

### Count 1

Refusal by the Gulf Council and NMFS to Reduce the Red Snapper
TAC Is Not Based on the Best Scientific Information Available
And Is Arbitrary and Capricious
(Violation of Magnuson-Stevens Act and APA)

43.    Plaintiffs reallege and incorporate herein each allegation in Paragraph 1 through
Paragraph 42.

44.    The Magnuson-Stevens Act mandates that all fishery management measures be
based on the best scientific information available. 16 U.S.C. § 1851(a)(2).

45.    If a fishery management measure violates the APA, 5 U.S.C. § 706(2)(A), (B),
(C), or (D), any such measure shall be set aside as unlawful  16 U.S.C. § 1855(f).

46.    NMFS has determined that maintenance of a red snapper TAC for 2000 of 9.12
million pounds is consistent with the provisions of the Magnuson-Stevens Act and other
applicable law  However, this permitted level of directed fishing is directly contrary to the best
scientific information available that the TAC should be set at no higher than 6 million pounds,
particularly now that NMFS has concluded that BRDs will not reduce juvenile red snapper
mortality by 60 percent. Moreover, the TAC does not take into account any previous overfishing
of the TAC in prior years by the recreational fleet, the very real possibility that stricter measures
will have to be adopted to meet a new definition of overfishing for the fishery, the expanding
recreational fleet, and information that the bycatch mortality in the recreational fishery is much
higher than currently presumed.  Therefore, NMFS, by failing to reduce the 2000 red snapper
TAC to 6 million pound or less, has violated the Magnuson-Stevens Act and the APA.

**FIRST AMENDED COMPLAINT** - 17

Case 2:00-cv-00028 Document 18 Filed in TXSD on 03/10/2000 Page 77 of 81

## Count 2

### The 1998 Red Snapper TAC Fails To Prevent
### Overfishing Of Sub-Adult and Adult Red Snapper
### (Violation of Magnuson-Stevens Act and APA)

47.    Plaintiffs reallege and incorporate herein each allegation in Paragraph 1 through Paragraph 46.

48    The Magnuson-Stevens Act mandates that all fishery management measures prevent overfishing while achieving the optimum yield for each fishery. 16 U.S.C. § 1851(a)(1).

49.    If a fishery management measure violates the APA, 5 U.S.C § 706(2)(A), (B), (C), or (D), any such measure shall be set aside as unlawful. 16 U.S.C. § 1855(f).

50.    The Gulf Council and NMFS have determined that maintenance of a red snapper TAC for 2000 of 9.12 million pounds is consistent with the provisions of the Magnuson-Stevens Act and other applicable law. However, this permitted level of directed fishing sanctions the continued overfishing of sub-adult and adult red snapper that has been underway since 1984. As a consequence, the failure of NMFS to reduce the TAC to 6 million pounds or less violates the Magnuson-Stevens Act and the APA.

## Count 3

### The Red Snapper TAC for 2000
### Does Not Fairly and Equitably Allocate Fishery Resources
### Among All Sectors of the Red Snapper Fishery
### (Violation of Magnuson-Stevens Act and the APA)

51.    Plaintiffs reallege and incorporate herein each allegation in Paragraph 1 through Paragraph 50.

52.    The Magnuson-Stevens Act requires that, to the extent that rebuilding plans or other conservation and management measures are necessary to reduce the overall harvest of a

FIRST AMENDED COMPLAINT - 18

fishery, harvest restrictions or recovery benefits shall be fairly and equitably allocated among the commercial, recreational, and charter fishing sectors of the fishery  16 U.S.C. §§ 1853(a)(14)

53.    If a fishery management measure violates the APA, 5 U.S.C. § 706(2)(A), (B), (C), or (D), any such measure shall be set aside as unlawful.  16 U.S.C. § 1855(f).

54.    The 2000 TAC for directed harvests of red snapper that will allow overfishing, when viewed in light of the requirement that shrimp vessels use BRDs to protect juvenile red snapper, results in an unfair and inequitable burden for recovery of the red snapper population being placed on shrimp fishermen.  In essence, the shrimp fishery is being forced to incur inordinate costs, possibly in excess of one hundred million dollars, in an attempt to exclude less than one-half of one percent of the inadvertent bycatch in their nets so that the directed fisheries can continue to overfish the sub-adult and adult red snapper.  This overfishing will prevent the recovery of the red snapper population to the point that BRDs or other restrictions on the shrimp fleet are no longer needed.  Such a result violates the Magnuson-Stevens Act and the APA.

### Count 4

#### Failure to Prepare an Environmental Assessment
#### or a Supplement Environmental Impact Statement
#### (Violation of NEPA)

55.    Plaintiffs reallege and incorporate herein each allegation in Paragraph 1 through Paragraph 54.

56.    NEPA requires that before a federal agency takes a major action significantly affecting the quality of the human environment, it must write a detailed statement evaluating the environmental impact of the proposed action.  42 U.S.C. § 4332(2)(C)(i).

57.    NEPA requires that federal agencies prepare an EA to determine whether a proposed action constitutes a major action significantly affecting the quality of the human

FIRST AMENDED COMPLAINT - 19

Case 2:00-cv-00028   Document 18   Filed in TXSD on 03/10/2000   Page 79 of 81

environment and therefore requires the preparation of an environmental impact statement. 40
C.F.R. § 1508.9, National Oceanic and Atmospheric Administration Order 216-6 at 6.05a (Aug.
6, 1991).

58.     Federal Defendants failed to prepare an EA that addressed the environmental and
fishing impact of maintaining the 2000 TAC at 9.12 million pounds when the agency had
determined that BRDs will not reduce bycatch mortality by 50 to 60 percent. Previously, the
agency had determined that such a reduction rate and a 9.12 million pound TAC would be
consistent with the fishery management objectives for the red snapper fishery. The agency also
failed to consider how the continued overfishing of the annual quota by the recreational sector
impacts the ability of the red snapper stocks to recover to 20 percent SPR by 2019. In summary,
NMFS made no determination whatsoever on these critical environmental questions when it
agreed to maintain the TAC at 9.12 million pounds for 2000.

59.     Therefore, Federal Defendants violated NEPA by failing to prepare either an EA
or a supplemental environmental impact statement with respect to its red snapper TAC
determination for 2000. Such failure is arbitrary and capricious and in violation of NEPA and
the APA.

### Prayer for Relief

WHEREFORE, Plaintiffs, having been caused irreparable harm and lacking an adequate
remedy at law for the unlawful actions of Federal Defendants, respectfully request that this
Court:

1.     Issue a declaratory judgment that Federal Defendants have unlawfully failed to
reduce the red snapper TAC for 2000 and acted in a manner that was arbitrary,
capricious, an abuse of discretion, and not in accordance with law (the Magnuson-

FIRST AMENDED COMPLAINT - 20

Case 2:00-cv-00028  Document 18  Filed in TXSD on 03/10/2000  Page 80 of 81

Stevens Act, NEPA and the APA), in excess of statutory authority and short of

the statutory rights of Plaintiffs, and without observance of required procedures.

2.    Grant an injunction setting aside the regulations maintaining the 2000 red snapper

TAC at 9.12 million pounds and remand them to Federal Defendants for further

review and action consistent with applicable law, including the preparation of an

EA or, if necessary, an environmental impact statement.

3     Award Plaintiffs their reasonable costs, attorneys fees and disbursements; and

4.    Grant any other and further relief as the Court may deem appropriate.

DATED: February 8 TH, 2000

Respectfully submitted,

C. Everett Boyd, Jr.
Florida Bar No 190960
ERVIN, VARN, JACOBS & ERVIN
305 South Gadsden
Post Office Drawer 1170
Tallahassee, FL 32302
Tel.: (850) 224-9135
Fax. (850) 222-9194

-and-

DAVIS WRIGHT TREMAINE LLP
James P. Walsh
One Embarcadero Center, Suite 600
San Francisco, CA 94111
Tel: (415) 276-6500
Fax. (415) 276-6599

Attorneys for Texas Shrimp Association
And Wilma Anderson

FIRST AMENDED COMPLAINT - 21

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of First Amended Complaint have been served by

U.S. Mail, this 8th day of February 2000, on the following:

William M. Daley
Secretary of Commerce
Room 558
14th and Constitution Avenue, N.W
Washington, D.C. 20230

William T. Hogarth
Regional Director
National Marine Fisheries Service
9721 Executive Center Drive
St. Petersburg, FL  33702

Honorable Janet Reno
Attorney General
Main Justice Building
Room 5111
10th Street and Constitution Ave., N W.
Washington, D.C.  20530

Penelope D. Dalton
Director
National Marine Fisheries Service
Room 14555
Silver Spring Metro Ctr  3
Silver Springs, MD  20910

Mike Patterson
United States Attorney
315 South Calhoun Street
Suite 510
Tallahassee, FL  32301

Jane Davenport
U S. Department of Justice
Environment and Natural Resources Div.
Ben Franklin Station
Post Office Box 7369
Washington, D.C.  20044-7369

C. Everett Boyd, Jr.
Florida Bar No. 190960
the Law Firm of
Ervin, Varn, Jacobs & Ervin
Post Office Drawer 1170  (32302)
305 South Calhoun Street
Tallahassee, FL  32301

Attorneys for Plaintiffs