Case 2:00-cv-00028   Document 28   Filed in TXSD on 03/20/2000   Page 1 of 33

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS, CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| GAMFW, INC. D/B/A FISHERMAN'S WHARF and BOBBY GRUMBLES | § § § | |
| VS. | § § | |
| THE UNITED STATES OF AMERICA AND THE DEPARTMENT OF COMMERCE, WILLIAM DALEY, Secretary, and NATIONAL MARINE FISHERIES SERVICE | § § § § § § § | CAUSE NO. C-00-028 |

United States District Court
Southern District of Texas
FILED

MAR 2 0 2000

Michael N. Milby, Clerk

**PLAINTIFFS' BRIEF IN SUPPORT OF
THEIR MOTION FOR SUMMARY JUDGMENT**

TO THE HONORABLE JUDGE OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, CORPUS CHRISTI DIVISION:

COME NOW Plaintiffs and respectfully file and submit this their Brief in Support of Their Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and would show unto this honorable Court as follows:

1.    **Summary of the Case.**

   a)    **Organization of Brief.**

1)    Summary of the Case . . . . . . . . . . . . 1

   a)    Organization of Brief  . . . . . . . . 1

   b)    The Status Quo . . . . . . . . . . . . 2

   c)    The Challenged Interim Rule  . . . . . 3

2)    Jurisdiction, Venue, Standing and Mootness  4

3)    Record Before the Court . . . . . . . . . . 5

4)    The Legislative Framework . . . . . . . . . 6

5)   The Regulatory Process . . . . . . . . . . 7

6)   The History of the Reef Fish Fishery Management Plan . . . . . . . . . . . . . . 10

7)   Standard of Review . . . . . . . . . . . 15

8)   Procedural Safeguards of the Regulatory Flexibility Act (hereinafter "RFA") and the Magnuson Act . . . . . . . . . . . . . . . 16

9)   No Emergency or Overfishing Condition Exists . . . . . . . . . . . . 18

10)  Texas Fishermen are Disproportionately Harmed by the Extended Closure . . . . . . . . 21

11)  There is No Reduction in Overfishing by Reinstating Captain and Crew Bag Limits . 21

12)  Regulatory Discard is Increased by Changing the Minimum Size Limitation From 15" to 16" . . . . . . . 23

13)  Other Areas Where NMFS has Failed to Follow Procedural Requirements . . . . . . . . . 26

b) **The Status Quo.** On September 1, 1999, the National Marine Fisheries Service (hereinafter "NMFS") published a final rule to implement the approved provisions of a regulatory amendment to the red snapper fishery management plan prepared by the Gulf of Mexico Fishery Management Council. 64 Fed. Reg. No. 169, 47711 (A.R. Vol 1, 67). This rule established a 4-fish recreational bag limit with a 0-fish bag limit for the captain and crew of "for

hire" vessels; reaffirmed the 15" minimum size limitation for the recreational and commercial fishery (rejecting the council's proposal for a 14" size limitation); and set the opening date for the recreational fishery for January 1, 2000.  NMFS specifically rejected a council proposal to delay the recreational fishery opening until March 1, 2000, stating that such a delay would cause "unfair economic burden" to South Texas which is reliant upon winter tourism.  (AR 68).  NMFS concluded that a delayed opening would result in a loss of 6,891 total fishing trips.  This would have a disproportionate hardship on South Texas and was therefore inconsistent with national standard 4 which requires that the allocation of fishing privileges be fair and equitable.  (AR 68).

Further, NMFS approved the 0-fish limit on "for hire" captains and crews because it would extend the season and therefore maximize the economic benefit to those persons who are employed in the fishery.  (AR 68).

c)  **The Challenged Interim Rule.**  Eleven days before the recreational season was to be opened under the Fishery Management Plan (hereinafter "FMP") and in an immediate and stunning reversal of the final plan approved for the year 2000, NMFS published an "interim rule" on December 20, 1999, which made the following changes:

1.  Delayed the opening of the recreational fishery until April 21, 2000 (7-weeks beyond the council's prior rejected opening day);

2.  Reinstated a 4-fish bag limit for captains and

crews of "for hire" vessels (placing further burden on the recreational Total Allowable Catch (hereinafter "TAC") and further shortening the recreational season);

3. Increased the recreational size limit to 16" to compel further regulatory discard in order to extend the season into October, 2000; and

4. Maintained the 15" size limitation for the commercial fishery with that fishery to be open only the first ten days of each month (creating a "derby" on near shore stocks customarily targeted by recreational anglers).

5. Other procedural irregularities compel disapproval of the interim rule. An environmental statement should have been prepared and a 90 day review period should have been allowed under the Coastal Zone Management Act.

Plaintiffs challenged the interim rule because its provisions were previously determined by NMFS to be in violation of national standard 4, and the resultant inconsistencies in management by the interim rule are arbitrary and capricious as they do not in any way relate to reducing an "emergency" or overfishing condition.

**2. Jurisdiction, Venue, Standing and Mootness.** Jurisdiction is founded on the existence of a Federal question pursuant to 28 U.S.C. §1331. This action arises under the provisions of the Magnuson Fishery Conservation and Management Act, 16 U.S.C. §1801

*et seq*, (hereinafter "Magnuson Act"). This is an action for judicial review and for non-monetary relief under the provisions of the Administrative Procedure Act, 5 U.S.C. §702 *et seq*. The availability of relief to Plaintiffs is statutorily limited to a declaratory judgment by this Court that the challenged regulation is unlawful and set aside pursuant to 5 U.S.C. §706(2)(a)(b)(c) and (d); 16 U.S.C. §1855(b).

Venue of this action is proper within the United States District Court for the Southern District of Texas, Corpus Christi Division, pursuant to 5 U.S.C. §703.

Plaintiffs' standing is based upon their injury resulting from the delayed opening as previously acknowledged by NMFS; that such injury is directly caused by the challenged rule; and that such injury is remedied by the Court's ruling to restore the status quo. See <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136 (1996). It is also based upon Plaintiffs' direct interest in preserving the fishery.

NMFS' repeated practice of regulating the fishery through the use of interim and "emergency" measures makes it difficult to review the measures on a timely basis. As such, they are reviewable without regard to mootness. See <u>e.g.</u>, <u>Center for Marine Conservation v. Brown</u>, 917 F.Supp 1128, 1152-1153 (S.D. Tex. 1996). The challenged rule is in affect at the time of filing this motion but may expire during the pendency of this suit.

**3.   Record Before the Court.** Defendant, The United States of America, has filed the administrative record which is subject to

review pursuant to 16 U.S.C. §1855(b)(3)(B). Plaintiffs objected to the completeness of this record and this Court has ordered supplementation.

The legal effect of this challenge to the Rule, assuming Plaintiffs prevail, is that the regulatory amendment approved by NMFS on September 1, 1999, will be reinstated. The recreational fishery will be opened immediately, a 0-fish bag limit for captains and crew in the "for hire" sector will be restored, and the 15" minimum size limit will be restored in the recreational fishery.

**4.    The Legislative Framework.**    The body of federal law relating to this case is codified in the Magnuson Act, 16 U.S.C. §1801, *et seq*. The corresponding regulatory provisions adopted by the Secretary of Commerce are contained in the Fishery Conservation and Management Regulations, 50 C.F.R., Part 602, *et seq*. The Federal Defendants administer the Magnuson Act, which governs the use of the United States' fishery resources. See 16 U.S.C. §1801, United States v. F/V Alice Amanda, 987 F.2d 1078, 1079 (4th Cir. 1993).

Subchapter IV of the Magnuson Act codifies the National Fishery Management Program. 16 U.S.C. §1851, *et seq*. It authorizes the establishment of Regional Fishery Management Councils for the purpose of promulgating and implementing fishery management plans. 16 U.S.C. §1852. Such plans are submitted to the Secretary of Commerce for approval and are implemented through regulations promulgated by NMFS through notice and comment rule making procedures. 16 U.S.C. §§1852, 1854 (a), (b), and (c)(2).

CVisPDF - www.fasiso.com

Congress has mandated that all fishery management plans "shall be consistent with the national standards for fishery conservation and management" 16 U.S.C. 1851(a). Advisory guidelines (which do not have the force and effect of law) are established by the Secretary of Commerce to assist in the development of fishery management plans. 16 U.S.C.§1851(b).

5.   **The Regulatory Process.** The Gulf of Mexico Fishery Management Council is one of eight regional Fishery Management Councils which were established by the Magnuson Act. 16 U.S.C. §1852. The Gulf of Mexico Fishery Management Council prepares fishery plans which are designed to manage fishery resources in the 200-mile limit within the Gulf of Mexico. The offshore Gulf waters of the states of Texas (beyond 9 nautical miles), Louisiana, Mississippi, Alabama, and Florida comprise the area managed by the Gulf Council. This area is now known as the Exclusive Economic Zone (hereinafter "EEZ"). 16 U.S.C. §1811.

The Council is responsible for developing and monitoring fishery management plans to provide for the best use of the fishery resources in the Gulf of Mexico. The Council meets bi-monthly, varying its meeting locations from Key West, Florida, to Brownsville, Texas.

The Council is made up of representatives of groups who use the Gulf of Mexico's fishery resources. The Council is composed of the heads of the five state fishery management agencies, plus one additional obligatory member for each state. Other voting members may also include recreational fishermen, commercial fishermen,

Page 7

seafood processors, environmentalists, scientists, consumers, and representatives of other state conservation agencies. Members are nominated by each state's governor and appointed by the Secretary of Commerce for a term of three years. There are a total of seventeen voting members. The regional director of the National Marine Fisheries Service completes the list of voting members. Non-voting members include representatives of the U.S. Fish and Wildlife Service, Department of State, the Coast Guard, and the Gulf States Marine Fisheries Commission.

The Council employs a full-time executive director and a staff that operates the day-to-day business. The Council is further supplemented by a scientific and statistical committee made up of university and government employees. For each group of fish (reef fish, billfish, shellfish, etc.), there is also an advisory panel made up of users of the particular type of fish, including recreational, commercial, and consumer interests.

The management process begins with the Council identifying a species, group of species, or fish stock that is in need of management. Once identified, a draft Fishery Management Plan is written using the assistance of the scientific and statistical committee and the advisory panels. The plan includes the scientific information known about the species, the history and economics of the fishery, an estimate of the level of catch that will allow long-term, sustained production, and the regulations necessary to ensure the optimal yield.

Upon completion of the draft Fishery Management Plan, the

CVISPDF - www.lexisx.com

public is given 45 to 70 days to comment on the plan by writing the Council or attending public hearings.

At the end of the comment period, the Council reviews the public input and revises the plan if necessary. The Council then votes to accept or reject the plan. If approved, the Draft Fishery Management Plan is submitted to various elements of the federal government for technical review. Final approval of a Fishery Management Plan is made by the Secretary of Commerce (hereinafter "the Secretary") based upon the ten national standards. 16 U.S.C. §1851.

Once the plan is approved by the Secretary, the public has another 45 days to comment on the plan and 60 days to comment on the regulations. If there are no changes at the end of this period, the plan is published in the Federal Register, and the regulations become effective 30 days later.

After a plan goes into effect, the Council is responsible for monitoring changes in the fishery. The Fishery Management Plan can be altered through an amendment process as new information becomes available on the fishery established. The Plaintiffs participated in this process, which is the status quo final rule that was subsequently repealed by the challenged interim rule.

Regulations in a Fishery Management Plan are enforced by agents of the National Marine Fisheries Service and the U.S. Coast Guard. These agencies may, in turn, make enforcement agreements with state agencies and the Department of Defense. Civil penalties for violations include citations (essentially warnings), fines up

to $25,000, and forfeitures of equipment.  Provisions for criminal penalties also exist.  16 U.S.C. §1859.

**6.   The History of the Reef Fish Fishery Management Plan.**

The Reef Fish Fishery Management Plan (hereinafter "FMP") was implemented in November, 1984.  It established a 13" minimum size limit for red snapper and certain data reporting requirements.  The first red snapper assessment in 1988 indicated that red snapper stocks were significantly overfished and that reductions in fishing mortality rates of as much as 60 to 70 percent were necessary to rebuild red snapper and a recommended 20 percent spawning potential ratio (hereinafter "SPR").

Amendment 1, implemented in January, 1990, set a 7 fish recreational bag limit and a 3.1 million pound commercial quota for red snapper.  This amendment also implemented a framework procedure to allow for annual management changes and set a recovery goal for overfished reef fish stocks of 20 percent by the year 2000.

Amendment 2, implemented in 1990, prohibited the harvest of jewfish.

Amendment 3, implemented in July 1991, allowed the target date for rebuilding an overfished species to be amended depending on changes in scientific advice, except that the rebuilding period cannot exceed 1.5 times the generation time of the species under consideration.  This amendment also established a new red snapper target year of 2007 for achieving the 20 percent SPR goal established by Amendment 1.

A 1991 regulatory amendment set the 1991 red snapper TAC at

4.0 million pounds to be allocated with a commercial quota of 2.04 million pounds and a 7 fish recreational daily bag limit (1.96 million pounds).  The season opened on January 1, 1991, and the 2.04 million pound red snapper quota was reached on August 24, 1991.  The fishery was closed to further commercial harvest in the EEZ for the remainder of the year.

In 1992, the commercial red snapper quota remained at 2.04 million pounds.  However, extremely heavy harvest rates resulted in the quota being filled in just 53 days, and the commercial fishery was therefore closed on February 22, 1992.  An emergency rule, promulgated in 1992 by NMFS at the request of the Council, reopened the red snapper commercial fishery from April 3, 1992, through May 14, 1992, with a 1,000 pound trip limit.  This rule was implemented to alleviate economic upheavals that occurred as a result of the 1992 red snapper commercial quota being rapidly filled.  This emergency rule resulted in a quota overrun of approximately 600,000 pounds for the year 1992, with a total of 94 days of open season.

Amendment 4, implemented in May 1992, established a moratorium on the issuance of new reef fish permits for a maximum period of three years (to expire May 31, 1995).  The moratorium was created to moderate increases in fishing effort and to attempt to stabilize fishing mortality while the Council considered a comprehensive effort limitation program.

A second emergency rule implemented in December 1992, created a red snapper endorsement requirement to the reef fish permit for the start of the 1993 season.  The endorsement was issued only to

owners or operators of federally permitted reef fish vessels who had annual landings of at least 5,000 pounds of red snapper in two of the three years from 1990 through 1992. For the duration of the emergency rule, permitted vessels with red snapper endorsements were allowed a 2,000 pound possession limit of red snapper, and vessels without the endorsement were prohibited from possessing in excess of 200 pounds of red snapper. This emergency action was initially effective for 90 days but was extended for an additional 90 days. A related emergency rule delayed the opening of the 1993 commercial red snapper season until February 16, 1993.

In addition to the implementation of the endorsement system, the 1993 red snapper TAC was increased by a regulatory amendment to 6.0 million pounds, to be allocated with a commercial quota of 3.06 million pounds and a recreational allocation of 2.94 million pounds (to be regulated by a 7 fish recreational daily bag limit). This amendment also changed the target year to achieve a 20 percent SPR from 2007 to 2009. The commercial red snapper fishery opened on February 16 under the endorsement system, and the 3.06 million pound quota was filled and the season closed on May 21 (a duration of only 94 days, despite a 50% allocation increase and reduction in eligible participants).

Amendment 5, implemented in January, 1994, raised the red snapper minimum size limit to 14 inches beginning in 1994 and then gradually to 16 inches over a period of five years.

Amendment 6, implemented in June 1993, extended the provisions of the red snapper endorsement emergency rule to the end of 1994,

unless replaced sooner by a comprehensive effort limitation program. (The commercial quota was reached on April 28, 1994, a period of only 77 days).

A regulatory amendment for the 1994 red snapper season defined the red snapper trip limits as daily landing limits as well as at sea possession limits. It made it a violation for a dealer to buy or attempt to buy more than one trip limit per day from a fisherman, and for a fisherman to sell or attempt to sell more than one trip limit per day. It also delayed the opening of the 1994 commercial red snapper season until February 10, 1994.

Amendment 7, implemented in February, 1994, established a federal reef fish dealer permit (beginning April 1, 1994) and dealer record keeping requirements. It also allowed the temporary or permanent transfer of a red snapper endorsement to any person upon death or disability of the permit/endorsement holder, and allowed the temporary or permanent transfer of a reef fish permit to any person upon death or disability of the vessel owner.

Amendment 8, approved in November 1995, established a comprehensive effort management system (with appeals board) for the commercial red snapper fishery, based on either license limitations or individual transferable quotas (hereinafter "ITQs").

However, the federal government shutdown in December 1995-January 1996 forced an indefinite postponement of the appeals board meetings, and concerns about Congressional funding of the ITQ system made it inadvisable for the ITQ system to become operational, pending Congressional action. In October 1996,

Congress, through re-authorization of the Magnuson-Stevens Act, repealed the red snapper ITQ system and prohibited Councils from submitting, or NMFS from approving and implementing, any new individual fishing quota program before October 1, 2000.

Amendment 9, effective August 2, 1994, extended the reef fish permit moratorium and red snapper endorsement system through December 31, 1995. It also authorized the collection of information to be used to evaluate red snapper effort management alternatives. A regulatory amendment approved on December, 1995, increased the TAC to 9.12 million pounds and the target recovery date was extended to the year 2019, based on a new assessment of the generation time of 19.6 years.

Amendment 10, which relates to fish traps, was rejected by NMFS in May, 1994.

Amendment 11, approved in January 1996, relates to commercial sales restrictions of red snapper and permit transfers.

Amendment 12 implemented on January 1997, established bag limits for other species of reef fish.

Amendment 13, implemented in September 1996, further extended the red snapper endorsement system through the remainder of 1996 and, if necessary, through 1997, in order to give the Council time to develop a permanent limited access system that would be in compliance with the new provisions of the Magnuson Act.

Amendment 14, implemented in March, 1997, provided for a ten-year phase out for the fish trap fishery.

Amendment 15 established a split season for the commercial red

CilAPDF - www.fastio.com

snapper fishery, adopted trip limits and made other licensing provisions.

Amendment 16 relates to the use of fish traps and harvests of other reef fish species.

Proposed Amendment 17, expected approval date of March 16, 2000, extends the commercial permit moratorium for reef fish species.

Proposed Amendment 18 relates to grouper and other species.

7. **Standard of Review.** Congress established the standard of judicial review of regulations implementing FMPs in section 305(d) of the Magnuson Act, 16 U.S.C. §1855(d), by incorporating the standard of review that governs challenges to agency action under the Administrative Procedure Act (hereinafter "APA"), 5 U.S.C. §706(2)(a)-(d). The scope of judicial review generally is limited to the administrative record compiled before and relied upon by the Secretary. *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44, 105 S.Ct. 1598, 1607 (1985).

The Magnuson Act requires the Court to apply the standards of review prescribed by the APA at 5 U.S.C. §706(2)(A)-(D). 16 U.S.C. §1855(f)(1)(B). In accordance with these standards, a regulation is invalid if found "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A). The APA defeats a regulation if review reveals that the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter

CSisPDF - www.fasiso.com

to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. <u>Motor Vehicle Mfrs. Assn' of U.S. v. State Farm Mut. Auto Ins.</u>, 463 U.S. 29, 43, 103 S.Ct. 3856, 77 L.Ed.2d 443 (1983). Magnuson Act regulations will be declared invalid if their promulgation was arbitrary and capricious or otherwise not in accordance with the national standards. <u>Alaska Factory Trawler Ass'n v. Baldridge</u>, 831 F.2d 1456, 1460 (9th Cir.1987); <u>Organized Fisherman of Florida, Inc. v Franklin</u>, 846 F.Supp 1569, 1573 (S.D. Fla.1994); <u>C&W Fish Company, Inc. v Fox</u>, 745 F.Supp. 6, 8 (D.D.C.1990) <i>aff'd</i>, 931 F.2d 1556 (D.C. Cir.1991).

The Court's role is to "assure that the agency action was based on a consideration of relevant factors" and that "the agency has exercised reasoned discretion, with reasons that do not deviate from or ignore the ascertainable legislative intent." <u>Environmental Defense Fund v. Costle</u>, 657 F.2d 275, 283 (D.C.Cir.1981)(quotations omitted). The Eleventh Circuit confirmed that the Court's inquiry must be "searching and careful," although the standard of review remains "narrow." <u>See Fund for Animals v. Rice</u>, 85 F.3d 535, 541-42 (11th Cir.1996) (quoting <u>North Buckhead Civil Assn' v. Skinner</u>,903 F.2d 1533, 1538-40 (11th Cir.1990). More specifically, APA states that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law..." 5 U.S.C. §706(2)(A).

**8.   Procedural Safeguards of the Regulatory Flexibility Act**

**(hereinafter "RFA") and the Magnuson Act.**    In managing the red snapper fishery, the Secretary's discretion is not without limits. As re-authorized under the Sustainable Fisheries Act of 1996, 16 U.S.C. §§1801, <u>et.</u> <u>seq.</u> the Magnuson Act commands that the Secretary determine whether the FMP is consistent both with interests aimed at promoting conservation and protecting the fishing industry. <u>See</u> 16 U.S.C. §1854(g)(1). In that regard, the Secretary's regulatory actions must be consistent with the ten national standards calling on the Secretary to balance competing conservation and economic interests. <u>See</u> 16 U.S.C. §1851(a). NMFS' previous findings that the delayed opening of the recreational fishery would unfairly and adversely impact Texas anglers were ignored. This inconsistency is alone sufficient for this Court to find the agency action is capricious because it is so frustrating and fickle.

The Secretary's authority in this regard is ordinarily limited by the Regulatory Flexibility Act (hereinafter "REFA"), as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, 5 U.S.C. §§6701, <u>et.</u> <u>seq.</u>, which requires administrative agencies to consider the effects of their regulatory actions on small business entities. Under the RFA, an agency that publishes a notice of proposed rule-making must prepare an initial regulatory flexibility analysis describing the effects of the proposed rule on small businesses and discussing alternatives that might minimize adverse economic consequences. <u>See</u> 5 U.S.C. §603. When issuing a final rule, an agency must also prepare and issue a final

regulatory flexibility analysis. 5 U.S.C. §604(a). Nevertheless, the agency may choose instead to provide a certification that the final rule will not "have a significant economic impact on a substantial number of small entities," 5 U.S.C. §605(b) but this finding must also be supported in the administrative record.

The Regulatory Flexibility Act, 5 U.S.C. §601 <u>et. seq.</u>, requires an agency promulgating a rule to consider the effect of the proposed regulation on small businesses and to design mechanisms to minimize any adverse consequences. In 1996, by enacting Title II of the Small Business Regulatory Enforcement and Fairness Act of 1996 (hereinafter "SBREFA"), Pub.L. No. 104-121, Title II, Congress authorized judicial review of an agency's compliance with specific provisions of the RFA. Congress limited judicial review of the RFA to "agency compliance with the requirements of §§ 601, 604, 605(b), 608(b), 610." 5 U.S.C. §611(a)(1). The SBREFA allows judicial review "in accordance with Chapter 7" of the APA, including the "arbitrary and capricious" standard prescribed by 5 U.S.C. §706(2)(A). 5 U.S.C. §611(a)(1); See <u>Associated Fisheries of Maine, Inc. v. Daley</u>, 127 F3d 104 (1st Cir. 1997).

## ARGUMENT

9.    **No Emergency or Overfishing Condition Exists.**    T h e Magnuson Act contains detailed provisions for the preparation of fishery management plans and any amendments thereto. 16 U.S.C. §1853, 16 U.S.C. §1854. These provisions allow for several levels of review and comment by the public. If the Secretary finds that

CHMPDF - www.fesko.com

an emergency or overfishing condition exists, he may take emergency action and thereby bypass the usual provisions for implementing regulatory amendments.  The challenged rule claims that it is based upon an overfishing condition.  Actually, it is nothing less than an unlawful repeal of a regulation duly implemented under the usual management process.

Under the Magnuson Act, overfishing means a "rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis."  16 U.S.C. §1802(29).  "Overfishing" in the regulations is defined as follows: "When a reef fish stock or stock complex is overfished, overfishing is defined as harvesting at a rate that is not consistent with a program that has been established to rebuild the stock of stock complex to the 20 percent static SPR level.  (AR 1104).  At the time the interim rule was approved, no overfishing existed because the fishery had been properly closed pursuant to the approved fishery management plan.  Indeed, the challenged rule does nothing to reduce overfishing whatsoever.  It only rearranges regulatory amendments to a management plan already in place.  The TAC for the year 2000, which limits overfishing, was not altered. The status quo rule was consistent with an approved program to reach the desired SPR level.

No overfishing was occurring and there is nothing in the administrative record to show that the management plan amendments adopted on September 1, 1999, somehow "jeopardized the capacity of the fishery to produce the maximum sustainable yield on a

continuing basis."  Recourse to the emergency procedures in the Magnuson Act to make adjustments in a fishery management plan to accommodate special interests is not a valid use of the emergency procedures and certainly beyond the ascertainable legislative intent.  See generally, Environmental Defense Fund v. Costle, 657 F.2d 275, 283 (D.C. Cir. 1981).  The Secretary's determination that "overfishing" existed is both arbitrary and capricious.

NMFS made use of the interim rule process to bypass normal procedures.  The APA governs federal agency "rule making," which is defined as the "agency process for formulating, amending, or repealing a rule."  5 U.S.C. §551(5).  The APA defines a "rule" as "the whole or part of an agency statement of general or particular applicability and further effect designed to implement... or prescribe law or policy."  5 U.S.C. §551(4).  The APA's notice and comment requirements apply to such rules.  See United States v. Yuzary, 55 F.3d 47, 51 (2d Cir. 1995).  The attempt to circumvent this process by a conclusory claim of "overfishing" should be rejected by this Court.

The red snapper fishery, using NMFS' rational, is in a perpetual state of being "overfished," and this would provide a blanket exclusion to negate compliance with mandated rule making procedures.

NMFS' claim that "good cause" exists so that notice and public procedure are impracticable or contrary to public interest must be narrowly construed.  United States Steel Corp. v. EPA, 595 F.2d 207, 214 (5th Cir. 1978), clarified on other grounds, 598 F2d. 915

(5th Cir 1979). This is because the APA's good cause exception is generally treated as an emergency procedure. See Northern Arapaho Tribe v. Hodel, 808 F.2d 741, 751 (10th Cir. 1987). Such an exception should be inapplicable in this case because NMFS had previously considered and approved a regulatory amendment for the year 2000 season. See National Assoc. of Farmworkers Orgs. v. Marshal, 629 F.2d 604, 622 (D.C. Cir. 1990); Texas Food Indus. Assn. V. U.S. Dept of Agriculture, 892 F.Supp. 254, 260 (W.D. Tex. 1993).

**10. Texas Fishermen are Disproportionately Harmed by the Extended Closure.** NMFS previously acknowledged that a delayed closure would adversely impact the Texas fro-hire sector, and disapproves extending the closure until March 1, 2000. (supplemental record) (AR 0068). A complete reversal three months later is arbitrary. The national standards require that the allocation of fishing privileges be fair and equitable. Placing the burden of a delayed opening on Texas anglers violates this standard.

**11. There is No Reduction in Overfishing by Reinstating Captain and Crew Bag Limits.** Incredibly, NMFS is using the emergency procedures which are specifically limited to addressing overfishing to reinstate bag limitations for captains and crews of "for hire" chartered vessels. The administrative record does not contain any rational support for the contention that this immediate change will do anything to reduce overfishing. On the contrary, the administrative record reflects that the political pressure on

the administrative record reflects that the political pressure on the Secretary to reinstate such bag limits was to allow the captain and crew of such vessels to transfer to their patrons the possession limits to "increase customer satisfaction." Using the emergency provisions of the Magnuson Act to create special privileges is an abuse of discretion on the part of the Secretary.

It is also contrary to the prior recommendations of the national director of NMFS, William Hogarth, who stated the following: "I approved the Gulf Council's request for 0-fish bag limit for captain and crew, despite the council's subsequent request for disapproval, because this measure will reduce catch rates of an overfished stock and lengthen the recreational season without exceeding the quota." (AR 3513). He further noted that "NMFS analysis suggest that a 0-fish bag limit for captain and crew reduces catch rates by about three (3%) percent. Thus, the measure along with the 4-fish bag limit is expected to lengthen the red snapper recreational season substantially and increase economic benefits to both anglers and for hire vessels." (AR 3513).

Contrary to this, Florida charter boat owners had petitioned the council to reconsider this limitation with similar requests as made by Mr. Russell Underwood: "He asked the council to reconsider the captain and crew bag limit, adding that he did not believe that the fish kept was that significant and that these fish would help the businesses by allowing the captains to give customers extra fish." (AR 3059).

In a petition submitted to NMFS by the Panama City Boatmen

Association, it was stated that "it is extremely important that you approve the provision to reinstate the captain and crew bag limit in the for hire fishery. As was clearly stated during public testimony on November 10, 1999, the captain and crew bag limit is necessary in the for hire fishery to provide customer satisfaction." (AR 3556). Clearly, reinstating the captain and crew limitations was not a measure to address overfishing, but rather to grant a privilege to certain participants in the recreational fishery to exceed the regulatory limitation.

**12.   Regulatory Discard is Increased by Changing the Minimum Size Limitation From 15" to 16."**   The most serious flaw with the interim rule is that it causes an increase in red snapper mortality." The purpose of extending the minimum size limit to 16" was to lengthen the recreational season by forcing the discard of smaller fish and therefore reduce the number of fish brought to the dock and which would otherwise be includable in the TAC. Further, there is no decrease in the TAC to balance against increased mortality. The interim rule therefore worsens any "overfishing" it attempts to correct. This change in the management plan is not supported by the best scientific evidence available.

It is in direct violation of National Standard 9, which requires the reduction of bycatch. National Standard 9 states the following: "Conservation and management measures shall, to the extent practicable, minimize bycatch and to the extent bycatch can not be avoided, minimize the mortality of such bycatch." 16 U.S.C. §1851(a)(9). "Bycatch" under the act is defined as "fish which are

Page 23

harvested in the fishery, but which are not sold or kept for personal use, and includes economic discards and *regulatory discards*." 16 U.S.C. §1802(2) (emphasis added).

Incredibly, NMFS maintained the 15" minimum size limitation for the commercial fishery "due to the probability of increased mortality of discards from commercial gear and operations." (AR 3989). Recognizing the ambiguity in the regulations, a staff attorney for NMFS made the following remark: "You should throw in a phrase about the differential release mortality being attributed to the fact that commercial fishers operate in deeper waters. On its face, it doesn't make sense that there would be a different release mortality for the same fish." (AR 3990). This was exactly the complaint of Mr. David Dewhurst, Chairman of the Coastal Coordination Council for Texas, who objected to the emergency rule because "[t]he management measures for the red snapper fishery do not acknowledge the high release mortality of red snapper caught in the deeper waters of the Western Gulf." (AR 5533).

Michael J. Schirripa, a scientist with the Southeast Fishery Science Center, made the following observation concerning the use of size limitations to manage the fishery: "minimum legal size limits tend to focus fishing mortality on the fastest growing individuals of the population. This selective mortality can eventually lead to slow overall growth rates which in turn could reduce long term yield-per-recruit.... Of further consideration is the fact that increasing the minimum size will increase the number of fish discarded dead. These fish will suffer fishing mortality

Page 24

but will not contribute to the realized yield." (AR 3709). In other words, it is expedient from a regulatory standpoint to increase discard to avoid a TAC overage based upon landings, and thus increase fishing effort and mortality without violating management standards. The arbitrary nature of this provision as it relates directly to the challenged rule was addressed by Schirripa as follows: "Despite the fact that the analysis suggests that the season would be prolonged with an increase in minimum size, common sense suggests that this may well NOT be the case. Note that the model assumes constant effort. This is very important. The question becomes: Can a 4-fish bag limit at 15" be filled just as frequently as a 4-fish bag limit at 16?" At 17?" At 18?" We don't know... . However the end result of this will be an increase in the total number of the fish killed due to an increase in the number of fish being released." (AR 3071). Indeed, reliance upon the 'model' is irrational considering the abundance of personal testimony in the record concerning direct observations of discard mortality after the disastrous 18" minimum size limitation in 1999. See Schrouder testimony (AR 3047).

These destructive management practices by NMFS have caused an anomalous alliance of environmental groups joining forces with commercial and recreational fishermen. The Wall Street Journal reported on November 24, 1999, that The Environmental Defense Fund was joining in the opposition of the use of minimum size limits to regulate the red snapper fishery. (AR 3567). Dr. Shipp, a noted marine biologist, expressed concern that the mortality rate was

unnecessarily increased by reducing the size limit.  (AR 2191).

It has been noted that sixty-two percent of recreational caught fish are released because they are undersize.  (AR 2193) (AR 1125).  In 1993, red snapper measuring 15" or less constituted 45% of the recreational harvest.  (AR 1067).  In November, 1997, NMFS approved a regulatory amendment maintaining a 15" size limitation, specifically rejecting a planned increase to 16".  NMFS noted that "[a]s minimum size increased, the portion of the stock that was eligible to contribute to the yield decreased;  consequently, fishermen had to fish harder to produce the same yield.  This increase in effort in turn resulted in more fish being released and encountering release mortality.  (AR 1027).  In a December, 1998, regulatory amendment, the Council "noted that the release mortality for the recreational fishery is probably much higher than the 20 percent level currently being used in analyses."  (AR 1125).

**13.  Other Areas Where NMFS has Failed to Follow Procedural Requirements.**  First, given that NMFS acknowledges that the 16" limitation will cause further regulatory discard and mortality, the conclusion by the Secretary that "there will be no significant environmental impacts from the interim rule" is mere conjecture.  (AR 4399).  An environmental impact statement should have been prepared as required by law.  42 U.S.C. §4332(2).  The conclusion that NMFS is exempt is capricious because a 15" or smaller red snapper is clearly the majority size for fish caught (AR 264), and regulatory discard already is exceeding 60% of all fish caught.  (AR 2193).

Page 26

Second, NMFS' statement that all Gulf states agreed to an expedited schedule to approve the interim rule under the Coastal Zone Management Act is false, although NMFS conveniently omitted Texas' objection from the administrative record.  A true and correct copy of the objection of Mr. David Dewhurst dated December 23, 1999, is attached as Exhibit "2."  His original concerns are attached as Exhibit "1"  (AR 5533).

In conclusion, it is obvious that the challenged rule was ill-conceived and not consistent with the national standards for sound management practices of a depleted fishery.  It is respectfully requested this Court take note that this process had been rushed when it should have been deliberate.  This is made clear by the candid comments of NMFS personnel in an e-mail transmittal dated November 22, 1999:  "I doubt that the regulatory amendment will be ready before the end of the month.  There is a federal holiday this week which will 'gobble' up some time.  Also, we need to finish "stuffing" it with necessary rationale and supporting information so it doesn't end up being a 'turkey.'" (AR 4102).

WHEREFORE, PREMISES CONSIDERED, Plaintiffs request that their Motion for Summary Judgment be granted.

Respectfully submitted,

LES CASSIDY
1020 Bank of America Center North
500 North Water Street
Corpus Christi, Texas   78471
(361) 887-2965 office
(361) 887-6521 fax
State Bar Number 03979270
Federal Identification 5931

Page 27

**Of Counsel:**

**WOOLSEY & CASSIDY, P.C.**
**1020 Bank of America Center North**
**500 North Water Street**
**Corpus Christi, Texas  78471**
**(361) 887-2965 office**
**(361) 887-6521 fax**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was forwarded by fax and certified U.S. Mail March 20, 2000, to:

Heidi Kukis
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7369
Washington, D.C. 20044-7369

Robert G. Hayes
Ball Janik, LLP
1455 F. Street NW, Suite 225
Washington, D.C.  20005

_____
Les Cassidy



# Coastal Coordination Council

1700 N. Congress Avenue. Room 617 ♦ Austin. Texas 78701-1495 ♦ 512-463-5385 ♦ FAX 512-475-0680

December 10, 1999

**Chairman**

**David Dewhurst**
Texas Land Commissioner

•

**Members**

**Michael L. Williams**
Railroad Commission of Texas

**r. William H. Clayton**
Coastal Government
Representative

**John Barrett**
Agriculture Representative

**Bob Dunkin**
Coastal Resident Representative

**Jack Hunt**
Texas Water Development Board

**Robert J. Huston**
Texas Natural Resource
Conservation Commission

**Robert Nichols**
Texas Transportation Commission

**Elizabeth A. Nisbet**
Coastal Business Representative

**Waldo Smith**
Texas State Soil & Water
Conservation Board

**Mark E. Watson, Jr.**
Parks & Wildlife Commission
of Texas

•

**Janet Fatheree**
Secretary

**Lloyd Mullins**
Permitting Assistance Coordinator

Dr. William Hogarth
Regional Administrator
National Marine Fisheries Service
9721 Executive Center Drive North
St. Petersburg, Florida 33702

Re:     Proposed Rule for the Management of the Red Snapper
         Fishery

Dear Dr. Hogarth:

The Texas Coastal Coordination Council (Council) does
not agree that the adjusted management measures for the
recreational and commercial red snapper fisheries of the Gulf of
Mexico, proposed in a letter from the Gulf of Mexico Fishery
Management Council dated November 16, 1999, are consistent to
the maximum extent practicable with the Texas Coastal
Management Program. The Council's disagreement is based on
the following reasons:

• The proposed rules conflict with the Council's goal of ensuring
   sound management of all coastal resources by allowing for
   compatible economic development and multiple human uses of
   the coastal zone. 31 TAC §501.12(2). The red snapper fishery
   is Texas' primary offshore winter recreational fishery. Closing
   the red snapper recreational season from November 1st through
   April 15th will discourage winter visitors from coming to the
   Texas coast and will severely impact Texas' coastal
   economies. The red snapper fishery supports 200,000
   sportsfishing trips annually. This includes a private boat,
   charter boat, and headboat fishery with an economic benefit to
   Texas of approximately $100 million. Furthermore, the
   proposed rules impose additional economic burdens on the
   recreational and commercial red snapper fisheries while
   ignoring an illegal harvest that takes as many, if not more, red
   snapper than are allowed during the legal season. The chief of
   NMFS law enforcement for the Gulf of Mexico recently
   characterized the illegal harvesting and marketing of red
   snapper as "an organized conspiracy."

5532

**EXHIBIT "1"**

Dr. William Hogarth
December 10, 1999
Page two

- The proposed rules conflict with the Council's goal of making agency decisionmaking more effective by employing the most comprehensive, accurate, and reliable information and scientific data available. §501.12(8). The proposed rules ignore significant distinctions between the red snapper fishery in the Eastern and Western Gulf. The red snapper stocks off Texas are largely sedentary, and Texas' fishing conditions and fishing communities are unique in the Gulf. These unique facts warrant special regulations for the management of the Western Gulf red snapper. Our objection is also consistent with the national standard that fishery conservation and management measures shall be based upon the best scientific information available. 16 U.S.C. §1851(a)(2).

In addition, we interpret the proposed rules as conflicting with the following national fishery conservation and management standards:

- Conservation and management measures shall not discriminate between residents of different States. 16 U.S.C. §1851(a)(4). The proposed rules disadvantage Texas, where the red snapper is the primary offshore fish available to be caught during November through March, and advantage the states of the Eastern Gulf where other sportsfish are available during those months.
- Conservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches. §1851(a)(6). The management measures for the red snapper fishery do not acknowledge the higher release mortality of red snapper caught in the deeper waters of the Western Gulf. Evidence has shown that the actual release mortality for red snapper is at least twice that of the assumed mortality used in the current stock assessment model.
- Conservation and management measures shall take into account the importance of fishery resources to fishing communities in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities. §1851(a)(8). The proposed rules will not minimize the adverse economic impacts to Texas' coastal communities during the winter months.
- Conservation and management measures shall, to the extent practicable, promote the safety of human life at sea. §1851(a)(10). The proposed rules, by promoting commercial fishing "derbies" during the first ten days of each month, are contrary to promotion of the safety of human life at sea. These rules force commercial fishers to be at sea during the first ten days of each month regardless of sea or vessel conditions.

- 5533

Dr. William Hogarth
December 10, 1999
Page three

The Council is extremely concerned about the decline of this premium offshore
fishery, and it is not apparent that the current management measures will reverse the red
snapper's decline. Given the distinctive characteristics of the red snapper fishery in the
Western Gulf, it is appropriate that unique fishing regulations be developed for the red
snapper off Texas.

The Council looks forward to working with you on the restoration of the red snapper.
Please contact Andrew Neblett at 512/305-9477 or andrew.neblett@glo.state.tx.us if you have
any questions regarding this letter.

Sincerely,

David Dewhurst
Chairman

DD:jeb

cc:    Dr. Robert Shipp, Chairman, Gulf of Mexico Fishery Management Council
       Hal Osburn, Coastal Fisheries Division Director, Texas Parks and Wildlife Dept.
       Pete V. Aparicio, Texas Member, Gulf of Mexico Fishery Management Council
       Irby W. Basco, Texas Member, Gulf of Mexico Fishery Management Council

5534



# Coastal Coordination Council

P.O. Box 12873 ◆ Austin, Texas 78711-2873 ◆ (512) 463-5385 ◆ FAX (512) 475-0680

**Chairman**

**David Dewhurst**
Texas Land Commissioner

◆

**Members**

**Michael L. Williams**
Railroad Commission of Texas

**Dr. William H. Clayton**
Coastal Government
Representative

**John Barrett**
Agriculture Representative

**Bob Dunkin**
Coastal Business Representative

**Jack Hunt**
Texas Water Development Board

**Robert J. Huston**
Texas Natural Resource
Conservation Commission

**John Johnson**
Texas Transportation Commission

**Elizabeth A. Nisbet**
Coastal Resident Representative

**Waldo Smith**
Texas State Soil & Water
Conservation Board

**Mark E. Watson, Jr.**
Parks & Wildlife Commission
of Texas

◆

**Janet Fatheree**
Secretary

**Lloyd Mullins**
Permitting Assistance Coordinator
1-888-3-PERMIT

Dr. William T. Hogarth
Regional Administrator
Southeast Regional Office
National Marine Fisheries Service
9721 Executive Center Drive N.
St. Petersburg, FL 33702

Dear Dr. Hogarth:

Thank you for the National Marine Fisheries Service's (NMFS's) prompt response on December 14, 1999, to the Coastal Coordination Council's (Council's) finding that the adjusted management measures for the recreational and commercial red snapper fisheries of the Gulf of Mexico recently proposed by the Gulf of Mexico Fishery Management Council (Gulf Council) are not consistent with the Texas Coastal Management Program (Texas CMP).

However, NMFS's December 14 letter does not clearly describe how the proposed management measures are consistent to the maximum extent practicable with the Texas CMP. In particular, the Council disagrees with NMFS's determination that the proposed management measures are consistent with Texas's goal of "ensuring sound management of all coastal resources by allowing for compatible economic development." 31 TAC §501.12(2). While November through April is not the primary season for the red snapper fishery in the Gulf, Texas' headboat fleet comprises the greatest proportion of the Gulf red snapper winter fishery. Thus, the six-month closed season disproportionately affects Texas fishers and the Texas economy.

In addition, the response does not explain how the data used to make the decisions on the proposed management measures are the "most comprehensive, accurate, and reliable information and scientific data available." 31 TAC §501.12(8). The data and the mathematical models used by the Gulf Council are too imprecise to justify restrictive management measures that have enormous impact on Gulf fishing communities. For example:

**EXHIBIT "2"**

Case 2:00-cv-00028   Document 28   Filed in TXSD on 03/20/2000   Page 33 of 33

Dr. William T. Hogarth
December 23, 1999
Page 2

- The projection of maximum sustained yield at recovery calculated by the model is 120 to 550 percent of the greatest historical harvest.

- A study recently completed by the Gulf States Marine Fisheries Commission estimates that the charter fishing effort is 24 percent less than the five-year average in NMFS's national angling survey.

- Another study has found that the release mortality for red snapper caught in the deep waters off Texas is 44 percent, twice the assumed mortality used in the model.

- The management decisions have consistently failed to take into account the substantial illegal red snapper harvest and failed to include as a viable management measure the control of these illegal activities.

In addition, although the Council cooperated with NMFS's request for expedited review of the proposed management measures, the Council did not intend to waive the statutorily required 90-day period under the Coastal Zone Management Act and the Texas CMP rules from the issuance of the consistency determination to the final federal action. 16 U.S.C. §1456(c)(1)(C); 31 TAC §506.20(a). Consequently, on behalf of the Council, I request that the NMFS suspend the interim implementation of the proposed management measures on January 1, 2000, and allow the full 90 days to run before implementing the proposed management measures. This 90-day period will provide an opportunity for the Council and NMFS to meet and discuss these issues.

I know that NMFS and the Council both desire a healthy and productive red snapper fishery. However, restoration of the red snapper fishery will require management measures that are based on the best scientific data and that adequately reflect conditions in all portions of the Gulf of Mexico. Texas is willing to work with NMFS and the Gulf Council to establish specific management measures that meet the needs of the red snapper fishery and of Texas. I look forward to your response and to discussing these issues with you.

Sincerely,

David Dewhurst
Chairman

DD:sd

cc:   The Honorable Kay Bailey Hutchison, U.S. Senator