**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

United States District Court
Southern District of Texas
FILED

APR 2 8 2000

MICHAEL N. MILBY CLERK

| | | |
|---|---|---|
| GAMFW, *et al* | ) | |
| | ) | |
| | ) | |
| v. | ) | C.A. NO. C-00-028 |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| *et al.* | ) | |

**DEFENDANT-INTERVENOR'S MEMORANDUM IN RESPONSE TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT
OF DEFENDANT-INTERVENOR'S MOTION FOR SUMMARY JUDGMENT**

Defendant-Intervenor Coastal Conservation Association (CCA) submits this

memorandum in response to plaintiff's motion for summary judgment and in support of its

motion for summary judgment.  Citations to the Administrative Record are referenced as "AR

vol. __, p. ____".  This memorandum is organized as follows:

1.  Description of the Challenged Interim Rule

2.  Summary of the Plaintiffs' Complaint

3.  Aspects of the Red Snapper Regulations Which Are Not in Dispute

4.  Statutory Basis for the Red Snapper Regulations

5.  Role of the Gulf of Mexico Fishery Management Council

6.  Role of the Secretary of Commerce and his Delegates

7.  Recent History of the Changes to the Red Snapper Regulations

8.  Process Leading to the Promulgation of the Interim Rule

9.  Applicable Law

10. The Challenged Regulation Meets the Requirements of Applicable Law

1. Description of the Challenged Interim Rule

On December 20, 1999, the Defendant National Marine Fisheries Service (NMFS) promulgated an interim rule to modify, for a time certain, the permanent Federal regulations that govern the commercial and recreational fisheries for red snapper in that portion of the U.S. exclusive economic zone (EEZ) which lies within the Gulf of Mexico. 64 Fed. Reg. 71056-71057. AR. vol. 18, pp. 8876-8877.

The regulations promulgated on December 20, 1999: (a) delayed the opening of the year 2000 recreational fishing season from January 1 to April 21 and specified a closing date of October 31; (b) raised the minimum size for red snapper from 15 to 16 inches in the recreational sector, (c) reinstated a four fish bag limit for the captain and crew of recreational "for hire" vessels; and, (d) shortened the open seasons for the commercial sector.

2. Summary of the Plaintiffs' Complaint

Plaintiffs have filed a challenge to the interim rule. Plaintiffs seek an order from this Court declaring the interim rule unlawful. This challenge is relatively narrow considering the broad scope of regulations in the red snapper fishery. A successful challenge would require NMFS to cancel the increase in the red snapper minimum size, and to prohibit the captain and each crewmember of "for hire" recreational vessels from retaining the same number of fish as each of their passengers may retain. Such an order would also extend the open seasons for the commercial sector.

3. Aspects of the Red Snapper Regulations which are not in Dispute

2

The Plaintiffs do not challenge those features of the permanent red snapper regulations that remain in force.  In CCA's view, Plaintiffs would be time-barred to challenge, and this Court would lack jurisdiction to review, the permanent regulations, which were not modified by the interim regulations.  16 U.S.C. 1855(f).  See Kramer v. Mosbacher, 878 F.2d 134 (4th Cir. 1989) and Texas Shrimp Association v. Daley, Civ.No.4:00CV20-RH (N.D, Fla. Decided April 12, 2000) (Attachment 1).

Thus, assuming *arguendo* that Plaintiffs were completely successful in this litigation, the following permanent regulatory requirements would still apply:  (a) the annual red snapper total allowable catch (TAC) would be 9.12 million pounds; (b) the recreational sector share of that TAC would be 49% or 4.47 million pounds; (c) the recreational and commercial minimum size limits would both be 15 inches; (d) the captain and crew of recreational "for hire" vessels would be prohibited from retaining any red snapper at all; (e) the recreational season would begin on January 1 and would be closed whenever the recreational TAC had been harvested; and, (f) the available fishing seasons for the commercial sectors would be 15 days a month instead of 10 days a month.

There appears to be no disagreement between Plaintiffs and CCA that a primary objective of the red snapper regulations – to restrict the recreational harvest to 4.47 million pounds during calendar year 2000 – can only be achieved by a combination of minimum size bag limit, and seasonal restrictions.  The Plantiffs seek a smaller minimum size and an earlier season opening date than the Federal defendants have provided.  The Plaintiffs also seek to prevent the "for hire" vessels from landing the same number of fish as any other recreational vessel having the same number of persons on board.  Defendant –Intervenor CCA supports the interim regulations in

3

their entirety as the product of lawful deliberative processes undertaken by the appropriate

Federal fishery conservation authorities.

### 4. The Statutory Basis for the Red Snapper Regulations

The challenged rules are the most recent in a long series of regulatory measures that have

been adopted by the Secretary, acting through NMFS, in order to implement Congressional

policies and directives contained in the Magnuson-Stevens Fishery Conservation and

Management Act, 16 U.S.C. 1801 *et seq.,* hereinafter referred to as either the Magnuson-Stevens

Act or, in its original version, as the FCMA. Those Congressional policies and directives govern

all foreign and domestic fishing within the United States EEZ. 16 U.S.C. 1811(a).

The EEZ is the successor to the Fishery Conservation Zone established by the FCMA

which was later renamed after its primary sponsors Senators Warren G. Magnuson and Ted

Stevens. While the outer boundary of the EEZ extends 200 nautical miles from the coast, the

inner boundary "is a line coterminous with the seaward boundary of each of the coastal States."

16 U.S.C. 1802(11). We ask this Court to take judicial notice of the fact that all U.S. coastal

states have seaward boundaries of three nautical miles except for Texas and Florida, whose

seaward boundaries in the Gulf of Mexico extend three marine leagues, or nine nautical miles

from the coastline. This means that much of the Gulf water may be available to Texas fishermen

for the entire year regardless of the outcome of this litigation.

### 5. The Role of the Gulf Council

The Magnuson-Stevens Act established the Gulf of Mexico Fishery Management Council

(Gulf Council), 16 U.S.C. 1852(a)(1)(E), and directed that body to develop fishery management

4

plans and recommend regulations as necessary to conserve and manage the fishery resources of the Gulf EEZ. 16 U.S.C. 1852(h).

The Gulf Council is composed of four types of members: (1) there are eleven private citizens, including two from the State of Texas, who were appointed by the Secretary from lists of qualified individuals nominated by the State Governors; (2) there are five State officials who were designated by their Governors as having primary responsibility for marine fishery conservation and management programs in the State waters adjacent to the EEZ; (3) there is one voting Federal official, the Regional Administrator of the National Marine Fisheries Service, who is a subordinate of the Secretary; and, (4) there are three non-voting Federal officials who represent the Coast Guard, the State Department and the U.S. Fish and Wildlife Service. See generally, 16 U.S.C. 1852(b) and (c).

An up to date list of all members and staff of the Gulf Council is published on the Internet at the following address: http://www.gulfcouncil.org (Attachment 2). As indicated thereon, the Texas representatives include: Pete Aparicio of Victoria, Texas, representing the commercial fishing industry; Irby W. Basco of Nederland, Texas, representing recreational fishing interests, and Hal Osborn (or his designee Robin Reichers) of Austin, Texas, representing the Texas Parks and Wildlife Department.

The Magnuson-Stevens Act directs the Gulf Council to appoint advisory panels and scientific and statistical committees to assist the Council in developing its fishery management plans and proposed regulations to implement them. 16 U.S.C. 1852(g). The Council is required to conduct open meetings and public hearings in the course of its work. 16 U.S.C. 1852(h) and (i). The Council must submit each of its fishery management plans and proposed regulations to the Secretary for review and approval according to timetables specified by law. 16 U.S.C.

1854(a)(3).  Under the Magnuson-Stevens Act, the Council must submit its fishery management

plans to the Secretary for review and approval.  16 U.S.C. 1854(a).  The Council may also

request that the Secretary promulgate regulations in response to emergency situations or to

reduce overfishing.  16 U.S.C. 1855(c).

As reflected amply by the legislative history of the FCMA, the Gulf Council is charged

with establishing the Federal policies for conservation and management of the fisheries within

the Gulf of Mexico EEZ, subject to the requirement that those policies must be found lawful

upon review by the Secretary of Commerce and, if necessary, by the Federal courts.  In the

words of the FCMA's sponsor, the late Senator Magnuson:

> "This bill creates semi-independent regional fishery management councils to draw
> up management plans and to recommend regulation for the management of
> fisheries within their regions. . . For the most part, primary management decisions
> would be lodged in the regional council. . . The councils themselves would be
> made up of representatives of the various States.  As is evident, we have
> attempted to balance the national perspective with that of the individual States.
> We firmly believe that this institutional arrangement is the best hope we can have
> of obtaining fishery management decisions which in fact protect the fish and
> which, at the same time, have the support of the fishermen who are regulated."

Reprinted from *A Legislative History of the Fishery Conservation and Management Act,* United

States Senate Committee on Commerce, U.S. Government Printing Office, Washington, D.C.

1976, at 454-455.

6.  <u>Role of the Secretary</u>

The Secretary of Commerce has an oversight role to review the Gulf Council's plans for

legal sufficiency.  If the policies contained in a Council's plans meet the procedural requirements

and the substantive standards contained in the Magnuson-Stevens Act, and if they comply with

all other applicable Federal laws, the Secretary is directed to approve the plans and issue final

6

regulations to carry them out.  16 U.S.C. 1854(b).  In general, although the Magnuson-Stevens

Act charges the Gulf Council with selecting the appropriate Federal policies for conservation and

management of the Gulf EEZ, the Act charges the Secretary and his subordinates at NMFS with

ensuring that the Council's policies and policy-making procedures comport with the statutory

requirements.  In the words of Senator Stevens:

> "They [the Council] recommend regulations.  They become Federal regulations
> by virtue of approval by the Secretary and promulgation by him so they will then
> be enforceable by the Federal Government rather than by the State governments. .
> . So in the normal sense, the Council would make the proposals.  The Secretary
> would review them to see if they are consistent with the criteria that are set forth
> in the bill, and, if they are, he then promulgates them".

*Legislative History, supra* at pp. 492-493.

### 7.  The Recent History of the Red Snapper Regulations

The entire history of Federal regulation of the red snapper fishery in the Gulf of Mexico

is quite lengthy, extending many years prior to the documents which are contained in the

Administrative Record.  The Gulf Council prepared a useful summary of that history in 1997

during its deliberations on Amendment 16 to the Reef Fish Management Plan.  AR vol. 2, pp.

0846-0853.  In the interest of brevity, CCA merely notes that one of the very early decisions of

the Council, approved by the Secretary, divided the annual total allowable catch of red snapper

between the two sectors of the fishery at 51% commercial and 49% recreational.  That division

remains unchanged and whether it was an appropriate policy is not raised in this lawsuit.

For several years, although the recreational fishery was subject to minimum sizes and bag

limits, there were no seasonal restrictions.  Year after year, however, the recreational sector

harvested more than the quantity of fish that represented its 49% of the total allowable catch. AR vol. 1, p. 0027. AR vol. 2, p. 0852.

In 1996, as part of the Sustainable Fisheries Act, Pub. L. 104-297, Congress directed the Council and the Secretary to ensure that the recreational sector and the commercial sector each stayed within its allocated share; this provision is codified at 16 U.S.C. 1883(d). This change in the law required NMFS to close the fishery when the recreational quota was attained. The change in the law has had the effect of closing the season earlier and earlier each year. The 1997 season closed on November 27. AR vol. 4, p. 1901. The 1998 season closed on September 30. AR vol. 1, p. 0058. And, the 1999 season closed on August 29. AR vol. 1, p. 0070.

Over the same three-year period, the Council and NMFS also made certain adjustments to the minimum sizes and bag limits. On December 31, 1998, the recreational bag limit was reduced from five fish to four. AR vol. 1, p. 0062. On June 8, 1999, the recreational minimum size limit was temporarily raised from 15 inches to 18 inches to avoid an early closure of the season. AR Vol. 1, p. 0071. On September 1, 1999, the bag limit for captain and crew of "for hire" vessels was reduced from four fish to zero. AR Vol.1, p. 0069.

The Administrative Record, which contains many proposed rules, final rules, emergency rules and interim rules, and accompanying analytical documents prepared by the Council and NMFS, speaks volumes as to the difficulties the Council and the agency were having in trying to match the desires of the various recreational fishing constituencies with the inexorable mandate of the Sustainable Fisheries Act that the fishery not be allowed to exceed its share of the TAC. Until promulgation of the interim rule challenged in this litigation, the Council and NMFS found themselves frequently in disagreement.

In 1994, the Council first proposed to set a zero bag limit for the captain and crew of recreational "for hire" vessels. AR vol. 1, p. 0026. NMFS did not agree. NMFS found "little justification or rationale for the measure" and determined that it was not "consistent with national standard 4 of the Magnuson Act that requires management measures with allocation effects to be fair and equitable." AR vol. 1, p. 0032. In 1998, the Council again proposed to set the bag limit for captain and crew at zero. AR vol. 1, p. 0053. Again, NMFS did not agree. This time NMFS noted the controversiality of the measure and determined not to impose the zero bag limit by emergency rule. AR vol. 1, p. 0061. In 1998 and 1999, the Council proposed to delay the start of the recreational season from January 1 to March 1, and to reduce the minimum size from 15 inches to 14 inches, but NMFS also disagreed with these recommendations. The agency noted that the number of fishing trips lost with the delayed opening would not be made up by trips gained at the end of the season and that the measure would place an unfair burden on the Texas "for hire" sector. AR vol. 1, pp. 0061, 0064-0066, and 0067-0069. These regulatory changes were very disruptive to the recreational fishery. Some effort to fix the season was necessary to provide certainty in the fishery. See generally comments at AR vol. 6, pp. 3040-3076.

8. Process Leading to the Promulgation of the Interim Rule

In July 1999, Bill Hogarth, who had recently been appointed Southeast Regional Administrator of NMFS, requested Brad Brown, the Director of the regional NMFS Science Center, to analyze a number of options that Mr. Hogarth intended to present to the Gulf Council for its consideration. After the dramatic 1999 season, which had produced an unprecedented three-inch increase in the minimum size and the shortest recreational season on record, Mr. Hogarth was seeking to provide the Council with several combinations of controls on fishing

9

effort that would allow the red snapper regulations to remain stable for the next three years. AR vol. 11, p. 5854. On August 19, 1999, Mr. Hogarth forwarded a list of scientifically supportable options to the Council for its deliberations. AR vol. 11, p. 4858. As is evident from the documents themselves, Mr. Hogarth and the NMFS scientists believed that the Council could not have a year-round recreational season unless it also chose to have a very large minimum size and a very small bag limit. For that reason, Mr. Hogarth's list of options presented various shorter recreational seasons that would allow the fishery to operate under similar bag and size limits to those that had prevailed prior to 1999.

At approximately the same time, Mr. Hogarth asked representatives of various groups that had been actively involved in red snapper management issues to form a "stakeholders" group to consider options similar to those that he had presented to the Gulf Council. AR vol. 12, pp. 5230-5234. Included in the stakeholders group were representatives from environmental conservation groups, commercial red snapper fishermen, private recreational fishermen, and representatives of the charterboat and headboat fleet (the "for hire" sector). One of the original plaintiffs in the current litigation, the Recreational Fishing Alliance, was one of the organizers of the stakeholders group. AR. vol. 12, p.5231.

The stakeholders group met once in New Orleans on September 27, 1999, and a smaller subgroup met in Biloxi on October 20, 1999. According to the executive summary, the recreational stakeholders recommended: (a) a four-fish bag limit for each angler including the captain and crew; (b) a minimum size limit no larger than 16 inches; (c) a season beginning on March 1 and ending on October 31; and, (d) regulatory stability for three years. AR vol. 12, pp. 5232-5233. A minority report supporting a year-round season was filed by a stakeholder representing recreational interests in Aransas Pass, Texas. AR vol. 12, p. 5235. This report

10

clearly shows that the Texas charter boat group wanted a year-round fishery with a 13" minimum size and a 4 fish bag limit. It also shows that they knew in order to achieve their goal, the Council had to increase the TAC to 12 million pounds. The commercial and environmental groups also made other recommendations for management of the recreational sector. AR vol. 12, pp. 5233-5234.

The Gulf Council met the week of November 8 to 12, 1999, in Orlando, Florida, to develop recommendations for the red snapper fishery in year 2000. The Council was faced with several competing considerations. The Magnuson Stevens Act requires NMFS to close the recreational fishery when the quota is met. The recreation catch had grown by 110% from 1986 to 1997 and the recreational sector had exceeded its quota every year from 1991 to 1998 (except 1996). AR vol. 6, p 2985. The status quo would open the fishery in January and allow a derby until the quota was caught. This advantaged the "for hire" sector in Texas but substantially disadvantaged the private recreational anglers and the "for hire" sector in the rest of the Gulf. Further, the lack of a specific season made compatible regulation by the states, difficult. AR vol. 12, p 5223.

The Council's Reef Fish Management Committee met first and the complete minutes of the meeting are included in both draft and final forms in the Administrative Record. AR vol. 6, pp. 2954-2969. A review of these documents shows the Council was deliberating two issues involved with red snapper. The first was the TAC for 2000, which they left at 9.12 million pounds. Having made that decision, they turned to how the directed red snapper fishery would be conducted in 2000. The decision about the recreational fishery is the subject of this suit.

NMFS confirmed, and supplemented, the information it had presented to the stakeholders group. A year-round red snapper fishing season would require a 17 inch minimum size and a two fish bag limit. If the fishing season was shortened to April 15 to October 31, the minimum fish size could be lowered to 16 inches and the bag limit could be raised to 4 fish, except for the captain and crew of "for hire" vessels. If the captain and crew were allowed to retain 4 fish apiece, they would account for approximately 140,000 pounds of additional catch; and for that reason, the season would have to be shortened by 4 to 10 days depending upon the time of the year in which the season would be shortened. If the Council decided to allow limited winter fishing, but only on the weekends, the summer season would have to be shortened to May 15 until October 15. AR. vol. 6, p. 2966.

The Committee then voted upon several motions that contained its final recommendations to the full Council. By unanimous vote, the Committee recommended a four fish bag limit, a 16-inch minimum size, and an open season beginning on April 15 and ending on October 31. Myron Fischer, a Council member, but not a Committee member, suggested that it was unfair to single out charter vessel captains and crew while allowing the captain and crew of other vessels to catch their bag limits. By a vote of four to two, the Committee recommended reinstating the four fish bag limit for the captain and crew. AR vol. 6, p. 2968.

The Council took public testimony on the Reef Fish Management Committee's recommendations on November 10, 1999. Council Member Vernon Minton made the first presentation summarizing the recommendations, including no change to the red snapper TAC, a 4-fish bag limit, a 16-inch minimum size, and a recreational season from April 15 to October 31. Ted Forsgren, a CCA representative, supported those recommendations. He also noted that CCA

had no position on whether the captain and crew should have a bag limit. AR vol. 6, pp. 3043-3044.

John Williams, Santa Fe, Texas, representing the "for hire" sector supported a year-round fishery, a lower minimum size, and a modification to the bag limit to require the first four legal sized fish to be retained. Mr. Williams opposed reinstating the bag limit for captains and crew because it would reduce the available fishing time. AR. vol. 6, pp. 3045-3046. Ed Schroeder, Dickinson, Texas, also representing the "for hire" sector, supported a year-round season, a 4-fish bag limit, and a 13-inch minimum size. However, he also supported reinstating the bag limit for captain and crew. AR. vol. 6, pp. 3046-3047. Mike Nugent, Aransas Pass, Texas, representing the "for hire" sector, supported a year-round fishery, a 13-inch minimum size, and a first four fish bag limit. He took no position on whether captain and crew should be included. Although he did not support delaying the start of the season until April 15, he thought having a fall fishery was more important than having a winter fishery. AR vol. 6, pp. 3050-3052.

Bob Zales II, Panama City, Florida, chairman of the Council's Reef Fish Advisory Committee and a representative of the "for hire" sector, supported the 4-fish bag limit, a 16-inch minimum size limit, and the April 15 to October 31 open season. He would have preferred a year-round season with a first four fish bag limit instead of a minimum size; and he questioned the science supporting the shorter seasons; but he also supported the recommendations of the stakeholders meeting, including reinstatement of the captain and crew bag limit. AR vol. 6, pp. 3052-3054. Ed Thompson, Palm Harbor, Florida, strongly supported reinstating the captain and crew bag limit since without it, they could not bring fish home and eat it. AR. vol. 6, p. 3062.

After taking public testimony, the full Council took up the report from its Reef Fish Management Committee. After some discussion related to the Committee's recommendations for a 15-inch minimum size for the commercial fishery and a 16-inch minimum size for the recreational fishery, and the enforcement problems that might result from different size limits, the Council considered adopting a 15-inch size limit for the recreational fishery, together with a four fish bag limit and an April 15 to October 31 season. Several Council members opposed the motion.

Roy Williams, Florida Marine Fisheries Commission, opposed the motion because the recreational sector had requested the 16-inch size limit so as to extend the fishing season until October 31. Vernon Minton, the Director of Alabama's Marine Resources Division, opposed the lower minimum size because he thought a longer season was more important to the recreational sector. Bill Hogarth, the NMFS Regional Administrator, supported the Williams and Minton comments and added that consistency with State minimum sizes was also important. Florida had already set its minimum size limit at 16 inches. AR vol. 6, pp. 3509-3510. The motion to set the minimum size at 15 inches failed by a vote of 14 to 3. Two Council members from Texas, Irby Basco and Hal Osburn, opposed the motion; the other Texas Council member, Pete Aparicio, supported it. AR vol. 6, p. 3074-3076.

The Council moved to adopt a 16-inch minimum size, a four fish bag limit and a season from April 15 to October 31. This motion carried by a vote of 13 to 4, with Texas Council members Aparicio and Osburn opposing the motion and Texas member Basco supporting it. AR vol. 6, p. 3076.

Hal Osburn, Texas Parks and Wildlife, then offered a motion to establish a separate area west of the Texas-Louisiana boundary in which there would be a 13-inch minimum size, a four fish bag limit, a requirement to keep the first four legal-sized fish, and a year-round season. Roy Williams, Florida Marine Fisheries Commission, believed that adoption of this proposal might require a 17-inch minimum size and a one fish bag limit in the rest of the Gulf of Mexico unless the season could be closed earlier than November 1. NMFS Regional Administrator Hogarth also opposed the motion. Mr. Osburn's motion was defeated on a vote of 13 to 4. AR vol. 6, pp. 3078-3079.

Vernon Minton, Alabama Marine Fisheries Division, on behalf of the Council's Reef Fish Management Committee, moved to reinstate the four fish bag limit for the captain and crew of "for hire" recreational vessels. Mr. Minton reported that the charter sector felt depriving the captain and crew of a bag limit was unfair and the Coast Guard concluded it was a prohibition, which was difficult to enforce. The motion carried by a vote of 14 to 2. AR vol.6, p. 3080.

After the Council had considered a number of other issues not pertinent to this litigation, Pete Aparicio, the Texas commercial representative on the Council, questioned whether other regulatory actions necessary to comply with the Sustainable Fishery Act might affect the red snapper fishery. NMFS advised that there might need to be a reduction in the red snapper total allowable catch unless other measures were adopted to compensate. Vernon Minton then moved the Council to request NMFS to issue an interim rule containing the 16-inch minimum size limit, a four fish bag limit including the captain and crew, and a recreational season running from April 15 to October 31. The request also authorized the Regional Administrator to adjust the season as necessary to allow the captain and crew to be included in the bag limit. This motion carried by a vote of 14 to 2. The commercial and recreational Council members from Texas, Aparicio and

Basco, both supported the request for the interim rule and the State's principal fishery official, Osburn, opposed it. AR vol. 6, pp. 3095-3096.

On November 16, 1999, the Council transmitted its request for an interim rule to NMFS. AR vol. 12, pp. 5213-5215. The NMFS staff began preparing the rule together with all of the other documents required to verify compliance with other applicable Federal law. Volumes 6 through 12 of the Administrative Record contain numerous drafts, email messages, written comments, and other internal correspondence concerning these efforts.

Volumes 12 through 18 of the Administrative Record contain copies of the many unsolicited letters received by NMFS regarding the Council's request for an interim rule; 96 per cent of the letters support the interim rule and 4 per cent oppose it. AR. vol.18, p. 8359.

As required by the National Environmental Policy Act, NMFS prepared an environmental assessment. AR vol.12, pp. 5419-5453. As required by the Endangered Species Act, NMFS prepared a biological opinion. AR vol.12, pp. 5327-5332. As required by the Coastal Zone Management Act, NMFS prepared statements of consistency. AR vol.12, pp. 5316-5325. NMFS received expedited confirmation of consistency from Florida, Alabama, Mississippi, and Louisiana. AR vol.12, pp. 5524-5531.

The State of Texas objected to the NMFS consistency determination. AR vol.12, pp. 5376-5378. NMFS provided a further explanation as to why the interim measure was consistent to the maximum extent practicable with the Texas program. AR vol. 12, pp. 5372-5375.

As required by Executive Order 12866, NMFS submitted its regulations to the Office of Management and Budget. AR vol.12, pp. 5291-5304, 5333. When that office questioned why

NMFS was planning to allow captains and crew of "for hire" vessels to retain red snapper, but not mackerel. AR vol. 9, p. 4347. NMFS provided an explanation of the fact that recreationally caught red snapper could not lawfully be sold, but recreationally caught mackerel could be sold. AR. vol. 9, p. 4530-4531.

As required by the Magnuson-Stevens Act and the Administrative Procedure Act, NMFS published the interim rule in the Federal Register. AR vol. 18, pp. 8876-8880. On December 17, 1999, NMFS also notified the Gulf Council that it had fulfilled the Council's request for the interim rule. AR vol. 12, p. 5541.

9. Applicable Law

Under the Magnuson-Stevens Act, regulations are subject to the same "arbitrary and capricious" standard of review as applies to challenges to agency action brought under the Administrative Procedure Act, 16 U.S.C. 1855(f) (incorporating by reference 5 U.S.C. 706(2) (A)-(D)); United States v. F/V Alice Amanda, 987 F.2d 1078, 1085(4th Cir. 1993). In general the scope of judicial review is limited to the administrative record before the Court and relied on by the agency; Florida Power & Light Co. v. Lorion, 470 U.S. 729, 743-44 (1985). The Court may not declare a Magnuson-Stevens Act regulation invalid unless it finds the regulation to be arbitrary and capricious or otherwise not in accordance with the law; Alaska Factory Trawler Assn. v. Baldridge, 831 F.2d 1456, 1460 (9th Cir. 1987).

Under the APA standard, the Court's only function is to determine whether the Secretary "has considered the relevant factors and articulated a rational connection between the facts found and the choice made"; Washington Crab Producers Inc. v. Mosbacher, 924 F.2d 1438, 1441 (9th Cir. 1990)(citing Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, 462 U.S. 87,

105 (1983)). The Court's role is to ensure that the agency's decision is rational, but may not substitute its own judgment for that of the agency. Sea Watch International v. Mosbacher, 762 F. Supp. 370, 378 (D.D.C. 1991); Alliance Against IFQs v. Brown, 84 F3d. 343, 345 (9th Cir. 1996). See also Lindel Fair v. United States, Case No. C-93-022, (S.D. Texas, Corpus Christi Div. 1995) (Attachment 3). The Court's only function is to determine whether the Secretary has considered the relevant factors and articulated a rational connection between the facts found and the choices made. Alliance Against IFQs, at 345.

Activities of the Council are not, per se, subject to judicial review because those policies can only be given effect by the intervening action of the Secretary through promulgation of Federal regulations. Even the Secretary's decision to approve a Council's fishery management plans is not, standing alone, subject to judicial review until it is implemented by Federal regulation. Washington Trollers Assn. v. Kreps, 466 F. Supp 309 (W.D., Wash. 1979) *reversed on other grounds,* 645 F.2d 684 (9th Cir. 1981). Indeed, even if a Council departs from required procedures: "If the Secretary has followed the appropriate rulemaking procedures and has established a rational basis for his action in promulgating regulations . . . procedural challenges for irregularities at the Council level will not provide a justification for invalidating the regulations." Alaska Factory Trawlers, at 1464. See also, Louisiana v. Baldridge, 538 F.Supp. 625, 630 n. 1 (E.D. La. 1982)"

"Because the APA standard affords great deference to agency decision making and because the Secretary's action is presumed valid, judicial review, even at the summary judgment stage is narrow". Associated Fisheries of Maine, Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1996). The Court is "to defer to the agency's interpretation of equivocal evidence, so long as it is reasonable'. Central Arizona Water Conservation Dist. v. U.S. EPA, 990 F.2d 1531, 1539 (9[th]

Cir.) *cert. denied*, 510 U.S. 828 (1993). Consequently, this Court is required "only to determine whether the Secretary's decision to promulgate the interim fishery regulation was consonant with his statutory powers, reasoned, and supported by substantial evidence in the record. Associated Fisheries, 127 F.3d at 109. The same standards for judicial review apply when the Secretary promulgates rules to address emergency situations. Trawler Diane Marie, 918 F.Supp. 925 (E.D.N.C. 1995).

The Secretary of Commerce's decision not to file an Environmental Impact Statement (EIS) for a Magnuson-Stevens Act regulation will be upheld if reasonable. Alaska Factory Trawlers; 831 F.2d at 1465 (citing Foundation for North American Wild Sheep v. Department of Agriculture, 681 F.2d 1172, 1177 (9th Cir. 1982)). An EIS must be prepared "when substantial questions are raised as to whether a project may cause significant degradation of the environment". Alaska Factory Trawlers, 831 F.2d at 1465 (citing Friends of Endangered Species, Inc. v. Jantzen, 760 F.2d 976, 1465 (9th Cir. 1985)}.

Fishery management regulations may be used to allocate fishery resources from one group of fishermen to another so long as the regulations: (1) do not discriminate between residents of different States; (2) are fair and equitable to all such fishermen; (3) are reasonably calculated to promote conservation; and (4) do not provide particular entities with an excessive share of the fishing privileges. 16 U.S.C. 1851(a)(4). "Inherent in an allocation is the advantaging of one group to the detriment of another." Sea Watch International; 762 F.2d. 370, 378.

While judicial review is now available to ensure that regulatory agencies comply with the Regulatory Flexibility Act (RFA), 5 U.S.C. 601 *et seq.*, the RFA does not apply unless the

agency is required to issue a notice of proposed rulemaking followed by a final rulemaking.  5

U.S.C. 601(2), 603, 604.  In other words, the RFA does not apply to emergency or interim rules.

Under the Coastal Zone Management Act (CZMA), Federal agencies are required to

conduct their activities "to the maximum extent practicable" with approved State management

programs.  16 U.S.C. 1456(c)(1).  By its terms, the CZMA does not authorize the Secretary to

violate other provisions of Federal law, such as the Magnuson-Stevens Act.

10.    The Challenged Regulation Meets the Requirements of Applicable Law

a)  The Secretary has broad discretion in managing the directed red snapper fishery.  The

climate in which the 2000-year regulations were being developed was one in which the

recreational sector was not happy with how the fishery was being managed.  Despite

attempts to lengthen the 1999 season, it had been closed with little notice on August 27

making it the shortest season in history.  After consulting with his scientists, the new

Regional Administrator of NMFS decided to bring representatives of those interested in

or affected by the red snapper regulations (including the plantiffs) together to consider a

range of options for regulation that would provide a longer and more defined the red

snapper fishing season.  The same list of options was provided to the Gulf Council.  The

regulatory options recommended by the stakeholders group were then considered by the

Council's Reef Fish Management Committee and by the Council itself.  The Council then

recommended that NMFS issue an interim rule that closely followed the

recommendations it had received from both the stakeholders group and its own

management committee.  The processes that produced the Council recommendation were

completely open and above board.  Persons in favor of the recommendation and persons

20

opposed to it had the opportunity to address the Council during its November meeting and to present additional information and policy recommendations. The Record is replete with rational for each of the measures selected.

b) The use of the interim rule is appropriate. The Magnuson-Stevens Act specifically authorizes the Secretary to issue interim rules, with or without the approval of the Council. 16 U.S.C. 1855(e)(i). The Secretary may use interim rules where he determines they are "so needed to reduce overfishing for any fishery." 16 U.S.C. 1855(e) The fishery in this instance is defined to include all species listed in 50 CFR part 622, Appendix A for all areas of the EEZ in the Gulf of Mexico and all adjoining state waters. 50 CFR 622.1(b). The state of Texas and others had indicated that they intended to leave state waters open unless the Federal regulations were adjusted to provide certainty in the recreational season. Such an event had occurred in 1999. A 2000 season that was unacceptable to a majority of the Gulf states and the recreational fishing public was likely to have the same results. Faced with the clear statutory mandate to ensure that the recreational fishery did not exceed its quota and a requirement to prevent overfishing, including in state waters, the Secretary honored the request of the Gulf Council and published an interim rule that was broadly, if not uniformly, supported by the regulated public and the impacted states. By doing so, the Secretary met the threshold requirement for the use of an interim rule by preventing overfishing.

c) The "reversal" of the September 9 decision was not arbitrary. The framework regulatory process followed in the summer of 1999 coupled with the early closure of the fishery in August caused considerable debate and concern within the fishing public. The debate generated the stakeholders meeting in which the concerns of the Texas "for hire" industry

were clearly heard. They, like all other stakeholders, were asking the Council and the NMFS to change the September regulations. AR vol. 12, pp. 5230-5234. The record does not include the volumes of comments received in stakeholders' process. The overwhelming majority of those comments did not support the status quo as represented by the September regulation. The failure of NMFS to act on the new information it had regarding the state and the regulated public's views of the September regulation would have been arbitrary and capricious. Its decision to respond was not.

d) There is adequate information in the record to justify the authorization of a bag limit for the captain and the crew. The rationale for this proposal as expressed by Vernon Minton appears to be three-fold. First, some segments of the "for hire" industry felt failure to give the captain and the crew a bag limit was unfair. AR vol. 6, p. 3080. Second, the Coast Guard concluded that no captain and crew bag limit would be difficult to enforce because not all for hire vessels operated solely in that mode. Lastly, allowing the bag limit produced only a six-day reduction in the season. AR vol. 6, p. 3080. This may not be a policy choice CCA would have made, however, the Secretary having made it does have a reasonable basis in the record for the decision and this court should not overturn it.

e) The season closure and the size limits did not violate National Standard Four. 16 U.S.C. 1851(a)(4). Plaintiff's allegation is that the regulation is "unfair" to the Texas "for hire" industry. Almost any change in size, season or bag limit will produce an allocation subject to National Standard 4. Fairness in the Magnuson Act context recognizes that "inherent in an allocation is the advantaging of one group to the detriment of another." 50 CFR 602.14(c)(3)(i)(A). The Secretary must weigh the relative advantages and disadvantages to each impacted group and then determine "fairness" in the context of the

22

overall benefits to the fishery.  The Council operating as the policy arm of the Secretary did just that at its Orlando meeting.  It considered within the context of the rebuilding plan and a 9.12 million-pound TAC whether the Texas proposal (13", 4 fish, all year) was achievable.  AR vol. 6, pp. 3077-3080.  It concluded it was only achievable if the rest of the Gulf significantly curtailed its fishery.  The Council rejected the proposal by a vote of 14-2.  "Fairness" in the Magnuson Act does not require all parties to be treated the same.  It only requires a reasonable balance of the interests affected.  <u>Lindel Fair</u> v. <u>United States</u>, Case No. C-93-022 (S.D. Texas, Corpus Div.).  The Secretary and the Council clearly accomplished that.

f)   The interim rule does not violate NEPA, RFA or CZMA.  The NMFS complied with NEPA throughout the process.  In fact given the level of public involvement and the number of Environmental Assessments made in a three-year period, it over-complied.

The Regulatory Flexibility Act only applies to actions where notice and comment rule making under 5 U.S.C. 553 is required.  As argued above the use of the interim regulatory mechanism is permissible and therefore no notice and comment is required.

The interim rule complies with the Coastal Zone Management Act.  The only requirement is that the Secretary notify the State and to the extent practicable he must make Federal rules consistent with a State's Coastal Zone Plan.  The CZMA does not give the state a veto power.  In order to comply with the Texas request the Secretary would have had to adopt different conservation measures off Texas than for other Gulf States.  To have one set of rules for Texas and stricter rules for the other Gulf states would be impracticable, and perhaps violate the Magnuson-Stevens Act.  The CZMA does not allow one State to compel the Secretary to be

23

consistent with its coastal zone program at the expense of forcing the Secretary to be inconsistent with the coastal zone program of the other States in the region.

## Conclusion

The regulated public broadly supports the interim rule.  It does not satisfy everyone, but it certainly meets the goals of the late Senator Magnuson.  The "primary management decisions" reflected in the interim rule were made by the Gulf Council.  The Council is "composed of representatives of the various States."  And, "this institutional arrangement is the best hope we can have of obtaining fishery management decisions which in fact protect the fish and which, at the same time, have the support of the fishermen who are regulated."

The Court should deny the Plaintiffs' Motion for Summary Judgment and Grant the Motion for Summary Judgment in favor of the Federal Defendants and the Defendant-Intervenor, the Coastal Conservation Association.  An appropriate order is appended hereto.

Respectfully submitted,

By: _Bruce S. Hawn_

Robert G. Hayes, Attorney in Charge
D.C. Bar Number: 393215
BALL JANIK LLP
1455 F Street. N.W.
Washington, D.C. 20005
[202] 638-3307, fax [202] 783-6947

Bruce S. Hawn
State / Fed Bar No.: 00784228          / 17584
THE KLEBERG LAW FIRM
800 N. Shoreline Blvd., Suite 900N
Corpus Christi, Texas 78401
[361]693-8500; fax [361]693-8600

ATTORNEYS FOR THE COASTAL
CONSERVATION ASSOCIATION

24

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this memorandum has been sent by United States certified mail, return receipt requested, this _27th_ day of April, 2000, to the following attorneys of record:

**ATTORNEY FOR PLAINTIFFS**

Les Cassidy
Woolsey & Cassidy
1020 Bank of America Center North
500 North Water Street
Corpus Christi, Texas 78471

**ATTORNEYS FOR THE DEFENDANTS, THE UNITED STATES OF AMERICA, THE DEPARTMENT OF COMMERCE, WILLIAM DALEY and NATIONAL MARINE FISHERIES SERVICE:**

Allison Areias
United States of Department of Justice
Environment & Natural Resources Division
950 Pennsylvania Avenue, NW, Room 2736
Washington, D.C. 20530

Eve Joy
United States Department of Commerce
National Oceanic and Atmospheric Administration
Office of General Counsel – Southeast Region
9721 Executive Center Drive N, Suite 137
St. Petersburg, Florida 33702

Constance Sathre
United States Department of Commerce
National Oceanic and Atmospheric Administration
Office of General Counsel for Fisheries
1315 East-West Highway, Room 15602
Silver Spring, Maryland 20910

Bruce S. Hawn

# ATTACHMENT 1

PDF - www.fastio.com

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

TEXAS SHRIMP ASSOCIATION,
et al.,

      Plaintiffs,

v.                        CASE NO.  4:00cv20-RH

WILLIAM M. DALEY, et al.,

      Defendants.
_____/

## ORDER OF DISMISSAL

This case concerns a challenge to an interim rule
promulgated by the National Marine Fisheries Service, acting
through the delegation of authority by the Secretary of
Commerce.  Ostensibly, the Texas Shrimp Association and
industry representative Wilma Anderson challenge the
National Marine Fisheries Service's decision to reinstate a
red snapper total allowable catch of 9.12 million pounds in

**ENTERED ON DOCKET** 4/12 **BY** H
[Rules 58 & 79(a) FRCP or 32(d)(1) & 55 FRCRP]
Copies mailed to: Oxd. Liath,
Canah Tulson
antista, Hayes

OFFICE OF CLERK
U.S. DISTRICT CT.
NORTHERN DIST. FLA.
TALLAHASSEE, FLA.

00 APR 12  AM 10: 05

- 33 -      FILED

the Gulf of Mexico for the year 2000 fishing season.   In
actuality, however, plaintiffs seek to challenge the failure
of the National Marine Fisheries Service to sua sponte
change the 9.12 million pounds total allowable catch status
quo established in 1996.   Because no regulations concerning
the total allowable catch status quo were promulgated by the
National Marine Fisheries Service as part of its interim
rule, there has been no agency action giving rise to
judicial review.

## I.   **STATUTORY BACKGROUND**

A regulatory scheme for the conservation of the
nation's fisheries was established by Congress through the
Magnuson-Stevens Fishery Conservation and Management Act
(the "Magnuson-Stevens Act").   <u>See</u> 16 U.S.C. § 1801 et seq.
Pursuant to the Magnuson-Stevens Act, eight regional fishery
management councils were developed.   <u>Id.</u>   The regional
council for the Gulf of Mexico is the Gulf of Mexico Fishery
Management Council ("Gulf Council").   16 U.S.C. §
1852(a)(5).

2

Under the Magnuson-Stevens Act, each council is charged with promulgating a fishery management plan for its defined geographical region. Proposed fishery management plans and implementing regulations are submitted by the applicable councils to the National Marine Fisheries Service ("NMFS") (to whom the Secretary of Commerce has delegated his authority under the Magnuson-Stevens Act) for review, public comment and approval. <u>See</u> 16 U.S.C. § 1854. The implementing regulations for the Gulf Council's fishery management plan are contained at 50 C.F.R. pt. 622.

Until amended, a fishery management plan remains in effect and remains the basis for agency regulations. The Magnuson-Stevens Act sets forth a detailed structure governing the amendment of fishery management plans, which can only be accomplished in one of two ways: (1) the appropriate council may submit a proposed amendment to NMFS for public comment and approval; or (2) when the appropriate agency fails to act, NMFS may amend the plan in response to a formal petition for rulemaking.

3

CutePDF - www.fastio.com

Typically, plan amendments originate with the appropriate council.  <u>See</u> 16 U.S.C. § 1854.  Proposed amendments are reviewed by NMFS and published in the Federal Register, thereby initiating a period of public comment.  16 U.S.C. § 1854(a)(1).  Once the comment period is complete, NMFS must approve or disapprove the proposed amendment within 30 days.  16 U.S.C. § 1854(a)(3).  If an amendment is disapproved or partially approved, the council may submit a revised amendment.  16 U.S.C. § 1854(a)(4).

Proposed regulations implementing a fishery management plan are enacted through a process very similar to the plan amendment process.  <u>See</u> 16 U.S.C. § 1854(b).  When emergency overfishing occurs, however, NMFS has the authority under a separate procedure to issue interim rules, which remain in effect for 180 days.  16 U.S.C. § 1855(c).

Regulations "promulgated" by NMFS under the Magnuson-Stevens Act are subject to a limited judicial review.  16 U.S.C. § 1855(f)(1).  A challenge to such regulations, however, must be filed "within 30 days after the date on which the regulations are promulgated or the action is

4

published in the Federal Register." <u>Id.</u> Challenges filed

pursuant to the Magnuson-Stevens Act are subject to

expedited judicial review. 16 U.S.C. § 1855(f)(4).

Although the Magnuson-Stevens Act contemplates that

proposed amendments will originate with the appropriate

council, NMFS is authorized to itself prepare a plan

amendment where the council fails to do so and the fishery

requires conservation and management. 16 U.S.C. §

1854(c)(1). Thus, pursuant to the Administrative Procedure

Act (APA), a person who believes that a council has

neglected its obligation to propose necessary plan

amendments can petition NMFS for rulemaking under this

Magnuson-Stevens Act provision. <u>See</u> 16 U.S.C. § 1855(d); 5

U.S.C. § 533(e). The agency's decision to accept or deny a

person's petition for rulemaking is subject to judicial

review under the APA. <u>See</u> 5 U.S.C. § 701 et seq.

## II.  **FACTUAL BACKGROUND**

One of the Gulf of Mexico fisheries protected by the

Magnuson-Stevens Act is the red snapper fishery. Among the

5

various methods employed by the Gulf Council and NMFS to

conserve the red snapper fishery is the enforcement of a

total allowable catch ("TAC") for red snapper per fishing

season.  On September 16, 1996, the TAC for red snapper in

the Gulf of Mexico was raised to 9.12 million pounds per

year.  See 61 Fed. Reg. 48,641 (1996) (codified at 50 C.F.R.

§ 622.42).  Until the present, the TAC status quo for red

snapper has remained at 9.12 million pounds.

On April 14, 1998, NMFS issued an interim rule holding

3.12 million pounds of red snapper TAC in reserve pending an

assessment of the efficacy of certain bycatch reduction

devices simultaneously mandated for shrimp trawlers.  See 63

Fed. Reg. 18,144 (1998) (interim rule reserving portion of

TAC); 63 Fed. Reg. 18,139 (1998) (final rule mandating

BRDs).  The interim rule, however, did not alter the TAC

status quo of 9.12 million pounds.  Subsequently, on August

27, 1998, NMFS issued an emergency interim rule releasing

the 3.12 million pounds of TAC previously held in reserve.

6

63 Fed. Reg. 45.760 (1998).[1]

On December 20, 1999, NMFS published the interim rule
currently being challenged by plaintiff Texas Shrimp
Association ("TSA").  In order to prevent overfishing of red
snapper in the Gulf of Mexico, the Gulf Council proposed
changes to the recreational and commercial fishing seasons,
an increase in red snapper size limits, and reinstatement of
a reduced bag limit for red snapper.  <u>See</u> 64 Fed. Reg.
71,056 (1999).  The Gulf Council, however, specifically
declined to recommend a change to the 9.12 million pounds
TAC status quo.  <u>Id.</u>  Because NMFS implemented only those

---

[1]    In a prior related case, <u>Florida Wildlife
Federation v. Daley</u>, 4;98cv101-RH, Texas Shrimp Association
unsuccessfully challenged NMFS's decision to release the
3.12 million pounds of TAC held in reserve.  In this court's
opinion, an explanatory discussion of TAC described the
April 14, 1998 interim rule as "keeping" TAC at 9.12 million
pounds.  <u>Florida Wildlife Fed'n v. Daley</u>, 4;98cv101-RH, slip
opin. at 42 (N.D. Fla. Nov. 3, 1999).  Additionally,
footnote 14 of the opinion stated that "TAC is annually set
with the prior year's TAC a factor in the analysis."  <u>Id.</u> at
42 n.14.  These descriptions were merely intended as
background to the issues raised in that case and should not
be read to infer that NMFS promulgates new TAC regulations
each year.  In fact, although the Gulf Council assesses on a
yearly basis whether to propose a change, the TAC of 9.12
million pounds is the status quo until otherwise altered by
NMFS.

7

interim measures proposed by the Gulf Council, no change was

made to the current TAC:

> At this time, NMFS is not implementing
> any measures to reduce overfishing beyond
> those requested by the Council.  The
> Council recommended no change to the
> status quo TAC of 9.12 million pounds;
> thus, this interim rule <u>does not address
> or alter</u> the current TAC.

<u>Id.</u> (emphasis added).

On January 14, 2000, TSA brought the instant action,

arguing that the retention of 9.12 million pounds of TAC is

in violation of the Magnuson-Stevens Act because it will

permit overfishing of red snapper.  TSA's complaint is

styled as a challenge to the December 20, 1999 interim rule.

Thus, TSA asserts that it has met the Magnuson-Stevens Act

requirement that all challenges to agency rulings must be

brought within 30 days of the challenged regulation's

promulgation or publication.

8

Case 2:00-cv-00028   Document 49   Filed in TXSD on 04/28/2000   Page 35 of 60

### III.   DISCUSSION

Unless presented with a formal petition for rulemaking, NMFS's authority to enact plan amendments is limited to modifications proffered by the Gulf Council.  See 16 U.S.C. § 1854.  Once proposed modifications are published by NMFS, members of the public must file their objections within 30 days.  Id.  Challenges brought outside the 30 day deadline are untimely.

Plan amendments which are premised upon or retain a status quo do not equate to "promulgation" of a new status quo.  Thus, even when a proposed amendment includes new limits which are contingent upon a previously-enacted status quo amount, only the new limits themselves, and not the status quo amount, are subject to timely challenge.  See, e.g., Midwater Trawlers Coop. v. Mosbacher, 727 F. Supp. 12 (D.D.C. 1989) (holding that although new catch limits were "premised upon" an optimal yield status quo set four years previously, the enactment of the new catch limits did not subject the optimal yield amount to timely challenge under

9

ClikPDF - www.fastio.com

the Magnuson-Stevens Act); <u>Connecticut v. Daley</u>, 53 F. Supp.
2d 147 (D. Conn. 1999) (holding that challenge to plan
amendment which "retained" state quota system was in
actuality an untimely challenge seeking to overturn state
quota system established four years previously).

Although no change to the 9.12 million pounds of TAC
status quo was considered or proposed by NMFS in its
December 20, 1999 interim rule, TSA nevertheless attempts to
couch its complaint as a challenge under 16 U.S.C. § 1855(f)
to regulations promulgated by NMFS.  TSA argues that because
the interim measures (season modification, bag limits, size
limits) adopted by NMFS are "predicated upon" a TAC of 9.12
million pounds, NMFS must by inference have "promulgated" a
new regulation concerning the TAC.  This assertion cannot
withstand scrutiny.

The interim rule clearly states that the Gulf Council
did <u>not</u> recommend any alteration to the 9.12 million pounds
TAC status quo.  Additionally, the interim rule just as
clearly states that NMFS, therefore, did <u>not</u> address or
modify the TAC status quo.  Because no regulations

10

concerning the TAC status quo were promulgated by NMFS as part of its interim rule, there was no agency action giving rise to judicial review.

In actuality, this action is not a challenge to the interim rule, but a challenge to the 9.12 million pounds of TAC status quo established on September 16, 1996.  Such a dispute, brought more than three years after NMFS established the 9.12 million pounds of TAC status quo, is clearly untimely under the Magnuson-Stevens Act's 30 day requirement.

In reality, TSA challenges the Gulf Council's failure to propose a reduction in TAC.  Under the structure set forth by Congress, the proper procedure for such a challenge is through a formal petition for rulemaking, not through this action brought pursuant to 16 U.S.C. § 1855(f).

Accordingly,

IT IS ORDERED:

The federal defendants' motion to dismiss (document 25) and defendant-intervenor Coastal Conservation Association's motion to dismiss (document 16) are GRANTED.  The clerk

11

shall enter judgement stating, "Judgment is entered in favor

of defendants dismissing the petition."  The clerk shall

close the file.

SO ORDERED this __12th__ day of April, 2000.

Robert L. Hinkle
United States District Judge

12

# ATTACHMENT 2

Case 2:00-cv-00028   Document 49   Filed in TXSD on 04/28/2000   Page 40 of 60

# How to Contact the Gulf of Mexico Fishery Management Council

| Home |
|---|
| **About the Council** |
| **Contact the Council** |
| **Fishing Rules** |
| **Press Releases** |
| **Newsletter** |
| **Upcoming Public Hearings** |
| **Downloadable Files** |
| **Links** |



Mail:

Hints for writing to the Council

| Mailing Address | | Phone/Fax/E-mail |
|---|---|---|
| Gulf of Mexico Fishery Management Council The Commons at Rivergate 3018 U.S. Highway 301 North, Suite 1000 Tampa, Florida 33619-2266 | Phone Fax e-mail | 813-228-2815 888-833-1844 (toll-free) 813-225-7015 gulfcouncil@gulfcouncil.org |

(Note: Comments on fishery management issues that are sent to the Council's or e-mail address will be copied to all Council members and technical staff. Yo not need to send separate notices to each individual.)

When providing comments on fisheries issues, the Counci requests that you include your name, city and state, and y relevant background and interest (commercial fisherman, recreational fisherman, conservationist, etc.). If you are commenting on behalf of an organization, please include y organization's name and number of members.

Council officers for 1999-2000

**Chairman: Robert L. Shipp (Alabama)**
**Vice-Chairman: Karl J. Lessard (Florida)**

A new Chaiman and Vice-Chairman is elected each year at the Septem Council meeting.

**Appointed Voting Members** - These members are appointed to 3-yea terms, and can serve a maximum of 3 consecutive terms. Terms begin end in August.

**1999 Membership Changes** - Effective August 1999, Dr. Felicia Col (Florida) is replaced by Mr. James Fensom (Florida).

| Name & Address | Year App. | Sector | Phone/Fax/E-mail | |
|---|---|---|---|---|
| **Florida** | | | | |
| James B. Fensom 340 South Bonita Avenue Panama City, Florida 32401 | 1999 | Recreational | Phone Fax e-mail | 850-785-7454 850-785-2999 jimfensom@aol.com |
| Alex M. Jernigan One Genie Court Yankeetown, | 1998 | Recreational | Phone Fax | 352-447-0538 352-447-0538 |

Case 2:00-cv-00028   Document 49   Filed in TXSD on 04/28/2000   Page 41 of 60

| Name | Year | Type | Contact | |
|---|---|---|---|---|
| Florida 34498 | | | e-mail | ajernigan@hitter.net |
| Karl J. Lessard<br>809 Lime Lane<br>Marathon,<br>Florida 33050 | 1994 | Commercial | Phone<br>Fax<br>e-mail | 305-743-5996<br>305-289-1207 |
| **Alabama** | | | | |
| Albert L. King, Sr.<br>P.O. Box 498<br>Gulf Shores,<br>Alabama 36547 | 1991 | Commercial | Phone<br>Fax<br>e-mail | 334-968-7653<br>334-968-7654<br>fishking@gulftel.com |
| Dr. Robert L. Shipp<br>Department of Marine Sciences<br>University of South Alabama<br>Life Sciences Building, Room 25<br>Mobile, Alabama 36688 | 1991 | Recreational | Phone<br>Fax<br>e-mail | 334-460-7136<br>334-633-3178<br>334-460-7357<br>rshipp@jaguar1.usouth |
| **Mississippi** | | | | |
| R. Douglas Horn<br>Clark Seafood<br>P.O. Box 220<br>Pascagoula,<br>Mississippi 39567 | 1998 | Commercial | Phone<br>Fax<br>e-mail | 228-762-4511<br>228-769-5108 |
| H. Kay Williams<br>P.O. Box 450<br>Pascagoula,<br>Mississippi 39568-0450 | 1997 | Commercial | Phone<br>Fax<br>e-mail | 228-826-2160<br>228-826-3135<br>hkaywilliams@hotma |
| **Louisiana** | | | | |
| Dr. Maumus F. Claverie, Jr.<br>830 Union Street, Third Floor<br>New Orleans,<br>Louisiana 70112 | 1996 | Recreational | Phone<br>Fax<br>e-mail | 504-524-5418<br>504-554-0770<br>504-524-1066<br>maumusjr@aol.com |
| Myron James Fischer<br>147 West 107th St.<br>Cut-Off,<br>Louisiana 70345 | 1997 | Recreational | Phone<br>Fax<br>e-mail | 504-632-4525<br>504-632-4262<br>ddrum@cajunnet.com |
| **Texas** | | | | |
| Pete Aparicio<br>5809 Salem Road<br>Victoria, Texas | 1996 | Commercial | Phone<br>Fax | 361-578-4989<br>361-578-0875 |

Case 2:00-cv-00028    Document 49    Filed in TXSD on 04/28/2000    Page 42 of 60

| 77904-4989 | | | e-mail |
|---|---|---|---|
| Irby W. Basco<br>Basco<br>Construction,<br>Inc.<br>P.O. Box 1025<br>Nederland, Texas<br>77627<br><br>(First term<br>exipires in<br>August 1998,<br>has been<br>nominated for<br>reappointment.) | 1995 | Recreational | Phone    409-722-4434<br>Fax       409-722-6428<br>e-mail |

### State and Federal Voting Representatives

| State | Name & Address | Phone/Fax/E-mail |
|---|---|---|
| Florida | Roy O. Williams or Russell Nelson (designees for Allan Egbert) Florida Fish and Wildlife Conservation Commission Div. of Marine Fisheries Farris Bryant Building 620 South Meridian Street Tallahassee, Florida 32399-1600 | Phone    850-487-0554<br>Fax       850-487-4847<br>Williams: williar@gfc.state.fl.us<br>e-mail    Nelson: nelsonr@gfc.state.fl.us<br>Egbert: egberta@gfc.state.fl.us |
| Alabama | R. Vernon Minton, Director Alabama Dept. of Conservation and Natural Resources Marine Resources Div. P.O. Box 189 | Phone    334-861-2882<br>Fax       334-861-8741<br>e-mail    rvminton.amrdgs@gulftel.com |

| | | | |
|---|---|---|---|
| | Dauphin Island, Alabama 36528 | | |
| Mississippi | Corky Perret (designee for Glade Woods) Department of Marine Resources 1141 Bayview Avenue, Suite 101 Biloxi, Mississippi 39530 | Phone<br>Fax<br>e-mail | 228-374-5000<br>228-374-5220<br>Perret: cperret@datasync.com<br>Woods: woods@datasync.com |
| Louisiana | Karen Foote (designee for Jimmy Jenkins) Louisiana Dept. of Wildlife anf Fisheries, Room 356 P.O. Box 98000 Baton Rouge, Louisiana 70898-9000 | Phone<br>Fax<br>e-mail | 225-765-2383<br>225-765-2489<br>Foote: foote_k@wlf.state.la.us<br>Jenkins: (none) |
| Texas | Robin Reichers (designee for Hal Osburn) Texas Parks and Wildlife Department 4200 Smith School Road Austin, Texas 78744 | Phone<br>Fax<br>e-mail | 512-389-4648<br>512-389-4685<br>Reichers:robin.reichers@tpwd.stat<br>Osburn: hal.osburn@tpwd.state.tx |
| NMFS | Dr. William Hogarth Regional Administrator National Marine Fisheries Service 9721 Executive Center Drive, North St. | Phone<br>Fax<br>e-mail | 727-570-5301<br>727-570-5300<br>william.hogarth@noaa.gov |

Case 2:00-cv-00028   Document 49   Filed in TXSD on 04/28/2000   Page 44 of 60

| | Petersburg, Florida 33702 | |
|---|---|---|

## Staff E-mail

| Name | Title | E-mail |
|---|---|---|
| Wayne Swingle | Executive Director | wayne.swingle@gulfcoun |
| Rick Leard | Senior Biologist | rick.leard@gulfcouncil.or |
| Steven Atran | Population Dynamics Statistician | steven.atran@gulfcouncil |
| Peter Hood | Fishery Biologist | peter.hood@gulfcouncil.o |
| Tony Lamberte | Economist | tony.lamberte@gulfcounc |
| Cathy Readinger | Administrative Officer | cathy.readinger@gulfcou |
| Trish Kennedy | Administrative Assistant | trish.kennedy@gulfcounc |
| Anne Alford | Travel Coordinator | anne.alford@gulfcouncil. |
| Camilla Moyer | Transcription Specialist | camilla.moyer@gulfcoun |
| Jennifer Biggs | Transcription Specialist | jennifer.biggs@gulfcounc |
| Lorna Evans | Transcription Specialist | lorna.evans@gulfcouncil. |


Back to Gulf Council Home Page

*Last Updated February 4, 2000*

Case 2:00-cv-00028   Document 49   Filed in TXSD on 04/28/2000   Page 45 of 60

# How to Contact the Gulf of Mexico Fishery Management Council



- Home
- About the Council
- Contact the Council
- Fishing Rules
- Press Releases
- Newsletter
- Upcoming Public Hearings
- Downloadable Files
- Links

Mail: 

Hints for writing to the Council

| Mailing Address | Phone/Fax/E-mail | |
|---|---|---|
| Gulf of Mexico Fishery Management Council The Commons at Rivergate 3018 U.S. Highway 301 North, Suite 1000 Tampa, Florida 33619-2266 | Phone | 813-228-2815 888-833-1844 (toll-free) |
| | Fax | 813-225-7015 |
| | e-mail | gulfcouncil@gulfcouncil.org |

(Note: Comments on fishery management issues that are sent to the Council's or e-mail address will be copied to all Council members and technical staff. Yo not need to send separate notices to each individual.)

**When providing comments on fisheries issues, the Counci requests that you include your name, city and state, and y relevant background and interest (commercial fisherman, recreational fisherman, conservationist, etc.). If you are commenting on behalf of an organization, please include y organization's name and number of members.**

Council officers for 1999-2000

**Chairman: Robert L. Shipp (Alabama)
Vice-Chairman: Karl J. Lessard (Florida)**

A new Chaiman and Vice-Chairman is elected each year at the Septem Council meeting.

**Appointed Voting Members** - These members are appointed to 3-yea terms, and can serve a maximum of 3 consecutive terms. Terms begin end in August.

**1999 Membership Changes** - Effective August 1999, Dr. Felicia Col (Florida) is replaced by Mr. James Fensom (Florida).

| Name & Address | Year App. | Sector | Phone/Fax/E-mail | |
|---|---|---|---|---|
| **Florida** | | | | |
| James B. Fensom 340 South Bonita Avenue Panama City, Florida 32401 | 1999 | Recreational | Phone Fax e-mail | 850-785-7454 850-785-2999 jimfensom@aol.com |
| Alex M. Jernigan One Genie Court Yankeetown, | 1998 | Recreational | Phone Fax | 352-447-0538 352-447-0538 |

Case 2:00-cv-00028  Document 49  Filed in TXSD on 04/28/2000  Page 46 of 60

| | | | | |
|---|---|---|---|---|
| Florida 34498 | | | e-mail | ajernigan@hitter.net |
| Karl J. Lessard<br>809 Lime Lane<br>Marathon,<br>Florida 33050 | 1994 | Commercial | Phone<br>Fax<br>e-mail | 305-743-5996<br>305-289-1207 |
| **Alabama** | | | | |
| Albert L. King, Sr.<br>P.O. Box 498<br>Gulf Shores,<br>Alabama 36547 | 1991 | Commercial | Phone<br>Fax<br>e-mail | 334-968-7653<br>334-968-7654<br>fishking@gulftel.com |
| Dr. Robert L. Shipp<br>Department of Marine Sciences<br>University of South Alabama<br>Life Sciences Building, Room 25<br>Mobile, Alabama 36688 | 1991 | Recreational | Phone<br>Fax<br>e-mail | 334-460-7136<br>334-633-3178<br>334-460-7357<br>rshipp@jaguar1.usouth |
| **Mississippi** | | | | |
| R. Douglas Horn<br>Clark Seafood<br>P.O. Box 220<br>Pascagoula,<br>Mississippi 39567 | 1998 | Commercial | Phone<br>Fax<br>e-mail | 228-762-4511<br>228-769-5108 |
| H. Kay Williams<br>P.O. Box 450<br>Pascagoula,<br>Mississippi 39568-0450 | 1997 | Commercial | Phone<br>Fax<br>e-mail | 228-826-2160<br>228-826-3135<br>hkaywilliams@hotma |
| **Louisiana** | | | | |
| Dr. Maumus F. Claverie, Jr.<br>830 Union Street, Third Floor<br>New Orleans,<br>Louisiana 70112 | 1996 | Recreational | Phone<br>Fax<br>e-mail | 504-524-5418<br>504-554-0770<br>504-524-1066<br>maumusjr@aol.com |
| Myron James Fischer<br>147 West 107th St.<br>Cut-Off,<br>Louisiana 70345 | 1997 | Recreational | Phone<br>Fax<br>e-mail | 504-632-4525<br>504-632-4262<br>ddrum@cajunnet.com |
| **Texas** | | | | |
| Pete Aparicio<br>5809 Salem Road<br>Victoria, Texas | 1996 | Commercial | Phone<br>Fax | 361-578-4989<br>361-578-0875 |

Case 2:00-cv-00028   Document 49   Filed in TXSD on 04/28/2000   Page 47 of 60

| | | | |
|---|---|---|---|
| 77904-4989 | | | e-mail |
| Irby W. Basco<br>Basco<br>Construction,<br>Inc.<br>P.O. Box 1025<br>Nederland, Texas<br>77627<br><br>(First term<br>exipires in<br>August 1998,<br>has been<br>nominated for<br>reappointment.) | 1995 | Recreational | Phone  409-722-4434<br>Fax     409-722-6428<br>e-mail |

### State and Federal Voting Representatives

| State | Name & Address | Phone/Fax/E-mail |
|---|---|---|
| Florida | Roy O. Williams or Russell Nelson (designees for Allan Egbert) Florida Fish and Wildlife Conservation Commission Div. of Marine Fisheries Farris Bryant Building 620 South Meridian Street Tallahassee, Florida 32399-1600 | Phone  850-487-0554<br>Fax     850-487-4847<br>e-mail  Williams: williar@gfc.state.fl.us<br>Nelson: nelsonr@gfc.state.fl.us<br>Egbert: egberta@gfc.state.fl.us |
| Alabama | R. Vernon Minton, Director Alabama Dept. of Conservation and Natural Resources Marine Resources Div. P.O. Box 189 | Phone  334-861-2882<br>Fax     334-861-8741<br>e-mail  rvminton.amrdgs@gulftel.com |

Case 2:00-cv-00028   Document 49   Filed in TXSD on 04/28/2000   Page 48 of 60

| | | | |
|---|---|---|---|
| | Dauphin Island, Alabama 36528 | | |
| Mississippi | Corky Perret (designee for Glade Woods) Department of Marine Resources 1141 Bayview Avenue, Suite 101 Biloxi, Mississippi 39530 | Phone<br>Fax<br>e-mail | 228-374-5000<br>228-374-5220<br>Perret: cperret@datasync.com<br>Woods: woods@datasync.com |
| Louisiana | Karen Foote (designee for Jimmy Jenkins) Louisiana Dept. of Wildlife anf Fisheries, Room 356 P.O. Box 98000 Baton Rouge, Louisiana 70898-9000 | Phone<br>Fax<br>e-mail | 225-765-2383<br>225-765-2489<br>Foote: foote_k@wlf.state.la.us<br>Jenkins: (none) |
| Texas | Robin Reichers (designee for Hal Osburn) Texas Parks and Wildlife Department 4200 Smith School Road Austin, Texas 78744 | Phone<br>Fax<br>e-mail | 512-389-4648<br>512-389-4685<br>Reichers:robin.reichers@tpwd.stat<br>Osburn: hal.osburn@tpwd.state.tx |
| NMFS | Dr. William Hogarth Regional Administrator National Marine Fisheries Service 9721 Executive Center Drive, North St. | Phone<br>Fax<br>e-mail | 727-570-5301<br>727-570-5300<br>william.hogarth@noaa.gov |

Case 2:00-cv-00028   Document 49   Filed in TXSD on 04/28/2000   Page 49 of 60

| | Petersburg, Florida 33702 | |

## Staff E-mail

| Name | Title | E-mail |
|------|-------|--------|
| Wayne Swingle | Executive Director | wayne.swingle@gulfcoun |
| Rick Leard | Senior Biologist | rick.leard@gulfcouncil.or |
| Steven Atran | Population Dynamics Statistician | steven.atran@gulfcouncil |
| Peter Hood | Fishery Biologist | peter.hood@gulfcouncil.o |
| Tony Lamberte | Economist | tony.lamberte@gulfcounc |
| Cathy Readinger | Administrative Officer | cathy.readinger@gulfcou |
| Trish Kennedy | Administrative Assistant | trish.kennedy@gulfcounc |
| Anne Alford | Travel Coordinator | anne.alford@gulfcouncil. |
| Camilla Moyer | Transcription Specialist | camilla.moyer@gulfcoun |
| Jennifer Biggs | Transcription Specialist | jennifer.biggs@gulfcounc |
| Lorna Evans | Transcription Specialist | lorna.evans@gulfcouncil. |


Back to Gulf Council Home Page

*Last Updated February 4, 2000*

# ATTACHMENT 3

CVisPDF – www.fwsvia.com

05/08/95   08:56   ☎145°            1459        GCSE            ⌒→ NOAA GC            ☑002/011

5- 8-95  8:13   :DEPT. OF JUSTICE         NOAA/GCSE FLA    :         2027249941:= 2/11

*Priscilla*

United States District Court
Southern District of Texas
FILED

MAY 01 1995

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS MICHAEL N. MILBY, CLERK
CORPUS CHRISTI DIVISION

LINDEL FAIR, ET AL.         §
                            §
VS.                         §         C.A. NO. C-93-022
                            §
UNITED STATES OF AMERICA    §

United States District Cou
Southern District of Texas
ENTERED
MAY 02 1995
Michael N. Milby
Clerk of Court

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs are individuals and an association of individuals who are reef fish permit holders and who make a living, in whole or in part, by fishing for red snapper off the coast of Texas. On December 30, 1992, the National Marine Fisheries Service ("NMFS") published an emergency rule limiting the ability of plaintiffs to harvest red snapper to the amount of 200 pounds per trip, while permitting individuals who qualify for an endorsement to harvest up to 2000 pounds per trip.[1] Through Amendments 6 and 9 to the Reef Fish Fishery Management Plan, NMFS extended the red snapper endorsement system through December 31, 1995.

Plaintiffs contend that the red snapper endorsement system constitutes an arbitrary and inequitable economic allocation of fishing resources in violation of the Magnuson Fishery Conservation and Management Act. 16 U.S.C. § 1851 et seg. Plaintiffs seek declaratory relief[2] and ask the Court to remand Amendment 9 to NMFS

---

[1] To be eligible for an endorsement, a vessel must document total annual red snapper landings of at least 5,000 pounds in two out of three qualifying years.

[2] This is an action for judicial review and non-monetary relief under the Administrative Procedure Act, 5 U.S.C. § 702 et. seg. Plaintiffs originally sought both declaratory and injunctive relief, but no longer seek an injunction. (See, D.E. # 54.)

Case 2:00-cv-00028   Document 49   Filed in TXSD on 04/28/2000   Page 52 of 60

for further consideration.  Defendant counters that the endorsement system is a management effort designed to prevent the derby-like fishing season that occurred in 1992.  In 1992, the red snapper quota was filled in just 53 days, resulting in a number of social, economic, and fishery conservation consequences, including lower red snapper prices, unemployment, and a quota overrun of 600,000 pounds.  Both parties move for summary judgment.

<u>Standard of review</u>

Under the Magnuson Act, regulations implementing Fishing Management Plans ("FMPs"") are subject to the same standard of review governing challenges to agency action under the Administrative Procedures Act, 5 U.S.C. § 706(2) (A)-(D).  In general, the scope of judicial review is limited to the administrative record before it and relied on by the Secretary.  <u>Florida Power & Light Co. v. Lorion</u>, 470 U.S. 729, 743-44, 105 S. Ct. 1598, 1607 (1985).  The Court may not declare Magnuson Act regulations invalid unless it finds the regulations to be arbitrary and capricious or otherwise not in accordance with the law.  <u>Alaska Factory Trawler Ass'n v. Baldridge</u>, 831 F.2d 1456, 1460 (9th Cir. 1987).  The Court's role is to ensure that the Secretary's decision is rational, but may not substitute its own judgment for that of the Secretary.  <u>See</u>, <u>Sea Watch International v. Mosbacher</u>, 762 F. Supp. 370, 378 (D.D.C. 1991).

-2-

## Discussion

Fishing Management Plans ("FMPs") must comply with the seven
national standards enumerated by the Magnuson Act. See 16 U.S.C.
§ 1851(a) (1)-(7). Plaintiffs complain that the endorsement system
violates national standards 4 and 5,[3] and that the 5,000 pounds
landings qualifier is not supported by the administrative record.

### National Standard 4

Plaintiffs allege that the endorsement system discriminates
between Gulf state fishermen, pointing out that, although most red
snapper are harvested from offshore Texas, as of August 1994, only
35 endorsements had been issued to Texas fisherman while Florida
fishermen had been issued 50.

There is no evidence that the red snapper endorsement system
discriminates between state residents. Residency is irrelevant for
the purposes of qualifying for the endorsement. Qualification
requirements are based entirely on the vessel owners' or operators'

---

[3]National standards 4 and 5 state:

4.  Conservation and management measures shall not discrimi-
    nate between residents of different states. If it be-
    comes necessary to allocate or assign fishing privileges
    among various United States fishermen, such allocation
    shall be (a) fair and equitable to all such fishermen;
    (b)reasonably calculated to promote conservation; and,
    (c).carried out in such a manner that no particular indi-
    vidual, corporation, or other entity acquires an exces-
    sive share of such privileges.

5.  Conservation and management measures shall, where
    practicable, promote efficiency in the utilization of
    fishery resources; except that no such measure shall have
    economic allocation as its sole purpose.

-3-

Case 2:00-cv-00028   Document 49   Filed in TXSD on 04/28/2000   Page 54 of 60

historical landings over the 1990-1992 seasons.[4]  Based on the
historical landing criteria, Florida fishermen have been issued
approximately 60 endorsements compared to approximately 40
endorsements issued to Texas fishermen; however, the criteria
themselves are neutral.[5]  Under the Magnuson Act regulations,
conservation and management measures that have different effects on
persons in various geographical locations are permissible.  50
C.F.R. § 602.14(b).  See also, 50 C.F.R. § 602.14(b)(2) (rule that
disadvantages fishermen from one state is permissible under
National Standard 4 as long as it has no discriminatory intent).

        Plaintiffs also argue that the endorsement system is not fair
and equitable to all fishermen.  Plaintiff points out that, out of
the 2,214 reef fish permit holders, only 135 received endorsements.
Plaintiffs numbers are misleading, however, because only 251 of the
2,214 reef fish permit holders actually applied for a red snapper
endorsement, and 131 (over 52%) were finally approved for an
endorsement.[6]

        In defining "fairness and equity," the regulations recognize
that "[i]nherent in an allocation is the advantaging of one group
to the detriment of another."  50 C.F.R. § 602.14(c)(3)(i)(A).  The

_____

        [4]E.R.A.R., Tab III-92.

        [5]Florida fishermen participate in a trip ticket program.  This
additional record keeping may have made it easier for Florida
fishermen to prove that they had met the 5,000 pound qualifier to
receive an endorsement.

        [6]A.9.A.R., Tab 12 at 20.

CutePDF - www.tevix.com

Case 2:00-cv-00028   Document 49   Filed in TXSD on 04/28/2000   Page 55 of 60

regulations also state that "[a]n allocation of fishing privileges may impose hardship on one group if it is outweighed by the total benefits received by another group or groups."   50 C.F.R. § 602.14(c)(3)(i)(B).   The endorsement system provides a justification for favoring one group over another:   it favors those fishermen who have demonstrated "a historical dependence on the fishery, while still allowing a fair level of take by those who had traditionally landed smaller quantities of red snapper."[7]

The endorsement system requires that vessels document total annual red snapper landings of 5,000 pounds in two out of the three qualifying years in order to be eligible for an endorsement.   An endorsement allows a fisherman to catch up to 2,000 lbs/trip. Vessels not qualifying for an endorsement are permitted to catch up to 200 lbs/trip.   The Gulf Council arrived at these figures by reviewing the average trip landings and percentage of red snapper per trip at various total annual landings.   Below the 5,000 lb annual landing point, the average trip landing was less than 180 pounds.[8]  The Council concluded that the 200 pound limit per trip would not have a major negative impact on the non-qualifying vessels because these vessels historically caught less than 200 lbs/trip.   The data also showed that, for those vessels whose 1991 landings were less than 5,000 pounds, only 33% of the total catch was red snapper, but for the vessels landing over 5,000 pounds in

---

[7]SR-1; E.R.A.R., IV-5; A.9.A.R., Tab 12 at 24-26.

[8]SR-3; E.R.A.R., Tab III-32 at 3.

-5-

1991, the percentage of red snapper "increased dramatically." [9]

The questionable aspect of the endorsement system is not the 5,000 pounds landings qualifier, but rather the inability of a non-qualifying fishermen, one without an adequate historical catch, ever to obtain an endorsement.  The present endorsement system permanently divides and stagnates the red snapper fishery into two groups, those with endorsements and those without.  Endorsements are precluded to those with a low catch history.  This results in both groups shrinking.[10]  Plaintiffs have not challenged this aspect of the endorsement system, and the Court, therefore, does not address it.

The record reflects that the Council considered various alternatives in attempting to reach a "fair and equitable result" in allocating the red snapper fishery.[11]  The record also shows that the industry fishermen participated in the deliberations of

---

[9] SR-3 at 22.  The Council examined data from the years 1991 and 1992.  The 1991 data was given greater weight and considered more representative of the traditional fishery because of the 1992 derby.

[10] Ironically, this result is likely a good one for the red snapper stock because, presumably, fewer fishermen will take fewer red snapper and improve the stock.  The record indicates that the red snapper stock is in great need of protection, and that greater emphasis should be placed on that goal then has been placed in the past.  For example, the targeted 20 percent spawning stock potential ratio ("SPR") has never been reached during the period of regulation and the target SPR year has been moved further into the future several times.

[11] E.R.A.R., Tab III-17; E.R.A.R., Tab III-50.

-6-

the endorsement system.   The Court concludes that the endorsement
system does not violate national standard 4.

## National Standard 5

Plaintiffs  contend  that  the  endorsement  system  violates
national standard 5 because it is solely an economic allocation of
the fishery, and not a conservation measure.  Plaintiffs point out
that NMFS increased the total allowable catch for red snapper in
1993 from 4.0 to 6.0 million pounds (a 50% increase over 1992).
Further, recreational fishermen are not affected by the endorsement
system as allowable trip limits of seven (7) snapper per person
continues through 1995.

Plaintiffs restricted interpretation of the word "conserva-
tion" is not supported by the Magnuson Act regulations:

> An allocation scheme may promote conservation by encour-
> aging a rational more easily managed use of the resource.
> Or it may promote conservation (in the sense of wise use)
> by optimizing yield in terms of size, value, market mix
> price, or economic or social benefit of the product.

50 C.F.R. § 602.14(c)(3)(ii).   Further, "[e]fficiency in terms of
aggregate  costs  then  becomes  a  conservation  objective,  where
conservation constitutes wise use of all resources involved in the
fishery, not just fish stocks."   50 C.F.R. § 602.15(b)(2).

Allocation systems, which at first glance may appear to be
purely economic measures, are not unusual under the Magnuson Act.
See, e.g. Sea Watch International v. Mosbacher, 762 F. Supp. 370
(D.D.C. 1991) (limited access fishery allocation for the atlantic
surf clam fishery); Alaska Factory Trawler Assoc. v. Baldridge, 831

F.2d 1456 (9th Cir. 1987) (sablefish allocation favoring longline
fishermen over pot and trawler fishermen); and <u>National Fisheries
Institute Inc. v. Mosbacher</u>, 732 F. Supp. 210 (D.D.C. 1990)
(upholding FMP which prohibited the sale of billfish to prevent
development of a commercial billfish market, to conserve billfish
for recreational use.)  Economic measures are not prohibited if
implemented to achieve the greater purpose of conservation and
management.

Further, the Court notes that the endorsement system serves
some conservation purposes.  The endorsement system will promote
enforcement of catch limitations by requiring better monitoring of
the catch and more meaningful records keeping.  In addition, the
endorsement system allows the continued collection of historical
red snapper landings data which is needed to evaluate alternatives
for long-term management of the fishery.  <u>However, the Court finds
little in the record to show real concern for the red snapper
stock, and wonders how long NMFS will wait before addressing the
long-term biological health of the red snapper stock.</u>

<u>Conclusion</u>

In an effort to prevent the reoccurrence of the 1992 derby-
like fishing season, the Secretary implemented the endorsement
system and reef fish permit moratorium to limit access to the red
snapper fishery.  The administrative record demonstrates that the
5,000 pounds landings qualifier was arrived at after review of past
catch landings, consideration of dependency on the red snapper

Case 2:00-cv-00028    Document 49    Filed in TXSD on 04/28/2000    Page 59 of 60

1459

fishery, consideration and rejection of other options, and
opportunity for public comment and input. The decision of the
Secretary is rational where challenged. Plaintiffs' motion for
summary judgment is denied and defendant's motion for summary
judgment is granted.

ORDERED this ____/____ day of _____, 1995.

H. W. HEAD, JR.
UNITED STATES DISTRICT JUDGE

—9—

Case 2:00-cv-00028   Document 49   Filed in TXSD on 04/28/2000   Page 60 of 60

United States District Court
Southern District of Texas
ENTERED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

MAY 0 2 1995

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| LINDEL FAIR, ET AL. | § | |
| | § | |
| VS. | § | C.A. NO. C-93-022 |
| | § | |
| UNITED STATES OF AMERICA | § | |

## FINAL JUDGMENT

Judgment is entered for defendant.  Each party shall bear its

own costs.

ORDERED this ____1____ day of __Ml~__, 1995.

_____
H. W. HEAD, JR.
UNITED STATES DISTRICT JUDGE