United States District Court
Southern District of Texas
FILED

MAY 0 1 2000

Michael N. Milby, Clerk

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### CORPUS CHRISTI DIVISION

| | |
|---|---|
| GAMFW, INC. D/B/A FISHERMAN'S WHARF and BOBBY GRUMBLES )<br><br>Plaintiffs, )<br><br>v. )<br><br>THE UNITED STATES OF AMERICA, et. al )<br><br>Defendants. ) | CAUSE NO. C-00-028 |

## DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56 and Local Rule 6, Defendants hereby oppose

Plaintiffs' Motion for Summary Judgment and crossmove for Summary Judgment on the grounds

that the Second Amended Complaint fails to state a claim upon which relief may be granted. In

support of their motion, Defendants submit the attached memorandum of points and authorities

detailing the grounds for summary judgment in favor of Defendants.

Respectfully submitted this 1st day of May, 2000,

MERVYN M. MOSBACKER
UNITED STATES ATTORNEY

by: _____
LARRY LUDKA
Assistant U.S. Attorney

50.

SBOT I.D. # 12667500
Admissions # 10721
Wilson Plaza, Suite 1400
606 N. Caranachua
Corpus Christi, Tx. 78476
 (361) 888-3111


LOIS J. SCHIFFER
Assistant Attorney General
Environment and Natural Resources Division

JEAN WILLIAMS
Chief, Wildlife and Marine Resources Section
Environment and Natural Resources Division

ALLISON AREIAS
Attorney-in-charge
DC Bar # 453909
United States Department of Justice
Environment and Natural Resources Division
P.O. Box 7369
Washington, D.C. 20044-7369
Tel: (202) 305-0213
Fax: (202) 305-0275

Attorneys for Defendants


OF COUNSEL:
ANTHONY P. HOANG
GEOFFREY GARVER
CAROLINE BLANCO
U.S. Department of Justice

MICHAEL McLEMORE
E.V.E JOY
CONSTANCE SATHRE
NOAA Office of the General Counsel

Certificate of Service

I certify that a copy of the foregoing Defendants' Cross motion for summary judgment, opposition to Plaintiffs' motion for summary judgment and Defendants' memorandum has been mailed via first class mail, postage prepaid to Plaintiffs' counsel on this the 1st day of May, 2000.

Larry Ludka
Assistant United States Attorney

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | |
|---|---|
| GAMFW, INC. D/B/A FISHERMAN'S ) <br> WHARF and BOBBY GRUMBLES ) <br> ) <br>      Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> THE UNITED STATES OF AMERICA, ) <br> et. al ) <br> ) <br>      Defendants. ) | CAUSE NO. C-00-028 |

## DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANTS CROSS MOTION FOR SUMMARY JUDGMENT

MERVYN M. MOSBACKER
UNITED STATES ATTORNEY

By: _____

LARRY LUDKA
Assistant U.S. Attorney
SBOT I.D. # 12667500
Admissions # 10721
Wilson Plaza, Suite 1400
606 N. Carancahua
Corpus Christi, Tx. 78476
(361) 888-3111

LOIS J. SCHIFFER
Assistant Attorney General
Environment and Natural Resources Division

JEAN WILLIAMS
Chief, Wildlife and Marine Resources Section
Environment and Natural Resources Division

ALLISON AREIAS
Attorney-in-charge
DC Bar # 453909
United States Department of Justice
Environment and Natural Resources Division
P.O. Box 7369
Washington, D.C. 20044-7369
Tel: (202) 305-0213
Fax: (202) 305-0275

Attorneys for Defendants

OF COUNSEL:
ANTHONY P. HOANG
GEOFFREY GARVER
CAROLINE BLANCO
U.S. Department of Justice

MICHAEL McLEMORE
E.V.E JOY
CONSTANCE SATHRE
NOAA Office of the General Counsel

# TABLE OF CONTENTS

PAGE

I.    INTRODUCTION · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · 1

II.  BACKGROUND · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · 1

       A.    STATUTORY AND REGULATORY BACKGROUND · · · · · · · · · · · · · · 1

               1.    The Magnuson-Stevens Act · · · · · · · · · · · · · · · · · · · · · · · · · · 1

                       a.    The FMP And FMP Amendment Process · · · · · · · · · · · · · · · · 1

                       b.    The Regulatory Amendment Process · · · · · · · · · · · · · · · · · 2

                       c.    Interim Or Emergency Rules · · · · · · · · · · · · · · · · · · · · · · · 2

               2.    National Environmental Policy Act · · · · · · · · · · · · · · · · · · · · · 3

               3.    Coastal Zone Management Act · · · · · · · · · · · · · · · · · · · · · · 3

       B.    FACTUAL BACKGROUND · · · · · · · · · · · · · · · · · · · · · · · · · · · 4

               1.    The History Of The Red Snapper Fishery And Status Of The Stock · · · · · · · 4

               2.    Events Leading To The Publication Of The Interim Rule · · · · · · · · · · · 5

                       a.    The September 1, 1999 Red Snapper Regulatory Amendment · · · · · 5

                       b.    The Stakeholder Process · · · · · · · · · · · · · · · · · · · · · 6

                       c.    Gulf Council Action On Stakeholder Suggestions · · · · · · · · · · · 7

                       d.    The December 20, 1999, Interim Rule · · · · · · · · · · · · · · · · 9

III.  STANDARD OF JUDICIAL REVIEW · · · · · · · · · · · · · · · · · · · · · · · · · 11

IV.   ARGUMENT · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · 12

       A.    The Secretary's Use Of The Interim Rule Is Appropriate To Reduce
               Overfishing · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · 12

               1.    The Red Snapper Fishery Is Overfished. · · · · · · · · · · · · · · · · · 12

2.    The MSA Does Not Require NMFS To Provide Notice And Comment
      On the Interim Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

B.   NMFS Reasonably Concluded That The Interim Rule Will Reduce Overfishing . . . . 16

     1.    Compatible Federal/State Regulations Reduce Overfishing . . . . . . . . . . . . . 16

           a.    Overfishing Increases Without Compatible Federal/State
                 Regulations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

           b.    NMFS Appropriately Reversed Its Disapproval Of A Delayed
                 Season . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

     2.    Minimum Size Limits Are Expressly Authorized By The MSA And Are
           Appropriate For This Fishery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

     3.    Reinstatement Of The 4-Fish Bag Limit For Captain And Crew Alleviated
           A Restriction, Improved The Chances of Compliance, and Did Not Raise
           The Overall Harvest Rate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

C.   The Interim Rule Complies With The CZMA and NEPA . . . . . . . . . . . . . . . . . . 21

     1.    Plaintiffs Lack Standing to Assert Violation of CZMA . . . . . . . . . . . . . . . 21

     2.    Defendants Have Fully Complied with NEPA . . . . . . . . . . . . . . . . . . . . . 23

V.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

CSHPDF - www.fasiso.com

# TABLE OF AUTHORITIES

CASES                                                                                    PAGE

Alaska Factory Trawler Association v. Baldridge, 831 F.2d 1456 (9th Cir. 1987)  ............................. 2

Baltimore Gas & Electric Co., v. Natural Resources Defense Council, 462 U.S. 87 (1983)  ............. 25

C & W Fish Co. v. Fox, 931 F.2d 1556 (D.C. Cir. 1991)  ................................................ 11

California Trout v. Schaefer, 58 F.3d 469 (9th Cir. 1995)  ................................................ 24

Camp v. Pitts, 411 U.S. 138 (1973)  ......................................................................... 12

Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402 (1971)  .................................... 11

Douglas County v. Babbitt, 48 F.3d 1495 (9th Cir. 1995)  ................................................ 22

Fund for Animals v. Rice, 85 F.3d 535 (11th Cir. 1996)  .................................................. 23

Knaust v. The City of Kingston, No. 96-CV-601 (N.D. N.Y., October 10, 1997)  ............................ 22

Kramer v. Mosbacher, 878 F.2d 134 (4th Cir. 1989)  ........................................................ 1

Lujan v. National Wildlife Federation, 497 U.S. 871 (1990)  ............................................. 22

Marsh v. Oregon Natural Resources Council, 490 U.S. 360 (1989) ................................. 3,11

Motor Vehicle Manufacturers Associate v. State Farm Mutual Automobile Insurance Co.,
    463 U.S. 29 (1983)  ..................................................................................... 11,18

National Fisheries Institute, Inc. v. Mosbacher, 732 F. Supp. 210 (D.D.C. 1990)  ...................... 12,20

Northwest Resources Information Center v. NMFS, 56 F.3d 1060 (9th Cir. 1995)  ......................... 25

Public Citizen v. U.S. Department of Justice, 491 U.S. 440 (1989)  .................................... 13

Republican National Committee v. FEC, 76 F.3d 400 (D.C. Cir. 1996)  ......................... 18

Riverbend Farms, Inc. v. Madigan, 958 F.2d 1479 (9th Cir. 1992)  .................................... 15

Robertson v. Method Valley Citizens Council, 490 U.S. 332 (1989)  .................................. 3

Sabine River Authority v. U.S. Department of Interior, 951 F.2d 669 (5th Cir. 1992)  ...................... 3

Sagebrush Rebellion, Inc. v. Hodel, 790 F.2d 760 (9th Cir. 1986) .................................... 15

Sierra Club v. Glickman, 67 F.3d 90 (5th Cir. 1995) .................................................. 11

Stricken's Bay Neighborhood Council, Inc. v. Karen, 444 U.S. 223 (1980) ...................... 3

Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519 (1978) .......................... 12

<u>STATUTES</u>

5 U.S.C. § 553(b)(3)(B) ....................................................................................... 3
5 U.S.C. § 553(d)(3) ........................................................................................... 14
5 U.S.C. § 601 (2), § 604 .................................................................................... 9
5 U.S.C. § 604 .................................................................................................... 9
5 U.S.C. § 706 .............................................................................................. 12,15
5 U.S.C. § 706(2)(A) .......................................................................................... 11

16 U.S.C § 1452 .................................................................................................. 22
16 U.S.C § 1455 .................................................................................................. 3
16 U.S.C. §1456(a)(1)(C) ..................................................................................... 10
16 U.S.C. §1456(c)(1)(A) ..................................................................................... 3,4
16 U.S.C. § 1802(29) ........................................................................................... 13
16 U.S.C. § 1851(a) ............................................................................................. 2
16 U.S.C. §1851(6) .............................................................................................. 20
16 U.S.C. §1851(9) .............................................................................................. 20
16 U.S.C. § 1853(b)(3)(A) .................................................................................... 19
16 U.S.C. § 1854 ............................................................................................... 1,2
16 U.S.C. § 1854(a)(1)(A) .................................................................................... 2
16 U.S.C. § 1854(a)(3) ......................................................................................... 2
16 U.S.C. § 1854(a)(4) ......................................................................................... 2
16 U.S.C. § 1854(c) ............................................................................................. 2
16 U.S.C. § 1855 ................................................................................................. 2
16 U.S.C. § 1855(c) ....................................................................................... 9,14,16
16 U.S.C. § 1855(c)(1) ......................................................................................... 2
16 U.S.C. § 1855(c)(2) ......................................................................................... 2
16 U.S.C. § 1855(c)(3)(B) .................................................................................... 2
16 U.S.C. § 1883(a) ............................................................................................. 5
16 U.S.C. § 1883(d) ............................................................................................. 5
42 U.S.C. § 4332(2)(C) ........................................................................................ 3

15 C.F.R. § 930.32(a) .......................................................................................... 4
15 C.F.R. § 930.34(b) .......................................................................................... 4
15 C.F.R. § 930.41 .............................................................................................. 4

40 C.F.R. § 1501.4(a) .......................................................................................... 23
40 C.F.R. § 1508.27 ............................................................................................ 24

50 C.F.R. § 600.310(d)(1)(ii) ........................................................................................ 13
50 C.F.R. § 600.310(d)(1)(iii) ........................................................................................ 13
50 C.F.R. § 600.310(5)(ii) ........................................................................................ 14

64 Fed. Reg. 71056 (Dec. 20, 1999) ........................................................................................ 6
64 Fed. Reg. 47711 (Sept. 1, 1999) ........................................................................................ 6

ChkPDF - www.fastio.com

# I.  INTRODUCTION

In this case, Plaintiffs challenge an interim fishery management rule for the Gulf of Mexico red snapper fishery, promulgated by the National Marine Fisheries Service ("NMFS"), under the Magnuson-Stevens Fishery Conservation and Management Act, ("MSA"), 16 U.S.C. §§ 1801 *et seq.* Plaintiffs argue that the issuance of the rule violates the National Environmental Policy Act ("NEPA"), the Coastal Zone Management Act ("CZMA"), and the MSA.  Plaintiffs' challenge is without merit. This Court should deny Plaintiffs' motion and grant Defendants' motion for summary judgment.

## II.  BACKGROUND

### A.    STATUTORY AND REGULATORY BACKGROUND

#### 1.    The Magnuson-Stevens Act

Under the MSA, Congress delegated to the Secretary of Commerce "broad authority to manage and conserve coastal fisheries."[1]  Kramer v. Mosbacher, 878 F.2d 134, 135 (4th Cir. 1989). To assist the Secretary in carrying out specific management and conservation duties, the MSA created independent regional fishery management councils ("Councils").  Id.  A Council's "principal task is to prepare fishery management plans ("FMPs") for its area, which must 'assess and specify the present and probable future condition of, and the maximum sustainable yield' of a fishery."  Id. (quoting 16 U.S.C. §§ 1852, 1853).

##### a.    The FMP And FMP Amendment Process

Once proposed by a Council, an FMP is submitted to NMFS (to which the Secretary of Commerce has delegated his authority under the MSA) for review, approval, public comment, and implementation.   See 16 U.S.C. § 1854; see also Florida Wildlife Federation, Def. Exh. A, at 3-4. Upon transmittal by the Council, NMFS must immediately commence review of the plan or amendment to determine if it is consistent with the MSA's ten national standards for fishery

---

[1]    For the most part, state waters extend out to 3 nautical miles seaward of a state coastline. For historical reasons, however, state waters off of Texas and the west coast of Florida extend to 3 marine leagues (approximately 9 nautical miles) seaward.  Federal management begins at the seaward boundary of state waters and extends to 200 miles seaward of the coast.

conservation and management, 16 U.S.C. § 1851(a), or other statutory provisions, and any other applicable law. 16 U.S.C. § 1854(a)(1)(A). Within 30 days after the end of a 60-day public comment period, the Secretary must approve, disapprove, or partially approve the FMP or FMP amendment. 16 U.S.C. § 1854(a)(3). The Secretary may not selectively modify the plan or plan amendment. Id. See also Texas Shrimp Association v. Daley, Def. Exh. B, at 9. Rather, if the Secretary disapproves or partially approves an FMP or plan amendment, the Council may submit a revised FMP or plan amendment to the Secretary for further review. 16 U.S.C. § 1854(a)(4). The Secretary may not independently develop an amendment, unless the Council fails to submit a revised amendment. 16 U.S.C. § 1854(c). Final implementing regulations, once promulgated by the Secretary, have the force and effect of law. 16 U.S.C. §§ 1854, 1855; see Alaska Factory Trawler Ass'n v. Baldridge, 831 F.2d 1456, 1464 (9th Cir. 1987).

### b.   The Regulatory Amendment Process

Most FMPs include "framework" regulatory adjustment provisions to allow the Councils and NMFS to respond to annual fluctuations in the status of managed stocks and to make periodic changes in certain fishing limitations (e.g., bag and size limits, trip limits, area restrictions, etc.) in a timely manner. These framework provisions are established within FMPs through FMP amendments under procedures set forth in the MSA. See 16 U.S.C. § 1854. Once established, the framework provisions authorize the Councils and NMFS to change the fishery management measures in accordance with the framework procedure.

### c.   Interim Or Emergency Rules

The MSA authorizes the Secretary to implement temporary measures to address an emergency if certain criteria can be met, 16 U.S.C. § 1855(c)(1), AR, Vol. 6, 3001 (Emergency Rule Guidelines), or interim measures to reduce overfishing, 16 U.S.C. § 1855(c)(2). Emergency and interim measures can be implemented without notice and comment rulemaking.[2] 16 U.S.C.

---

[2]   To codify permanently the measures contained in an emergency or interim rule, NMFS must promulgate the measures through notice and comment rulemaking. Otherwise, both an emergency rule and interim will expire after 180 days (although both types of rules can be extended for an additional 180 days after notice and comment on the extension,16 U.S.C. § 1855(c)(3)(B).

§ 1855(c), 5 U.S.C. §553(b)(3)(B).

## 2. National Environmental Policy Act

The purpose of NEPA, 43 U.S.C. § 4321 et seq., is to focus the attention of the federal government and the public on a proposed action so that the consequences of the action can be studied before the action is implemented and potential negative environmental impacts can be avoided. Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 371 (1989). NEPA requires a federal agency to prepare an environmental impact statement ("EIS") if the agency proposes to undertake "a major federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). If the agency determines, on the basis of an environmental assessment ("EA"), that the environmental effects are not significant, as NMFS did with the Interim Rule here, the agency issues a finding of no significant impact ("FONSI") and determines not to prepare an EIS. The statute imposes essentially procedural requirements on the federal agency, not substantive ones.[3] "NEPA does not work by mandating that agencies achieve particular substantive environmental results." Marsh, 490 U.S. at 371; see also Stricken's Bay Neighborhood Council, Inc. v. Karen, 444 U.S. 223, 227-228 (1980).

## 3. Coastal Zone Management Act

The CZMA, 16 U.S.C. §§ 1451-65, seeks to protect the nation's coastal zones through a cooperative federal-state effort. It gives states primary responsibility for developing coastal resource management programs through the development of Coastal Management Plans (CMPs) which are then approved and partially funded by the Secretary of Commerce. 16 U.S.C. § 1455.

Federal agency activities affecting the coastal zone must be consistent, to the maximum extent practicable, with the enforceable policies of federally-approved state CMPs. 16 U.S.C. § 1456(c)(1)(A). In general, the federal agency must provide the state with a consistency

---

[3]    Regulations promulgated by the Council on Environmental Quality (CEQ), 40 C.F.R. §§ 1500-1508, provide guidance in the application of NEPA. These regulations are entitled to substantial deference. Robertson v. Method Valley Citizens Council, 490 U.S. 332 (1989); Sabine River Authority v. U.S. Dept. of Interior, 951 F.2d 669, 677 (5th Cir. 1992). NOAA Administrative Order 216-6 also provides guidance and procedures for NMFS's compliance with NEPA.

determination at least 90 days before the federal activity is to commence. 15 C.F.R. § 930.34(b). The state then has 45 days to concur with or object to the consistency determination. 15 C.F.R. § 930.41. If consistency review cannot be completed within the designated time frames, then the federal agency and state may agree to an alternative schedule. 15 C.F.R. § 930.34(b).

If the coastal state agrees with the consistency determination, then the federal agency has fulfilled its coordination responsibilities under the CZMA. 16 U.S.C. § 1456(c)(1)(A). If the state objects, then the state and federal agency attempt to resolve their differences. A federal agency may proceed with its activity over a state's objection only if it determines that the activity is consistent to the maximum extent practicable with the enforceable policies of the state's CMP. 15 C.F.R. 930.32(a). In this case, NMFS made the determination of consistency with regard to the Interim Rule. AR, Vol. 12, at 5494 (Dec. Memo) and 5501 (Determinations).

## B. FACTUAL BACKGROUND

### 1. The History Of The Red Snapper Fishery And Status Of The Stock

Management of the red snapper fishery began in 1984, when the Gulf of Mexico Fishery Management Council's ("Council") Reef Fish Fishery Management Plan ("Reef Fish FMP" or "FMP") for the Gulf of Mexico became effective. AR, Vol. 2, at 0595 (1995 Stock Assessment, Executive Summary) See also 50 C.F.R. Part 622. In 1988, the first red snapper stock assessment found that the fishery was "overfished." AR, Vol. 2, at 0847 (History of Management). See also AR, Vol. 2, at 0396. (Complete 1988 stock assessment at 0393-0517). In 1990,[4] NMFS implemented Amendment One to the Reef Fish FMP, which established a stock rebuilding plan.

Throughout the 1990s, the red snapper fishery was managed through a series of plan amendments and regulatory amendments focused on rebuilding the declining fish stocks. AR, Vol. 2, at 0847-0853 (History of Management). See also AR, Vol. 2, at 1099 (Dec.1998 Regulatory Amendment or "Reg. Amdmt"). Each year, stock assessments or assessment updates were

---

[4]   The 1990 stock assessment determined that red snapper abundance had declined more than 90 percent since the early 1970s. AR, Vol. 2, at 0521 (1990 Stock Assessment), 0518-0593 (complete assessment).

conducted,[5] and, based on these assessments, the Gulf Council recommended that NMFS change the management measures to achieve the rebuilding goals. Id. Management measures were geared to "restore the stock to a level above the presently defined overfished threshold of 20 percent spawning potential ratio (SPR)[6] by the year 2019." Id., at 1098.

The status of the red snapper stock became controversial, however, and, in 1997, Congress mandated an independent scientific assessment of the red snapper stock and a peer review of the scientific information, including the fisheries statistics, stock assessments, and "appropriateness of the scientific advice used for red snapper fishery management." 16 U.S.C. § 1883(a), AR, Vol. 3, at 1161 (Peer Review Report), 1155-1254 (complete report). The independent reviewers, who participated in three panel meetings, agreed that "all the scientifically credible assessments of [Gulf] red snapper, including additional assessments run at the panel meeting, very strongly support the conclusion that the stock is severely overfished." Id., at 1163. Since the independent scientific review, NMFS continued to develop its own stock assessments, AR, Vol. 4, at 2251-2335 (1998 Status Document), and, in September, 1999, it again concluded that the Gulf of Mexico red snapper stock was overfished and that overfishing was occurring. AR, Vol. 6, at 3345. (1999 Stock Assessment Panel Report).

A recreational fishery quota was established in 1997, AR, Vol. 1, at 0044 (March 1997 Final Rule), and, once the quota is filled, the fishery must be closed. 16 U.S.C. §1883(d), AR, Vol. 2, at 0973-94. (March 1997 Reg. Amdmt.) The recreational fishery has exceeded its quota every year since 1997. AR, Vol. 12, at 5423 (EA).

## 2. Events Leading To The Publication Of The Interim Rule

### a. The September 1, 1999 Red Snapper Regulatory Amendment

In June, 1999, in accordance with the Reef Fish FMP framework amendment procedures,

---

[5]    For examples of stock assessments, see AR, Vol. 2, at 0393-0517 (1988 Stock Assessment); AR, Vol. 2, at 0518-0593 (1990 Stock Assessment); AR, Vol. 2, at 0594-0769 (1995 Stock Assessment); and AR, Vol. 6, at 3231-3336 (1999 Stock Assessment)

[6]    For an explanation of SPR, see AR, Vol. 2, at 0848 (History, Amdmt. 1), AR, Vol. 2, at 0981-0984 (March 1997 Reg. Amdmt.).

NMFS published a proposed regulatory amendment that included the following measures: (1) a 4-fish bag limit for recreational fishermen; (2) a 0-fish bag limit for captain and crew of charter vessels or headboats; (3) a reduction in the open periods of the fall red snapper commercial season from the first 15 days of each month to the first 10 days of each month, beginning September 1 each year; and (4) a delayed opening of the recreational season until March 1. 64 Fed. Reg. 47711 (Sept. 1, 1999); AR, Vol. 1, at 0068 (September 1 Rule) In the final rule, NMFS approved all of the measures except for the one regarding the delayed season. Id., at 0067. NMFS disapproved this measure because, in conjunction with the other proposed measures, the fishery was projected to close on July 30, thereby eliminating a fall fishery. AR, Vol. 12, at 5423 (EA). NMFS determined that elimination of both a winter fishery (via a delayed season) and a fall fishery (via a July 30 closure) would violate National Standard Four, which requires allocation of fishing privileges to be fair and equitable. 64 Fed. Reg. 71056 (Dec. 20, 1999); AR, Vol. 18, at 8877 (Interim Rule), 16 U.S.C. § 1851(4). Like the other Gulf states, Texas typically has a winter season and an even stronger fall season. AR, Vol. 12, at 5425 (EA).

### b. The Stakeholder Process

Although NMFS promulgated the September 1 Rule, NMFS was aware that many fishermen were dissatisfied with the red snapper management regime. AR, Vol.11, at 4858 (Letter from Hogarth to Council). NMFS believed that the red snapper management system would benefit from more stakeholder involvement, AR, Vol. 5, at 2901 (Executive Summary of Stakeholder Process or "Stakeholder Summary"), and offered to fund a series of stakeholder meetings involving four categories of defined stakeholder groups: for-hire (charter boats), conservation, commercial and private recreational.[7] Id.

The stakeholders developed suggested measures for each stakeholder category, including the for-hire and recreational fishermen. The suggested measures for the recreational fishery included: (1) a "uniform" four-fish bag limit (applicable to anglers and charterboat/headboat captains and crew);

---

[7] Defendants understand that Plaintiff Bobby Grumbles participated in the stakeholder process, along with other Texas fishermen.

(2) no more than a 16-inch minimum size limit; (3) a recreational fishing season from March 1-October 31; and (4) maintenance of regulations and total allowable catch ("TAC") level for a three year period.[8] Id. at 2902 and 2903 (Stakeholder Summary)  A group of Texas fishermen developed a "minority" position supporting a year-round season, 4-fish bag limit, and 13-inch minimum size limit.[9]

     c.    **Gulf Council Action On Stakeholder Suggestions**

The Gulf Council Reef Fish Management Committee met on November 9, 1999.  AR, Vol. 6, at 2954 (Committee Meeting Minutes or "Comm. Min.").  The Committee discussed the stakeholder suggestions, including the minority opinion of the Texas recreational fishery stakeholders. AR, Vol. 6, at 2957.  NMFS's analyses demonstrated that the recreational season could be open year-round with 2-fish bag limit and a 17-inch minimum size, or the season could run from April 1 to October 31 with a 4-fish bag limit, 0-fish bag limit for captain and crew, and 16-inch size limit.  AR, Vol. 6, at 2957 (Comm. Min.).  NMFS estimated the harvest impact of a 4-fish bag limit for captain and crew at 140,000 pounds -- the equivalent of 4-5 days of peak season harvest, or 10 days during the offseason.  Id.  See also id., at 2959 (Council member discussion).

The Committee voted 6-0 to recommend to the Council that the recreational fishery have a 4-fish angler bag limit, 0-fish captain and crew bag limit, 16-inch minimum size, and an April 1-October 31 season.  AR, at Vol. 6, at 2961 (Comm. Min.).  Discussion continued, however, on the 0-fish bag limit for captain and crew,[10] id., at 2962, and the Committee approved a substitute motion

---

[8]    To facilitate the stakeholder process, NMFS provided an options paper on possible management combinations, based on the best scientific information available. AR, Vol. 11, at 4858-67 (Letter from Hogarth to Council).  NMFS also paid the cost of convening the meetings, but the stakeholders chose their own representatives and set their own agenda.  AR, Vol. 5, at 2901 (Stakeholder Summary).

[9]    The Texas stakeholders also supported an increase in Total Allowable Catch ("TAC") from 9.12 million pounds to 12 million pounds. AR, Vol. 6, at 3000.  (Texas minority opinion "handout").

[10]    Concerns remained that: (1) it was unfair to single out charter vessel captains and crew while allowing the captain and crew of other vessels to catch their bag limit; (2) the Coast Guard could not differentiate between a vessel being used as a charter vessel or a private recreational vessel; and (3) reinstating the bag limit would not have a significant impact on the fishery. AR, Vol.6, at 2962

that reinstated the 4-fish bag limit for captain and crew. Id., at 2968.

The full Gulf Council met for the following three days,[11] AR, at 3040 (Council Meeting Minutes or "Council Min."), heard public testimony on red snapper management options,[12] discussed the various suggestions, id., at 3043-62, heard a summary of the Reef Fish Management Committee Report, id., at 3070-71, and debated various combinations of measures to reduce overfishing. Id., at 3043-62, 70-71. The Council debated several motions to establish a subquota for Texas, including one in which Texas would receive 25% of the entire Gulf red snapper recreational quota. The Council voted 13 to 4 to reject a Texas subquota and other measures supported by the Texas minority.[13] Id., at 3079 (Council vote against subquota).

The Council then voted 14-3 to recommend a 4-fish uniform bag limit, a 16-inch minimum size, an April 15 - October 31 season, and a commercial season that was open only on the first 10

---

(Comm. Min.).

[11] On October 25, 1999, the Council published a Federal Register notice providing public notification of the upcoming meeting and the red snapper issues that would be discussed. At the meeting, the public had an opportunity to comment on the measures contained in this interim rule. AR, Vol. 6, at 3672-73; AR, at 8879 (Interim Rule)

[12] A charter vessel fisherman from Texas, who participated in the stakeholder process and submitted comments on behalf of the "entire contingent from Texas," AR, at 3000 ("handout"), maintained that while he did not support the April 1 opening date, the fact that the season would remain open later in the year would greatly benefit his fishery. AR, at 3051 (Nugent comments).

[13] The Texas Council representative, Mr. Osburn, proposed a measure that would have given 25% of the total Gulf red snapper recreational fishing quota to Texas, with the bag and size limits, seasons and gear restrictions to be set by the Texas Parks and Wildlife Commission ("Commission"). Such a measure, he explained, was necessary due to, among other things, the "uniqueness" of the area specified off of Texas. AR, Vol. 6, at 3076 (Council Min.). Other Council members objected to allowing the Commission to set the management restrictions, noting the Commission's refusal in the past to close Texas state waters to red snapper recreational fishing when other Gulf states had closed their waters to comply with the federal closure. Id., at 3078. Mr. Osburn withdrew his motion, and substituted the motion that was eventually defeated, which would have established a recreational fishery subquota for Texas with a 13-inch size limit, a 4-fish bag limit, retention of the first 4 fish over 3 inches and a year-round season. Id., at 3078-79. The Council rejected the substitute motion, id., at 3079, because a Texas subquota would substantially shorten the prime April to October season. AR, Vol. 12, at 5449 (EA - Controversy section). Furthermore, shortening the April to October season would increase the likelihood that illegal fishing would occur during the closed season, resulting in overfishing of the recreational quota. Id.

8

days of each month. Id., at 3071-76. Because the fishery was scheduled to open on January 1, 2000, the Council also voted to recommend that NMFS implement the measures on a temporary basis through an interim rule, id., at 3095-96 (Council vote on IR), and permanently implement the measures through a regulatory amendment.[14] Id., at 3096 (Roll Call vote to submit regulatory amendment for 2000 and 2001 measures.) The Council's recommendation was then submitted to NMFS for review on November 16, 1999. NMFS received 1311 unsolicited comments supporting the recreational fishing stakeholder suggestions, and 58 against. AR, Vols. 12-18, at 5549 to 8817 (Public comment). Commenters ranged from U.S. senators to state resource agencies to private fishermen.

### d.    The December 20, 1999, Interim Rule

NMFS determined that the proposed amendment was consistent with the MSA and published the recommended measures in an interim rule ("Interim Rule") on December 20, 1999, pursuant to 16 U.S.C. § 1855(c). AR, Vol. 18, at 8876 (Interim Rule). NMFS, however, changed the starting date of the recreational fishery from April 15 to April 21, as it had been authorized by the Council to do, if necessary, to accommodate the reinstatement of the 4-fish bag limit for captain and crew. AR, Vol. 12, at 5427 (EA - Recreational Bag Limit)

In issuing the Interim Rule, NMFS prepared an economic analysis,[15] AR, Vol. 12, at 5441-48 (EA), which examined the impacts of the Interim Rule, the status quo under the current regulations (promulgated in the September 1 Rule), and several other alternatives for changing the length and

---

[14]    Two of the three Texas state representatives on the Council voted for the measures.

[15]    NMFS conducted the economic analysis pursuant to Executive Order 12866, which requires NMFS to undertake a regulatory impact review of each rule. While Plaintiffs discuss, in some detail, the statutory requirements and judicial review provisions of the Regulatory Flexibility Act ("RFA"), Plaintiffs do not state a claim under the RFA upon which relief may be granted, in either the 2nd Amended Complaint or the Motion for Summary Judgment. Therefore, Defendants do not address any RFA claims herein. Defendants do note, however, that the Interim Rule is exempt from the RFA because it does not require notice and comment. AR, Vol.18, at 8876, 8879 (Interim Rule), See 5 U.S.C. § 601 (2), § 604.

starting date for the recreational red snapper season, angler and captain-and-crew bag limits, and minimum fish sizes for recreational fishing. The analysis found that the Interim Rule was preferable to the status quo because the Interim Rule

> approximates the season proposed by the Council while accommodating the additional harvest expected to accrue to a reinstatement of the 4-fish captain and crew limit, will accommodate stock recovery requirements, will allow increased target trips, will allow approximately equal consumer surplus from red snapper trips, will result in fewer trip cancellations, and will result in less foregone for-hire gross revenues due to trip cancellations."

Id., at 5446.

NMFS prepared and issued an EA and FONSI, id., at 5419-53, which examined the environmental impacts of the implementation of the interim rule and the status quo regulations, and considered several other alternatives for changing the length and starting date for the recreational red snapper season, angler and captain-and-crew bag limits, and minimum fish sizes for recreational fishing. See AR, Vol. 12, at 5428, 5447-48 (EA). The EA noted:

> The actions proposed in this interim rule are adjustments of the original regulations of the FMP under the framework procedure set forth in Amendment 1 to rebuild overfished reef fish stocks. The proposed actions should not result in impacts significantly different in context or intensity from those described in the environmental impact statement and environmental assessment published with regulations implementing the FMP and amendment 1 and a supplemental environmental impact statement prepared with Amendment 5.

Id. at 5449. The EA found that the Interim Rule would not affect the physical environment, wetlands or endangered or threatened species; it would reduce overfishing and thus likely benefit the fishery resource; and it would result in benefits to the recreational and commercial fishing sectors. Id., at 5450-51. On the basis of the EA, NMFS concluded "that there will be no significant environmental impacts from the interim rule, or fishing under this action." Id., at 5451.

In order to comply with the CZMA's procedural requirements under 16 U.S.C. § 1456(a)(1)(C), and to maximize the period for review by the Gulf Coast states, NMFS issued the CZMA consistency determination on November 19, 1999, AR, Vol.12, at 5316-24 (Letters to States), three days after receiving the proposed Interim Rule from the Council. In its consistency

determination, NMFS explained that the Interim Rule "must be effective by January 1, 2000, in order to change the recreational season," and, thus, asked the states for an expedited review of its consistency determination.  Id.  All of the Gulf Coast states responded to NMFS's consistency determination, and, with the exception of the state of Texas, all concurred that the Interim Rule was consistent with their state coastal management plans. AR, Vol. 12, at 5524-27 (Letters from States). Texas responded on an expedited basis, but disagreed that the Interim Rule was consistent with its CMP.  AR, Vol. 12, at 5376 (Texas Letter).  On December 14, 1999, NMFS responded to Texas's objection, reiterating and explaining in more detail how the Interim Rule was consistent to the maximum extent practicable with Texas's CMP as well as the rationale underlying the Interim Rule. AR, Vol. 12, at 5372 (NMFS Letter to Texas).  Because the fishery was scheduled to open on January 1, 2000, NMFS published the Interim Rule in the Federal Register on December 20, 1999. AR, Vol. 18, at 8876 (Interim Rule).

## III. <u>STANDARD OF JUDICIAL REVIEW</u>

Review of agency action under the MSA, NEPA, and CZMA is governed by the Administrative Procedure Act (APA), 5 U.S.C. §§ 500-706.  <u>See, e.g.</u>, <u>Marsh v. Oregon Natural Resources Council</u>, 490 U.S. 360 (1989); <u>Citizens to Preserve Overton Park v. Volpe</u>, 401 U.S. 402 (1971); <u>Sierra Club v. Glickman</u>, 67 F.3d 90 (5th Cir. 1995); <u>C & W Fish Co. v. Fox</u>, 931 F.2d 1556, 1562 and 1565 (D.C. Cir. 1991).

Section 706(2)(A) of the APA directs a reviewing court to affirm final agency action, unless that action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accord with the law." 5 U.S.C. § 706(2)(A).  Thus, judicial review of agency action under the arbitrary and capricious standard is narrow in scope and designed to determine whether the agency has provided a reasoned explanation of its decision and has examined all relevant data.  It is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.  <u>Motor Vehicle Manufacturers Assoc. v. State Farm Mutual Automobile Insurance Co.</u>, 463 U.S. 29, 43, 50 (1983).

In reviewing NMFS's findings and actions, the Court should pay substantial deference to the

agency:

> [It is] especially appropriate for the Court to defer to the expertise and experience of those individuals and entities - the Secretary, the Councils, and their advisors - whom the Act charges with making difficult policy judgments and choosing appropriate conservation and management measures based on their evaluations of the relevant quantitative and qualitative factors.

National Fisheries Institute, Inc. v. Mosbacher, 732 F.Supp. 210, 223 (D.D.C. 1990) (citing Pittston Coal Group v. Sebben, 488 U.S. 105 (1988) and Marsh, 490 U.S. 360, 379 (1989)).

The scope of judicial review under the APA is limited to the administrative record that was before the agency when the agency rendered its decision. 5 U.S.C. § 706; Florida Power and Light, 470 U.S. 729, 743-44 (1985); Camp v. Pitts, 411 U.S. 138, 142 (1973); Glickman, 67 F.3d at 95-97. If the agency's decision cannot be sustained based on the administrative record when subjected to this standard of review, the court must remand to the agency for further consideration. Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 549 (1978).

## IV.   ARGUMENT

**A.**   **The Secretary's Use Of The Interim Rule Is Appropriate To Reduce Overfishing.**

   **1.**   **The Red Snapper Fishery Is Overfished.**

As described above, the red snapper fishery is overfished and overfishing is occurring. Plaintiffs do not and cannot seriously question the overwhelming scientific support in the record that the red snapper fishery is overfished. Plfs. Mem., at 10. Instead, Plaintiffs argue that, since overfishing is defined as fishing at a rate that is inconsistent with the rebuilding schedule, Plfs. Mem., at 19, "overfishing" can only occur when the fishery is open and currently being harvested (at this inconsistent rate). Because the red snapper directed fishery was still closed on December 20, 1999, the day that the Interim Rule was published, Plaintiffs argue that no overfishing was occurring, and no interim rule to control overfishing was necessary or authorized.

Plaintiffs' attempt to confine the rate of fishing mortality to the daily harvest by the directed fishery is erroneous. The MSA and the regulations define "overfishing" as "a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a

continuing basis." 16 U.S.C. 1802(29), 50 C.F.R. § 600.310(d)(1)(ii). The regulations further explain that "overfished" is used in two senses: first, to describe a stock that is subjected to a level of fishing mortality described in 50 C.F.R. § 600.310(d)(1)(ii), and second, to describe any stock or stock complex whose size is sufficiently small that a change in management practices is required in order to achieve an appropriate level and rate of rebuilding. 50 C.F.R. § 600.310(d)(1)(iii). Amendment 1 to the Reef Fish FMP defines an "overfished" reef stock as one below the level of 20% SPR, and "overfishing" is defined as "harvesting at a rate that is not consistent with a program that has been established to rebuild the stock or stock complex to the 20% static SPR level." AR, Vol. 2, 1104 (Dec. 1998 Reg. Amdmt.) The statute and the regulations make clear that overfishing and overfished are qualitative values that describe either a rate of overall fishing mortality, or the biological status of a stock that requires immediate management action.

The Council and NMFS evaluate red snapper mortality from all sources on an annual basis in order to determine whether overfishing is occurring. The year-round state and federal shrimp fishery has a significant impact on red snapper mortality.[16] Other directed fisheries, both in state and federal waters, also continue to harvest red snapper as bycatch. Therefore, closure of the directed red snapper recreational fishery on a particular date is irrelevant to the scientific determination of whether overfishing is occurring. Plaintiffs' attempt to read a temporal limitation into the statute here must be rejected. Public Citizen v. U.S. Department of Justice, 491 U.S. 440, 453-54, 467 (1989) (court should reject interpretation of statute that leads to unreasonable results).

## 2. The MSA Does Not Require NMFS To Provide Notice And Comment On the Interim Rule.

---

[16] For every pound of shrimp caught in the Gulf in shrimp trawls, approximately 4.2 pounds of finfish are also caught. Much of this bycatch is discarded dead. AR, Vol. 2, at 0082 (Proposed Rule, Amdmt. 9). Bycatch by shrimp trawls has a significant impact on stocks of red snapper. AR, Vol. 2, at 0595 (1995 Stock Assessment). Fisheries experts estimate that 83 to 88 percent of all juvenile red snapper die as bycatch in shrimp trawls. Id., at 0596. Most of the red snapper bycatch consists of unmarketable juvenile fish that have not yet reached spawning age. Id.

Plaintiffs argue that NMFS used the Interim Rule "to bypass normal procedures," Plfs. Mem., at 20, and attempted to circumvent normal notice and comment through a "conclusory"claim of overfishing.[17] Plfs. Mem., at 20. Plaintiffs' argument is baseless. The MSA authorizes publication of an interim rule to prevent overfishing. See section II.A.1.c., supra; 16 U.S.C. § 1855(c). The APA authorizes waiver of notice and comment and the delayed effectiveness period for good cause. 5 U.S.C. § 553(b)(3)(B) and (d)(3). The MSA implementing regulations state that "[i]f interim measures are made effective without prior notice and opportunity to comment, they should be reserved for exceptional situations, because they affect fishermen without providing the usual procedural safeguards." 50 C.F.R. § 600.310(5)(ii). The regulations also provide that "a Council recommendation for interim measures without notice-and-comment rulemaking will be considered favorably if the short-term benefits of the measures in reducing overfishing outweigh the value of advance notice, public comment, and deliberative consideration of the impacts on participants in the fishery." 50 C.F.R. § 600.310(5)(ii).

The facts leading to publication of the Interim Rule meet the APA good cause exception and the "exceptional situation" standard, and the benefits of the Interim Rule measures outweigh any harm due to lack of public comment. Red snapper recreational and commercial fishermen across the Gulf had expressed their dissatisfaction with the September 1 Rule, increasing the probability of noncompliance. The Gulf states were unlikely to comply with the estimated July 30 federal closure, which would allow continued fishing in state waters, increasing the likelihood of significant overfishing of the red snapper stock. AR, Vol. 9, at 4312 (E-Mail); AR, Vol. 12, at 5424 (Dec. Mem.) The open and inclusive stakeholder and Council process had resulted in a rational set of industry-crafted and supported measures, where the public had an opportunity to comment on and debate the measures amongst themselves and before the Council. AR, Vol. 12, at 5487-5503 (EA and

---

[17]    Contrary to Plaintiffs' claim, Plfs. Mem., at 21, the Interim Rule is not an "emergency" rule. An emergency rule requires a showing of an emergency, while an Interim Rule requires only a showing of overfishing. 16 U.S.C. § 1855(c).

Dec. Mem.). No opinion was excluded from the process.

The benefit of immediate implementation of the new measures -- which would ensure a lucrative fall fishery yet eliminate one of the most intractable causes of overfishing, incompatible state/federal seasons -- outweighed the harm of foregoing comment,[18] which had already substantially occurred in the stakeholder and Council processes. Thus, NMFS's use of an interim rule was appropriate.

Plaintiffs also claim NMFS abused the APA's "good cause" exception to exempt the rule from notice and comment because that exception is "generally treated as an emergency procedure," and, Plaintiffs argue, no emergency existed. However, for the reasons stated above (and in NMFS's decision documents), the same reasons that justify promulgation of the Interim Rule on a temporary/interim basis also made it impracticable and contrary to the public interest to provide notice and opportunity for comment upon, or to delay for 30 days the effective date of the interim regulations under the provisions of sections 553(b) and (d) of the APA. AR, Vol. 12, at 5502 (Dec. Mem.). If the new measures were not effective on January 1, 2000, the fishery would have opened pursuant to the September 1 regulations. Any landings made between January 1 and the effective date of a future regulatory amendment would have to be compensated for by shortening the proposed April 21-October 31 season.[19] Id., at 5502 (Dec. Mem.) Since the April 21-October 31 season is

---

[18]    Although the measures were implemented without formal notice and comment, the Interim Rule requested public comment on the measures. AR, Vol. 18, 8876 (Interim Rule).

[19]    In any event, the APA requires that upon review of final actions such as the NMFS's Interim Rule, the Court is to take "due account" of "the rule of prejudicial error." 5 U.S.C. § 706. See Riverbend Farms, Inc. v. Madigan, 958 F.2d 1479, 1487 (9th Cir. 1992). In the notice and comment context, error is held to be harmless if the complaining party had sufficient actual notice of the relevant issues. Riverbend Farms, 958 F.2d at 1487 n.7; Sagebrush Rebellion, Inc. v. Hodel, 790 F.2d 760, 764-65 (9th Cir. 1986). Here, Plaintiffs were aware of and in fact actively participated in the stakeholder process that led up to the Interim Rule. Their concerns were also raised and considered at the Council meeting. Thus, Plaintiffs were well aware of the recommended changes to the September 1 Rule well before the issuance of the Interim Rule. Accordingly, even assuming arguendo that NMFS erred in implementing the Interim Rule measures before notice and comment were complete, the error was harmless. Moreover, consistent with 16 U.S.C. § 1855(c), NMFS will

15

supported by a majority of the recreational sector, NMFS's decision to make the measures effective immediately was rational.

**B.    NMFS Reasonably Concluded That The Interim Rule Will Reduce Overfishing.**

**1.    Compatible Federal/State Regulations Reduce Overfishing.**

**a.    Overfishing Increases Without Compatible Federal/State Regulations.**

Although NMFS has managed the federal red snapper harvest to reduce excessive harvest, incompatible federal/state seasons remain one of the most significant causes of overfishing.[20] If the state seasons remain open after the federal season closes, the conservation benefit of the federal restrictions is lost.[21] In addition, enforcement efforts are difficult and noncompliance increases. AR, Vol. 12, at 5424 (EA).

NMFS initiated the stakeholder process to solve this problem and provide state resource managers and red snapper fishermen with an opportunity to recommend a combination of bag limits, size limits, and closed seasons that, based upon the best available science, would result in a catch that approximates the quota, and eliminates the need for NMFS to close the fishery during the state season. AR, Vol., 11, at 4858 (Hogarth Letter to Council)  Although the stakeholders preferred a year-round fishery, NMFS's analysis demonstrated that a year-round fishery required a 2-fish bag limit and 17-inch minimum size to prevent a quota overrun. AR, Vol. 6, at 2957 (Comm. Min.). Therefore, the stakeholders recommended shifting the fishery to the April-October period, the time of greatest demand for all the Gulf states, including Texas.  With the enactment of the Interim Rule, Florida, Alabama, Louisiana and Mississippi are expected to establish an April 15-October 31

---

provide notice and comment on any extension of the Interim Rule, and any regulatory amendment that makes the measures permanent will be implemented after notice and comment.

[20]    The other significant cause of overfishing is bycatch of juvenile red snapper in shrimp trawls. To address this problem, in 1998, NMFS approved Amendment 9 to the Shrimp FMP, which required shrimp vessels fishing in federal waters to install bycatch reduction devices ("BRDs") in their nets. AR, Vol. 1, at 0088 (Final Rule, Amdmt. 9 to Gulf Shrimp FMP).

[21]    NMFS estimated that management under the Sept. 1 Rule could  result in continued state harvests during the Federal closures of over 600,000 pounds. AR, Vol. 12, at 5429 (EA).

recreational season.  AR, Vol.12, at 5332 (Section 7 consultation).

Plaintiffs argue that the September 1 Rule was sufficient to control overfishing, and that nothing shows that the September 1 rule "jeopardizes the capacity of the fishery to produce the maximum yield." Plfs. Mem., at 19.  Plaintiffs are wrong.  The September 1 Rule, with its specific combination of measures and seasons, faced almost assured state fishing during the federal closure and noncompliance by anglers.  AR, Vol.9, at 4312 (E-Mail); AR, Vol. 12, at 5424 (EA)  The impact of the state and illegal harvest would have resulted in continued, increased overfishing and jeopardization of the capacity of the fishery to produce the maximum yield.  Id., at 5428.  Therefore, given these factors, NMFS's approval of the stakeholder and Council-supported measures was rational and justified.

### b.     NMFS Appropriately Reversed Its Disapproval Of A Delayed Season.

NMFS's decision to delay the recreational season, even though it disapproved a proposed delayed season in the September 1 Rule, was not arbitrary and capricious, as Plaintiffs claim.    As the administrative record shows, NMFS disapproved the proposed delayed season in the September 1 Rule because NMFS determined that, under the Council's proposal, the fishery would still close on July 30, and, thus, instead of extending the fishery into the fall, as the Council intended, there would be a net loss of fishing days for the year.  AR, Vol. 12, at 5424 (EA);  AR, Vol.18, at 8877 (Interim Rule, Recreational Season).  Therefore, if the winter fishery was eliminated due to the delayed season and the fall fishery was eliminated due to the July 30 closure, the benefit of the delayed season would not outweigh the harm to Texas fishermen, who depended on the winter season.  AR, Vol. 1, at 0068 (September 1 Rule, Response 2).

Through the Interim Rule, however, NMFS determined that compatible state/federal seasons, combined with the recommended changes to the bag and size limits, would help reduce the harvest rate overall and, therefore, ensure a late summer and fall fishery for all Gulf fishermen, including Texas. The Interim Rule also reduces the number of commercial fishing days per month, which is expected to reduce the harvest rate and the probability of exceeding the commercial quota.  AR, Vol.

17

9, at 4212 (E-Mail); AR, Vol. 12, at 5424 (EA).  Thus, in contrast to the September 1 Rule, NMFS's Interim Rule ensured a fall fishery, which is typically more lucrative for all of the Gulf states, including Texas.  See infra.  Under these circumstances, NMFS's change in approach from the September 1 Rule to the Interim Rule is reasonable.  Motor Vehicles Mfrs. Assn v. State Farm, 463 U.S. 29, 57 (1983) ("An agency's view of what is in the public interest may change, either with or without a change in circumstances," provided the agency supplies a reasoned analysis); Republican National Committee v. FEC, 76 F.3d 400, 407 (D.C. Cir. 1996) (agency change in position will be upheld so long as it provides reasoned explanation for doing so).

The entire "burden" of the new season will not fall on Plaintiffs, as they claim. Plfs. Mem., at 21. All of the Gulf states have a winter fishery, AR, Vol. 2, at 0629 (1995 Stock Assessment, Figure 60), and all the states will share any possible burden.  Texas, however, stands to benefit significantly from a legal fall fishery, both in terms of landings and number of trips.  During 1996, when the red snapper fishery was last open year round, Texas monthly landings for the May-October period exceeded those of any other months.  AR, Vol. 12, at 5425 (EA).  Landings in 1995-1998 for the August-October period averaged 137,000, while January-March landings only averaged 96,000 pounds.  Id., at 5425.  Headboat trips in Texas in the August-October period average 8,000 trips per month, as compared to 5,000 in the January-March period.[22]  Id., at 5425.  Therefore, far from being disproportionately harmed, Texas fishermen will benefit from the rule.[23]

## 2.   Minimum Size Limits Are Expressly Authorized By The MSA And Are Appropriate For This Fishery.

The MSA and the Reef Fish framework authority expressly authorize the use of minimum size limits when necessary and appropriate for the conservation and management of a fishery. 16 U.S.C. § 1853(b)(3)(A); AR, Vol. 2, at 0857 (Oct. 1994 Reg. Amdmt.).  Plaintiffs' attempt to discredit the

---

[22]   Charterboats average 2,000 trips per month during August-October, but only 1,200 during January-March.  AR, Vol. 12, at 5425 ( EA).

[23]   In fact, if the Texas Commission refuses to close its state waters after October 31, Texas fishermen will be disproportionately benefitted.

use of minimum size limits, Plfs. Mem., at 5 and 23, disregards Congress' intent, reaffirmed as recently as the 1996 amendments to the MSA, to authorize minimum size limit adjustments to manage a fishery. Furthermore, the mortality of released fish is an important consideration in evaluating the conservation efforts of regulations that set minimum sizes and total allowable catch. AR, Vol. 2, at 0606 (1995 Stock Assessment). In evaluating a minimum size regulation, NMFS accounts for this mortality, which often varies according to the fishery and the depth at which the fish is caught. AR, Vol. 2, at 0606 (1995 Stock Assessment, Release Mortality). In shallow waters, where the recreational fishery usually fishes with hand lines, the red snapper mortality is as low as 20%. In deeper waters, however, where the commercial fishery uses electrical reels to bring the fish quickly to the surface (and the resulting rapid pressure change is more likely to kill the fish) mortality can be as high as 33%. AR, Vol. 12, at 5426 (EA). These mortality estimates were considered in setting the TAC for red snapper and the resulting quota for the commercial and recreational fisheries. The greater mortality in the commercial fishery explains why NMFS approved the stakeholder and Council recommendation to retain the 15-inch minimum size limit for that fishery. AR, Vol.18, at 8878 (Interim Rule); AR, Vol. 6, at 3256-3336 (1999 Stock Assessment).

Plaintiffs also argue that the increase in the minimum size from 15 inches to 16 inches violates National Standard 9 because it results in the increased mortality of released, under-size fish.[24] Plaintiffs' argument is flawed for two reasons. First, National Standard 9 provides that conservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent

---

[24] In their summary judgment motion, Plaintiffs argue that (1) the increase in minimum size limitation violates National Standard 9, and that (2) the limitation increase violates National Standards 6 and 9. Plfs. Mtn. ¶¶4(c), 7. In their summary judgment brief, however, Plaintiffs provide a detailed argument only as to the alleged National Standard 9 violation. Faced with this apparently inconsistent approach, Defendants address herein only the merits of the alleged National Standard 9 claim. Defendants deny Plaintiffs' conclusory allegation that the increase in minimum size limitation violates National Standard 6 because it is fatally flawed. This National Standard requires conservation and management measures to consider and allow for variations among, and contingencies in, fisheries, fishery resources, and catches. 16 U.S.C. §1851(6) NMFS has appropriately considered variations among the recreational and commercial fisheries, AR, Vol. 12, at 5426 (EA). The administrative record and Plaintiffs show no evidence supporting special measures for Texas.

bycatch cannot be avoided, minimize the mortality of such bycatch. 16 U.S.C. § 1851(9). The language *"to the maximum extent practicable"* provides the Secretary with the flexibility and discretion to implement a measure that may cause a minimal increase in mortality, but provide other valuable conservation benefits. In this case, those benefits include a reduction in the harvest rate, which, in conjunction with the bag limits and closed season, will help ensure that the recreational quota is not exceeded and reduce overfishing. Second, NMFS's analysis shows that a minimum size of 16 inches, harvested in shallow waters, can still achieve red snapper biomass targets. AR, Vol. 12, at 5426 (EA); Vol. 1, at 0271 and 0275 (Figure 2) (1999 Options Document). The mortality associated with the increased minimum size is within acceptable mortality ranges.

In this case, the minimum size limit is a necessary component of the Interim Rule because it will restrict harvest and reduce the risk of overfishing. AR, Vol. 12, at 5426 (EA). As such, NMFS reasonably included it in the management measures approved for implementation.[25]

### 3. Reinstatement Of The 4-Fish Bag Limit For Captain And Crew Alleviated A Restriction, Improved The Chances of Compliance, and Did Not Raise The Overall Harvest Rate.

NMFS initially approved the zero-fish bag limit for captain and crew in the September 1 Rule in order to extend the season without increasing the harvest, since the risk of overfishing remained due to the incompatible state/federal seasons. AR, Vol. 12, at 5427 (EA); AR, Vol. 12, at 5444 (Economic Analysis). NMFS questioned, however, the likely success of the 0-fish bag limit: the for-hire fishery vigorously opposed the measure, AR, Vol. 12, at 5426 (EA), and the Gulf states were unlikely to enact a compatible 0-fish bag limit. AR, Vol. 12, at 5427 (EA).

---

[25] Plaintiffs cite to statements made by Michael Schirripa, a NMFS scientist, during a Council discussion of the merits of a minimum size limit. Mr. Schirripa posits that the end result [of an increase in minimum size] will be "an increase in the total number of fish killed due to an increase in the number of fish being released." Plfs. Mem., at 25. These statements reflect a normal, open discussion of issues between the scientists, which NMFS encourages. Courts have also acknowledged the benefits of such a discussion. See National Fisheries Institute v. Mosbacher, 732 F.Supp. 210, 227 (D.D.C. 1990) ("That the administrative record . . . reflects a certain amount of disagreement among the countless individuals involved in developing or commenting on the FMP is inevitable and indicates that the debate was as open and vigorous as Congress intended.")

CutePDF - www.tevia.com

In eliminating the 0-fish bag limit for captain and crew, NMFS relieved a restriction on charter and headboat captains and crew, who were the only group of recreational fishermen who could not harvest red snapper.  AR, Vol. 12, at 5506 (Council letter to Hogarth).  Furthermore, because the overall recreational quota remained the same, no increase in fishing harvest would occur.  The only harvest impact would be an increase in the harvest rate, reducing the season by 4-5 days in the high season.  The stakeholders and public indicated that they would be willing to sacrifice these fishing days in return for reinstatement of the bag limit.[26]  AR, Vol. 12, at 5427 (EA).  The Council accordingly authorized NMFS to adjust the opening date to accommodate the reinstated bag limit, and NMFS responded by delaying the opening date from April 15 to April 21.

Since any increase in harvest rate due to reinstatement of the bag limit could be accounted for through the delay from April 15 to April 21, NMFS rationally concluded that reinstatement was consistent with the rebuilding schedule.  Furthermore, reinstatement would encourage compliance among the for-hire fishery (which accounted for 73 % of the recreational harvest by weight), AR, Vol. 12, at 5506 (Council Letter), and reduce the likelihood of increased overfishing through noncompliance.

## C.     The Interim Rule Complies With The CZMA and NEPA.

### 1.     Plaintiffs Lack Standing to Assert Violation of CZMA.

The CZMA does not provide a private right of action against the federal government for noncompliance.  Knaust v. The City of Kingston, No. 96-CV-601, slip op. at 14 (N.D. N.Y., October 10, 1997).  Def. Exh. C.  Unlike the Clean Water Act, the Endangered Species Act and similar environmental statutes, the CZMA does not contain any provisions allowing a citizen to act as a "private attorney general" to enforce the CZMA's substantive or procedural requirements.  Plaintiffs assert a violation of National Oceanic and Atmospheric Administration's (NOAA) (NMFS's parent

---

[26]    The Texas fisherman who wrote the minority position "handout," AR, Vol.12, at 5500, testified at the Council meeting that he "supported a captain and crew bag limit if this catch only affected the season by a few days."  AR, Vol. 6, at 3050 (Council Min.)

affording Texas ninety days to concur with or object to NMFS' consistency determination. Plfs. Mem., at 27; 2nd Am.Compl., at ¶ 10(f). Texas was able to fully respond to NMFS's consistency determination, however, by objecting to it as inconsistent with its coastal zone management plan. AR, Vol. 12, at 5376 (Letter from Texas). Plaintiffs have not explained how or why they could fall within the zone of interests that the CZMA was designed to protect. The CZMA was intended to encourage and assist the *states* in their management of the coastal zone and improve coordination of state coastal management efforts with federal activities affecting the coastal zone. Accordingly, Plaintiffs are not "adversely affected or aggrieved" within the meaning of the CZMA or the APA[27] and lack standing to assert a cause of action. See Douglas County v. Babbitt, 48 F.3d 1495, 1499 (9th Cir. 1995) ("a plaintiff challenging a statutory provision under the [APA], must show that the injury he or she has suffered falls within the 'zone of interests' that the statute was designed to protect."). See also Lujan v. National Wildlife Federation, 497 U.S. 871, 883 (1990). In any event, as set forth in the December 14, 1999, letter, AR, Vol. 12, at 5373, (NMFS Letter to Texas), the Interim Rule is consistent to the maximum extent practicable with the enforceable policies of Texas's CMP.

### 2.    Defendants Have Fully Complied with NEPA.

Plaintiffs claim that NMFS was obligated to prepare an EIS for the Interim Rule and that its determination that the Interim Rule will have no significant environmental impacts is arbitrary, capricious, and unsupported by its administrative record. 2nd Am. Cmplt., ¶ 10(e). In one perfunctory paragraph in their summary judgment brief, Plaintiffs alleged that NMFS has

---

[27] The zone of interest is defined by the underlying goals of the CZMA – to encourage and assist states to effectively exercise their coastal zone management responsibilities by encouraging state preparation of coastal management plans that will protect coastal natural resources, reasonable coastal-dependent economic growth, protect life and property in hazardous areas, and improve government decision-making through communication and intergovernmental participation by states and federal agencies. 16 U.S.C. § 1452. In exchange for developing their state CMP to manage their coastal areas, and submission of the programs for approval under the CZMA, states receive CZMA funding and the benefits of the federal consistency requirement of section 307.

acknowledged that the 16-inch size limitation for recreational fishing "will cause further regulatory discard and mortality," Plfs. Mem. at 26, citing AR, Vol. 9, at 4399 (Draft EA, FONSI); and "because a 15" or smaller red snapper is clearly the majority size for fish caught (citing AR, Vol. 1, at 0264, (Research Report)), and regulatory discard already is exceeding 60% of all fish caught (citing AR, Vol. 4, at 2193, (Nov. 1998 Council Min.)." Plfs. Mem., at 26. The Plaintiffs' claim is specious and should be rejected by this Court.

Contrary to Plaintiffs' suggestion, not every federal action or proposal requires preparation of an EIS. Under the CEQ regulations,[28] in deciding whether to prepare an EIS for a proposed action, an agency must initially determine if the action is of the type that (1) normally requires the preparation of an EIS or (2) normally does not require either an EIS or an EA. 40 C.F.R. § 1501.4(a). If the proposed action falls into neither category, the agency must prepare an EA. Id. § 1501.4(b). The EA is expected to be a brief and concise document containing sufficient evidence and analysis for the agency to determine whether to prepare an EIS or a Finding of No Significant Impact ("FONSI"). Id. §§ 1501.4(b), 1508.9(a)(1), 1508.13. Thus, if the agency determines through the preparation of an EA that the proposed action will not have a significant effect on the quality of the human environment, the agency issues a FONSI, and it does not need to prepare an EIS. Id. §§ 1501.4(b), 1508.13. See, e.g., Fund for Animals v. Rice, 85 F.3d 535, 546 (11th Cir. 1996); California Trout v. Schaefer, 58 F.3d 469, 472 (9th Cir. 1995). The CEQ regulations provide criteria for determining the significance of environmental impacts. 40 C.F.R. § 1508.27.

In determining the legal adequacy of NMFS's decision not to prepare an EIS, this Court must use "the highly deferential 'arbitrary and capricious' standard." Sabine River Authority, 951 F.2d 669, 677-78 (5th Cir. 1992). "Under this standard of review, a reviewing court has the 'least latitude

---

[28]    The NOAA NEPA procedures track the CEQ regulations regarding the general requirements for EAs. NAO 216-6 § 5.03, at 16-17. The procedures also generally track the CEQ regulations regarding the criteria for determining environmental significance. NAO 216-6 § 6.01, at 30-32. In addition, the procedures set forth specific guidance for determining the significance of fishery management actions. NAO 216-6 § 6.02, at 32-33.

in finding grounds for reversal.' . . . It may not substitute its judgment for that of the agency, but must studiously review the record to ensure that the agency has arrived at a reasoned judgment based on a consideration and application of the relevant factors." Id. at 678 (citation omitted). Further, under this standard, "the agency and not the reviewing court has the discretion to accept or reject from the several sources of evidence." Id.

In this case, NMFS prepared an EA in which it analyzed the environmental impacts associated with the implementation of the Interim Rule, including the possibility of increased mortality associated with an increase in the minimum size limit for recreational fishing. AR, Vol. 12, at 5426 (EA). Based on its analysis, NMFS determined that "the measures contained in this interim rule, including any additional mortality associated with the increase in the minimum size limit, will not jeopardize the long-term recovery of the stock." Id. The agency noted that the Interim Rule does not include a corresponding increase in the commercial size limit because of the higher mortality rates associated with commercial fishing, in which fish are caught from deeper waters and brought with electric reels to the surface more quickly than with recreational fishing.[29] Id. Finally, as noted above, NMFS took into account the detailed environmental analysis prepared for the FMP and prior amendments. Id., at 5449. On these bases, NMFS determined that the Interim Rule "should not result in impacts significantly different in context or intensity from those described in the environmental impact statement and environmental assessment published with regulations implementing the FMP and Amendment 1 and a supplemental environmental impact statement prepared with Amendment 5." Id.

In short, NMFS complied with NEPA by ensuring that the agency decisionmaker and the public were fully informed of the environmental consequences of implementing the Interim Rule. See Baltimore Gas & Elec. Co., v. Natural Resources Defense Council, 462 U.S. 87, 105 (1983);

---

[29] Plaintiffs ignore the reduced mortality that the Interim Rule is likely to achieve through reduced likelihood of illegal fishing and better adherence to fishing quotas. AR, Vol. 12, at 5423-24, 5488 (EA).

<u>Northwest Resources Information Center v. NMFS</u>, 56 F.3d 1060, 1064 (9th Cir. 1995).

## V.   CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment should be denied and Defendants are entitled to summary judgment.

25



CibPDF - www.fasto.com

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


THE FLORIDA WILDLIFE
FEDERATION, et al.,

      Plaintiffs,

v.                                CONSOLIDATED
                                   CASE NO. 4:98cv101-RH

WILLIAM M. DALEY, et al.,

      Defendants.

_____/


## ORDER DENYING PETITIONS CHALLENGING REGULATIONS


### I.   INTRODUCTION


    This case concerns challenges by two sets of plaintiffs
to regulations promulgated by the National Marine Fisheries
Service, acting through the delegation of authority by the
Secretary of Commerce.  Specifically, the Texas Shrimp
Association and industry representative Wilma Anderson

ENTERED ON DOCKET *11/3* BY *Th*
[Rules 58 & 79(a) FRCP or 32(d)(1) & 55 FRCRP]

Copies mailed to: *Guest Senpri)*
*Canon, Baja California,*
*Schneder, Ginsberg,* 93:...-.. ..:..:
*Latsinger, Hughes.*
*McKnight — 96*

RECEIVED
FEB 2 2 2000
By _____

challenge an amendment to a fishery management plan that requires the use of bycatch reduction devices on shrimp trawlers west of Cape San Blas, in the Gulf of Mexico.  In addition, the Texas Shrimp Association challenges the National Marine Fisheries Service's related decision to release 9.12 million pounds of total allowable catch of red snapper.  The Florida Wildlife Federation, along with the Coastal Conservation Association and the Center for Marine Conservation, also challenges the amendment requiring the use of bycatch reduction devices.  They, however, base their challenge on the failure to apply the regulation to the portion of the Gulf of Mexico east of Cape San Blas.

I conclude that the Secretary of Commerce acted within his discretion in the approval and implementation of the regulations at issue, in compliance with the Magnuson-Stevens Fishery Conservation and Management Act, the Administrative Procedure Act, and the Regulatory Flexibility Act.  Accordingly, I deny all petitions.

## II. FACTUAL BACKGROUND

A Fishery Management Plan ("FMP") is promulgated by one of eight Regional Fishery Management Councils established by Congress through the Magnuson-Stevens Fishery Conservation and Management Act (the "Magnuson-Stevens Act"). See 16 U.S.C. § 1801 et seq. Congress instructed in the Magnuson-Stevens Act that any FMP must be consistent with various "national standards," which include requirements such as the prevention of overfishing, the use of the best scientific evidence in decision-making, and the promotion of efficient utilization of resources. See 16 U.S.C. § 1851 (a).[1] Once

_____

[1] 16 U.S.C. § 1851(a), pertaining to National Standards, states:

(a) In general
    Any fishery management plan prepared, and any regulation promulgated to implement any such plan, pursuant to this subchapter shall be consistent with the following national standards for fishery conservation and management:
    (1) Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry.
    (2) Conservation and management measures shall be based upon the best scientific information available.
    (3) To the extent practicable, an individual stock of fish shall be managed as a unit throughout its range, and interrelated stocks of

3

Case 2:00-cv-00028   Document 50   Filed in TXSD on 05/01/2000   Page 40 of 125

proposed by a Council, an FMP is submitted to the National

fish shall be managed as a unit or in close
coordination.

(4) Conservation and management measures shall
not discriminate between residents of different
States.  If it becomes necessary to allocate or
assign fishing privileges among various United
States fishermen, such allocation shall be (A)
fair and equitable to all such fishermen; (B)
reasonably calculated to promote conservation; and
(C) carried out in such manner that no particular
individual, corporation, or other entity acquires
an excessive share of such privileges.

(5) Conservation and management measures shall,
where practicable, consider-efficiency in the
utilization of fishery resources; except that no
such measure shall have economic allocation as its
sole purpose.

(6) Conservation and management measures shall
take into account and allow for variations among,
and contingencies in, fisheries, fishery
-resources, and catches.

(7) Conservation and management measures shall,
where practicable, minimize costs and avoid
unnecessary duplication.

(8) Conservation and management measures shall,
consistent with the conservation requirements of
this chapter (including the prevention of
overfishing and rebuilding of overfished stocks),
take into account the importance of fishery
resources to fishing communities in order to (A)
provide for the sustained participation of such
communities, and (B) to the extent practicable,
minimize adverse economic impacts on such
communities.

(9) Conservation and management measures shall,
to the extent practicable, (A) minimize bycatch
and (B) to the extent bycatch cannot be avoided,
minimize the mortality of such bycatch.

(10) Conservation and management measures shall,
to the extent practicable, promote the safety of
human life at sea.

4

Marine Fisheries Service (NMFS) (to whom the Secretary of

Commerce has delegated his authority under the Act) for

review, approval, public comment, and implementation.  See

16 U.S.C. § 1854.

The specific regulation at issue in the instant case is

Amendment 9 to the FMP for the Shrimp Fishery of the Gulf of

Mexico, implemented by final rule published April 14, 1998,

in the Federal Register, with an effective date of May 14,

1998.  See 63 Fed. Reg. 18,139 (1998)(to be codified at 50

C.F.R. pt. 622).[2]  Amendment 9 requires the use of certified

---

[2]  Amendment 9 requires:

> [T]he use of certified bycatch reduction devices (BRDs)
> in shrimp trawls in the exclusive economic zone (EEZ)
> in the Gulf of Mexico shoreward of the 100-fathom (fm)
> (183-m) depth contour west of 85 degrees 30' W. long.;
> sets the bycatch reduction criterion for the
> certification of BRDs; and establishes an FMP framework
> procedure for modifying the bycatch reduction
> criterion, for establishing and modifying the BRD
> testing protocol and its specifications, and for
> certifying and decertifying BRDs.  The intended effect
> is to reduce the bycatch mortality of juvenile red
> snapper, while, to the extent practicable, not
> adversely affecting the shrimp fisheries in the Gulf of
> Mexico.

63 Fed. Reg. at 18,139.

bycatch reduction devices[3] in a portion of the Exclusive

Economic Zone ("EEZ") west of Cape San Blas in the Gulf of

Mexico.  The goal of the regulation is to reduce the bycatch

of juvenile red snapper through the use of BRDs, that is, to

reduce the amount of red snapper inadvertently caught by

shrimp trawlers by requiring the use of a device that allows

marine life below a certain size to escape from shrimp nets.

Specifically, the regulation requires that shrimpers

trawling at a certain distance from shore and at a certain

depth attach certified BRDs to their gear.  See 63 Fed. Reg.

18,139.

    As it imposed significant costs on the shrimp

industry, the passage of Amendment 9 was controversial.  In

1991, Congress began a $15,000,000 study of the problem of

_____

    [3]  "Bycatch" is defined as fish that are harvested in a
particular fishery but are not sold or kept for personal use
and fish that are released dead in the recreational fishing
activity.  See 16 U.S.C. § 1802(2).  Bycatch reduction
devices (BRDs) are devices attached to fishing gear that
reduce the amount of bycatch by releasing marine life of a
certain size.  "Certified," in this context, means approved
by the NMFS.  A BRD must reduce bycatch mortality by 44
percent to be certified.  See 62 Fed. Reg. 35,774.

6

bycatch.[4]  The study, concluded in 1995, included input from

the NMFS and the shrimp industry as well as various experts.

See A.R. Vol. 2, 1.A.19 (1995 report to Congress).  The most

significant result of the study was a finding that

effectively restoring the red snapper population to an

acceptable level by the year 2019 would require a 50%

reduction in the bycatch mortality of juvenile red snapper.

See A.R. Vol. 3, I.A.35, at 2 (1997 briefing paper).  As a

result, the Gulf of Mexico Fishery Management Council

developed the BRD regulation at issue, Amendment 9.  After

public review and comment, as well as a statutorily mandated

peer review, the NMFS promulgated Amendment 9.  See 16

U.S.C. § 1883(a) (peer review requirement); 63 Fed. Reg.

---

[4]  The record makes clear that bycatch is a significant
problem for the nation's fisheries.  See, e.g.,
Administrative Record ("A.R.") Vol. 32, III.B.372, at 5;
A.R. Vol. 34, IV.A.456, at 35,774; A.R. Vol. 9, I.B.49k, at
24-25.  That the red snapper population, specifically, is
severely affected by bycatch resulting from shrimp trawlers
is also beyond dispute.  See A.R. Vol. 9, I.B.49k, at 24-25;
A.R. Vol. 3, I.A.35, at 1; A.R. Vol. 9, I.B.49l, at 24.
Further, because the mud bottom favored by shrimp is also
the habitat of young red snapper, the bycatch mortality
particularly affects juvenile population of red snapper.
See A.R. Vol. 3, I.A.35, at 1.

7

18,139 (final regulation procedural summary).

Also at issue is the related decision of the NMFS to release a total allowable catch ("TAC") of 9.12 million pounds of red snapper.[5]  The NMFS issued a regulation in April 1998, maintaining the TAC of red snapper at that level, consistent with previous years.  63 Fed. Reg. 18,144, 18,145 (1998)(to be codified at 50 C.F.R. pt. 622).  The NMFS, however, conditioned the release of a portion of that amount -- 3.12 million pounds -- on the findings of a study investigating the efficacy of BRDs. 63 Fed. Reg. at 18,145. The NMFS then, in a separate decision, released the 3.12 million pounds.  63 Fed. Reg. 45,760 (1998)(to be codified at 50 C.F.R. pt. 622).  Further limiting the amount of red snapper allowed to be caught, argues the Texas Shrimp Association ("TSA"), would eliminate the need for the use of BRDs.  They therefore also challenge both of the TAC decisions.

_____

[5]  TAC, or Total Allowable Catch, is a harvest quota system that limits the total amount of a fish that may be harvested.

## III. STANDARD OF REVIEW

This court may set aside a regulation promulgated under the Magnuson-Stevens Act only on a ground specified in 5 U.S.C. § 706(2)(A),(B),(C), or (D); i.e., pursuant to the traditional arbitrary and capricious standard set forth in the Administrative Procedure Act. See 16 U.S.C. § 1855(f)(1)(B). Under this standard, the court may set aside an agency decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard is deferential. See Fund for Animals, Inc. v. Rice, 85 F.3d 535, 541 (11th Cir. 1996). To determine whether the agency's decision is entitled to deference under this standard, the court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." North Buckhead Civic Ass'n v. Skinner, 903 F.2d 1533, 1538-40 (11th Cir. 1990). While the inquiry should be searching and careful, the ultimate standard of review is narrow. Id. The court's application of this

9

deferential standard of review should be limited to the administrative record the agency presents.  See Florida Power & Light Co. v. Lorion, 470 U.S. 729, 742-44, 105 S. Ct. 1598, 84 L. Ed. 2d 643 (1985); Preserve Endangered Areas of Cobb's History, Inc. v. United States Army Corps of Engineers, 87 F.3d 1242, 1246 (11th Cir. 1996).  As to the specific claims under the Regulatory Flexibility Act, the Small Business Regulatory Enforcement and Fairness Act of 1996 authorizes judicial review of an agency's compliance with the specific provisions of the Regulatory Flexibility Act.  See 5 U.S.C. § 611(a)(1).  That standard of review is in accordance with the arbitrary and capricious standard of the Administrative Procedure Act, as described above.

## IV.  DISCUSSION

The parties present numerous arguments.  I will first address TSA's challenge to Amendment 9, then TSA's challenge to the TAC decision, and finally Florida Wildlife Federation's challenge to the geographic scope of the Amendment.

10

## A.   **TSA's Challenge to the Issuance of Amendment 9**

TSA contends that the NMFS's decision to implement the BRD regulation was arbitrary and capricious, that it violated requirements of the Magnuson-Stevens Act, and that it was not in accordance with the Regulatory Flexibility Act.   Several specific arguments require analysis.

### 1.   Challenges to Scientific Information

#### a. Use of GLM Model

NMFS relied on a specific technical model in its determination of the impact of shrimp bycatch on red snapper population.   TSA claims that reliance on this model, the General Linear Model ("GLM"), was arbitrary and capricious. TSA contends that the model does not hold up to "close scrutiny" and points to the now-stricken declaration testimony of a Dr. Benny Gallaway, who attests to that scientific conclusion.

A court should defer to the use of a technical model unless there is no rational relationship between the model

11

and the focus of its use.  See Chemical Mfrs. Ass'n v. EPA, 28 F.3d 1259, 1265 (D.C. Cir. 1994).  In this case, the NMFS must be able to demonstrate, in the record, evidence illustrating a rational relationship between the GLM and the effect of shrimp bycatch on the red snapper population.

Evidence in the record indicates that there is a rational relationship between the GLM and the measure of effect of bycatch.  See A.R. Vol. 10, I.B.49n, at 5; A.R. Vol. 10, I.B.49r; A.R. Vol. 12, I.B.52.a-c (peer review reports).  Furthermore, some scientists specifically endorsed the use of the model as the most appropriate method of measuring such effects.

This case is notably different from the situation in Chemical Mfrs. Ass'n v. EPA, 28 F.3d 1259 (D.C. Cir. 1994), the case TSA presents as controlling.  In that case, concerning a challenge to an EPA model, the court observed that the EPA could not point to "any record evidence that shows a rational relationship . . . even in the face of specific scientific evidence to the contrary . . . ."  Id. at 1265.  In the present case, the opposite is true: aside

12

from evidence from Dr. Gallaway that is not part of the record, TSA can point to no evidence demonstrating that the Secretary's reliance on the majority of scientists is anything but rational.  I find, therefore, that the agency has met its burden of demonstrating the existence of a rational relationship on the record of the model and the effect of bycatch on the red snapper population.

#### b.   The 20% SPR Target

As another challenge to the Council's use of scientific evidence, TSA attacks the scientific soundness of the underlying aim of the regulation.  The NMFS found that a 20% spawning potential ratio ("SPR") for red snapper would be required to prevent overfishing.  The prevention of overfishing is set forth in the Magnuson-Stevens Act as National Standard 1.[6]  TSA claims that the decision to

_____

[6]  National Standard 1 requires that any FMP or implementing regulation be consistent with the following: "Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry."  16 U.S.C. § 1851(a)(1).

13

accept the 20% figure as an underlying goal in measuring
compliance with National Standard 1 constitutes an abuse of
discretion.

SPR is a technical measure of the health of a fish
stock; it measures the spawning percentage of a particular
stock relative to a healthy unfished stock. TSA contends
that the 20% goal violates National Standard 2, which
requires the use of the best scientific information
available,[7] as well as the requirement that FMPs specify
objective and measurable criteria for identifying when a
fishery is overfished.[8] TSA contends that this figure is so
conservative, in terms of protection of the stock, as to be
irrational.

The administrative record reflects that the 20%
threshold was endorsed by numerous biologists with expertise
in the relevant area. See Supplemental Administrative

---

[7] "Conservation and management measures shall be based
upon the best scientific evidence available." 16 U.S.C. §
1851(a)(2).

[8] See 16 U.S.C. § 1853(a)(10), regarding the specific
contents required in an FMP.

Record I.1. (*An Evaluation of the Use of Spr Levels as the Basis for Overfishing Definitions in Gulf of Mexico Finfish Fishery Management Plans*). See also 55 Fed. Reg. 2078, 2078-79 (1990)(to be codified at 50 C.F.R. pt. 641). A 1996 report by the Gulf of Mexico SPR Management Strategy Committee specifically concluded that the 20% threshold was reasonable. That committee was made up of experts in the field. TSA presents, essentially, an argument that the scientific opinion of experts in the field is incorrect. But where an agency makes a technical finding regarding a specific question, the job of the court is to make sure that decision is not unreasonable. See, e.g., Motor Vehicles Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983). In this case, a group of experts determined that a 20% SPR was necessary. The issue was extensively debated. See, e.g., A.R. Vol. 11, I.B.50d; A.R. Vol. 35, IV.A.472, at 18,140. The Secretary did not abuse his discretion when he, acting through the NMFS, accepted the recommendation of a committee of experts and set the 20% SPR

15

as a target for the prevention of overfishing.[9] The

Secretary's decision was not arbitrary and capricious.


    2. <u>The Practicality of BRDs</u>


National Standard 9 of the Magnuson-Stevens Act

requires that "[c]onservation and management measures shall,

---

[9] NMFS addressed in the Federal Register the claim
that Amendment 9 did not comport with the best scientific
evidence:

     NMFS disagrees that Amendment 9 is not based
    on the best available scientific information. The
    Director, Southeast Fisheries Science Center,
    determined that Amendment 9 was based on the best
    available scientific information . . . . In
    addition to the 1997 peer review of the bycatch
    estimates [using the GLM Model], the Council
    contracted with Dr. Phil Goodyear, a prominent
    stock assessment biologist, to review the 1995
    stock assessment and to determine the effects of
    over-estimates of red snapper bycatch on the
    scientific advice that bycatch had to be reduced
    to recover this species. Dr. Goodyear's
    sensitivity analysis showed that even with
    overestimates of bycatch up to 33 percent, red
    snapper bycatch in the shrimp fisheries still had
    to be reduced significantly for red snapper stock
    recovery. Based on these peer review results and
    on all other available information, the Council
    concluded that Amendment 9 is based on the best
    available scientific information.

63 Fed. Reg. 18,139, 18,140.

to the extent practicable, (A) minimize bycatch and (B) to
the extent bycatch cannot be avoided, minimize the mortality
of such bycatch." 16 U.S.C. § 1851(a)(9). TSA contends
that Amendment 9 violates this requirement because it is not
practicable. Specifically, TSA argues that the BRD
requirement is inconsistent with the advisory regulations to
National Standard 9, as set forth in 50 C.F.R. § 600.350(d),
in that the amendment does not result in "net benefits to
the Nation." Further, TSA contends that the BRD regulations
are impractical because they do meet the mortality reduction
criterion established by the NMFS.

            a.  Net Benefits to the Nation

     Under the practicability requirement mandated by
National Standard 9, the Council must consider the "net
benefits to the Nation." 50 C.F.R. § 600.350(d). Ten
factors are provided in the advisory guidelines as relevant
in the determination of whether a particular regulation
minimizes bycatch to an extent practicable, consistent with
maximization of "net benefits to the Nation" and the other

                          17

national standards.  500 C.F.R. § 600.350(d)(3)(i).  They
are population effects for the bycatch species; ecological
effects due to changes in the bycatch of that species, i.e.,
effects on other species; changes in the bycatch of other
species of fish and the resulting population and ecosystem
effects; effects on marine mammals and birds; changes in
fishing, processing, disposal, and marketing costs; changes
in fishing practices and behavior of fishermen; changes in
research, administration and enforcement costs and
management effectiveness; changes in the economic, social or
cultural value of fishing activities and nonconsumptive uses
of fishery resources; changes in the distribution of
benefits and costs; and social effects.  Id.

TSA contends the administrative record reflects that
Amendment 9 does not provide net benefits to the nation.
TSA points out various statements implying that the net
economic effect of the Amendment may not be positive.  See
TSA's and Wilma Anderson's Memorandum of Points and
Authorities in Support of their Motion for Summary Judgment,
at 26-27.  Even if I were to find that the net economic

18

benefit to the nation was in fact negative, this would not

necessarily mean the Amendment failed to comply with

National Standard 9, "to the extent practicable" clearly

encompasses a balancing of factors, as described by the

relevant C.F.R. guidelines.[10]   TSA could prevail on this

---

[10]   The Florida Wildlife Federation asserts that "to the extent practicable" means "unless costs are wholly disproportionate."   See Florida Wildlife Federation's Response to TSA's Memorandum of Law in Support of its Motion for Summary Judgment, at 10.   I reject this categorization. 50 C.F.R. § 600.350(d)(3) explicitly sets forth factors relevant in determining whether a regulation reduces bycatch to the extent practicable.   Consideration of these factors is plainly inconsistent with Florida Wildlife Federation's contention that a regulation must be adopted unless costs are wholly disproportionate to the potential benefits.   This is further illustrated by the legislative history of the Magnuson-Stevens Act.   See, e.g. 142 Cong. Rec. H11,418, H11,437 (1996) (Chairman of the House Resources Committee stating:   "The use of the term 'to the extent practicable' was chosen deliberately by both the Senate and the House. Both bodies recognize that bycatch can occur in any fishery, and that complete avoidance of mortality is impossible. Councils should make reasonable efforts in their management plans to prevent bycatch and minimize mortality.   However, it is not the intent of Congress that the councils ban a type of fishing gear or type of fishing in order to comply with this standard.   'Practicable' requires an analysis of the cost of imposing a management action; the Congress does not intent that this provision will be used to allocate among fishing gear groups, nor to impose costs on fishermen and processors that cannot be reasonably met.").   Finally, as the agency in charge of fishery management, the NMFS's interpretation of the term practicability should be given

19

point only if the Council (and through adoption the NMFS and

the Secretary of Commerce) abused their discretion in

balancing the above factors.  <u>See Southern Offshore Fishing</u>

<u>Ass'n v. Daley</u>, 995 F. Supp. 1411, 1425 (M.D. Fla. 1998)

(holding that agencies must only exercise reasonable

discretion after having considered the relevant factors).

I find that the NMFS acted within its discretion

after considering the relevant factors.  The record is

replete with opinions of the costs and benefits (economic

and otherwise) of different alternatives.  <u>See, e.g.,</u> A.R.

Vol. 34, IV.A.445, at 12-35 (a summary of the biological,

economic, and social impacts of each alternative); A.R. Vol.

34, IV.A.445 (Initial Regulatory Flexibility Analysis); A.R.

Vol. 35, IV.A.461 (Final Regulatory Flexibility Analysis).

TSA may be correct in its opinion that the net <u>economic</u>

effect of the regulation is negative.  Nonetheless, the NMFS

---

effect unless it is clearly contrary to Congressional
intent.  <u>See Chevron, U.S.A., Inc. v. Natural Resources</u>
<u>Defense Council, Inc.</u>, 467 U.S. 837, 842-43, 104 S. Ct.
2778, 81 L. Ed. 2d 694 (1984).  The balanced interpretation
made by the NMFS is not inconsistent with Congressional
intent and therefore applies.

and the Council weighed this particular factor with all the other standards, compared options, and came to a conclusion. TSA points to no evidence that this balance represents an abuse of the agency's decision-making discretion.

> b.   BRDs' Ability to Meet the Mortality
>      Reduction Criterion of 44%

TSA asserts the administrative record lacks evidence supporting NMFS's finding that certified bycatch reduction devices are able to meet the 44% mortality reduction rate set earlier by the agency, and as a result, Amendment 9 is impracticable.

Ample evidence in the record supports the agency's decision that certified BRDs can meet (and exceed) the required 44% reduced mortality rate.  <u>See, e.g.,</u> A.R. Vol. 25, III.A.E-Mail (report attached to email dated October 23, 1997); A.R. Vol. 2, I.A.19, at 33 (1995 report to Congress); A.R. Vol. 4, I.A.41, at 5 (1997 study); A.R. Vol. 34, IV.A.445, App. A, at 4 (1996 study).  Further, the contrary evidence relied on by TSA was specifically discounted.  <u>See</u>

21

A.R. Vol. 32, III.B.370.  The remaining data cited by TSA
was gathered after Amendment 9 was promulgated; it is thus
not pertinent to this review.  Even if it were to be
considered, however, I would conclude that the agency
exercised rational discretion in determining that certified
BRDs could achieve a bycatch mortality rate of 44%.  Nothing
in the record indicates an irrational choice; at the very
most, the record indicates a minority view that certified
BRDs cannot reach the 44% goal.  Rejecting that viewpoint in
favor of another, especially considering the evidence
supporting what seems to be the majority position, is simply
not an abuse of discretion.  <u>See Southern Offshore Fishing</u>
<u>Ass'n v. Daley</u>, 1433 F. Supp. 1411, 1433 (M.D. Fla.
1998)(noting that it is the prerogative of the Secretary to
weigh competing scientific opinions and make a policy
determination).

     3.  <u>Inequity of Burden</u>

Where a regulation reduces an overall harvest, any
harvest restrictions or recovery benefits must be

22

distributed "fairly and equitably among the commercial,
recreational, and charter fishing sectors in the fishery."
16 U.S.C. § 1853(a)(14).  TSA claims Amendment 9 unfairly
burdens the shrimp industry, while inequitably benefitting
recreational fishers.  This claim is based on the fact that
the BRD regulations impose an economic burden on the shrimp
trawlers, even though the same result (prevention of
overfishing of red snapper) allegedly could be reached by
further limitations on recreational fishing.

Though Amendment 9 undeniably places serious costs on
the shrimp industry, the burden is not distributed
inequitably.  First, the administrative record indicates
that the directed red snapper fishery (i.e., those whose
primary goal is to catch red snapper, such as recreational
and commercial fishers of red snapper) has, for several
years, been subject to numerous restrictions.  These include
(a) increased minimum size limits; (b) a total allowable
catch, or harvest quota, system; (c) reduced bag limits; and
(d) trip limits.  <u>See</u> A.R. Vol. 10, I.B.49n.

23

Second, the shrimp industry has been, until recently, required to do very little in terms of bycatch reduction of red snapper. See A.R. Vol 21, III.A.E-Mail (Attachment 1 to email dated 3/28/97); A.R. Vol. 34, IV.A.445 (history of management section of proposed Amendment 9). In fact, the NMFS was expressly prohibited by Congress from promulgating any regulations restricting red snapper bycatch by shrimp trawlers until April 1994. See Coast Guard Authorization Act of 1993, Pub. L. No. 103-206, § 702, 107 Stat. 2419, 2446 (1993).

Amendment 9 requires, in effect, that the shrimp industry pay part of the cost of restoring the red snapper fishery. Nothing in the record indicates an abuse of discretion in making this decision. Voluminous evidence indicates that bycatch reduction is necessary to the restoration of, or prevention of overfishing of, the red snapper fishery. See A.R. Vol. 3, I.A.35 (June 1997 Briefing Paper). The prevention of overfishing is required by statute. See 16 U.S.C. § 1851(a)(1). Imposing Amendment 9, or some type of bycatch reduction plan, on the shrimp

24

industry is therefore not only within the discretion of the
agency, but perhaps required.  As such, the NMFS did not act
inequitably, or abuse its discretion, in establishing
Amendment 9.

### 4.  Compliance with the Regulatory Flexibility Act

The NMFS's authority to promulgate regulations is
limited by the Regulatory Flexibility Act, as amended by the
Small Business Regulatory Enforcement Fairness Act of 1996,
5 U.S.C. § 601 et seq., which requires administrative
agencies to consider the effects of their regulatory actions
on small business entities.  Under the Regulatory
Flexibility Act, an agency must prepare an initial and final
regulatory flexibility analysis describing the effects of
the proposed rule on small businesses and discussing
alternatives that might minimize adverse economic
consequences.

The parties agree that an Initial Regulatory
Flexibility Analysis ("IRFA"), as well as a Final Regulatory
Flexibility Analysis ("FRFA"), was performed.  TSA contends,

25

however, that the analyses were so flawed as to require a striking down of the rule, or at minimum, the re-submission to the NMFS for review.  Specifically, TSA challenges the agency's analysis as "inaccurate and misleading," as well lacking proper public review procedure.  <u>See</u> TSA's and Wilma Anderson's Memorandum of Points and Authorities in Support of their Motion for Summary Judgment, at 32.

A court may require an agency to reconsider a rule, or even strike down that rule, where the terms of the Regulatory Flexibility Act are not met.  <u>See, e.g., Southern Offshore Fishing Ass'n v. Daley</u>, 995 F. Supp. 1411, 1437 (M.D. Fla. 1998).  This, however, is only appropriate where the agency exceeds the bounds of reasonableness; the court should not require NMFS to re-analyze the issue, or impose a more drastic remedy, where a good faith effort at compliance with the Regulatory Flexibility Act is made.  <u>See Associated Fisheries of Maine, Inc. v. Daley</u>, 127 F.3d 104, 114 (1st Cir. 1997); <u>Southern Offshore Fishing Ass'n v. Daley</u>, 995 F.

26

Supp. at 1435 (citing <u>Associated Fisheries of Maine</u>).[11]

The Regulatory Flexibility Act sets forth specific requirements for both the initial and final economic analyses.  Specifically, the Act requires an IRFA to contain the following:

> (1) a description of the reasons why action by the agency is being considered;
>
> (2) a succinct statement of the objectives of, and legal basis for, the proposed rule;
>
> (3) a description of and, where feasible, an estimate of the number of small entities to which the proposed rule will apply;
>
> (4) a description of the projected reporting, recordkeeping and other compliance requirements of the proposed rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record;
>
> (5) an identification, to the extent practicable, of all relevant Federal rules which may duplicate, overlap or conflict with the proposed rule.

---

[11]   Again, agency actions under the Regulatory Flexibility Act are to be reviewed for compliance in accordance with the "arbitrary and capricious" standard under the Administrative Procedure Act.  <u>See</u> § 5 U.S.C. 611 et seq.; <u>North Carolina Fisheries Ass'n, Inc. v. Daley</u>, 27 F. Supp. 2d 650 (E.D. Va. 1998).

5 U.S.C. § 603(b).   Section 603(c) prescribes the following:

> Each initial regulatory flexibility analysis shall also contain a description of any significant alternatives to the proposed rule which accomplish the stated objectives of applicable statutes and which minimize any significant economic impact of the proposed rule on small entities.  Consistent with the stated objectives of applicable statutes, the analysis shall discuss significant alternatives such as –

> (1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities;

> (2) the clarification, consolidation, or simplification of compliance and reporting requirements under the rule for such small entities;

> (3) the use of performance rather than design standards; and

> (4) an exemption from coverage of the rule, or any part thereof, for such small entities.

5 U.S.C. § 603(c).

> A FRFA must contain:

> (1) a succinct statement of the need for, and objectives of, the rule;

> (2) a summary of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a summary of the assessment of the agency of such issues, and a

28

statement of any changes made in the proposed rule
as a result of such comments;

(3) a description of and an estimate of the number
of small entities to which the rule will apply or
an explanation of why no such estimate is
available;

(4) a description of the projected reporting,
recordkeeping and other compliance requirements of
the rule, including an estimate of the classes of
small entities which will be subject to the
requirement and the type of professional skills
necessary for preparation of the report or record;
and

(5) a description of the steps the agency has
taken to minimize the significant economic impact
on small entities consistent with the stated
objectives of applicable statutes, including a
statement of the factual, policy, and legal
reasons for selecting the alternative adopted in
the final rule and why each one of the other
significant alternatives to the rule considered by
the agency which affect the impact on small
entities was rejected.

5 U.S.C. § 604(a).

   The IRFA at issue in this matter contained all the

necessary elements.  See A.R. Vol. 34, IV.A.445 (IRFA).  The

FRFA, as well, contained all five of the necessary elements.

See A.R. Vol. 35, IV.A.461 (FRFA).  TSA does not

specifically challenge any of the statutorily mandated

29

requirements, but rather three more technical aspects of the analysis. None of TSA's complaints is well founded or demonstrates any abuse of discretion.

First, TSA contends the NMFS misunderstood the estimated profit margin of shrimpers to be 51%. The record indicates, however, that this issue was addressed in the FRFA. <u>See</u> A.R. Vol. 35, IV.A.461 (FRFA, at 9). The FRFA explicitly states that "the pretax margin was 19%, not 51 percent of the revenue." <u>Id.</u> Second, TSA argues that certain figures in a table taken from a 1995 NMFS study were incorrectly "added up." The figures TSA notes are related to the overall economic analysis of Amendment 9. <u>See</u> A.R. Vol. 34, IV.A.445 (Table R-5, at 47). TSA's argument fails for two reasons. First, it appears that these figures are not intended to "add up." Second, even if these figures were incorrectly added, it appears from the record that the totaled figures were not the basis for any decision; rather, the underlying data was used for further decisions.

TSA's final argument is that NMFS refused to consider additional information provided by TSA, even though NMFS did

in fact consider additional information in preparing a
supplemental economic analysis.  It is difficult to
determine from the record if this is an accurate allegation,
though it does not appear that any such "new" information
made a substantive difference in the analysis.  A review of
the record indicates that an in-depth analysis was
performed, and that TSA was afforded the opportunity to
participate.  The Regulatory Flexibility Act requires that
an agency make a good-faith attempt to examine various
economic aspects of a regulation.  This was done in the
instant case, with sufficient thoroughness to ensure
compliance with the statute.

        5.   <u>Minimization of Adverse Impact to Fishing</u>
             <u>Communities (National Standard 8)</u>

     National Standard 8 requires that conservation
measures, to the extent practicable, minimize adverse
economic impact on fishing communities.[12]  16 U.S.C. §

---

[12]  A "fishing community" is "a community which is
substantially dependent on or substantially engaged in the
harvest or processing of fishery resources to meet social
and economic needs, and includes fish vessel owners,
operators, and crew . . . ."  16 U.S.C. § 1802(16).

1851(a)(8).  TSA alleges that the NMFS failed to meet this
requirement in that it failed to consider the impact on
shrimping communities.  TSA specifically contends that the
NMFS "failed to include even the most rudimentary
information" about the relevant shrimp fishing communities.
See TSA's motion for summary judgment (document 58).

I initially note that National Standard 8's goal
regarding minimization of adverse economic consequences is
not absolute.  It is limited by the explicit language of the
statute, which states that the minimization of adverse
economic impacts is to be achieved "consistent-with the
conservation requirements of this chapter (including the
prevention of overfishing and rebuilding of overfished
stocks)."  16 U.S.C. § 1851(a)(8).  Further, the section
includes the language "to the extent practicable," which, as
previously noted, implies a balancing of various factors.
Id.

An examination of the record reveals that the NMFS did
in fact consider the adverse consequences to the shrimping
communities in promulgating Amendment 9.  First, IRFA at

32

issue explicitly assessed the effects of a BRD requirement on the shrimp industry.  Second, the Regulatory Impact Review also examined the issue, similarly finding that there would indeed be significant costs.  Further, the FRFA specifically conceded the significant impact on shrimping communities.  <u>See</u> A.R. Vol. 35, IV.A.461 (FRFA, at 4-6)("The Council was aware of the potential adverse economic impact of BRDs on the shrimp industry . . . ."; "Regarding severe economic impacts on the shrimp industry and the United States, NMFS and the Council agree that requiring the use of BRDs will result in negative economic impact on the shrimp industry.").  Moreover, the record makes clear that the shrimp industry (including TSA specifically) had numerous opportunities, which it in fact utilized, to present evidence on this issue.

Lastly, the NMFS examined a variety of alternative proposals designed to meet the bycatch reduction goal while at the same time minimizing adverse economic impacts to shrimpers, as required by National Standard 8.  <u>See</u> A.R. Vol. 35, IV.A.461 (FRFA, at 10).  These included maintaining

33

the status quo and the closing of the shrimp fishery for a
portion of the season. Id. (FRFA, at 11). Additionally,
the regulation excluded certain depth and geographical areas
(depths more than 100 fathoms and the geographic area east
of Cape San Blas), as well as gear types. Id. The purpose
of these decisions was to minimize adverse economic impact
on the shrimping community.

This case is significantly different from the only
other case to extensively examine this issue, North Carolina
Fishing Ass'n, Inc. v. Daley, 16 F. Supp. 2d 647 (E.D. Va.
1997). In that case, the agency initially failed to prepare
any economic analysis pursuant to the Regulatory Flexibility
Act or National Standard 8, instead certifying that there
were no negative economic effects on the fishing
communities. 16 F. Supp. 2d at 651-54. The NMFS argued in
that case that the agency was not required to consider a
range of alternatives to the proposed rule. Id. at 654.
The court correctly ordered the NMFS to conduct an analysis,
in accordance with the Regulatory Flexibility Act and
National Standard 8. Id. The court later rejected the

34

analysis presented after remand because it "failed to give any meaningful consideration to the economic impact" and presented a "so-called economic report . . . designed to justify a prior determination." <u>North Carolina Fishing Ass'n, Inc. v. Daley</u>, 27 F. Supp. 2d 650, 652 (E.D. Va. 1998). The court held that the Secretary "completely abdicated his responsibilities" in terms of a determination of economic impact. <u>Id.</u> at 662. Further, the court observed that the analysis was "clearly skewed" and totally ignored the findings of the Secretary's own scientists. <u>Id.</u> at 667-68. In short, the court found a good-faith effort was not made.

Such an extreme situation is not present in the instant case. First, as discussed above, several analyses of the impact on the shrimp community were performed. Second, the reports frankly acknowledged a significant impact on the shrimping community. This is not an unlawful case of ignoring data or refusing to examine issues; rather, this is a case where the agency candidly described potential adverse effects of its action, considered alternatives, and made a

35

reasoned decision.  To the extent TSA contends an analysis

was not made, it is factually incorrect.[13]

>        6.  Avoidance of Serious Adverse Impact to the
>            Environment

Measures aimed at the reduction of bycatch must "be

consistent with . . . the need to avoid any serious adverse

environmental impact on such bycatch species or the ecology

of the affected area."  16 U.S.C. § 1881d(f)(2).  TSA states

that the NMFS "[made] no determination about this mandate."

See TSA's and Wilma Anderson's Memorandum of Points and

Authorities in Support of their Motion for Summary Judgment,

at 29.

This contention is without merit.  First, the record is

replete with research concerning the environmental impact of

the BRD requirement, including the effect on red snapper and

---

[13] The bulk of TSA's critique with regard to National
Standard 8 is not that the figures are so inaccurate as to
be contrary to statute, but that the NMFS failed to make the
analysis.  See TSA's and Wilma Anderson's Memorandum of
Points and Authorities in Support of their Motion for
Summary Judgment, at 31.  As discussed above, this is simply
not accurate.

the impact on the environment of the affected area.   See
A.R. Vol. 34, IV.A.445; A.R. Vol. 34, IV.A.457 (Attachment
B, at 1).   It is clear that the environmental impact on red
snapper was the preeminent justification for the measure.
Additionally, TSA points to no evidence in the record that
Amendment 9 is inconsistent with the need to avoid serious
adverse environmental impacts on bycatch or the ecology of
the affected areas.   Accordingly, I find that the Secretary
did not abuse his discretion relative to this provision.

### 7.   National Standard 5

Under National Standard 5, conservation measures must
not be based solely on economic allocation.   16 U.S.C. §
1851(a)(5).   TSA contends Amendment 9 is based solely on
economic allocation.   The record proves this not to be
accurate.   The obvious purpose of the BRD regulation is to
reduce bycatch.   While TSA may argue that the burden
distribution is unfair (as they do and as discussed above),
TSA points to no evidence in the record to support the
allegation that Amendment 9 was promulgated solely in an

37

attempt to allocate economic benefits.  Accordingly, this claim is unpersuasive.  <u>See Alaska Factory Trawler Ass'n v. Baldridge</u>, 831 F.2d 1456, 1465 (9th Cir. 1987) (holding that where the Secretary considered non-economic factors, National Standard 5 is not violated).

In sum, in light of the well-founded beliefs that the red snapper population is severely overfished and that bycatch reduction is required to restore the fishery, and in view of the statutorily mandated requirement of the prevention of overfishing, the NMFS made a reasonable decision in balancing the various objectives of the Magnuson-Stevens Act in the promulgation of Amendment 9.

## B. <u>Challenge to 1998 TAC Regulations</u>

TSA also challenges the decision of the NMFS to set the 1998 total allowable catch of red snapper at 9.12 million pounds.  Specifically, TSA challenges the original interim rule releasing 6 million pounds, as well as an emergency second regulation releasing the remaining 3.12 pounds.  <u>See</u> 63 Fed. Reg. 18,144 (1998)(to be codified at 50 C.F.R. pt.

622)(initial interim rule); 63 Fed. Reg. 45,760 (1998) (to be codified at 50 C.F.R. pt. 622)(emergency interim rule).

The federal defendants assert that TSA lacks standing to challenge this regulation because there is no casual connection between the TAC regulations and TSA's alleged injury, and because TSA's alleged injury would not be addressed even if its challenge to the TAC regulations was successful. I conclude that TSA does in fact have standing to challenge the TAC regulations.

Three requirements must be met to establish standing. First, TSA must have suffered an injury in fact; i.e., a "concrete and particularized" injury that is "actual or imminent," and not conjectural or hypothetical. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992). Next, standing requires a causal connection between the injury and the conduct at issue. The injury has to be "fairly trace[able]" to the defendant's conduct. Id. Finally, it must be likely that the injury would be redressed by a decision in a plaintiff's favor, that is, that a favorable decision would make an

39

"appreciable difference" in the plaintiff's own situation.

Id.; Allen v. Wright, 468 U.S. 737, 758, 104 S. Ct 3315, 82

L. Ed. 2d 556 (1984).

In the case at bar it is Amendment 9, and not the TAC

release, that directly injures TSA.  In the context of

Amendment 9, however, TSA certainly has standing.  TSA has

alleged a concrete and particularized injury:  the

regulations at issue require the shrimp industry to incur

significant costs in that BRDs lower productivity of shrimp

trawlers and raise the costs of shrimping.  Amendment 9

directly caused these costs, and the elimination of

Amendment 9 would address the injury.

The issue, then, is whether the increase in costs to

shrimpers is "fairly traceable" to the TAC regulations in

addition to Amendment 9, and whether a reduced TAC would

"likely" ameliorate this injury.  As the party invoking

federal jurisdiction, the burden is on TSA to establish

these elements.

Although the federal defendants assert that BRDs would

still be required, even were no TAC released, I conclude

40

that the relationship between the TAC and Amendment 9 is
sufficiently strong to provide TSA standing. The lower the
NMFS sets the yearly TAC, the more the red snapper fishery
grows. The more the red snapper fishery grows, the less the
need for the shrimp industry to incur the costs of BRDs. In
short, a lower TAC will help restore the red snapper fishery
more rapidly, thus alleviating the need for BRDs. Thus, the
costs incurred by the shrimp industry are "fairly traceable"
to the TAC regulations, and it is "likely" that a reduced
TAC would help alleviate the burden on shrimpers. Cf.
Bennett v. Spear, 520 U.S. 154, 117 S. Ct. 1154, 137 L. Ed.
2d 281 (1997)(holding that ranchers and irrigation district
alleged sufficient injury and connection as a result of
Secretary of Interior's decision to protect endangered
sucker fish through minimization of water project, which in
turn was likely to result in a decision to reduce water
available for irrigation).[14]

---

[14] Coastal Conservation Association claims that the TAC
issue is moot and therefore non-justiciable, because it has
already been decided. See Coastal Conservation
Association's Memorandum of Points and Authorities in
Opposition to TSA's Motion for Summary Judgment, at 34-35.

41

## 1.   The Interim Rule Releasing 6 Million Pounds TAC

TSA's sole argument with respect to the NMFS decision to keep the TAC at 9.12 million pounds (immediately releasing 6 million pounds and reserving the remaining 3.12 million pounds pending a later finding of the efficiency of the BRDs) is that "[n]ot a single scientific document in the record supports" the decision.  <u>See</u> TSA's and Wilma Anderson's Memorandum of Points and Authorities in Support of their Motion for Summary Judgment, at 35.  The record shows this is inaccurate.

NMFS scientists concluded that a 20% SPR could be achieved if the BRDs reached a 60% efficiency rate and the TAC was maintained at 9.12 million pounds.  <u>See</u> A.R. Vol. 42, VIII.D.584, at 18,145; A.R. Vol. 42, VIII.D.573.  The

_____

The TAC decision, however, is capable of repetition yet evading review; the TAC is annually set with the prior year's TAC a factor in the analysis.  <u>See Gannett Co., Inc. v. DePasquale</u>, 443 U.S. 368, 377, 99 S. Ct. 2898, 61 L. Ed. 2d 608 (1979).  As such, it is excepted from the mootness doctrine.  Thus, I disagree with the contention that TSA's "discovery skirmishes" warrant an equitable determination of non-justiciability.

20% SPR goal, as discussed earlier, is supported by the record. The 60% efficiency rate also is supported by the record, although perhaps not as clearly, and is within the reasonable range of decision-making. Though the BRD studies at the time of the decision were less than definitive, the Council noted that "efficiencies of 60% or greater had been achieved under experimental conditions." See 63 Fed. Reg. 18,144. See also A.R. Vol. 40, VII.518 (minutes, at 24). That the precise efficiency of the BRDs was not known does not prohibit the NMFS from making a decision based on reasonable expectations. See Southern Offshore Fishing Ass'n v. Daley, 995 F. Supp. 1411, 1429 (M.D. Fla. 1998)(noting that, in the face of uncertain scientific evidence, the Secretary's decision-making "will necessarily entail some measure of intuitive management that the proponents will applaud as wisdom and the detractors will condemn as mere caprice. This regulatory framework [the Magnuson-Stevens Act] permits this managerial result and implies the predictable commentary."); Associated Fisheries of Maine, Inc. v. Daley, 127 F.3d 104, 111 (1st Cir. 1997)

43

("Administrative decisionmaking is not an exact science, and judicial review must recognize that some arbitrariness is inherent in the exercise of discretion amid uncertainty."); Fisherman's Dock Coop., Inc. v. Brown, 75 F.3d 164, 172 (4th Cir. 1996).

The NMFS planned to start with a TAC of 6 million pounds and to release the rest depending on whether the BRDs worked as efficiently as hoped.  The 20% SPR figure is in accordance with the best scientific information, and the 60% goal was supported by a reasonable amount of evidence.  TSA apparently does not dispute that if the 60% level was reached, a TAC of 9.12 million pounds would be reasonable. In view of these facts, the initial interim rule does not constitute an abuse of discretion.

## 2.  Release of Remaining 3.12 Million Pounds TAC

The second regulation is more troublesome, because it is inconsistent with the express provisions of the interim rule; the remaining 3.12 million pounds of TAC was not to be released unless the BRDs reached a mortality reduction rate

44

of 60%.  See 63 Fed. Reg. 45,760.  Preliminary results of a
study examining BRD efficiency indicated that BRDs did not,
on average, reach that result.  Accordingly, TSA (as well as
the Center for Marine Conservation) contend the regulation
is arbitrary and capricious.

Two groups of evidence, however, support the agency's
decision and demonstrate that the emergency regulation was
not an abuse of discretion.  First, scientific evidence
revealed that although the BRDs did not, on average, reach
the desired 60% reduction goal, that target was imminently
reachable.  There exists evidence in the record that some
BRDs exceeded 60%, and that there was a reasonable prognosis
the other less effective BRDs could achieve 50% or higher in
the near future.  See 63 Fed. Reg. at 45,762; A.R. Vol. 4,
I.A.41, at 4-5.  Further, the NMFS determined that where
BRDs were installed properly and vessel captains taught how
to optimize BRD performance, efficiency levels were raised
to between 59 and 70%.  See 63 Fed. Reg. at 45,761.  Also,
NMFS has observed increased efficiency over time with
similar devices, and concluded through an apparently

45

reasonable analogy that BRDs would see the same result.  <u>See</u>
A.R. Vol. 40, VII.518 (minutes, at 23-24 (discussing turtle
excluder devices).

Second, the NMFS also based the emergency regulation on
more than just the study of BRD efficiency; it considered
the effect of the lower TAC on the red snapper industry.
The NMFS concluded that without the release of the remaining
TAC, "severe economic and social hardships" were likely to
impact the red snapper commercial and recreational
fisheries.  <u>See</u> 63 Fed. Reg at 45,761.  The scientific
evidence revealed that the BRDs were close to achieving the
desired rate (in terms of actual numbers and time until
those numbers were reached), and the NMFS determined that
the economic hardship on the red snapper industry would be
particularly severe.  It was within the discretion of the
agency to balance the potential success of the BRDs and the
cost to the red snapper industry and adjust the agency's
regulation accordingly.

## C.  **EEZ East of Cape San Blas**

Florida Wildlife Federation ("FWF") alleges that Amendment 9 is not in compliance with the Magnuson-Stevens Act in that it fails to include the EEZ east of Cape San Blas, Florida.  It bases this contention on three grounds: that Amendment 9 violates National Standard 9's practicability requirement, that Amendment 9 does not minimize adverse impact on essential fish habitat, and that Amendment 9 fails to comply with various national standards in place during the implementation of the amendment.  These contentions are incorrect.  The NMFS not did act in an arbitrary manner when it exempted trawlers in the EEZ east of Cape San Blas from the regulation.

### 1.  Minimizing Bycatch to the Extent Practicable

The NMFS determined that application of Amendment 9 to the eastern area of the Gulf of Mexico was not practicable. The predominant basis for this finding was that the potential increase in the minimal red snapper population

47

would not outweigh the significant costs associated with the
BRD requirement.  See 63 Fed. Reg. 48,139, 18,140 ("The
Council limited the geographical scope of the BRD
requirement . . . to the area west of cape San Blas, FL,
because most red snapper bycatch occurs in this area.";
"[T]he Council . . . minimized the adverse economic and
social impacts on the shrimp fisheries . . . by limiting the
BRD requirement to the geographical area west of Cape San
Blas."); A.R. Vol. 35, IV.A.472, at 18,140.

FWF argues, essentially, that the NMFS failed to
minimize bycatch to the extent practicable because of an
incorrect understanding of the definition of the term
"practicability."  FWF contends that "practicable" means
that a conservation action must be taken unless the costs
are wholly disproportionate to the potential benefits.  As
discussed earlier, I reject this definition.

As with TSA's challenges, my duty is to ensure that
NMFS's decision was within the realm of reasonableness; if
evidence in the record supports the agency's determination
that the application of Amendment 9 to the eastern portion

of the EEZ is not practicable, then that decision will not
be disturbed.

The record contains ample evidence that red snapper do
not exist in mass in the eastern EEZ.  See A.R. Vol. 14,
II.A.69c, at 6.  The record also contains ample evidence of
the social and economic costs to the shrimp industry
required to install and utilize BRDs.  Practicability, as
discussed earlier, entails balancing various factors, such
as the impact on fishing communities, the costs involved,
and the ecological benefit.  FWF has not demonstrated that
the balancing of factors by the NMFS was in any way
arbitrary or capricious.

### 2.  16 U.S.C. § 1853(a)(7)

All FMPs must minimize, to the extent practicable,
adverse impacts on essential fish habitat.  16 U.S.C. §
1853(a)(7).  This section was part of the Sustainable
Fisheries Act of 1996, which added several amendments to the
Magnuson-Stevens Act.  See Sustainable Fisheries Act of
1996, Pub. L. No. 104-297, §108(b), 110 Stat. 3559, 3575

49

(1996).  Section 108(b) of the Sustainable Fisheries Act,

which includes 16 U.S.C. § 1853(a)(7), allowed each regional

Council two years to implement the amendments.  <u>Id.</u>  The

date of the Act was October 11, 1996.  Therefore, FMPs were

not required to comply with the amendment until October 11,

1998, well past the date of Amendment 9.  Accordingly, 16

U.S.C. § 1853(a)(7) is inapplicable, and the minimization of

essential fish habitat is not a standard properly considered

here.[15]

_____

[15]  As an additional attack on NMFS's practicability
analysis, FWF contends that the NMFS was required to
consider the effect of bycatch of <u>all</u> finfish, not just red
snapper.  Amendment 9 clearly does not address the bycatch
of finfish other than red snapper.  As such, FWF argues,
Amendment 9 is impracticable and the implementation of the
regulation was arbitrary and capricious.

The consideration of bycatch on all finfish is required
in the preparation of a FMP.  16 U.S.C. § 1853(a)(11).  This
section, however, was enacted in the same manner as 16
U.S.C. § 1853(a)(7); i.e., pursuant to the Sustainable
Fisheries Act.  Section 1853(a)(11), like § (a)(7), falls
under the two year grace period.  As such, NMFS's decisions
were not subject to § 1853(a)(11) at the time Amendment 9
was enacted.  Because the Magnuson-Stevens Act did not
require every FMP to consider all finfish, this argument is
unsuccessful.

3.  <u>National Standards 1 and 3</u>

Finally, FWF briefly challenges Amendment 9 on the grounds that it does not manage the red snapper fishery throughout its range, as required by National Standard 3, and that it does not prevent overfishing while maintaining the optimal yield from each fishery, as required by National Standard 1.  FWF notes that the failure of Amendment 9 to apply to the entire EEZ has slowed the recovery of the fishery and left part of the red snapper fishery unprotected, thereby implicating the above two requirements.

Both National Standard 3 and National Standard 1 incorporate a practicability requirement.  <u>See</u> 16 U.S.C. § 1851(a)(1) and (3).  That requirement, as discussed above, allows the NMFS to reasonably balance a variety of factors in addition to National Standards 1 and 3.  The NMFS determined through the reasonable use of available science that the red snapper fishery will be effectively restored under Amendment 9.  FWF has not demonstrated an abuse of discretion in that determination.

51

Accordingly,

IT IS ORDERED:

Texas Shrimp Association's motion for summary judgment (document 57) and Florida Wildlife Federation's motion for summary judgment (document 60) are DENIED.  The federal defendants' cross-motion for summary judgment on both petitions (document 87) is GRANTED.  The clerk shall enter judgment stating, "Judgment is entered in favor of defendants dismissing each petition."  The clerk shall close the file.


SO ORDERED this 3d day of November, 1999.


Robert L. Hinkle
United States District Judge


52

B

Areias

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

TEXAS SHRIMP ASSOCIATION, et al.,

     VS                              CASE NO.  4:00cv20-RH

WILLIAM M. DALEY, et al.,

## JUDGMENT

     This action came before the Court for consideration with the Honorable Robert L.

Hinkle presiding. The issues have been considered and a decision has been rendered.

Judgment is entered in favor of defendants dismissing the petition.

                              ROBERT A. MOSSING, CLERK

__April 12, 2000__                   _____
DATE                         Deputy Clerk: Pamela L. Lourcey

Entered On Docket: 4/12 By: _____
Rules 58 & 79(a) FRCP or 32(d)(1) & 55 FRCRP
Copies mailed to: _____

Document No. -34

OFFICE OF CLERK
U.S. DISTRICT CT.
NORTHERN DIST. FLA.
TALLAHASSEE, FLA.

00 APR 12 AM 11 18

RECEIVED
APR 2 1 2000

FILED
By _____
90-8-8-09687

YOU COULD HAVE RECEIVED THIS NOTICE SOONER BY FAX.

Just complete and return the authorization below and you
will receive notice of orders and judgments within hours
of their entry.  It's FREE and it's FAST!


CHARLES C CARSON                              plk
US DEPT OF JUSTICE
WILDLIFE & MARINE RESOURCES SECT
PO BOX 7369
WASHINGTON, DC  20044


--------------------


4:00-cv-00020 #33
12 page(s).
04/12/00


--------------------

### AUTHORIZATION TO SEND ORDERS AND
### JUDGMENTS BY FACSIMILE TRANSMISSION

The Clerk of Court for the Northern District of Florida is authorized to
transmit notice of entry of judgment or orders under Fed.R.Civ.P. 77,
Fed.R.Crim.P. 49 by facsimile transmission of judgments, orders or
notices in any case in which this capability exists, and the undersigned
appears as attorney in charge.  I understand that this electronic notice
will be in lieu of notice by mail.  The following telephone number is
dedicated for facsimile transmission.


FAX Phone No: _____

Signature: _____    Address: _____

Attorney Name: _____              _____

State Bar No: _____    Phone No: _____

Mail to:    FAX Notification
            Clerk, Northern District of Florida
            110 E. Park Ave, Rm 122
            Tallahassee, FL 32301-7726


Control #: tl_notice-36136

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


TEXAS SHRIMP ASSOCIATION,
et al.,

       Plaintiffs,

v.                              CASE NO.  4:00cv20-RH

WILLIAM M. DALEY, et al.,

       Defendants.
_____/


## ORDER OF DISMISSAL


    This case concerns a challenge to an interim rule

promulgated by the National Marine Fisheries Service, acting

through the delegation of authority by the Secretary of

Commerce.  Ostensibly, the Texas Shrimp Association and

industry representative Wilma Anderson challenge the

National Marine Fisheries Service's decision to reinstate a

red snapper total allowable catch of 9.12 million pounds in

**ENTERED ON DOCKET** 4/12 **BY** *H*
**[Rules 58 & 79(a) FRCP or 32(d)(1) & 55 FRCRP]**
Copies mailed to: *Cox d. Cook,*
*Corach, Lincoln,*
*antista, Hayes*

OFFICE OF CLERK
U.S. DISTRICT CT.
NORTHERN DIST. FLA.
TALLAHASSEE, FLA.

00 APR 12  AM 10: 05

- 33 -   FILED

the Gulf of Mexico for the year 2000 fishing season.  In
actuality, however, plaintiffs seek to challenge the failure
of the National Marine Fisheries Service to sua sponte
change the 9.12 million pounds total allowable catch status
quo established in 1996.  Because no regulations concerning
the total allowable catch status quo were promulgated by the
National Marine Fisheries Service as part of its interim
rule, there has been no agency action giving rise to
judicial review.

## I.   **STATUTORY BACKGROUND**

A regulatory scheme for the conservation of the
nation's fisheries was established by Congress through the
Magnuson-Stevens Fishery Conservation and Management Act
(the "Magnuson-Stevens Act").  <u>See</u> 16 U.S.C. § 1801 et seq.
Pursuant to the Magnuson-Stevens Act, eight regional fishery
management councils were developed.  <u>Id.</u>  The regional
council for the Gulf of Mexico is the Gulf of Mexico Fishery
Management Council ("Gulf Council").  16 U.S.C. §
1852(a)(5).

2

Under the Magnuson-Stevens Act, each council is charged with promulgating a fishery management plan for its defined geographical region.  Proposed fishery management plans and implementing regulations are submitted by the applicable councils to the National Marine Fisheries Service ("NMFS") (to whom the Secretary of Commerce has delegated his authority under the Magnuson-Stevens Act) for review, public comment and approval.  See 16 U.S.C. § 1854.  The implementing regulations for the Gulf Council's fishery management plan are contained at 50 C.F.R. pt. 622.

Until amended, a fishery management plan remains in effect and remains the basis for agency regulations.  The Magnuson-Stevens Act sets forth a detailed structure governing the amendment of fishery management plans, which can only be accomplished in one of two ways: (1) the appropriate council may submit a proposed amendment to NMFS for public comment and approval; or (2) when the appropriate agency fails to act, NMFS may amend the plan in response to a formal petition for rulemaking.

3

Typically, plan amendments originate with the appropriate council.  See 16 U.S.C. § 1854.  Proposed amendments are reviewed by NMFS and published in the Federal Register, thereby initiating a period of public comment.  16 U.S.C. § 1854(a)(1).  Once the comment period is complete, NMFS must approve or disapprove the proposed amendment within 30 days.  16 U.S.C. § 1854(a)(3).  If an amendment is disapproved or partially approved, the council may submit a revised amendment.  16 U.S.C. § 1854(a)(4).

Proposed regulations implementing a fishery management plan are enacted through a process very similar to the plan amendment process.  See 16 U.S.C. § 1854(b).  When emergency overfishing occurs, however, NMFS has the authority under a separate procedure to issue interim rules, which remain in effect for 180 days.  16 U.S.C. § 1855(c).

Regulations "promulgated" by NMFS under the Magnuson-Stevens Act are subject to a limited judicial review.  16 U.S.C. § 1855(f)(1).  A challenge to such regulations, however, must be filed "within 30 days after the date on which the regulations are promulgated or the action is

4

published in the Federal Register." Id. Challenges filed
pursuant to the Magnuson-Stevens Act are subject to
expedited judicial review. 16 U.S.C. § 1855(f)(4).

Although the Magnuson-Stevens Act contemplates that
proposed amendments will originate with the appropriate
council, NMFS is authorized to itself prepare a plan
amendment where the council fails to do so and the fishery
requires conservation and management. 16 U.S.C. §
1854(c)(1). Thus, pursuant to the Administrative Procedure
Act (APA), a person who believes that a council has
neglected its obligation to propose necessary plan
amendments can petition NMFS for rulemaking under this
Magnuson-Stevens Act provision. See 16 U.S.C. § 1855(d); 5
U.S.C. § 533(e). The agency's decision to accept or deny a
person's petition for rulemaking is subject to judicial
review under the APA. See 5 U.S.C. § 701 et seq.

## II.   FACTUAL BACKGROUND

One of the Gulf of Mexico fisheries protected by the
Magnuson-Stevens Act is the red snapper fishery. Among the

5

various methods employed by the Gulf Council and NMFS to
conserve the red snapper fishery is the enforcement of a
total allowable catch ("TAC") for red snapper per fishing
season.  On September 16, 1996, the TAC for red snapper in
the Gulf of Mexico was raised to 9.12 million pounds per
year.  See 61 Fed. Reg. 48,641 (1996) (codified at 50 C.F.R.
§ 622.42).  Until the present, the TAC status quo for red
snapper has remained at 9.12 million pounds.

On April 14, 1998, NMFS issued an interim rule holding
3.12 million pounds of red snapper TAC in reserve pending an
assessment of the efficacy of certain bycatch reduction
devices simultaneously mandated for shrimp trawlers.  See 63
Fed. Reg. 18,144 (1998) (interim rule reserving portion of
TAC); 63 Fed. Reg. 18,139 (1998) (final rule mandating
BRDs).  The interim rule, however, did not alter the TAC
status quo of 9.12 million pounds.  Subsequently, on August
27, 1998, NMFS issued an emergency interim rule releasing
the 3.12 million pounds of TAC previously held in reserve.

6

63 Fed. Reg. 45.760 (1998).[1]

On December 20, 1999, NMFS published the interim rule currently being challenged by plaintiff Texas Shrimp Association ("TSA"). In order to prevent overfishing of red snapper in the Gulf of Mexico, the Gulf Council proposed changes to the recreational and commercial fishing seasons, an increase in red snapper size limits, and reinstatement of a reduced bag limit for red snapper. See 64 Fed. Reg. 71,056 (1999). The Gulf Council, however, specifically declined to recommend a change to the 9.12 million pounds TAC status quo. Id. Because NMFS implemented only those

---

[1]   In a prior related case, Florida Wildlife Federation v. Daley, 4;98cv101-RH, Texas Shrimp Association unsuccessfully challenged NMFS's decision to release the 3.12 million pounds of TAC held in reserve. In this court's opinion, an explanatory discussion of TAC described the April 14, 1998 interim rule as "keeping" TAC at 9.12 million pounds. Florida Wildlife Fed'n v. Daley, 4;98cv101-RH, slip opin. at 42 (N.D. Fla. Nov. 3, 1999). Additionally, footnote 14 of the opinion stated that "TAC is annually set with the prior year's TAC a factor in the analysis." Id. at 42 n.14. These descriptions were merely intended as background to the issues raised in that case and should not be read to infer that NMFS promulgates new TAC regulations each year. In fact, although the Gulf Council assesses on a yearly basis whether to propose a change, the TAC of 9.12 million pounds is the status quo until otherwise altered by NMFS.

7

interim measures proposed by the Gulf Council, no change was made to the current TAC:

> At this time, NMFS is not implementing any measures to reduce overfishing beyond those requested by the Council. The Council recommended no change to the status quo TAC of 9.12 million pounds; thus, this interim rule <u>does not address or alter</u> the current TAC.

<u>Id.</u> (emphasis added).

On January 14, 2000, TSA brought the instant action, arguing that the retention of 9.12 million pounds of TAC is in violation of the Magnuson-Stevens Act because it will permit overfishing of red snapper. TSA's complaint is styled as a challenge to the December 20, 1999 interim rule. Thus, TSA asserts that it has met the Magnuson-Stevens Act requirement that all challenges to agency rulings must be brought within 30 days of the challenged regulation's promulgation or publication.

8

## III.  **DISCUSSION**

Unless presented with a formal petition for rulemaking,
NMFS's authority to enact plan amendments is limited to
modifications proffered by the Gulf Council.  <u>See</u> 16 U.S.C.
§ 1854.  Once proposed modifications are published by NMFS,
members of the public must file their objections within 30
days.  <u>Id.</u>  Challenges brought outside the 30 day deadline
are untimely.

Plan amendments which are premised upon or retain a
status quo do not equate to "promulgation" of a new status
quo.  Thus, even when a proposed amendment includes new
limits which are contingent upon a previously-enacted status
quo amount, only the new limits themselves, and not the
status quo amount, are subject to timely challenge.  <u>See,
e.g., Midwater Trawlers Coop. v. Mosbacher</u>, 727 F. Supp. 12
(D.D.C. 1989) (holding that although new catch limits were
"premised upon" an optimal yield status quo set four years
previously, the enactment of the new catch limits did not
subject the optimal yield amount to timely challenge under

the Magnuson-Stevens Act); Connecticut v. Daley, 53 F. Supp. 2d 147 (D. Conn. 1999) (holding that challenge to plan amendment which "retained" state quota system was in actuality an untimely challenge seeking to overturn state quota system established four years previously).

Although no change to the 9.12 million pounds of TAC status quo was considered or proposed by NMFS in its December 20, 1999 interim rule, TSA nevertheless attempts to couch its complaint as a challenge under 16 U.S.C. § 1855(f) to regulations promulgated by NMFS.  TSA argues that because the interim measures (season modification, bag limits, size limits) adopted by NMFS are "predicated upon" a TAC of 9.12 million pounds, NMFS must by inference have "promulgated" a new regulation concerning the TAC.  This assertion cannot withstand scrutiny.

The interim rule clearly states that the Gulf Council did not recommend any alteration to the 9.12 million pounds TAC status quo.  Additionally, the interim rule just as clearly states that NMFS, therefore, did not address or modify the TAC status quo.  Because no regulations

10

concerning the TAC status quo were promulgated by NMFS as part of its interim rule, there was no agency action giving rise to judicial review.

In actuality, this action is not a challenge to the interim rule, but a challenge to the 9.12 million pounds of TAC status quo established on September 16, 1996.  Such a dispute, brought more than three years after NMFS established the 9.12 million pounds of TAC status quo, is clearly untimely under the Magnuson-Stevens Act's 30 day requirement.

In reality, TSA challenges the Gulf Council's failure to propose a reduction in TAC.  Under the structure set forth by Congress, the proper procedure for such a challenge is through a formal petition for rulemaking, not through this action brought pursuant to 16 U.S.C. § 1855(f).

Accordingly,

IT IS ORDERED:

The federal defendants' motion to dismiss (document 25) and defendant-intervenor Coastal Conservation Association's motion to dismiss (document 16) are GRANTED.  The clerk

11

shall enter judgement stating, "Judgment is entered in favor of defendants dismissing the petition."  The clerk shall close the file.

SO ORDERED this 12th day of April, 2000.


Robert L. Hinkle
United States District Judge


12

C

58

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

MARK KNAUST, BARBARA KNAUST and
HERMAN KARL KNAUST, II,

                              Plaintiffs,

        v.                                                      96-CV-601
                                                                (FJS)

THE CITY OF KINGSTON; THE CITY
OF KINGSTON PLANNING BOARD;
THE CITY OF KINGSTON LOCAL
DEVELOPMENT CORPORATION; and
THE UNITED STATES DEPARTMENT OF
COMMERCE, for and through the Economic
Development Administration, Wilbur F. Hawkins,
Deputy Assistant Secretary of Economic
Development,

                              Defendants.



U.S. DISTRICT COURT—N.D. OF N.Y.
**FILED**
OCT 10 1997
AT_____ O'CLOCK____
Lawrence K. Baerman, Clerk—Syracuse

APPEARANCES:                                          OF COUNSEL:

MCNAMEE, LOCHNER, TITUS                              JOHN J. PRIVITERA, ESQ.
& WILLIAMS, P.C.
P.O. Box 459
Albany, New York 12201-0459
Attorneys for the Plaintiff

COOK, TUCKER LAW FIRM                                ROBERT D. COOK, ESQ.
P.O. Box 3939
85 Main Street
Kingston, New York 12401
Attorneys for Defendants City of
Kingston and City of Kingston
Planning Board

WARD, SOMMER LAW FIRM                                MICHAEL J. MOORE, AAG
122 South Swan Street
Plaza Office Center
Albany, New York 12210
Attorneys for Defendants City of
Kingston and City of Kingston
Planning Board



U.S. DEPARTMENT OF COMMERCE                     RUSSELL W. CRAIG, ESQ.
14th & Constitution Avenue, N.W.
HCHB 5839
Washington, DC 20230
Attorney for Defendant U.S. Department of
Commerce - acting through the Economic
Development Agency

FREDERICK J. SCULLIN, JR., D.J.:

## MEMORANDUM-DECISION AND ORDER

### Introduction

This environmental action arises out of the planning and construction of a business

park on land adjacent to the Plaintiffs' property in the City of Kingston.  In their complaint,

Plaintiffs assert (1) claims against the City of Kingston, City of Kingston Planning Board, and

the City of Kingston Local Development Corporation (collectively the "Kingston

Defendants") for alleged violations of the Takings Clause of the Fifth Amendment pursuant to

42 U.S.C. § 1983; (2) claims against the City of Kingston and City of Kingston Planning

Board for alleged violations of the New York State Environmental Quality Review Act

("SEQRA"), New York Environmental Conservation Law 8-0101 et seq.; (3) claims against

the Economic Development Administration ("EDA") for alleged violations of the National

Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 and 4322, and the Coastal Zone

Management Act ("CZMA"), 16 U.S.C. § 1456; and finally (4) common law nuisance claims

against all of the Defendants.

### Factual Background

Plaintiffs own a parcel of real property in Kingston, New York.  The property contains

2

Case 2:00-cv-00028   Document 50   Filed in TXSD on 05/01/2000   Page 107 of 125

a subterranean lake located within an abandoned limestone mine. From the 1930s to the 1960s, the Knaust family operated a large commercial mushroom farming operation in the mine using water from the lake. From the end of the 1960s to the present time, the Plaintiffs abandoned their farming operations. However, for the past several years, the family has been investigating the possibility of starting another commercial mushroom farming operation in the mine again using the water from the lake.

During the spring of 1995, the City of Kingston and the Kingston Planning Board negotiated a series of contracts and agreements with a number of companies for the development and construction of a business park on a 107 acre parcel of property adjacent to the Knaust property. The business park will eventually be the site of a new manufacturing facility for Huck International, Inc. ("Huck"), a manufacturer of hand-held power tools and a major employer in the Kingston area.

On September 20, 1995, the Defendant EDA awarded a grant of $1.86 million dollars to help fund this project pursuant to the Public Works and Economic Development Act of 1965. See 42 U.S.C. §§ 3121 et seq.; 13 C.F.R. Part 308 (the Title IX Grant Program).[1] The EDA decided to award the grant after conducting two Environmental Assessments ("EAs") and finding that the project would have no significant impact on the environment as required by NEPA.[2]

---

[1] The Title IX program is designed to assist economically stressed areas such as Kingston, which has lost thousands of jobs in recent years, partly as a result of reduced defense spending by the federal government.

[2] The EDA's finding were based, in part, on two Environmental Impact Statements prepared by the Kingston LDC under New York's environmental protection laws.

3

Case 2:00-cv-00028   Document 50   Filed in TXSD on 05/01/2000   Page 108 of 125

Plaintiffs assert that the Defendants have failed to investigate the environmental impact of the proposed business park adequately. Plaintiffs maintain that the business park's storm water management system will not prevent petroleum based pollutants from seeping into Plaintiffs' lake because the system does not take into account the "karstic" (or porous) nature of the earth underlying the business park. Plaintiffs claim that the pollutants will create a nuisance and diminish the usefulness and commercial value of their property.

Presently before the Court are (1) Plaintiffs' motion for a preliminary injunction enjoining the Defendants from taking further steps to fund, develop, or construct the Kingston Business Park, (2) Plaintiffs' motion for summary judgment on their NEPA claim against the EDA, and (3) EDA's cross-motion to dismiss all of Plaintiffs' claims pursuant to Fed. R. Civ. Pro. 12(b), or in the alternative for summary judgment as to each of these claims.

### Discussion

### I.     EDA's Cross Motion to Dismiss and/or for Summary Judgment on Plaintiffs' Claims Against It for Violation of NEPA and CZMA

The Court will first address the EDA's cross-motion to dismiss and/or for summary judgment. In evaluating a motion to dismiss for failure to state a claim, the Court must "accept as true all the factual allegations in the complaint" and draw all reasonable inferences in favor of the plaintiff. Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 164 (1993). The court will not dismiss the complaint for failure to state a claim "'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Ricciuti v. New York City

4

Case 2:00-cv-00028  Document 50  Filed in TXSD on 05/01/2000  Page 109 of 125

Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 101-02 (1957)).

With respect to the summary judgment standard, the Court will grant summary judgment only if, despite construing the facts in favor of the non-moving party, the moving party demonstrates that "no genuine issue as to any material fact" exists and that the undisputed facts entitle the moving party to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In order to avoid summary judgment, the non-moving party must support each element of its claims with specific facts set forth by affidavit or other evidence. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).

As stated, the Plaintiffs have asserted claims against the EDA for violation of NEPA and the CMZA.

## A. NEPA

The EDA first argues that Plaintiffs lack standing to assert a NEPA claim. Alternatively, the EDA argues that it is entitled to summary judgment on Plaintiffs' NEPA claim because the EDA's decision to issue a Finding of No Significant Impact ("FONSI") was not arbitrary or capricious. The Court will address these arguments seriatim.

### 1. Standing

The EDA contends that the Plaintiffs lack standing to assert their NEPA claim because of the speculative nature of the alleged harm, and the fact that the Plaintiffs are concerned primarily about their economic interests -- interests that do not fall within the "zone of interests" protected by NEPA. Plaintiffs, on the other hand, argue that their allegations of

CVisPDF - www.fenrir.com

Case 2:00-cv-00028   Document 50   Filed in TXSD on 05/01/2000   Page 110 of 125

irreversible environmental injury are sufficient to establish standing under NEPA.

At a minimum, standing under Article III of the Constitution requires that a plaintiff suffer a concrete and particularized injury that is actual or imminent, not conjectural or hypothetical; a causal connection between the injury and the conduct at issue; and that it be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. See Defenders of Wildlife, 504 U.S. at 560-561. In addition to meeting these requirements, Plaintiffs must also demonstrate that the interests they seek to protect fall within the "zone of interests" protected by the applicable statute.[3] Lujan v. National Wildlife Federation, 497 U.S. 871, 883 (1990).

As stated, in this case Plaintiffs allege storm water runoff from the business park will contaminate the subterranean lake on Plaintiffs' property, and that this contamination will deny Plaintiffs of an economical use of their property. Plaintiffs argue that storm water runoff from the business park will contain pollutants that will not be filtered out by the business park's storm water management system. In addition, Plaintiffs allege that the ground underlying the park is "karstic" allowing the contaminated water to travel to the Knaust property. Moreover, upon reaching the Plaintiffs' property, the water will contain enough pollutants to contaminate the Knaust Lake.

If proven, these injuries would likely satisfy the "injury in fact" requirement of Article

---

[3] Because NEPA does not provide a private right of action, the Plaintiffs must proceed under § 10(a) of the Administrative Procedure Act ("APA"), which entitles a person to judicial review when the person is "adversely affected or aggrieved by agency action *within the meaning of the relevant statute.*" 5 U.S.C. § 702 (emphasis added).

CWPDF - www.fwsw.com

Case 2:00-cv-00028   Document 50   Filed in TXSD on 05/01/2000   Page 111 of 125

III.   However, to conclude that such an injury is concrete rather than hypothetical, the Court must pile inference upon inference.  In fact, Plaintiffs' plans for a mushroom farming operation do not even appear firm.  While Plaintiffs' standing under Article III is tenuous, the Court cannot conclude as a matter of law that none exists.

Turning to the EDA's argument that Plaintiffs' claims do not fall within the "zone of interests" covered by NEPA, the Court must refer to the particular provision of law upon which the Plaintiffs rely, as opposed to, the overall purpose of the Act in question. Bennett v. Spear, 117 S. Ct. 1154, 1167 (1997).  In this case, Plaintiffs allege that the EDA has failed to comply with section 4332(2)(c) of NEPA, which requires all federal agencies to prepare an detailed Environmental Impact Statement for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(c).  However, economic injury does not, by itself, fall within NEPA's zone of interests. Sabine River Auth. v. United States Dep't of Interior, 951 F.2d 669, 676 (5th Cir. 1992).  Thus, to withstand a motion for summary judgment, the Plaintiffs must allege that the proposed business park threatens to impose such injury as to damage the recreational use, aesthetics, or environmental well-being of the Knaust property requiring the preparation of an EIS. See Goos v. Interstate Commerce Comm'n, 911 F.2d 1283, 1290 (1990).   In this case, the Court is persuaded that the Plaintiffs' claims are primarily grounded in their concern that the business park will deprive them of the ability to operate a mushroom growing venture.  Yet, because the Court must draw all reasonable inferences in the Plaintiffs' favor, the Court finds that Plaintiffs' allegations of environmental injury are sufficient to establish standing under NEPA.

7

Case 2:00-cv-00028   Document 50   Filed in TXSD on 05/01/2000   Page 112 of 125

**2.      Merits of Plaintiffs' Underlying NEPA Claim**

Turning to the merits of Plaintiffs' NEPA claims, Plaintiffs allege that the EDA's FONSI was arbitrary and capricious because the EDA failed to consider a number of the factors established by the Council on Environmental Quality ("CEQ").[4] Specifically, Plaintiffs allege that the EDA failed to consider (1) the unique characteristics of the geographic area, (2) whether the Kingston Business Park will irretrievably commit (or contaminate) natural resources located on the Knaust Property, and (3) whether the effects on the quality of the human environment are likely to be highly controversial. The EDA argues that the Administrative Record fully supports the EDA's FONSI. Moreover, the EDA argues that the Administrative Record specifically addresses the concerns raised by the Plaintiffs.

*Purpose of NEPA/Standard*

NEPA is designed to infuse environmental considerations into the Government's decision-making processes by requiring federal agencies to follow certain procedures. City of New York v. Department of Transp., 715 F.2d 732, 747-748 (2d Cir. 1983). Although these procedures may affect substantive decisions, NEPA does not mandate particular substantive outcomes. Pursuant to NEPA, the CEQ has promulgated regulations governing the procedures an agency must follow to ensure that environmental considerations are taken into account. Pursuant to those regulations, an agency must first prepare an Environmental Assessment (or ("EA"). The EA must include a list all agencies and persons consulted in the

---

[4] The CEQ has established procedures to guide federal agencies in determining whether a proposed project will significantly impact the environment. 40 C.F.R. 1500-17.

preparation of the EA, and brief discussions regarding the necessity for the proposal and the environmental impacts of alternative courses of action. 40 C.F.R. 1508.9(b). Based on the EA, the agency must then determine whether or not the proposed government action will significantly affect the quality of the human environment. If the agency determines that the proposed action will _not_ have a significant impact, then the agency will complete its review by issuing a FONSI. 40 C.F.R. 1501.4. Alternatively, if the agency determines that the proposed agency action will have a significant impact on the quality of the human environment, then the agency must prepare a more detailed EIS.

The role of the courts in reviewing this process is simply to ensure that the relevant agency's decisions are not arbitrary or capricious. Baltimore Gas and Elec. v. Natural Resources Defense Council, Inc., 462 U.S. 87, 98 (1983). A reviewing court may not overturn an agency's determination and substitute its own judgment for that of the agency. Vermont Yankee Nuclear Power v. Natural Resources Defense Council, 435 U.S. 519, 558 (1978).

### *Administrative Record*

According to the Administrative Record submitted in this case, the EDA issued its first EA on August 17, 1995, finding that the proposed project was not controversial and did not significantly affect the quality of the human environment. Based on this first EA, the EDA concluded that an EIS was not necessary and recommended that a FONSI be issued. The EDA then awarded the Title IX grant to Kingston and KLDC. On February 7, 1996, the EDA received correspondence from the Plaintiffs alleging that the project posed an "imminent

9

Case 2:00-cv-00028   Document 50   Filed in TXSD on 05/01/2000   Page 114 of 125

threat" to the environment. In response, the EDA suspended the grant award so it could

conduct a Supplemental EA.

In preparing its Supplemental EA, EDA reviewed the reports submitted by the

Plaintiffs as well as numerous comments submitted by other governmental agencies, including

the Fish and Wildlife Service, the U.S. Farm Agency, and the New York Department of

Environmental Conservation ("NYDEC"). Additionally, EDA twice sent its Regional

Environmental Officer to Kingston to visit the proposed site and meet with the Plaintiffs. The

EDA also welcomed any additional reports or documentation that the Plaintiffs wished to the

agency to consider.

In its Supplemental EA, the EDA addressed each area of concern raised by the

Plaintiffs. First, the EDA acknowledged that the proposed project would result in relatively

permanent changes in land use, but concluded that none of the resources involved were

limited in nature, and that their commitment would not be significant. The EDA also

addressed the Plaintiffs' specific concern about water resources. As stated, Plaintiffs argued

that the business park's storm water system threatened to irretrievably and irreversibly commit

natural resources by disposing pollutants into Plaintiffs' lake and surrounding aquifer.

Plaintiffs base their claim, in part, on the opinion of hydrogeologist, Paul A. Rubin. Mr.

Rubin asserts that the ground underlying the business park facilitates the rapid transmission of

liquids through the earth because it is "karstic." However, also in the Administrative Record

is a report by Charles Merguerian, P.h.D., Professor of Structural Geology at Hofstra

University and President of Duke Geological Laboratory, which reaches the exact opposite

Case 2:00-cv-00028   Document 50   Filed in TXSD on 05/01/2000   Page 115 of 125

conclusion.

Plaintiffs also rely heavily on an affidavit submitted by Jonathan Jones, a licensed engineer specializing in water management.[5] Jones questions the effectiveness of the proposed storm water runoff system based on the types of pollutants generally found in storm water runoff and a review of the storm water management report. However, NYDEC, the regulatory agency in New York State charged with protecting environmental quality, found that the plans for the storm water management plan were acceptable and substantially reduced the potential for groundwater contamination. Based on all the information available to it for its supplemental assessment, the EDA concluded that even if runoff from the proposed park entered the Knaust mine, it should not adversely impact the water quality in the mine. Despite these findings, the EDA even conditioned the grant award on a requirement that any company locating in the business park must construct spill containment areas around its loading dock areas to protect against accidental spills. As a result, EDA concluded that the proposed project did not pose a significant threat to the water resources located on the Knaust property.

As stated, Plaintiffs allege that EDA failed to evaluate the "unique characteristics" of the geographic area. Plaintiffs assert that the Knaust property is highly unique because it includes limestone mines modernized with an air management system that depends on the quality of the water drawn from the Knaust Lake. In response to Plaintiffs' concerns about

---

[5] The Court notes that the EDA received Mr. Jones's affidavit after it made its FONSI determination. However, the Court finds that the affidavit does not contain any information that "presents a seriously different picture of the environment impact of the proposed project" that would require additional analysis by EDA. State of Wisconsin v. Weinburger, 745 F.2d 412, 421 (7th Cir. 1984).

CMxPDF - www.fancia.com

the uniqueness of the property as a mushroom growing area, the EDA investigated the

possibility of the land being prime or unique farmland.  However, the EDA discovered that

the area is currently zoned for one-family residences and that there were no applications for

variances or proposals to reinitiate mushroom farming in the area.  Moreover, the EDA

contacted the United States Farm Service Agency, who advised EDA that the construction of

the proposed business park would not result in any loss of prime or unique agricultural land.

Plaintiffs' final complaint is that EDA failed to consider whether the effects on the

quality of the human environment are likely to be highly controversial.  As stated, according

to the regulations promulgated by the CEQ, the degree to which the effects on the quality of

the human environment are likely to be highly controversial is one factor that the agency

should consider when determining whether an action "significantly" impacts the human

environment. 40 C.F.R. § 1508.27(b)(4).  The term "controversial" refers to a substantial

dispute as to the size, nature, or effect of the major federal action, not simply the level of

neighborhood opposition that exits.  Hanly v. Kleindienst, 471 F.2d 823, 830 (2d Cir. 1972).

Throughout its Supplemental EA, the EDA acknowledges that some difference of opinion

exists concerning the environmental effects of the proposed business park.  Moreover, in the

conclusion of its Supplemental EA, the EDA specifically states that the development of the

business park at the proposed location is controversial.  However, the EDA does not refer to

the proposal as "highly" controversial.  Moreover, even if the EDA determined that the effects

of the proposed business park were "highly" controversial, that is but one factor in

determining whether the project significantly impacts the human environment.

12

Case 2:00-cv-00028   Document 50   Filed in TXSD on 05/01/2000   Page 117 of 125

In addition to those concerns raised in Plaintiffs brief, the Supplemental EA also addressed the effects of the proposed business park on floodplains and wetlands, vegetation and wildlife, endangered species, historic resources, wild and scenic rivers, ambient air quality, coastal zone management, and pollution prevention. Moreover, the EDA reviewed the alternative sites considered by the Kingston Defendants, alternative uses of the proposed site, and the "no action" alternative. Based on its analysis of all of the information available to it, the EDA acknowledged that the proposed business park would create adverse effects that some people may find unacceptable. However, the EDA determined that none of the adverse effects appear to have the potential to affect the quality of the human environment significantly. Furthermore, the EDA concluded that economic opportunities created by the project outweighed any adverse effects. Therefore, the EDA determined that an EIS was not required and reaffirmed the grant award.

After thoroughly reviewing the Administrative Record, the Court finds that the EDA has adequately considered and disclosed the environmental effects of the business park. Therefore, the Court holds that the EDA's actions in this matter were not arbitrary or capricious as a matter of law. Accordingly, the Court grants EDA's cross-motion for summary judgment on Plaintiffs' NEPA claim against it and consequently denies the Plaintiffs' motion.

**B.    CZMA**

The Coastal Zone Management Act ("CZMA"), 16 U.S.C. § 1456(d), forbids federal agencies from approving proposed projects that are inconsistent with a state's coastal zone

13

management plan.[6] As stated, the EDA has moved for summary judgment on this claim. The Court will begin its analysis with the issue of standing.

1.    **Standing**

The EDA argues that the Plaintiffs lack standing to bring their CZMA claim under the APA because the interest that the Plaintiffs seek to protect does not fall within the zone of interests protected by the CZMA. Specifically, the EDA alleges that the CZMA seeks to encourage and assist the states in their management of coastal zones and was not intended to protect the type of speculative economic interests of which the Plaintiffs complain.

Like NEPA, the CZMA does not provide a private right of action against the federal government for noncompliance. Rather, judicial review is made available only under § 10(a) of the APA. State of New York v. DeLyser, 759 F. Supp. 982, 986 (W.D.N.Y. 1991). Therefore, Plaintiffs must meet the same standing requirements as discussed above.

As an initial matter, the Court could not find a single case in which an *individual* brought a claim challenging a federal agency's failure to obtain a consistency determination

---

[6] 16 U.S.C. § 1456(d) provides:
"State and local governments submitting applications for Federal assistance under Federal programs, in or outside of the coastal zone, affecting any land or water use of natural resource of the coastal zone shall indicate the views of the appropriate state or local agency as to the relationship of such activities to the approved management program for the coastal zone. Such applications shall be submitted and coordinated in accordance with the provisions of section 6506 of Title 31. Federal agencies shall not approve proposed projects that are not consistent with the enforceable policies of a coastal state's management program, expect upon a finding by the Secretary that such project is consistent with the purposes of this chapter or necessary in the interest of national security."

14

pursuant to the CZMA.[7]  Moreover, the Plaintiffs do not even assert that the APA is the basis

for their CZMA claim in the complaint.  However, even assuming the Court treats the

Plaintiffs' CZMA claim under the APA, the Court again questions whether the Plaintiffs have

demonstrated a concrete and particularized harm.  Moreover, the relationship between the

interest that Plaintiffs seek to protect and the CZMA's zone of interest is tenuous at best.

Notwithstanding these concerns, the Court will proceed to address the issue of mootness.

2.      **Mootness**

The EDA's second argument is that the Court should dismiss Plaintiffs' CZMA claim

because the claim is moot.  Specifically, the EDA alleges that it has fulfilled its statutory

obligations by obtaining a statement from the New York Department of State ("NYDOS"),

dated May 21, 1996, which provides that the Kingston Business Park is consistent with New

York State's Coastal Management Plan ("CMP").[8]

To comply with 16 U.S.C. § 1456(d), a Federal agency must obtain a consistency

determination from the appropriate state agency 90 days before final approval of a major

Federal activity declaring that the proposed project is consistent with the state's coastal

management program.  Here, EDA issued its first EA and FONSI with the stipulation that

---

[7] The Court finds that the CZMA, a grant-in-aid statute, was primarily intended to benefit the
states and increase the states' ability to manage their coastlines.  However, environmental groups have
been granted standing to bring claims for violations of the CZMA.  See State of California v. Watt, 683
F.2d 1253, 1296-1271 (9th Cir. 1982), rev on other grounds sub nom., Secretary of the Interior v.
California, 464 U.S. 312 (1984).  Although environmental groups are not necessarily the intended
beneficiaries of the CZMA, they are more likely to have standing because of their shared interest in the
preservation of coastal areas.

[8] NYDOS is the agency designated to implement the New York State CMP.

15

CutePDF - www.foxito.com

disbursement of the grant was conditioned upon the receipt of evidence showing that the proposed project was consistent with New York's coastal zone management plan. Prior to issuing its Supplemental EA, the Kingston Urban Cultural Park Commission, acting as the Waterfront Consistency Review Board, found that the proposed project was consistent with the Local Waterfront Revitalization Program. Finally, on May 21, 1996, NYDOS determined that the proposed project would advance New York State's CMP as expressed in the City of Kingston's approved Local Waterfront Revitalization Program.[9] Therefore, the Court finds that Plaintiffs' CZMA claim is moot, and grants the EDA's cross-motion to dismiss the claim.[10]

## C.    Common Law Nuisance

Finally, the EDA moves to dismiss Plaintiffs' common law nuisance claim. EDA asserts that the Court should dismiss the claim because the United States has not waived its sovereign immunity, and the Plaintiffs have failed to set forth a basis for subject matter jurisdiction.

It is well settled that the federal government cannot be held liable in tort for the

---

[9] The Court notes that EDA did not obtain a consistency determination until after it issued its Supplemental EA. This violates the spirit 15 C.F.R. § 930.34, which requires agencies to provide the consistency determination to State agencies at least 90 days before final approval of the Federal activity unless both the Federal agency and the State agency agree to an alternative notification schedule. However, Plaintiffs do not allege any harm resulting from EDA's delay, and the state did not lodge any protest in this case.

[10] Moreover, the Plaintiffs seek injunctive and declaratory relief directing the Department of Commerce to disapprove the Kingston Business Park project as being inconsistent with the New York State CMP. Because the CZMA is only a procedural statute, the Court may not require the agency to reach a particular outcome.

discretionary acts of its employees in the absence of a waiver. Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 687-688 (1949). Here, the EDA's decision to award a Title IX grant was discretionary in nature, and the Plaintiffs have not alleged that the federal government has waived its sovereign immunity. Therefore, the Court lacks subject matter jurisdiction over the plaintiffs' common law nuisance claim and grants the EDA's motion to dismiss the claim.

## II.    Preliminary Injunction

Remaining in this action are Plaintiffs' claims against the Kingston Defendants for violation of the Takings Clause of the Fifth Amendment, pursuant to 42 U.S.C. § 1983, SEQRA, and Plaintiffs' common law nuisance claims. Plaintiffs' claims are based on the assertion that storm water runoff containing pollutants from the Kingston Business Park will seep through the earth into the Plaintiffs' property causing irreparable harm to the Knaust Lake. To prevent the alleged harm, Plaintiffs move to enjoin the Kingston Defendants from any further construction of the business park during the pendency of this action.

. A preliminary injunction is an extraordinary and drastic remedy for which plaintiffs carry a heavy burden of persuasion. See Borey v. National Union Fire Ins. Co., 934 F.2d 30, 33 (2d Cir. 1991). To succeed on a motion for a preliminary injunction, the movant must demonstrate irreparable harm and either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. . International Dairy Foods Ass'n v. Amestoy, 92 F.3d 67, 70 (2d Cir.1996) (quoting Jackson

17

Case 2:00-cv-00028   Document 50   Filed in TXSD on 05/01/2000   Page 122 of 125

<u>Dairy, Inc. v. H.P. Hood & Sons, Inc.</u>, 596 F.2d 70, 72 (2d Cir.1979) (per curiam)).

A showing of "probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." <u>Reuters Ltd. v. United Press Int'l. Inc.</u>, 903 F.2d 904, 907 (2d Cir. 1990) (internal quotations and citations omitted). "[A] mere possibility of irreparable harm is insufficient to justify the drastic remedy of a preliminary injunction." <u>Borey</u> 934 F.2d at 34.

Here, Plaintiffs allege that further development of the Kingston Business Park will cause irreparable harm including pollution, degradation, contamination and destruction of the Knaust Lake, as well as the deprivation of all economically viable uses of the Knaust property.[11] In support of their allegations, Plaintiffs assert that Jonathon Jones's affidavit establishes "beyond dispute" that storm water runoff will contain pollutants and contaminants, and that the affidavit of Mr. Rubin "indisputably establishes" that the storm water runoff will migrate to the Knaust property. As discussed above, Mr. Jones reviewed the storm water management plan on a conceptual level, and based his review on the types of pollutants generally found in storm water runoff and on a report prepared for the KLDC by professional engineers describing the storm water management system. In essence, Mr. Jones questioned the effectiveness of the storm water system to remove pollutants without having actually visited the site.

Also, Mr. Rubin states that the business park is underlain by a karst aquifer system

---

[11] As an initial matter, Plaintiffs allegations of economic harm cannot support their motion for a preliminary injunction because economic harm, by its very nature, is redressable with monetary damages. <u>See</u> <u>Borey</u>, 934 F.2d at 34.

CilsPDF - www.fasiio.com

Case 2:00-cv-00028   Document 50   Filed in TXSD on 05/01/2000   Page 123 of 125

which facilitates the rapid transmission of liquids into the earth. Based on his analysis, Mr. Rubin concluded that storm water runoff from the Kingston Business Park will be discharged to the karst aquifer and "most likely" into the Knaust Lake. (Rubin Aff. ¶ 24.)

The Defendants point to the testimony of Dr. Merguerian which directly refutes Mr. Rubin. After personally visiting the site, Dr. Merguerian emphatically states that the region is not karstic, and that the region experiences normal surface drainage. Dr. Merguerian also states that karstic features occur on a regional level and that he could find no professional geologist who has characterized the Kingston region as karstic. Moreover, the Defendants emphasize that NYDEC and other governmental agencies charged with protecting the environment approved the storm water management plans after carefully reviewing them.

After thoroughly reviewing all of the evidence submitted in this case, the Court finds that, at best, Plaintiffs have demonstrated that there is a "possibility" that storm water runoff from the Kingston Business Park will make its way into the Plaintiffs' lake. However, the speculative nature of the alleged harm in this case is clearly insufficient to justify the drastic remedy of a preliminary injunction.[12] Therefore, the Court denies Plaintiffs' motion for a preliminary injunction.[13]

---

[12] Moreover, even if storm water runoff polluted the Knaust Lake, it is difficult to see why the Plaintiffs could not be fully compensated with monetary damages. For example, the Plaintiffs could recover compensatory damages for any costs associated with removing pollutants from the lake.

[13] Even if Plaintiffs suffered irreparable harm, the Court doubts whether the plaintiffs could satisfy the second prong of the preliminary injunction test. As an initial matter, with respect to all of Plaintiffs' remaining claims, the Court questions whether Plaintiffs have demonstrated the "injury in fact" necessary to assert standing. Moreover, each of Plaintiffs' claims appears to be insufficient on the merits. For example, Plaintiffs' Takings Clause claim will likely fail because the Plaintiffs have not demonstrated that there has been a physical invasion of their property, or that the Defendants' actions have deprived them of all economical use of their property. Plaintiffs' SEQRA claim will likely fail

CVAPDF - www.fevia.com

Case 2:00-cv-00028   Document 50   Filed in TXSD on 05/01/2000   Page 124 of 125

## Conclusion

Therefore, after carefully considering the allegations in the complaint, the papers submitted, and the arguments of counsel, it is hereby

ORDERED that Plaintiffs' motion for summary judgment is DENIED with respect to their NEPA claim; and it is further

ORDERED that EDA's cross-motion for summary judgment is GRANTED with respect to all of Plaintiffs' NEPA, CZMA, and common law nuisance claims against the EDA, and therefore all claims against the United States Department of Commerce are DISMISSED; and finally, it is further

ORDERED that Plaintiffs' motion for a preliminary injunction is DENIED.

The Plaintiffs are directed to initiate a telephone status conference on *November 6, 1997 at 9:00 a.m.*

**IT IS SO ORDERED.**

DATED:        October *10*, 1997
              Syracuse, New York

Frederick J. Scullin, Jr.
United States District Judge

---

because the Kingston defendants seem to have fulfilled their requirement under SEQRA to take a "hard look" at the environmental impacts of the project. Finally, Plaintiffs' nuisance claim will likely fail because under New York Law, a landowner cannot be held liable for damages to adjoining property owners for the natural flow of surface water. Moreover, the balance of the hardships in this case tips decidedly in favor of the Defendants because the City of Kingston stands to lose a substantial revenue and over two hundred jobs if the Court grants the injunction; whereas, the Plaintiffs stand to lose only potential profits from a yet uncertain economic use of their property.

20

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | |
|---|---|
| **GAMFW, INC. D/B/A FISHERMAN'S WHARF and BOBBY GRUMBLES** ) <br> ) <br> ) <br> **Plaintiffs,** ) <br> ) <br> **v.** ) <br> ) <br> **THE UNITED STATES OF AMERICA,** ) <br> **et. al** ) <br> ) <br> **Defendants.** ) <br> ) | **CAUSE NO. C-00-028** |

## ORDER FOR SUMMARY JUDGMENT

After considering the Cross Motions for Summary Judgment filed in this case pursuant to Rule 56 of the Federal Rules of Civil Procedure, this court grants Defendants' Motion.


_____
U.S. District Judge