UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS, CORPUS CHRISTI DIVISION

United States District Court
Southern District of Texas
FILED

JUL 07 2000

Michael N. Milby, Clerk

| | | |
|---|---|---|
| GAMFW, INC. D/B/A FISHERMAN'S WHARF and BOBBY GRUMBLES | § | |
| VS. | § | |
| THE UNITED STATES OF AMERICA AND THE DEPARTMENT OF COMMERCE, WILLIAM DALEY, Secretary, and NATIONAL MARINE FISHERIES SERVICE | § | CAUSE NO. C-00-028 |

**PLAINTIFFS' SUPPLEMENTAL COMPLAINT**

TO THE HONORABLE JUDGE OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, CORPUS CHRISTI DIVISION:

COME NOW GAMFW, Inc. d/d/a Fisherman's Wharf and Bobby Grumbles, Plaintiffs, and respectfully file and submit this their Supplemental Complaint, and would show unto this Honorable Court as follows:

**1.** On Friday, June 9, 2000, the National Marine Fisheries Service published a notification that the interim rule challenged by the Plaintiffs would be extended for an additional 180 days. No other modification or changes were made to the interim rule. A copy of this notice is attached as Exhibit "1."

**2.** The Plaintiffs therefore file this Supplemental Complaint to challenge the interim rule, as extended.

**3.** No new issues or claims are presented. The purpose of filing the Supplemental Complaint is to avoid any contention by the Defendants that Plaintiffs' challenge to the interim rule has been waived or otherwise rendered moot by failing to challenge the

subsequent extension.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully file and submit this their Supplemental Complaint and request general relief.

**Respectfully submitted,**

**LES CASSIDY**
**1020 Bank of America**
**500 North Water Street**
**Corpus Christi, Texas 78471**
**(361) 887-2965 office**
**(361) 878-6521 fax**
**State Bar Number 03979270**
**Federal ID 5931**
**Attorney-In-Charge for Plaintifs**

**Of Counsel:**

**WOOLSEY & CASSIDY, P.C.**
**1020 Bank of America Center North**
**500 North Water Street**
**Corpus Christi, Texas 78471**
**(361) 887-2965 office**
**(361) 887-6521 fax**



ClibPDF - www.fastio.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was forwarded by fax and Certified U.S. Mail, Return Receipt Requested, on July 7, 2000, as indicated below to:

Allison Areias (fax) 202-305-0274
U.S. Department of Justice
Environmental & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7369
Washington, D.C. 20044-7369

Larry Ludka (fax) 888-3200
Asst. U.S. Attorney
521 Starr
Corpus Christi, Texas 78401

Robert G. Hayes (fax) 202-783-6947
Ball Janik, LLP
1455 F. Street NW, Suite 225
Washington, D.C. 20005

Les Cassidy



ClibPDF - www.fastio.com

Case 2:00-cv-00028 Document 60 Filed in TXSD on 07/07/2000 Page 4 of 7



prove to be misleading and is in need of clarification.

**Correction of Publication**

Accordingly, the publication on May 12, 2000 of the final regulation, which was the subject of FR Doc. 00-11410; is corrected as follows:

**§32.37 [Corrected]**

1. On page 30793, in the first column, amendatory instruction 44.e. is corrected to read as follows:

e. Revising paragraphs A.6. and B.4. of Umatilla National Wildlife Refuge to read as follows:

Dated: June 1, 2000.

**Leslie A. Marler,**

*Division of Refuges, Federal Register Liaison.*

[FR Doc. 00–14202 Filed 6–8–00; 8:45 am]

BILLING CODE 4310–55–U

---

**DEPARTMENT OF COMMERCE**

**National Oceanic and Atmospheric Administration**

**50 CFR Part 622**

[Docket No. 991210334–0122–02; I.D. 112399A]

**RIN 0648–AN41**

**Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic; Reef Fish Fishery of the Gulf of Mexico; Extension of Effective Date of Red Snapper Management Measures**

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Interim rule; extension of effective date.

**SUMMARY:** An interim rule is in effect through June 19, 2000, that changes the management measures for the red snapper fishery in the exclusive economic zone (EEZ) of the Gulf of Mexico in order to reduce overfishing, as requested by the Gulf of Mexico Fishery Management Council (Council). That interim rule modifies the recreational and commercial fishing seasons, increases the recreational minimum size limit, and reinstates a 4–fish bag limit for the captain and crew of for-hire vessels (i.e., charter vessels and headboats). NMFS extends this interim rule for an additional 180 days. The intended effect is to reduce overfishing of red snapper in the Gulf of Mexico.

**DATES:** The effective date for the interim rule published at 64 FR 71056, December 20, 1999, is extended from June 19, 2000, through December 18, 2000.

**ADDRESSES:** Copies of the documents supporting this rule, i.e., an analysis of the economic consequences and an environmental assessment, may be obtained from the Southeast Regional Office, NMFS, 9721 Executive Center Drive N., St. Petersburg, FL 33702; telephone: 727–570–5305, fax: 727–570–5583.

**FOR FURTHER INFORMATION CONTACT:** Dr. Roy Crabtree, telephone: 727–570–5305; fax: 727–570–5583; e-mail: Roy.Crabtree@noaa.gov.

**SUPPLEMENTARY INFORMATION:** The reef fish fishery of the Gulf of Mexico is managed under the Fishery Management Plan for the Reef Fish Resources of the Gulf of Mexico (FMP). The FMP was prepared by the Council and is implemented under the authority of the Magnuson-Stevens Fishery Conservation and Management Act (Magnuson-Stevens Act) by regulations at 50 CFR part 622.

In response to a request from the Council, NMFS issued an interim rule (64 FR 71056, December 20, 1999), under section 305(c)(1) of the Magnuson-Stevens Act, that changed the management measures for the red snapper fishery in the exclusive economic zone (EEZ) of the Gulf of Mexico by (1) increasing the recreational minimum size limit to 16 inches (40.6 cm); (2) establishing a recreational season of April 21 to October 31, 2000; (3) reinstating the 4–fish bag limit for captain and crew of for-hire vessels; and (4) changing the openings of the spring red snapper commercial season from the first 15 days of each month to the first 10 days of each month, beginning February 1. This action was, and remains, necessary to address overfishing of the red snapper resource.

Under section 305(c)(3)(B) of the Magnuson-Stevens Act, NMFS may extend the effectiveness of an interim rule for one additional period of 180 days, provided the public has had an opportunity to comment on the interim rule and the Council is actively preparing proposed regulations to address the overfishing on a permanent basis. NMFS solicited public comments on the initial interim rule and received numerous comments. These comments are summarized herein along with agency responses. The Council has prepared a regulatory amendment, under the FMP's framework procedure for regulatory adjustments, that is intended to address overfishing of the red snapper resource; if approved and implemented by NMFS, the regulatory amendment would replace this interim rule. The expiration date of the interim rule is being extended because red snapper remain overfished and NMFS cannot take action to address the overfishing via the regulatory amendment by June 19, 2000.

Additional details concerning the basis for these changes to the red snapper management measures and discussion of the ongoing efforts of the Council and NMFS to evaluate and implement measures to rebuild the red snapper stock consistent with the requirements of the Magnuson-Stevens Act are contained in the preamble to the interim rule and are not repeated here.

**Comments and Responses**

NMFS received a total of 1,465 comments addressing the interim rule (64 FR 71056, December 20, 1999). Most of these supported the Council's request for the interim rule and were received prior to publication of the interim rule. All comments received before, during, or after the comment period are summarized and addressed below.

*Comment 1:* A total of 1,359 letters supported the measures contained in the interim rule. Specifically, these letters supported the April 21–to-October 31 recreational season because this season would provide the greatest economic benefits.

*Response:* NMFS agrees that the measures implemented by the interim rule will provide economic benefits to the greatest number of Gulf fishers, as well as reduce overfishing and allow the recovery of the red snapper stock.

*Comment 2:* A total of 179 letters opposed the interim rule. Most opposition was from fishers and organizations in south Texas who believe that the recreational season will cause economic hardship in their area. Many of those who objected to the April 21–to-October 31 recreational season requested a year-round fishery.

*Response:* Based on public testimony and the best available scientific information, NMFS concluded that a season from April 21 to October 31 offers the greatest benefits to Gulf anglers and is compatible with the recreational quota. A year-round fishery is expected to exceed the 2000 recreational quota.

The measures implemented by this interim rule are based, in part, on the recommendations to the Council from a stakeholder conference held in New Orleans, LA, on September 27, 1999. Stakeholders' recommendations for the 2000 recreational red snapper fishery included a 4–fish bag limit for the captain and crew of for-hire vessels, a size limit not to exceed 16 inches (40.6

EXHIBIT "1"

ClibPDF - www.fastio.com

cm), and a March 1-to-October 31 recreational season.

The Council attempted, to the extent possible, to implement the stakeholders' recommendations; however, based on the best available scientific information, the harvest from a March 1 to October 31 season would exceed the current recreational quota. A group of south Texas anglers who participated in the stakeholders conference submitted a minority report requesting a year-round fishery with a 4-fish bag limit and a 13-inch (33.0-cm) minimum size limit. However, the harvest from a year-round fishery, if implemented, would greatly exceed the quota and jeopardize the recovery of the stock. Therefore, the Council recommended a shorter season as close to the stakeholders' recommendation as possible.

The stakeholders discussed the request for a winter fishery from some south Texas anglers, but neither the stakeholders nor the south Texas minority report recommended a winter fishery. At its November 1999 meeting, the Council considered adding a January-February opening with a reduced bag limit to allow a winter fishery but concluded that, to do so, the reduced bag limit would substantially shorten the prime April-to-October season and, thus, increase the likelihood of illegal fishing during the closed season; such occurrence would result in a harvest that would exceed the recreational quota. Further, because other Gulf states, including Texas, would not likely enact the compatible closures required to accommodate a winter fishery, the EEZ would be closed without compatible state closures, thereby resulting in overfishing of red snapper.

The interim rule provides Texas anglers, as well as anglers in other states, the opportunity to fish during the months of the greatest historical demand. During 1996, the last year that the red snapper recreational fishery was open all year, Texas monthly recreational landings during May-October exceeded those of any other monthly period. Analyses based on recent years (1995-1998) show that, during January-March, monthly landings in Texas average 95,000 lb (43,565 kg), substantially less than during August-October when monthly landings average 137,000 lb (62,142 kg). Furthermore, the interim rule will provide economic benefits to the Texas for-hire industry by allowing the industry to operate during the months of greatest demand. Texas headboat trips during January-March average 5,000 trips per month as opposed to 8,000 trips per month during August-October. Texas charter boat trips show a similar trend, with an average of 1,206 trips per month during January-March and of 2,000 trips per month during August-October.

*Comment 3*: An environmental organization and several individuals expressed concerns regarding regulatory discards, mortality rates of released fish, and the use of minimum size limits as conservation measures in the red snapper fishery.

*Response*: NMFS is also concerned with regulatory discards and the mortality rates of released red snapper. Based on the best scientific information available, NMFS believes that minimum size limits are an effective conservation measure in this fishery. Minimum size limits are a widely used fishery management tool designed to allow females to spawn at least once before entering the fishery. This pool of unfished mature females acts as a buffer against overfishing and recruitment failure in a severely overfished stock. The effectiveness of this strategy depends on the survival rate of released fish. NMFS' stock assessments assume a survival rate of 80 percent for released red snapper in the recreational fishery and 67 percent in the commercial fishery. NMFS is currently reviewing recent studies on the release mortality rates of red snapper and will recommend changes in management measures, if justified.

*Comment 4*: One commercial fishing organization objected to the status quo total allowable catch (TAC) of 9.12 million lb (4.14 million kg) and stated that the TAC should be no greater than 6 million lb (2.72 million kg). Two individuals also expressed concerns regarding the magnitude of the TAC.

*Response*: The interim rule was intended to reduce overfishing by increasing the probability of achieving compatible state and Federal regulations. The Council recommended no change to the status quo TAC of 9.12 million lb (4.14 million kg); thus, this interim rule does not address or alter the current TAC.

The Magnuson-Stevens Act, as amended by the Sustainable Fisheries Act of 1996 (SFA), mandates that overfished stocks be rebuilt to a biomass level capable of producing maximum sustainable yield (MSY). On November 17, 1999, NMFS disapproved the Council's red snapper rebuilding plan, as proposed in the Generic SFA Amendment to the Gulf of Mexico Fishery Management Council's Fishery Management Plans, because it specified a fishing-mortality-based rebuilding target rather than a biomass-based target and because it did not estimate the time to rebuild in the absence of fishing mortality; these are requirements of the Magnuson-Stevens Act and the national standard guidelines. The Council must submit a new red snapper rebuilding plan as soon as possible to NMFS for agency review, approval, and implementation.

The recent stock assessment included a wide range of estimates of MSY and the stock biomass associated with MSY for red snapper. NMFS recognizes that a considerable uncertainty associated with these estimates exists and that the Council has latitude to consider this uncertainty when developing a new rebuilding plan. Conditions approaching those estimated to exist for red snapper resource near MSY have not been seen in decades, and, thus, the assessment models for estimating MSY require assumptions regarding the productivity of the stock. The SFA requires greater reductions in the red snapper harvest and in shrimp trawl bycatch mortality of juvenile red snapper to rebuild this resource than were required by the Magnuson-Stevens Act prior to the SFA. The Council's Reef Fish Stock Assessment Panel estimate of the acceptable biological catch (ABC) of red snapper for 2000 ranges from 0 to 9.12 million lb (0 to 4.14 million kg), depending on the reduction of red snapper bycatch mortality achieved in the shrimp fishery and appropriate rebuilding parameters. The best available scientific information indicates that the status quo 9.12 million-lb (4.14 million-kg) TAC for 2000 may slow the rate of recovery in the early years of any rebuilding program but would not jeopardize recovery of the stock consistent with the rebuilding requirements of the Magnuson-Stevens Act, particularly if greater reductions in bycatch mortality are achieved as expected. However, an immediate and significant reduction in TAC would have devastating effects upon participants in the fishery.

NMFS will continue to provide the Council with the best available scientific information regarding the status of the red snapper stock, the effectiveness of bycatch reduction devices (BRDs), and the effectiveness of the FMP's management measures in rebuilding the overfished red snapper resource. NMFS is working with the commercial shrimp fishing industry to develop new BRDs that will further reduce finfish bycatch while minimizing shrimp loss. Also, NMFS will continue to work with the Council in implementing the FMP's current red snapper stock rebuilding plan and in modifying this plan as necessary to restore the stock to a biomass level

capable of producing MSY. Management options include, but are not limited to, adjustments to the fishing season, bag limit changes, quota reductions, fishing effort reduction, vessel buy-back programs, and additional measures to reduce shrimp trawl bycatch mortality.

*Comment 5*: One environmental group stated that a set recreational fishing season, i.e., beginning and closing dates fixed, violates the Sustainable Fisheries Act requirement that the red snapper recreational fishery be closed once its quota is reached.

*Response*: NMFS disagrees. The SFA requires that the Gulf of Mexico red snapper recreational fishery be closed when the quota is reached. To comply with this requirement, NMFS works jointly with the Council to implement management measures and establish closure dates that, based upon the best available scientific information, are likely to result in annual catches that approximate the quota within the margin of error of the harvest projections. NMFS uses a computer simulation model to assess the future status of the red snapper stock. The model integrates estimates of stock abundance with fishing effort to project estimates of how many fish will be caught for various time periods. This projection assumes that the current year's fishing effort will be similar to that of previous years. In-season data are not used to establish or adjust closure dates; instead, closure is based entirely on projections. This is the only practicable method of setting closure dates because the NMFS Marine Recreational Fisheries Statistics Survey (MRFSS) is not designed for real-time quota monitoring. MRFSS data are available only in 2-month blocks, referred to as waves, and landings are not available until 5 weeks after the end of a wave. Thus, there is a time lag of at least 3 months before even preliminary MRFSS landings data can be evaluated; consequently, NMFS cannot determine the closure date based on real-time fishery data. In projecting recreational fishery harvest rates, NMFS attempts to approximate the quota in the long term, while recognizing that annual variations in the catch are inevitable.

## Classification

The Assistant Administrator for Fisheries, NOAA (AA), after considering all public comments received on the interim rule, has determined that this extension of the interim rule is necessary to reduce overfishing of red snapper in the Gulf of Mexico and is consistent with the Magnuson-Stevens Act and other applicable laws.

This extension of the interim rule is not subject to review under E.O. 12866.

This extension of the interim rule is exempt from the procedures of the Regulatory Flexibility Act because the initial interim rule was issued without opportunity for prior public comment.

NMFS prepared an economic analysis of the expected regulatory impacts of the interim rule. NMFS analyzed commercial fishing derbies during the last decade to determine the probable economic consequences of commercial spring and fall seasons consisting of a series of 10-day mini derbies during the year 2000. NMFS concluded that compared to 15-day openings, a series of 10-day commercial derbies conducted under a 9.12 million-lb (4.14 million-kg) TAC could measurably increase the average total and net revenues for the year. Shorter mini-seasons during 1998–99 reduced landings per month, supported higher ex-vessel prices, and extended domestic supplies. The expected economic consequences for the recreational sectors are less definite because of uncertainties regarding the recreational catch that may be realized versus recreational catches that can be forecast with available data.

If the changes in the recreational fishery regulations, which include an April 21 to October 31 season and an increase in the size limit to 16 inches (40.6 cm), result in catches that are no greater than the recreational quota, then NMFS expects an increase in net benefits for all portions of the recreational fishery in aggregate. However, if the realized catches exceed the quota, then longer term benefits will be reduced because stock recovery will be slowed by an indeterminate amount. In theory, if the management measures in this interim rule are very different from the management measures preferred by the Gulf states, it is unlikely that the Gulf states will adopt compatible regulations. Under incompatible Federal and state regulations, harvests will probably continue in state waters after Federal closures. These harvests will impede stock rebuilding efforts. Under the existing management scheme, for example, harvests during the Federal closures could exceed 600,000 lb (272,155 kg) during a fishing year. The Gulf states are more likely to adopt any scenario approximating the Council's requested season of April 15–October 31, thus reducing the negative effects of incompatible Federal and state rules.

Copies of the economic analysis are available upon request (see ADDRESSES).

This extension of the interim rule will help to ensure that management measures necessary to address the overfishing of the red snapper resource will remain in effect until a more permanent regulatory solution can be implemented. In the past, the lack of compatible management of the red snapper fishery by most Gulf states resulted in continued fishing in state waters after Federal waters were closed. This contributed to quota overruns and overfishing. NMFS anticipates that four of the five Gulf states will adopt measures compatible with the measures of the interim rule. This will enhance the effectiveness of the closed seasons and will significantly reduce the probability of overfishing. The increase in the recreational minimum size limit will reduce the harvest rate and, in combination with the bag limit and closed seasons, will help ensure that the recreational quota is not exceeded and that overfishing does not occur. Reducing the openings of the commercial fishery from 15 days per month to 10 days per month will slow the harvest rate and reduce the probability of exceeding the commercial quota and overfishing. Reinstating the 4–fish bag limit for captain and crew of for-hire vessels relieves a restriction on that sector of the fishery. The majority of public comments received on the interim rule supported the rule. None of the relatively few comments opposing various aspects of the interim rule warranted a revision of any measures in the interim rule. Delaying action to reduce overfishing in the red snapper fishery of the Gulf of Mexico to provide further notice and an opportunity for public comment would increase the likelihood of a loss of long-term productivity from this fishery and increase the probable need for more severe restrictions in the future. Furthermore, the Council has submitted for Secretarial review a regulatory amendment that contains the measures implemented by this interim rule; an opportunity for public comment on the proposed rule for the regulatory amendment will be provided. Accordingly, under authority set forth at 5 U.S.C. 553(b)(B), the AA finds, for good cause, namely the reasons set forth above, that providing prior notice and the opportunity for prior public comment would be contrary to the public interest. For these same reasons, under 5 U.S.C. 553(d)(3), the AA finds for good cause that a 30-day delay in the effective date of this interim rule would be contrary to the public interest.

The President has directed Federal agencies to use plain language in their communications with the public, including regulations. To comply with this directive, we seek public comment

on any ambiguity or unnecessary complexity arising from the language used in this interim rule. Such comments should be directed to NMFS Southeast Regional Office (see ADDRESSES).

Dated: June 2, 2000.

Bruce C. Morehead,

*Acting Deputy Assistant Administrator for Fisheries, National Marine Fisheries Service.*

[FR Doc. 00–14529 Filed 6–8–00; 8:45 am]

BILLING CODE 3510–22–P

## DEPARTMENT OF COMMERCE

### National Oceanic and Atmospheric Administration

### 50 CFR Part 648

[Docket No. 000119014–0137–02; I.D. 060200A]

### Fisheries of the Northeastern United States; Black Sea Bass Fishery; Commercial Quota Harvested for Quarter 2 Period

AGENCY: National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

ACTION: Commercial quota harvest for Quarter 2 period.

SUMMARY: NMFS announces that the black sea bass commercial quota available in the Quarter 2 period to the coastal states from Maine through North Carolina has been harvested. Commercial vessels may not land black sea bass in the Northeast Region for the remainder of the 2000 Quarter 2 quota period (through June 30, 2000). Regulations governing the black sea bass fishery require publication of this notification to advise the coastal states from Maine through North Carolina that the quota has been harvested and to advise vessel permit holders and dealer permit holders that no commercial quota is available for landing black sea bass in these states north of 35°15.3' N.lat.

DATES: Effective June 9, 2000, 0001 hrs, local time through June 30, 2000, 2400 hrs, local time.

FOR FURTHER INFORMATION CONTACT: Jennifer L. Anderson, Fishery Management Specialist, at (978) 281–9226.

SUPPLEMENTARY INFORMATION: Regulations governing the black sea bass fishery are found at 50 CFR part 648. The regulations require annual specification of a commercial quota that is allocated into four quota periods based upon percentages of the annual quota. The Quarter 2 commercial quota (April through June) is distributed to the coastal states from Maine through North Carolina. The process to set the annual commercial quota is described in § 648.140.

The initial total commercial quota for black sea bass for the 2000 calendar year was set equal to 3,024,742 lb (1,372,000 kg) (65 FR 33486, May 24, 2000). The Quarter 2 period quota, which is equal to 29.26 percent of the annual commercial quota, was set at 885,040 lb (401,447 kg).

Section 648.141 requires the Regional Administrator, Northeast Region, NMFS (Regional Administrator), to monitor the commercial black sea bass quota for each quota period that is based upon dealer reports, state data, and other available information to determine when the commercial quota has been harvested. NMFS is required to publish a notification in the Federal Register advising and notifying commercial vessels and dealer permit holders that, effective upon a specific date, the black sea bass commercial quota has been harvested and no commercial quota is available for landing black sea bass for the remainder of the Quarter 2 period, north of 35°15.3' N. lat. The Regional Administrator has determined, based upon dealer reports and other available information, that the black sea bass commercial quota for the 2000 Quarter 2 period has been harvested.

The regulations at § 648.4(b) provide that Federal black sea bass moratorium permit holders agree as a condition of the permit not to land black sea bass in any state after NMFS has published a notification in the Federal Register stating that the commercial quota for the period has been harvested and that no commercial quota for the black sea bass is available. The Regional Administrator has determined that the Quarter 2 period for black sea bass no longer has commercial quota available. Therefore, effective 0001 hrs local time, June 9, 2000, further landings of black sea bass in coastal states from Maine through North Carolina, north of 35°15.3' N. lat. by vessels holding commercial Federal fisheries permits are prohibited through June 30, 2000, 2400 hrs local time. The Quarter 3 period for commercial black sea bass harvest will open on July 1, 2000. Effective June 9, 2000, federally permitted dealers are also advised that they may not purchase black sea bass from federally permitted black sea bass moratorium permit holders that land in coastal states from Maine through North Carolina for the remainder of the Quarter 2 period (through June 30, 2000).

The regulations at § 648.4(b) also provide that, if the commercial black sea bass quota for a period is harvested and the coast is closed to the possession of black sea bass north of 35°15.3' N. lat., any vessel owners who hold valid commercial permits for both the black sea bass and the NMFS Southeast Region Snapper-Grouper fisheries may surrender their Black Sea Bass moratorium permit by certified mail addressed to the Regional Administrator (see Table to § 600.502) and fish pursuant to their Snapper-Grouper permit, as long as fishing is conducted exclusively in waters, and landings are made, south of 35°15.3' N. lat. A moratorium permit for the black sea bass fishery that is voluntarily relinquished or surrendered will be reissued upon the receipt of the vessel owner's written request after a minimum period of 6 months from the date of cancellation.

### Classification

This action is required by 50 CFR part 648 and is exempt from review under E.O. 12866.

Authority: 16 U.S.C. 1801 *et seq.*

Dated: June 5, 2000.

Richard W. Surdi,

*Acting Director, Office of Sustainable Fisheries, National Marine Fisheries Service.*

[FR Doc. 00–14518 Filed 6–5–00; 4:17 pm]

BILLING CODE 3510–22–P

ClibPDF - www.fastio.com